UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JOHN FAIRCHILD and SUSIE FAIRCHILD, individually, and as Independent Administrators of, and on behalf of, the ESTATE OF KELLI LEANNE PAGE and the heirs-at-law of KELLI LEANNE PAGE, | § § § § § § § | |
| | § | CASE NO. 6:19-CV-00029-ADA-JCM |
| Plaintiffs, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY; and WESLEY HARLAND PELFREY, | § § § | |
| Defendants. | | |

## FIRST AMENDED PLAINTIFFS' ORIGINAL COMPLAINT

> **Coryell County custom, policy, and/or practice, and two Coryell County jailers, caused Kelli Page's death in a jail cell. The medical examiner ruled the death a homicide.**



# Table of Contents

I.   Introductory Allegations ................................................................................... 4

    A.   Parties ............................................................................................................. 4

    B.   Jurisdiction .................................................................................................... 6

    C.   Venue ............................................................................................................. 6

II.  Factual Allegations ........................................................................................... 6

    A.   Introduction ................................................................................................... 6

    B.   Kelli Leanne Page ......................................................................................... 7

    C.   Jailer Lovelady's October 7, 2017 Use of Force with and Cell Extraction of Kelli .............................................................................................................. 7

    D.   Jailer Lovelady's and Jailer Pelfrey's October 8, 2017 Use of Force with Kelli and Kelli's Death .................................................................................. 9

    E.   Relevant Coryell County Written Jail Policies and Procedures ......................... 16

    F.   Autopsy Report ........................................................................................... 24

    G.   Coryell County's Post-Death Reporting ..................................................... 26

    H.   Texas Commission on Law Enforcement Records ..................................... 28

    I.   Coryell County's *Monell* Liability ............................................................. 31

        1.   Coryell County's Failure to Provide Reasonable Medical Care to Kelli .................................................................................................... 31

        2.   Coryell County Jail Culture ................................................................ 32

        3.   Coryell County's Customs and Unwritten Policies Practices, Contrary to Relevant Written Jail Policies and Procedures, were Moving Forces Behind and Caused Kelli's Death .................................. 34

        4.   Coryell County's Policy, Practice, and/or Custom of Understaffing the Jail was a Moving Force Behind and Caused Kelli's Death .............. 34

        5.   Coryell County's Policy, Practice, and/or Custom of Allowing an Overcrowded Jail Was a Moving Force Behind and Caused Kelli's Death .................................................................................................. 36

        6.   Coryell County's Failure to Discipline and/or Require Additional Training of Defendants Lovelady and Pelfrey is Evidence of Coryell County's Custom and/or Unwritten Policy. ............................................. 38

        7.   Coryell County's Policy, Practice, and/or Custom in Failing to Train Jailer Pelfrey Was a Moving Force Behind and Caused Kelli's Death ................................................................................................................ 39

III. Causes of Action .............................................................................................. 40

A.     Cause of Action Against Defendants Lovelady and Defendant Pelfrey Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights ...................... 40

B.     Cause of Action Against Defendants Lovelady and Defendant Pelfrey Under 42 U.S.C. § 1983 for Violation of 14th Amendment Rights ..................... 43

C.     Cause of Action Against Coryell County Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights ................................................................. 46

D.     Cause of Action Against Defendant Coryell County Under 42 U.S.C. § 1983 for Violation of 14th Amendment Rights ............................................. 49

E.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .......................... 51

IV.     Concluding Allegations ................................................................................. 55

A.     Conditions Precedent ............................................................................ 55

B.     Use of Documents ................................................................................. 55

C.     Jury Demand .......................................................................................... 55

D.     Prayer ..................................................................................................... 55

TO THE HONORABLE UNITED STATES DISTRICT COURT:

The Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff John Fairchild ("Mr. Fairchild") is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Mr. Fairchild was Kelli Leanne Page's biological father, and he was Kelli's legal father at the time of Kelli's death. Mr. Fairchild brings claims in this lawsuit individually and as the Independent Administrator of the Estate of Kelli Leanne Page. Mr. Fairchild asserts any and all claims available in his capacity as the Independent Administrator regarding Kelli's death, including all claims on behalf of the Estate and all of Kelli's heirs-at-law including but not necessarily limited to Kelli's children – Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell. Letters of independent administration were issued to Mr. Fairchild on or about November 19, 2018, in Cause Number 18-10032, in the County Court at Law of Coryell County, Texas, in a case styled *In the Estate of Kelli Leanne Page, Deceased.*"

2.      Plaintiff Susie Fairchild ("Ms. Fairchild") is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Ms. Fairchild was Kelli Leanne Page's biological mother, and she was Kelli's legal mother at the time of Kelli's death. Ms. Fairchild brings claims in this lawsuit individually and as the Independent Administrator of the Estate of Kelli Leanne Page. Ms. Fairchild asserts any and all claims available in her capacity as the Independent Administrator regarding Kelli's death, including all claims on behalf of the Estate and all of Kelli's heirs-at-law including but not necessarily limited to Kelli's children – Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany

May Gruwell. Letters of independent administration were issued to Ms. Fairchild on or about November 19, 2018, in Cause Number 18-10032, in the County Court at Law of Coryell County, Texas, in a case styled *In the Estate of Kelli Leanne Page, Deceased*."

3. Defendant Coryell County, Texas ("Coryell County") is a Texas county. Coryell County has been served with process and has appeared in this case through the filing of an answer. Coryell County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). Coryell County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.

4. Defendant Steven Russell Lovelady ("Jailer Lovelady" or "Mr. Lovelady") is a natural person who resides and is domiciled in Texas. Mr. Lovelady has made an appearance in this case through the filing of an answer. Mr. Lovelady is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Lovelady was employed by and/or was the agent and/or designee and/or contractor of and for Coryell County at all such times and acted or failed to act in the course and scope of his duties for Coryell County.

5. Defendant Wesley Harland Pelfrey ("Jailer Pelfrey" or "Mr. Pelfrey") is a natural person who resides and is domiciled in Texas. Mr. Pelfrey has made an appearance in this case through the filing of an answer. Mr. Pelfrey is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Pelfrey was employed by and/or was the agent and/or designee and/or contractor of and for Coryell County at all such times and acted or failed to act in the course and scope of his duties for Coryell County.

6.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and a federal statute - 42 U.S.C. § 1983.

7.    The court has personal jurisdiction over Coryell County because it is a Texas county.  The court has personal jurisdiction over the natural person Defendants because they reside in, are domiciled in, and are citizens of Texas.

C.    Venue

8.    Venue is proper in the Waco Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division in the district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

II.    Factual Allegations

A.    Introduction

9.    The Plaintiffs provide in the factual allegations sections below the general substance of certain factual allegations.  The Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, the Plaintiffs intend that those sections provide the Defendants sufficient fair notice of the general nature and substance of the Plaintiffs' allegations, and further demonstrate that the Plaintiffs' claim(s) have facial plausibility.  Whenever the Plaintiffs plead factual allegations "upon information and belief," the

Plaintiffs are pleading, in accordance with Federal Rule of Civil Procedure 11(b)(3), that the specified factual contentions have evidentiary support or in the alternative will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

### B.     Kelli Leanne Page

10.     Kelli Leanne Page ("Kelli") was born as Kelli Leanne Fairchild in February 1971 in Atchison, Kansas.  Kelli, as a young child, seemed to always have a smile on her face, and she had a big heart and wanted to help others.  She went to high school, through the 9th grade, in Atchison.  Kelli enjoyed fishing and going on nature walks.  Kelli suffered hardships as a result of choices made later in life, but she did not deserve the death she ultimately suffered.

### C.     Jailer Lovelady's October 7, 2017 Use of Force with and Cell Extraction of Kelli

11.     On Saturday, October 7, 2017, the day before Kelli's death, Jailer Lovelady and Jailer Washington extracted Kelli from her cell in a manner violating numerous Coryell County jail extraction policies detailed in this complaint.  As a result of the manner in which they chose to extract Kelli on that date, Kelli's head/face hit the jail cell wall.  She suffered a contusion and hematoma significant enough for Coryell County jailers to take her to Coryell Memorial Hospital for medical care.  Medical records for that visit indicate that Kelli had bilateral pitting edema (swelling) of both lower legs.  Upon information and belief, Jailer Lovelady was aware of such swelling, and that it indicated that Kelli had significant health issues.

12.     Both Jailer Lovelady and Jailer Washington indicated in statements that Kelli was placed into a restraint chair after being physically extracted from her cell.  Thus, they should have complied with Coryell County cell extraction rules and not attempted to extract Kelli with only two jailers.  Regardless, Jailer Lovelady was put on notice that, if he chose to extract Kelli from

the cell the following day, he may need assistance and should certainly comply with Coryell County policy in utilizing at least a five-person extraction team. Upon information and belief, Jailer Lovelady also used OC pepper spray at that time. Another prisoner indicated that, after this incident, Kelli could "barely get around."

13.    Upon information and belief, Southern Health Partners provided healthcare at the Coryell County jail to prisoners at all times relevant to this case. A Southern Health Partners record indicates that Coryell County Officer Willingham made a call on October 7, 2017, because one of Kelli's feet was cool or blue in comparison to the other. The record also indicates that Kelli had new or worsening symptoms. Moreover, Officer Willingham said that Kelli's feet were turning black, and were swollen. Apparently, the person working for Southern Health Partners said that Kelli should be taken to a hospital emergency room immediately. Upon information and belief, Jailer Lovelady was aware of Kelli's issue arising on the same day that he had chosen to use force with her, ultimately causing a hospital visit due to her suffering a black eye when hitting the cell wall.

14.    Further, upon information and belief, a detention medical questionnaire report regarding Kelli was available to both Defendants Lovelady and Pelfrey, and they were generally aware of the issues in it regarding Kelli. In the alternative, if they were not aware of such issues, it would have been due to a Coryell County policy, practice, or custom of deliberate indifference in not requiring jailers to become generally aware of health issues with prisoners. That record indicates that Kelli had as some issues:  shortness of breath; heart problems; and high blood pressure. Thus, upon information and belief, Defendants Lovelady and Pelfrey knew that they would be dealing with a person with significant health issues and must adjust any use of force accordingly.

15.      Information in this portion of the complaint was gained through review of video recordings obtained from the Texas Department of Public Safety in response to a Public Information Act request.  Times provided below of certain events are made upon information and belief, and best efforts have been used to provide the appropriate times.  Plaintiffs intend that the actual video recordings provide the exact times.

16.      On Sunday, October 8, 2017, the day Kelli died, a video camera captured much of what occurred in her cell during a relevant time period.  This pleading does not detail all of the recordings made on the morning of Kelli's death, but rather the material substance of what appeared to occur as evidenced by those recordings for a certain time preceding her death as well as during the unreasonable use of force incident causing Kelli's death.

17.      Kelli was, for a significant period of time prior to cell entry by Defendants Lovelady and Pelfrey, primarily standing by her cell door, not acting aggressively, and not doing much of anything of importance.  The video recording shows Kelli apparently sleeping on the cell bed for a period ending at approximately 7:08 a.m.  Kelli then wakes up and lays on the bed from approximately 7:09 a.m. until approximately 7:26 a.m.  She then sits up on the bed until approximately 7:38 a.m. at which time she uses the restroom.  She finishes using the restroom at approximately 7:45 a.m., finishes dressing, and stands by the cell door until approximately 7:52 a.m.  From that time until approximately 7:57 a.m., Kelli stands by the cell door for most of the time.  She also combs her hair and uses what appears to be a Styrofoam cup of water.  In substance, Kelli is not doing much of anything, is not acting aggressively, and is not a danger to herself or

others.  She also is not causing a disturbance and/or doing anything that materially affects order in the jail.

18.    From approximately 7:57 a.m. until approximately 8:15 am.  Kelli is primarily standing by the door and tapping on the window at times.  She hits her hip against the door at least once.  She appears to be attempting to get someone's attention, but she is not aggressively banging on the door, slamming her body against the door, and/or taking any other actions which indicate any aggressive intent.

19.    From approximately 8:14 a.m. to approximately 8:27 a.m., Kelli appears to be talking to someone on the other side of her cell door and/or is primarily standing by the door and/or using and/or refilling the apparent Styrofoam cup with water.  From approximately 8:27 a.m. until approximately 8:29 a.m., Kelli stands by the door, sets the apparent Styrofoam cup back on a shelf (after drinking from it before), puts her shoes on, and goes back to standing by the door.  Thus, when viewing Kelli and her actions in the minutes leading up to cell entry by Defendants Lovelady and Pelfrey, Kelli appears to be doing nothing much of any importance.  Instead, Kelli simply appears to be a person in a cell who was bored and wants to communicate with other human beings.

20.    There certainly appears to be nothing leading up to the cell entry by Defendants Lovelady and Pelfrey which would cause any reasonable officer or jailer to believe that the force which Defendants Lovelady and Pelfrey would ultimately use was reasonable or necessary.  In fact, the use of force was punishment.  Kelli is not acting aggressively, is not a danger to herself or others, and is not, in the minutes leading up to the cell entry and use of force, significantly affecting order in the jail.

21.    Kelli, at approximately 8:28:40 a.m., holds onto the sink in her cell with her right hand, with apparently a brush in her hand, to steady herself to be able to put on her shoes.  The

shoes appeared to be Crocs-style shoes. It appears that Kelli must steady herself due to a physical inability to stand while putting on her shoes and/or balance herself while doing so. Kelli then returns to the door and lightly taps on the glass with her brush. The recording ends at approximately 08:29:15 a.m.

22.     The next recording begins at approximately 08:29:35 a.m. Thus, upon information and belief, there were 20 seconds immediately preceding the use of force cell entry, by Defendants Lovelady and Pelfrey, which were not recorded. However, based upon the manner in which Kelli was standing at the beginning of this recording, and at the conclusion of the prior recording, upon information and belief, Kelli was not in the intervening approximately 20 seconds acting aggressively, banging on the door, kicking on the door, or doing anything else that would require cell extraction and placement into a restraint chair. Thus, upon information and belief, any such cell extraction and intent to place her into a restraint chair was unnecessary, unreasonable, uncalled-for, and would simply constitute unconstitutional punishment. It would be likewise be unreasonable to any jailer in the position of Defendants Lovelady and Pelfrey.

23.     At approximately 08:29:41 a.m., a jailer appears in the window outside of Kelli's door. Kelli immediately backs away to what appears to be at least three to four feet from the door, out of deference for the officer appearing at her door, and she continues facing the door. There appears to be some discussion at that point, and Kelli is not making any aggressive movements. The officer, Jailer Lovelady, leans down and sprays what was, upon information and belief, OC spray, at Kelli through the door slot designed for the passing of food and/or other items. Jailer Lovelady chose to use this improper use of force as a result of his use of force incident with Kelli the day before. Thus, before he even entered the cell, Jailer Lovelady expected that he and Jailer Pelfrey would need to use significant force with Kelli. Jailer Lovelady knew that he and Jailer

Pelfrey should not go into the cell if they intended to use force, which Plaintiffs contend was unreasonable and unnecessary, unless he used at least a five-member extraction team contemplated by Coryell County policy.

24.     Kelli reacts as any human being would, by turning around and walking away from the door toward the back of the cell.  She was simply moving so that she would not suffer the effects of OC spray on her face and/or other exposed skin areas.

25.     At this point, the bed was to Kelli's right, on the wall, and she was facing the commode and sink (which appeared to be an integrated unit, and which were mounted to a wall jutting out from the back wall of the cell at some angle (possibly a right angle)).  Kelli merely stands in that position, facing the back of the cell, attempting to avoid being sprayed in the face or on other parts of her body with OC spray.  She is holding a brush in her right hand, but not doing anything at all with it, not raising her hand, and not acting in an aggressive manner.  She then places her left hand onto the sink to, upon information and belief, steady herself.  Upon information and belief, Kelli's legs were swollen due to underlying health issues.

26.     Jailer Lovelady opens the cell door and begins to enter.  Kelli turns around, still steadying herself with her left hand on the sink, with the brush in her right hand and her arm straight down at her side, with arm relaxed, and making no aggressive movement whatsoever toward the entering officer.  Another jailer enters just behind, such jailer being, upon information and belief, Jailer Pelfrey.  At approximately 08:30:10 a.m., Jailer Lovelady either sprays or acts as if he intends to spray Kelli with OC spray, causing her to turn her head for protection.  At approximately 08:30:14 a.m., Jailer Lovelady reaches over toward Kelli and sprays OC spray toward her face, while she at the same time naturally turns her head to avoid the likely stinging sensation of such spray.

27.     Kelli continues steadying herself by holding onto the sink with her left hand, and Jailer Lovelady sprays her again at approximately 08:30:17 a.m.  Jailer Lovelady appears to spray her yet an additional time at approximately 08:30:18 a.m.  Kelli then picks up what appears to be a blanket to cover her head to protect herself from the continued administration of what was, upon information and belief, OC spray.  Jailer Lovelady then, while behind Kelli, grabs Kelli's right wrist with both of his hands while turning his body in a clockwise position, pulls on Kelli's arm, and slams her to the concrete floor – face-down.  Both Jailer Lovelady and Jailer Pelfrey appear to be large men, as measured by their weight.

28.     Jailer Lovelady extracts the brush from Kelli's hand at approximately 08:30:33 a.m., and the brush falls to the floor.  Thus, at this point, it appears that Kelli had nothing in her hands which could be used as a weapon.  Moreover, upon information and belief, the brush was not of sufficient size, shape, or design that it could have caused serious injury or death either to Jailer Lovelady or Jailer Pelfrey, if in fact Kelli had hypothetically attempted to use is as a weapon.

29.     At approximately 08:30:36 a.m., Jailer Lovelady puts what appears to be a significant portion of his weight on Kelli's posterior area, being on her buttocks, while she is face down.  Shortly thereafter, he gets off of Kelli and is attempting to do or does one or more things which are blocked from view by his body being between the camera and Kelli's body.  Kelli continues in a prone position (face down) until approximately 08:31:16 a.m. at which time she rotates her body such that her left side is on the floor and her right side is rising from the floor.  Upon information and belief, she does so because she is having difficulty breathing due to her pre-existing medical conditions, compounded by the struggle initiated by Jailer Lovelady and being slammed to the floor by him, as well as the position in which Jailer Lovelady has put Kelli.  Kelli attempts to flip over onto her back and ultimately is able to generally do so.

30.     Jailer Lovelady punches Kelli in her face with a closed fist at approximately 08:31:44 a.m.  Upon information and belief, there are other times when Jailer Lovelady hits Kelli with a closed fist and are not necessarily described in this pleading.   Upon information and belief, Kelli continues having difficulty breathing.  At approximately 08:31:57 a.m., Jailer Lovelady once again punches Kelli in the head with a closed fist while she lays on the floor.  Some time at or before approximately 08:31:57 a.m., Jailer Pelfrey puts his weight onto his forearm onto Kelli's upper back and/or neck area (partially obscured from view by Jailer Pelfrey's body) while Kelli is prone on the concrete floor.  At around the same time or shortly thereafter Jailer Lovelady put his weight on Kelli's lower back and/or buttocks region.  Jailer Pelfrey's legs are extended outside the open cell door in to the hallway.  Thus, if there were any additional available jailers in the hallway, they would likely see Jailer Pelfrey and come to help.  However, upon information and belief, due to Coryell County custom, policy, and/or practice, no such jailers were present.

31.     Jailer Pelfrey continues pinning Kelli's upper body region to the floor, while Kelli was face down, while Jailer Lovelady handcuffs Kelli behind her back.  Kelli moves her legs, upon information and belief, and attempts to breathe and/or move her body in a manner allowing her to breathe.  At some point during the use of force by Defendants Lovelady and Pelfrey, Kelli's body goes limp.

32.     At approximately 08:34:48 a.m., the jailers turn Kelli's body over.  Kelli is lying on her back, not moving.  Jailer Lovelady shakes Kelli's upper body at approximately 08:35:08 a.m. and receives no response.  He and Jailer Pelfrey appear to do not much of anything for a few seconds and then, at approximately 08:35:47 a.m. Jailer Pelfrey unlocks the handcuffs.   At approximately 08:36:05 a.m., Jailer Lovelady begins doing chest compressions.  Unfortunately, it

was too late.  Kelli does not recover and dies as a result of the use of force by Defendants Lovelady and Pelfrey.

33.     Kelli did not, at the time she was killed, present a threat of serious bodily harm to Jailer Lovelady or Jailer Pelfrey.  Her attempts to flip over from the prone position were, upon information and belief, natural attempts to breathe and save her own life.  Kelli was thus resisting being handcuffed and/or subdued, but she was no match for the two large jailers.  This was evidenced by the jailers' ability to hold Kelli in a prone position on the floor with enough force to ultimately kill her.

34.     Moreover, Kelli was clearly not fleeing at the time.  She was literally captive in a jail cell.  There was absolutely no reason for the jailers to use such force with her when they could have, if necessary (which the Plaintiffs deny), used a five-member extraction team to assure that no serious injury to Kelli or any jailer occurred.  It was patently unreasonable for the two jailers to violate County policy, and ultimately kill Kelli.  There were no exigent circumstances requiring immediate entry, and Jailers Lovelady and Pelfrey could have taken more time to formulate an appropriate plan.  Instead, they chose to take matters into their own hands, violating both Coryell County policy and Kelli's constitutional rights.

35.     These facts also inform a third factor to be considered when determining the reasonableness of force by jailers – whether the injured person had been accused of committing any serious crime.  Here, Kelli had merely been tapping her brush on the cell door in order to get the attention of a jailer to communicate regarding one or more issues.  Thus, she had committed no crime and certainly did not deserve the treatment that she received.  According to Fifth Circuit precedent, and its clearly-established law,  Jailer Lovelady and Jailer Pelfrey were put on notice that manhandling and forcing Kelli into a constricting, prone (face-down) position, under such

circumstances, was a violation of clearly-established constitutional rights. It was clearly established that the "eggshell skull" rule applies to constitutional tort cases brought under 42 U.S.C. § 1983. Thus, Jailers Lovelady and Pelfrey possessing, upon information and belief, information regarding Kelli's pre-existing issues and inability to breathe well, are liable for her death even if a reasonable healthy person would not have died with application of the same amount of force.

36.     Moreover, it was clearly established that forcing a person onto his or her stomach and applying pressure to his or her back is an unreasonable use of force, especially in light of any pre-existing medical conditions which might contribute to that person's ultimate death. It was also clearly established that a jailer must exercise greater care with a person such as Kelli, who was obese, when using force, and that handcuffing a person behind his or her back and laying that person in a prone position could lead to positional asphyxia (otherwise known as hypoxia).

37.     Every reasonable officer/jailer in Jailer Lovelady's and Jailer Pelfrey's positions would have known that their actions violated such clearly-established constitutional rights. Jailer Lovelady's and Jailer Pelfrey's actions resulted in, were producing causes of, and were proximate causes of Kelli's death and all damages asserted and/or referenced in this pleading.

E.     Relevant Coryell County Written Jail Policies and Procedures

38.     Coryell County, pursuant to its jail's chief policymaker (as designated by the Coryell County Commissioner's Court), Sheriff Scott A. Williams, had in place at the time of Kelli's death a "Jail Policy and Procedure Operations Manuel" (sic) ("Jail Manual"). The jail was operated at the time by the Coryell County Sheriff.

39.     Defendant Lovelady and Pelfrey intended to extract Kelli from her cell just prior to her death. The Jail Manual contains a cell extraction policy which indicates, in part, is "to be used

[t]o safely extract offenders from cells who refuse to be moved." The policy indicates that the jail "will maintain a well-trained cell extraction team in order to remove offenders from their cells when their behavior poses a threat to the smooth operation of the jail or themselves." Upon information and belief, Defendant Lovelady and Defendant Pelfrey were aware of this policy and chose not to comply with it.

40.     Further, Coryell County, upon information and belief, chose not to sufficiently staff the jail so that compliance with the policy, as referenced above and below, would occur. Nevertheless, even if Coryell County chose not to sufficiently staff the jail, Defendants Lovelady and Pelfrey should have refused to extract Kelli unless and until there was sufficient staff available. Choosing not to comply with the policy resulted in unreasonable, unconstitutional use of force and Kelli's death.

41.     The Jail Manual indicates that the Sheriff is responsible for the assignment, training, and readiness of the jail cell extraction team. The Jail Manual reads: "Cell extractions will be executed by trained teams ONLY. Any other staff, alone or in groups, will NOT attempt cell extractions, except in emergency situations, and then only to prevent eminent [sic] serious injury or death." Kelli's situation on the date of her death was not an emergency, and there was no need to enter her cell to prevent imminent serious injury or death. Thus Defendants Lovelady and Pelfrey were deliberately indifferent to Kelli's health and safety and chose to act in an objectively unreasonable manner.

42.     The cell extraction policy in the Jail Manual is fairly specific. It requires in part that:

- Each team member, unless directed otherwise by the team leader, will perform his or her own specific assignment.

- There is to be no talking between team members when inside a cell, other than an announcement of when restraints have been applied, and then simply the statement "handcuffs on" and/or "leg irons on."

- The sequence of staff members should not be broken when executing a cell extraction.

- There must always be one or two alternate staff members standing by in the event they are needed.

- Each cell extraction team must have the following equipment:

  - Helmet clearly marked by a number or letter to identify the staff member and assignment;

  - Flak vest;

  - Groin protector;

  - Leather gloves;

  - Gas mask;

  - Shin guards;

  - Elbow pads;

  - Jumpsuit/coveralls properly marked for identification; and

  - Shield.

43.     Jailer Lovelady and Jailer Pelfrey chose not to follow any of these requirements and thereby acted in a constitutionally unreasonable manner when using force with Kelli.  If they had chosen to follow this policy, which could have only occurred with additional staff provided by Coryell County, then they would have been provided protection from any alleged injury by

Kelli. By choosing not to follow these policies, Jailer Lovelady and Jailer Pelfrey escalated the situation and invited and caused injury and extended physical exertion.

44. The cell extraction policy in the Jail Manual also contains a fairly detailed policy regarding video camera operations, which has embedded in it additional policies related to the cell extraction. For example:

- The cell extraction recording shall begin in a marshalling area or neutral area where the team has been assembled and suited-up in protective equipment.

- The video operator shall introduce himself or herself as the operator and note the current date and time of day.

- The video recorder will introduce the supervisor/team leader by full name and rank.

- The team leader/supervisor will introduce the members of the extraction team, each member being identified by his or her specific job assignment corresponding with an alphabetical or numerical designation on his or her helmet, also at the same time describing the events leading up to the decision to deploy a forced extraction team.

- When the extraction team is ready to mobilize to the incident site, the video operator will assume responsibility for narrating the remainder of the incident, except for the debriefing which will be conducted by the team leader/supervisor.

- A step-by-step narrative will describe the significance of the events from the moment of deployment, the narration being as descriptive as possible throughout the entire event (including transfer, decontamination, and medical exam and debriefing).

- If OC or other chemical mix is used, the narrator/video recorder shall announce the time that the inmate was warned, and the narrator shall don a gas mask.

- The cell extraction team may use an electronic control device during a cell extraction, in compliance with the use of force policy.

None of these things happened. In fact, the manner in which Jailer Lovelady and Jailer Pelfrey chose to conduct the extraction operation had not even a slight resemblance to Coryell County policies regarding such extraction. Their failure to comply with such policies is evidence of unreasonableness and deliberate indifference giving rise to Fourth Amendment and Fourteenth Amendment violation claims.

45. The cell extraction policy also includes a section for responsibilities of the team leader/supervisor. That section lists responsibilities in eight lettered paragraphs. The policy also has a section for responsibilities of team members, such responsibilities being listed in several lettered paragraphs. The first responsibility of a team member requires: "No maneuver utilized by team members will place any pressure on the front of an offender's neck that would result in the compression of the airway." Upon information and belief, Jailer Lovelady and Jailer Pelfrey knew of this policy – and that failing to comply with it could result in a prisoner's death. Moreover, the policy was an admission by Coryell County that failing to provide appropriate staff to conduct a cell extraction, thus resulting in a lesser number of staff potentially maneuvering a prisoner into such a position, could result in a prisoner's death by mechanical asphyxiation.

46. The policy recommends a five-member cell extraction team, with each member doing the following regarding a prisoner:

| Position Number | Duty |
| --- | --- |
| 1 | Pin offender to the wall and take control of offender's head |
| 2 | Pull legs out from under offender, then control left arm |
| 3 | Secure right arm and apply handcuffs |
| 4 | Secure left leg |
| 5 | Secure right leg and apply leg irons |

Interestingly, Coryell County chooses to refer to its prisoners as "offenders" even though many such prisoners had not been convicted of anything (such as Kelli). Nevertheless, this policy recognized that only two jailers conducting extraction of a prisoner who does not wish to be extracted would be wholly inadequate and unreasonable. Upon information and belief, Jailer Lovelady and Jailer Pelfrey knew of this policy, and that extraction by only two people of a prisoner such as Kelli would be unreasonable and could result in serious injury to and death of Kelli.

47. The portion of the cell extraction policy regarding use of force through use of a TASER includes the following warning:

> A contributing factor to serious injury or death is the level of a subject's exhaustion. Studies recommend that when jail staff members believe that control of a subject will be necessary and met with resistance, deployment of the Electronic Control Device should be considered early on in the event so that the person has not reached a level of exhaustion prior to the Electronic Control Device's use.

This policy which was, upon information and belief, known to Jailer Lovelady and Jailer Pelfrey, put them on notice that extended physical interaction with Kelli, and exertion by her, especially in light of her underlying health issues and visibly apparent obesity, would quickly lead to her exhaustion. While an electronic control device was not used in this case, Jailer Lovelady and Jailer Pelfrey were on notice that such exhaustion would significantly increase the risk of Kelli's death – especially if Kelli were put into a prone position on the concrete floor and at the same time handcuffed behind her back.

48. The policy explicitly recognizes that constitutional duties are at issue, by noting that jailers could be sued for improper use of force. Specifically, the policy indicates that jail personnel should consider a particular prisoner – and any vulnerabilities the prisoner may have – because "some jails have been criticized as well as sued for use [of TASERs] on pregnant women

and the elderly." Kelli's condition was clear to both Jailer Lovelady and Jailer Pelfrey, and Jailer Lovelady and Jailer Pelfrey were fully aware that they owed constitutional obligations to Kelli to not use excessive force.

49.     The policy also requires that medical personnel should be alerted, when available, in the jail clinic during cell extractions. Further, the cell extraction team leader/supervisor must ensure that a prisoner has no medical conditions that would present the use of OC and/or chemical agents. The policy also reads that, where feasible, on-site medical staff or EMS should be available during cell extractions. It appears that these policies were wholly or substantially ignored. Regardless, it also appears that Coryell County had failed to sufficiently staff the jail to allow compliance with such policies. This amounted to deliberate indifference to the health and safety of Coryell County prisoners.

50.     The policy also requires that, prior to the use of OC or OC mixed with chemical agents, approval must be obtained from the highest-ranking person on site. Further, gas masks must be used, and the offender must be warned by the extraction team leader that OC or OC mixed with chemical agents will be applied. The policy once again emphasizes a five-person extraction team by requiring that such a five-person extraction team move the prisoner after the cell extraction is complete. Once again, this policy was violated with regard to Kelli.

51.     The policy also requires jail staff to make all reasonable efforts to avoid striking prisoners in the head, neck, eyes, or genitals. The policy also warns about positional asphyxiation. The policy includes the statement: "As a precaution against positional asphyxiation, a restrained offender will not be left in a prone position alone or for any length of time following the use of OC or OC mixed with chemical agents." The policy further specifically reads, "No maneuver,

which places any pressure on the front of the offender's neck, resulting in compression of the airway, may be used." Jailer Lovelady and Jailer Pelfrey also violated these policies.

The cell extraction policy also includes the following:

- All personnel will receive training prior to being assigned to a position involving the possible use of force.

- All jail staff must receive training in cell extractions before they can participate on a cell extraction team.

- All applicable staff will be required to re-qualify/re-certify in use of force-related tactics and equipment in accordance with guidelines established by the sheriff.

It appears that no such training of Defendant Lovelady and Defendant Pelfrey occurred. This is evidence of Coryell County's deliberate indifference to the health and safety of its prisoners and gives rise to liability of the County for Kelli's death.

52. The Jail Manual also contains a use of restraints section. That section defines an emergency restraint chair as a "chair specifically designed to restrain an inmate's arms, legs, shoulders, and chest while in a seated position." Defendants Lovelady and Pelfrey intended to place Kelli into an emergency restraint chair after extracting her from the cell. This section of the manual also prohibits the "hog-tie" method of restraining an inmate. It further reads, "No inmate shall be placed in the restraint chair without the approval of the jail administrator or shift commander."

53. The training section of the Jail Manual mandates that the Sheriff shall be responsible for the hiring and training of all personnel necessary to operate and maintain the jail. Such training would thus include training regarding use of force including cell extraction. Upon information and belief, the Sheriff, as the chief policymaker for the jail, decided not to provide

such training to Defendants Lovelady and Pelfrey in a manner that complied with County policy. Thus, it was the County itself that chose not to provide, upon information and belief, such training.

F.     Autopsy Report

54.     The Office of the Medical Examiner, in Dallas County, at the Southwestern Institute of Forensic Sciences at Dallas, conducted an autopsy of Kelli.  The autopsy was performed at the request of Justice of the Peace Coy Latham, Precinct 4, in Coryell County.  Upon information and belief, Justice of the Peace Latham did so because he knew that the Dallas County Office of the Medical Examiner employed competent, experienced medical examiners who would reach accurate conclusions regarding Kelli's death.

55.     The autopsy indicated that Kelli was 5'–6" tall, weighed 220 lbs., and therefore had a body mass index of 35.51.  The medical examiner determined that Kelli was morbidly obese. This determination did not require a medical opinion, as it was obvious to Jailer Lovelady and Jailer Pelfrey that Kelli was obese at the time they used force just prior to her death.

56.     There were red abrasions over Kelli's central chest, and her sternum was fractured at the level of the third rib.  The left second through sixth ribs were also fractured, and there were hemorrhages involving the mediastinum, as well as focal contusions involving the atria.  The medical examiner noted that the fractures and hemorrhages were consistent with injuries which could occur during attempted cardiopulmonary resuscitation, although it was possible that they were present before such attempted resuscitation.  If they were present before such attempted resuscitation, upon information and belief, they were caused by the use of force by Jailer Lovelady and Jailer Pelfrey.  The medical examiner also noted blunt force injuries to the head.

57.     The medical examiner's finding included the finding that Kelli died of "[m]echanical asphyxia in association with physical restraint."  The medical examiner wrote:

Per reported history and/or video evidence, jailers attempted to restrain the decedent and she resisted and became combative. The officers attempted to handcuff her, but she took the handcuffs and refused to give them back. **She was eventually restrained in a prone position with one officer putting force on her upper back region and another officer putting force on her buttocks/thighs until she became unresponsive.**

(Emphasis added).

The medical examiner also wrote:

Based on the case history and autopsy findings, it is my opinion that Kelli Leanne Page, a 46-year-old female, **died as a result of mechanical asphyxia in association with physical restraint**. Hypertensive cardiovascular disease cirrhosis, and obesity likely contributed to the cause of death.

(Emphasis added).

58. The medical examiner listed as the manner of death, "Homicide." Jailer Lovelady and Jailer Pelfrey killed Kelli through the manner in which they chose to physically restrain Kelli, together with their actions in the jail cell leading up to that physical restraint. Kelli did not "just die." She was killed.

59. There is little doubt that the opinion regarding the cause and manner of Kelli's death, determined by the medical examiner conducting the autopsy, was shared by numerous other competent medical examiners at the Dallas County Office of the Medical Examiner. The following physicians signed the report on the following respective dates:

Stephen M. Hastings, M.D. – November 7, 2017
Medical Examiner

Stephen M. Lenfest, M.D. – November 8, 2017
Medical Examiner

Chester S. Gwin, M.D. – November 9, 2017
Medical Examiner

Jill E. Urban, M.D. – November 8, 2017
Medical Examiner

Janis K. Townsend-Parchman, M.D. – November 12, 2017
Medical Examiner

Emily Ogden, M.D. – November 7, 2017
Medical Examiner

Tracy J. Dyer, M.D., J.D. – November 13, 2017
Medical Examiner

Elizabeth Ventura, M.D. – November 8, 2017
Medical Examiner

Reade A. Quinton, M.D. – November 14, 2017
Deputy Chief Medical Examiner

Jeffrey J. Barnard, M.D. – November 8, 2017
Director and Chief Medical Examiner

Upon information and belief, these physicians signed the autopsy only after reviewing evidence sufficient to provide each with the professional medical opinion that the autopsy findings were accurate based on a reasonable degree of medical probability.

G.     Coryell County's Post-Death Reporting

60.     Coryell County Sheriff Scott Williams completed a custodial death report, as required by law, and it was transmitted to the Attorney General of Texas. He also completed an amended report, which was also transmitted to the Attorney General of Texas.

61.     The amended report indicated that Kelli's original date of custody was May 5, 2017 – over five months prior to her eventual death. Therefore, upon information and belief, Jailer Lovelady and Jailer Pelfrey were well aware of Kelli's personality, physical limitations, illnesses, pre-existing medical conditions, and medication needs.

62.     The Sheriff was candid when writing, "Manner of Death:  Homicide (includes Justifiable Homicide)." He was also candid when writing, "Medical Cause of Death: Mechanical asphyxia in association with physical restraint." The Sheriff also noted that Kelli had been treated

for a medical condition which he believed "caused" Kelli's death, although Plaintiffs disagree that the pre-existing medical condition was the primary proximate or producing cause of her death. Nevertheless, even if Kelli was more susceptible to injury and/or death than an average person, the "eggshell skull" rule allows recovery in this case. Despite the fact that the Sheriff listed the manner of Kelli's death as being a homicide, when completing an answer to the question in the standard report, "Who caused the death?" he wrote, "Not applicable." The Sheriff knew who caused Kelli's death, but he refused to list Jailer Lovelady's and Jailer Pelfrey's names.

63. The report also admits that the purpose of Jailer Lovelady and Jailer Pelfrey entering the cell on the day of Kelli's death was to restrain her, extract her from the cell, and put her into a restraint chair until she allegedly "calmed down." However, upon information and belief, Kelli did not need to "calm down." Instead, upon information and belief, this was a cover-up of an improper use of force.

64. The entire use of force preceding Kelli's death was for the purpose of the cell extraction – and to punish Kelli. The report also indicates that Kelli allegedly "refused all orders given to her by jail staff." While Plaintiffs do not necessarily agree with such an assertion, if true, it had become clear to Jailer Lovelady and Jailer Pelfrey that an extraction team would need to be used (as opposed to simply two officers entering the cell without back-up). Jailer Lovelady knew this from his use of force with Kelli the day before (resulting in her being taken to a hospital for medical treatment) and Jailer Pelfrey had learned sufficient details of Jailer Lovelady's use of force to also put him on notice as to the need for at least a five-person extraction team.

65. The report also indicates that one of the jailers sprayed OC pepper spray through the food slot of the cell door. The report also indicate that jailers had applied two knee strikes to Kelli's right leg, and also struck her in the head with a closed fist. Further, the report indicates

that the jailer "struck Page about the face." There are references to Kelli biting or attempting to bite one of the officers. While Plaintiffs do not necessarily agree that all of these statements are true, if believed by the jailers, and/or if true, this is further evidence of the need for an appropriate, trained extraction team as opposed to two jailers, attempting to do what could only reasonably be done by a five-person extraction team.

H. Texas Commission on Law Enforcement Records

66. Upon information and belief, all of Jailer Lovelady's and Jailer Pelfrey's training related to working in a county jail has been reported to the Texas Commission on Law Enforcement (TCOLE). According to TCOLE, Jailer Lovelady was initially licensed as a jailer at approximately the same time he began working for the Coryell County sheriff's office – on or about May 3, 2004. Moreover, according to his TCOLE record, he continued working for Coryell County, without interruption, from that date through the date Kelli died. Therefore, he had gained significant experience as well as education reflected by his TCOLE record, regarding how to interact with prisoners, and use of force which could result in serious injury or death of prisoners (including but not limited to holding obese prisoners and/or prisoners with preexisting health issues in a prone position on a hard floor). Further, prior to his employment at the Coryell County Sheriff's Office, he gained additional experience while working pursuant to a contract jailer certificate at the T. Don Hutto Correction Center from approximately March 10, 2003 through approximately February 8, 2006. As these dates reveal, there is a period of time where Jailer Lovelady was working for both Coryell County and at the T. Don Hutto Correction Center. Jailer Lovelady received his basic jailer certificate on September 25, 2007, and his intermediate jailer proficiency certificate on May 11, 2009.

67.    Jailer Lovelady, according to TCOLE records, completed at least the following training, some of which was use-of-force-specific, and the rest of which, upon information and belief, included use-of-force training:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3500 | Jail | 10/09/13 | 8 | Bill Blackwood LEMI of Texas |
| 3500 | Jail | 10/30/12 | 8 | Bill Blackwood LEMI of Texas |
| 3500 | Jail | 9/22/11 | 8 | Bill Blackwood LEMI of Texas |
| 3500 | Jail | 05/02/11 | 8 | Bill Blackwood LEMI of Texas |
| 35004 | Use of Force in Corrections (DE) | 10/04/09 | 2 | TCOLE Online |
| 3500 | Jail | 06/09/09 | 16 | Comal County Sheriff's Office |
| 3500 | Jail | 01/07/09 | 8 | Texas Association of Counties |
| 3721 | County Correction Officer Field Training | 04/09/08 | 160 | Coryell County Sheriff's Office |
| 3504 | Use of Force in a Jail Setting (Intermediate) | 02/01/06 | 16 | Texas Association of Counties |
| 35003 | Legal Liabilities for Jailers (DE) | 12/21/05 | 3 | TCOLE Online |
| 35001 | Inmates with Mental Illness DE | 12/20/05 | 5 | TCOLE Online |
| 3500 | Jail | 12/09/05 | 7 | Texas Commission on Jail Standards |
| 1007 | Basic County Jail Course | 3/24/03 | 80 | T. Don Hutto Correctional Center |

68.    Upon information and belief, Jailer Lovelady would have learned from these courses that he should not have used the force which is otherwise more specifically described herein with Kelli, including but not limited to holding her in a prone position after she had been exerting herself, and due to her pre-existing healthcare issues and obesity.  Further, upon information and belief, Jailer Lovelady would have learned of legal liabilities potentially arising from constitutional violations related to use of excessive force, as well as related case law regarding the reasonable use of force.

69.     TCOLE records for Jailer Pelfrey show that, at the time of Kelli's death, Jailer Pelfrey had not had even a single hour of training related to jail operations, use of force, how to physically handle prisoners with pre-existing health care issues, or the effects of holding a prisoner in a prone position.  Instead, upon information and belief, Coryell County chose to save money at the expense of Kelli's life by hiring Jailer Pelfrey and using him pursuant to a temporary jailer license.  Upon information and belief, there would have been sufficient jailers in the employment market, with jailer licenses, who Coryell County could have hired instead of hiring Jailer Pelfrey.

70.     TCOLE records indicate that Jailer Pelfrey received a temporary jailer license on May 22, 2017 under which he operated until approximately April 2, 2018, all the time working for the Coryell County Sheriff's Office.  TCOLE records also indicate that Jailer Pelfrey did not receive a jailer license until well after Kelli's death – on or about April 2, 2018.  In fact, TCOLE records indicate that Jailer Pelfrey did not receive any training whatsoever related to acting as a jailer at the Coryell County jail until November 1, 2017 (at which time he took an 8-hour less lethal chemical weapons training course).  TCOLE records indicate that Jailer Pelfrey did not even complete the Basic County Jail Course, comprised of 108 hours, until March 29, 2018.  When he did so, that training occurred out of county – at the Bell County Sheriff's Office.

71.     Regardless of his lack of training regarding working in the county jail, upon information and belief, Jailer Pelfrey knew when he participated in holding Kelli in a prone position, after observing and participating in the use of force leading up to it, that she likely would not survive.  While Jailer Pelfrey indicated in a statement that he had training and experience, while working for the Texas Department of Criminal Justice, regarding use of force and use of different type of chemical agents, the TCOLE records still reflect no jail-related training as of the time of Kelli's death.

I.      Coryell County's *Monell* Liability

72.     Coryell County is liable for all damages referenced and asserted in this pleading pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny.  Such liability arises due to the action and/or inaction of the chief policymaker for Coryell County regarding jailer policies.  The chief policymaker for the jail was the Sheriff at all relevant times, or the chief policymaker for the County had delegated such chief policymaking authority, regarding jail activities, to the Sheriff.  In the alternative, the Coryell County Commissioner's Court was the chief policymaker regarding issues related to staffing and budgets.  Regardless, Fifth Circuit precedent is clear that Plaintiffs need not identify the specific chief policymaker at this stage of the proceedings.  The County's action and inaction otherwise referenced in this pleading, related to alleged damages, and its policies, practices, and/or customs were moving forces behind, resulted in, were producing causes of, and were proximate causes of the referenced constitutional violations and damages.

1.      Coryell County's Failure to Provide Reasonable Medical Care to Kelli

73.     Upon information and belief, Kelli needed to have her inhaler refilled, and one or more Coryell County employees failed and/or refused to do so.  Upon information and belief, this would help Kelli breathe better.  The Coryell County jail was also put on notice in July 2017 of Kelli's ongoing significant health issues.  Nicole Crouch and James Crouch wrote a letter to the Texas Commission on Jail Standards which, upon information and belief, was fairly quickly thereafter transmitted to the Coryell County jail.  That letter read in part:

> I am writing your office today because of an issue in Coryell County Jail in Gatesville, TX about an inmate Kelli Page[.]  On the sixth of July at approximately 2:47[,] I called the jail and asked to speak with someone about Mrs. Page's care.  I was connected to the nurse and she was rude and unprofessional and showed no

bedside manner. I told her of mine and my uncle's concern that Mrs. Page's whole body was extremely swollen. She has had episodes like this at her home and she ended up hospitalized. I proceeded to ask the nurse why she could not be taken to a clinic or an emergency room[,], and her statement was that she had segregated her and she was having good care at the jail. She was rude when she said it. I was a nurse [and] I know she couldn't tell me anything about her care. I then asked to speak to her supervisor and asked her the same questions[,] and she showed no concern of Mrs. Page's healthcare. I asked her if she could give me the number to the Jail Standards[,] and she denied to give me access to that number. I then looked it up on my phone.

**The concern at hand is that Ms. Page has a history of not being able to breath[e] when she gets this swollen and has needed the care of a doctor.** I would ask you to please investigate this situation and inform our family of your findings.

(Emphasis added)

Thus, the Coryell County jail, and, upon information and belief, Jailer Lovelady and Jailer Pelfrey were aware of Kelli's breathing problems. This was further information possessed by those two jailers, as if they needed it, that Kelli should not be handcuffed and restrained in a prone position on her jail cell floor.

### 2.    Coryell County Jail Culture

74.    The actions of Defendants Lovelady and Pelfrey were consistent with what appears to be recent Coryell County jail employee culture. This culture, or custom, upon information and belief, was a moving force behind and was a proximate and/or producing cause of Kelli's death.

75.    On Wednesday, October 11, 2017, two Coryell County jailers surrendered to the Sheriff after one of them put pepper spray into a prisoner's food in June 2017. Jason David Sherrill and Brent Welden Schmidt were charged with official oppression after a Texas Rangers investigation resulted in allegations that Sherill had put pepper spray into the food of a male

inmate. Jailer Schmidt allegedly looked on while this occurred. This arrest was only three days after Kelli's death and demonstrated, upon information and belief, the jail's anti-prisoner culture.

76.     Before that, on or about January 25, 2017, two Coryell County jailers were arrested for selling drugs to County jail inmates. Jailers Kevin Arzate and Paul Picetti were booked for delivering controlled substances.

77.     If these arrests were not enough, on or about November 29, 2018, a grand jury indicted a Coryell County jail administrator for oppression. Lieutenant Karen Porter assaulted a female inmate in August 2018. Apparently, there is and has been something amiss in the Coryell County jail.

78.     Coryell County jail issues are due in part due to the County's refusal to compensate its jailers well enough to assure proper interaction with and care of prisoners. Coryell County, by refusing to pay market-level wages, has decided not to hire competent jailers but instead, upon information and belief, jailers who will not perform as well as at least an average jailer. Coryell County Sheriff Scott Williams was quoted in a late 2018 news story indicating that, for Coryell County to be competitive with other Texas counties, it needs to raise base salaries by at least $10,000.00 per year. He further said

> The pool that I have to draw from to hire jailers, dispatchers and deputies is getting quite shallow and very mossy. And by saying that, I don't want to hire someone else's problem. I don't want to hire somebody that may become a civil liability. So, I would like to promote and move on and train the folks that I know are going to be an asset to Coryell County.

Sheriff Williams also said that it has been difficult for him to keep employees when Coryell County has not provided wages that are competitive. This County decision, and thus policy, was upon information and belief a moving force behind, and a producing cause of and/or a proximate cause

of, Kelli's death, including by but not limited to the necessity of hiring Defendant Pelfrey without his having secured a jailer license and the attendant jail training.

### 3. Coryell County's Customs and Unwritten Policies Practices, Contrary to Relevant Written Jail Policies and Procedures, were Moving Forces Behind and Caused Kelli's Death

79.     Coryell County's customs and practices, contrary to relevant written jail policies and procedures, were moving forces behind and caused Kelli's death.  As set forth in this pleading, Coryell County had in place certain written policies applicable to the use of force with and attempted cell extraction of Kelli.  However, written policies alone are not dispositive as to a county's actual customs and practices.  In fact, as shown above and below in this pleading, despite Coryell County's written policies regarding use of at least a five-member cell extraction team, Coryell County's jail culture, failure to properly staff the jail, decision to allow the jail to be overly-crowded, and, upon information and belief, practice and custom of allowing less than a five-member team to extract prisoners from cells are moving forces behind and proximately caused Kelli's injuries and death.  Regardless, even though the Plaintiffs plead such written policies above, they do so for other reasons set forth in this pleading, including but not necessarily limited to show Defendant Lovelady's and Defendant Pelfrey's disregard of and failure to comply with them (thus supporting their knowledge that they were engaging in constitutional violations).

### 4. Coryell County's Policy, Practice, and/or Custom of Understaffing the Jail was a Moving Force Behind and Caused Kelli's Death

80.     Coryell County's policy, practice, and/or custom of understaffing its jail was a moving force behind and caused Kelli's death.  Coryell County made a conscious decision to understaff its jail, and that decision, which was or resulted in a policy, practice, and/or custom, was a moving force behind and caused Kelli's death.  Coryell County purported to have a written

cell extraction policy which required five people to enter a cell to extract a prisoner. However, upon information and belief, Coryell County decided not to staff its jail with a sufficient number of people to allow such a safe cell extraction to occur. Instead, due to Coryell County's decision not to appropriately staff the jail, considering the jail's overcrowded conditions and thus the number of inmates present, jailers on duty could not safely and reasonably extract Kelli from her cell if in fact such were necessary (which Plaintiffs deny). Texas Ranger Adam Russell, when testifying at an inquest regarding Kelli's death, noted the difficulty arising when Coryell County chose to understaff its jail:

> You have to take into consideration the jail and what its purpose is on the inside, that's the security and safety for everyone in there, not just the inmates but also the jailers. You have three jailers on duty with up to 100 people plus on a daily basis going in and out of that jail. You have one person in the control room, one floor supervisor, and one jail assistant. **So you have two people that can walk freely among the halls and attend to the needs of a hundred plus people**, which includes feeding them, getting them their mail, getting them their medication, which is helped out also by the nurse who is on staff. So there needs to be –

(Emphasis added).

That testimony was cut short by Coryell County District Attorney Dusty Boyd, who said, "Let me stop you there. . . ." Regardless, Coryell County chose to apparently provide only two people at the time Kelli was in the jail as well as, upon information and belief, on an ongoing basis, at most two-to-three people when it knew that a cell extraction would, if conducted reasonably and safely, require at least five people. This policy, practice, and custom, due to only two jailers attempting to extract Kelli from her cell, was a moving force behind and caused Kelli's death.

81.     Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit over 25 years ago, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established. In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for

the death of her child. Kelli's case obviously does not involve a jail suicide. However, Judge Goldberg's instruction to Texas counties, provided long ago, put Coryell County on notice that it had continuous duties, twenty-four hours per day, 365 days per year, to assure that the constitutional rights of its prisoners were not violated (whether through failure to appropriately staff a jail or otherwise). Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit: "We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation." *Id.* at 395-96. Therefore, Coryell County's duties to appropriately staff its jail extended beyond the Monday thru Friday typical work week, and included the weekend, and specifically the Sunday, on which Kelli died.

### 5. Coryell County's Policy, Practice, and/or Custom of Allowing an Overcrowded Jail Was a Moving Force Behind and Caused Kelli's Death

82.     Coryell County's policy, practice, and/or custom of allowing an overcrowded jail was a moving force behind and caused Kelli's death. Coryell County knew that it had a significant problem housing all its inmates in its jail. Therefore, it was forced to reach agreements with other counties to have inmates held by those counties in lieu of having them held at the Coryell County jail. Nevertheless, the overcrowding in the Coryell County jail was such that, as a result of Coryell County staffing policies, there was insufficient staff to address inmate situations including that occurring just prior to Kelli's death. Even though Coryell County shipped off its prisoners to other jails, the result was still a jail that was far too crowded, especially in light of the limited staff which Coryell County chose to pay. This amounted to deliberate indifference regarding needs of prisoners and an unreasonable course of action.

83.     On or about July 11, 2016, the Coryell County Commissioner's Court voted to approve an inter-local cooperation agreement with Limestone County to provide housing and care of Coryell County inmates.  Those inmates would be incarcerated in the Limestone County jail at a cost of $44.00 per day.  Upon information and belief, this was due to continued overcrowding in the Coryell County jail.

84.     On June 26, 2017, the Coryell County Commissioner's Court once again voted to approve an inter-local cooperation agreement with Limestone County to provide housing and care of Coryell County inmates.  Upon information and belief, this additional agreement was further evidence that Coryell County's jail was overcrowded.

85.     On or about July 24, 2017, the Coryell County Commissioner's Court approved yet another inter-local cooperation agreement regarding the housing of Coryell County inmates.  The Court approved an agreement with McLennan County, such that McLennan County would provide housing and care of Coryell County inmates.  This agreement was additional evidence that Coryell County continued having an overcrowded jail and, more importantly, Coryell County's inability as a result to properly care for its inmates and have staff on-duty sufficient to address any situation which might arise.  Further, even Kelli had been moved to the Milam County Jail from approximately June 7, 2017 to approximately June 11, 2017, due to overcrowding at the Coryell County jail.  Kelli had been in a segregated cell in Coryell County since approximately September 12, 2017.

86.     The Texas Commission on Jail Standards ("TCJS") had, long before Kelli's death, warned Coryell County about its jail overcrowding.  In a February 19, 2016 inspection report, the TCJS inspector provided "technical assistance."  The inspector indicated that she had a discussion

with Coryell County officials regarding a new jail facility due to housing approximately 50 prisoners out-of-county on a monthly basis.

87.     Moreover, in a March 14, 2017 TCJS inspection report, relating to the Coryell County jail, the inspector once again provided "technical assistance."  The inspector discussed with one or more Coryell County officials the number of inmates that are housed out-of-county and the possibility of building a new facility.  Thus, long before Kelli's death, Coryell County had been put on notice of its overcrowding issues and its necessarily-related understaffing issues. These issues, which were customs and/or practices of Coryell County, were moving forces behind and caused Kelli's death.

88.     Even after Kelli's death, the Texas Commission on Jail Standards once again provided "technical assistance" to Coryell County regarding overcrowding at its jail.  An April 11, 2018 report, indicates that the TCJS inspector discussed with one or more Coryell County officials the number of inmates that are housed out-of-county, and once again the possibility of building a new facility.  Coryell County's failure to remedy these issues constituted deliberate indifference and an unreasonable course of action.

> 6.     Coryell County's Failure to Discipline and/or Require Additional Training of Defendants Lovelady and Pelfrey is Evidence of Coryell County's Custom and/or Unwritten Policy.

89.     Upon information and belief, Coryell County failed to discipline Defendants Lovelady and/or Pelfrey as a result of the unconstitutional seizure and use of force.  Upon information and belief, Defendants Lovelady and/or Pelfrey were not given any time off without pay, were not disciplined, were not reprimanded, were not instructed to act in any different manner in the future, and were not instructed to participate in any additional training and/or education. The County possessed all the evidence referenced in this complaint – and more – and nevertheless,

upon information and belief, failed to take any adverse action against Defendants Lovelady and/or Pelfrey indicating its and/or the Sheriff's displeasure and/or disagreement with the manner in which force was used with Kelli and which caused her death. Thus, the failure to take any action following her death was evidence of unwritten policies and/or customs of the County, otherwise referenced herein. These unwritten policies and/or customs, regarding use of force with Kelli, were moving forces behind and caused Kelli's death.

### 7.   Coryell County's Policy, Practice, and/or Custom in Failing to Train Jailer Pelfrey Was a Moving Force Behind and Caused Kelli's Death

90.   Coryell County's policy, practice, and/or custom in failing to train jailer Pelfrey was a moving force behind and caused Kelli's death. As made clear elsewhere in this pleading, according to Coryell County's jail manual, the Sheriff was responsible for training jail employees. Moreover, upon information and belief, he was a – or the – chief policymaker regarding jail practices at all times relevant to this case. As shown above, TCOLE records indicate that Jailer Pelfrey did not receive jail-specific training prior to being allowed to work pursuant to his temporary jailer license. While Jailer Pelfrey apparently had received some training while working for the Texas Department of Criminal Justice, undoubtedly training to work in a jail must be significantly different. Otherwise, presumably, TCOLE would allow such prior training and experience to substitute for the education Jailer Pelfrey received, after Kelli's death, and which is referenced in the TCOLE section of this pleading above. Thus, upon information and belief, Coryell County's policy, practice, and/or custom, in deciding not to have Jailer Pelfrey trained regarding jail practices and/or use of force prior to Kelli's death, were moving forces behind and caused Kelli's death.

## III.     Causes of Action

### A.     Cause of Action Against Defendants Lovelady and Defendant Pelfrey Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights

91.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendants Lovelady and Pelfrey are liable to the Plaintiffs and Kelli's heirs at law, pursuant to 42 U.S.C. § 1983, for violating Kelli's rights guaranteed by the Fourth Amendment, as the Fourth Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment or otherwise.  Defendants Lovelady and Pelfrey acted and failed to act under color of state law at all times referenced in this pleading. Defendants Lovelady and Pelfrey were deliberately indifferent to Kelli's constitutional rights, and they acted in an objectively unreasonable manner when seizing and using force with Kelli.  They exercised constitutionally impermissible excessive force and seizure.  Defendants Lovelady and Pelfrey violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

92.     It was clearly-established law, in the Fifth Circuit, at the time Defendants Lovelady and Pelfrey chose to assault Kelli, hold her in a prone position on the floor, and handcuff her behind her back, that people such as Kelli with such underlying health conditions, and who are morbidly obese, should not be treated in such a manner.  This is particularly true with a person who is not fleeing (but in this case confined to a jail cell) and who is not suspected of a serious crime (or for that matter any crime at all).  Moreover, their violation of Coryell County policies is evidence that a constitutional violation occurred.  There were no circumstances allowing Defendants Lovelady and Pelfrey to use the force they chose to use, and they are not entitled to

qualified immunity.[1]

93.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Kelli's heirs-at-law, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell, and the Independent Administrators of the Estate of Kelli Leanne Page, seek all remedies and damages available under Texas and federal law including but not necessarily limited to pursuant to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Kelli's estate and/or her heirs at law suffered the following damages, for which they seek recovery from these natural person

---

[1]     The defense of qualified immunity is, and should be held to be, a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. The Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited. Congress makes law. Courts do not. The natural person Defendants cannot show that jailers would fall within the category of persons referenced in the first sentence of this footnote. This would be the Defendants' burden, if they assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that Defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. The Plaintiffs include allegations in this footnote to assure that, if necessary, the qualified immunity abrogation or limitation issue has been preserved.

Defendants:

- Kelli's conscious physical pain, suffering, and mental anguish;

- Kelli's medical expenses;

- Kelli's funeral expenses;  and

- exemplary/punitive damages.

All such damages were caused and/or proximately caused by the natural person Defendants.  If Kelli had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

94.     Mr. Fairchild and Ms. Fairchild also seek all damages available to them individually, and all other heirs-at-law individually (including Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell), as a result of Kelli's wrongful death.  Like all other damages alleged in this section of this pleading, damages suffered by these people were caused and/or proximately caused by the natural person Defendants. Therefore, these people seek and are entitled to obtain all remedies and damages available to them for the 42 U.S.C. § 1983 claims.  The natural person Defendants' actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by these people (to the full extent allowed by law), for which they individually seek compensation:

- loss of services that they would have received from Kelli;

- Kelli's funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death;

- future mental anguish and emotional distress suffered by them resulting from and caused Kelli's death;

- loss of companionship and society; and

- exemplary/punitive damages.

95.     Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Kelli's constitutional rights.  The natural person Defendants' actions and/or inaction showed a reckless or callous disregard of, or indifference to, Kelli's rights and safety.  In addition, all such damages resulted from the natural person Defendants choosing to proceed with conscious indifference to and disregard of Kelli's rights, safety, or welfare after having an actual subjective awareness of the risk involved but nevertheless proceeding with actions resulting in her injuries and death.  The natural person Defendants' actions, when viewed objectively from their standpoint at the time of the acts and/or omissions involved, resulted in an extreme degree of risk, considering the probability and magnitude of potential harm to Kelli.  Moreover, all Plaintiffs (and all heirs) seek from the natural person Defendant reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.


B.      Cause of Action Against Defendants Lovelady and Defendant Pelfrey Under 42 U.S.C. § 1983 for Violation of 14th Amendment Rights

96.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendants Lovelady and Pelfrey are liable to the Plaintiffs and Kelli's heirs at law, pursuant to 42 U.S.C. § 1983, for violating Kelli's rights guaranteed by the Fourteenth Amendment.  Defendants Lovelady and Pelfrey acted and failed to act under color of state law at all times referenced in this pleading.  Defendants Lovelady and Pelfrey were deliberately indifferent to Kelli's constitutional rights, and they acted in an objectively unreasonable manner when seizing and using force with Kelli.  Kelli was a pre-trial

detainee, who had not been convicted, and thus was not constitutionally allowed to be punished at all. Jailer Lovelady's and Jailer Pelfrey's actions referenced herein constituted impermissible, unconstitutional, punishment of a pre-trial detainee, in violation of the Fourteenth Amendment to the United States Constitution. Defendants Lovelady and Pelfrey violated clearly established constitutional rights, and their conduct constituted deliberate indifference toward punishment of Kelli and/or was objectively unreasonable.

97.     Moreover, their violation of Coryell County policies is evidence that a constitutional violation occurred. There were no circumstances allowing Defendants Lovelady and Pelfrey to use the force they chose to use, in punishing Kelli, and they are not entitled to qualified immunity.

98.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Kelli's heirs-at-law, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell, and the Independent Administrators of the Estate of Kelli Leanne Page, seek all remedies and damages available under Texas and federal law including but not necessarily limited to pursuant to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Kelli's estate and/or her heirs at law suffered the following damages, for which they seek recovery from these natural person Defendants:

- Kelli's conscious physical pain, suffering, and mental anguish;

- Kelli's medical expenses;

- Kelli's funeral expenses;  and

- exemplary/punitive damages.

All such damages were caused and/or proximately caused by the natural person Defendants.  If Kelli had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

99.     Mr. Fairchild and Ms. Fairchild also seek all damages available to them individually, and all other heirs-at-law individually (including Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell), as a result of Kelli's wrongful death.  Like all other damages alleged in this section of this pleading, damages suffered by these people were caused and/or proximately caused by the natural person Defendants. Therefore, these people seek and are entitled to obtain all remedies and damages available to them for the 42 U.S.C. § 1983 claims.  The natural person Defendants' actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by these people (to the full extent allowed by law), for which they individually seek compensation:

- loss of services that they would have received from Kelli;

- Kelli's funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death;

- future mental anguish and emotional distress suffered by them resulting from and caused Kelli's death;

- loss of companionship and society; and

- exemplary/punitive damages.

100.    Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Kelli's constitutional rights.  The natural person Defendants' actions

and/or inaction showed a reckless or callous disregard of, or indifference to, Kelli's rights and safety. In addition, all such damages resulted from the natural person Defendants choosing to proceed with conscious indifference to and disregard of Kelli's rights, safety, or welfare after having an actual subjective awareness of the risk involved but nevertheless proceeding with actions resulting in her injuries and death. The natural person Defendants' actions, when viewed objectively from their standpoint at the time of the acts and/or omissions involved, resulted in an extreme degree of risk, considering the probability and magnitude of potential harm to Kelli. Moreover, all Plaintiffs (and heirs) seek from the natural person Defendant reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

C.    Cause of Action Against Coryell County Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights

101.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Coryell County is liable to the Plaintiffs and Kelli's heirs at law, pursuant to 42 U.S.C. § 1983, for violating Kelli's rights guaranteed by the Fourth Amendment, as the Fourth Amendment has been incorporated to apply to the States pursuant to the Fourteenth Amendment or otherwise. Defendants Lovelady and Pelfrey were at all times referenced in this pleading acting in the course and scope of their duties of and for Coryell County, and they were acting under color of state law. The County acted or failed to act under color of state law at all relevant times.

102.    Coryell County's customs, practices, and/or policies caused, were proximate causes of, and/or were producing causes of all damages referenced herein. The Coryell County Sheriff was the chief policymaker at all times relevant to this pleading, and he was the one that determined

the customs, practices, and policies referenced herein, or the County's chief policymaker had delegated to the Coryell County Sheriff such chief policymaking authority. In the alternative, regarding some or all policies referenced herein, the Coryell County Commissioner's Court was the chief policymaker for the County. Regardless, the Fifth Circuit has made it clear that Plaintiffs need not identify the specific policymaker at this stage of the proceedings.

103. Plaintiffs incorporate all factual and *Monell* allegations above regarding the basis for Coryell County's liability in this case. The County was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Kelli's constitutional rights. The County's customs, practices, and/or policies were moving forces behind and caused violations of Kelli's constitutional rights and showed deliberate indifference to the known or obvious consequences of constitutional violations. They also caused, were proximate causes of, and were producing causes of all damages (and death) resulting from unconstitutional excessive force against and seizure of Kelli.

104. The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Kelli's heirs-at-law, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell, and the Independent Administrators of the Estate of Kelly Leanne Page, seek all remedies and damages available under Texas and federal law including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Kelli's estate and/or her heirs at law suffered the following damages, for which they seek recovery from the County:

- Kelli's conscious physical pain, suffering, and mental anguish;

- Kelli's medical expenses; and

- Kelli's funeral expenses.

All such damages were caused and/or proximately caused by the County. If Kelli had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

105. Mr. Fairchild and Ms. Fairchild also seek all damages available to them individually, and all other heirs-at-law individually (including Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell), as a result of Kelli's wrongful death. Like all other damages alleged in this section of this pleading, damages suffered by these people were caused and/or proximately caused by the County and the County's policies, practices, and/or customs were moving forces behind and caused such damages. Therefore, the County's actions, policies, practices, and customs caused, were proximate causes of, were producing causes of, and were moving forces behind the following damages suffered by these people (to the full extent allowed by law), for which they individually seek compensation:

- loss of services that they would have received from Kelli;

- Kelli's funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death; and

- loss of companionship and society.

Moreover, all Plaintiffs (and heirs) seek from the County reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

D.  Cause of Action Against Defendant Coryell County Under 42 U.S.C. § 1983 for Violation of 14th Amendment Rights

106.  In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Coryell County is liable to the Plaintiffs and Kelli's heirs at law, pursuant to 42 U.S.C. § 1983, for violating Kelli's rights guaranteed by the Fourteenth Amendment.  Defendants Lovelady and Pelfrey were at all times referenced in this pleading acting in the course and scope of their duties of and for Coryell County, and they were acting under color of state law.  The County acted or failed to act under color of state law at all relevant times.

107.  Kelli was a pre-trial detainee, who had not been convicted, and thus was not constitutionally allowed to be punished at all.  Jailer Lovelady's and Jailer Pelfrey's actions referenced herein constituted impermissible, unconstitutional, punishment of a pre-trial detainee, in violation of the Fourteenth Amendment to the United States Constitution.  Defendants Lovelady and Pelfrey violated clearly established constitutional rights, and their conduct constituted deliberate indifference toward punishment of Kelli and/or was objectively unreasonable.

108.  Coryell County's customs, practices, and/or policies caused, were proximate causes of, and/or were producing causes of all damages referenced herein.  The Coryell County Sheriff was the chief policymaker at all times relevant to this pleading, and he was the one that determined the customs, practices, and policies referenced herein, or the County's chief policymaker had delegated to the Coryell County Sheriff such chief policymaking authority.  In the alternative, regarding some or all policies referenced herein, the Coryell County Commissioner's Court was

the chief policymaker for the County. Regardless, the Fifth Circuit has made it clear that Plaintiffs need not identify the specific policymaker at this stage of the proceedings.

109.     Plaintiffs incorporate all factual and *Monell* allegations above regarding the basis for Coryell County's liability in this case. The County was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Kelli's constitutional rights. The County's customs, practices, and/or policies were moving forces behind and caused violations of Kelli's constitutional rights and showed deliberate indifference to the known or obvious consequences of constitutional violations. They also caused, were proximate causes of, and were producing causes of all damages (and death) resulting from unconstitutional excessive force against and seizure of Kelli.

110.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Kelli's heirs-at-law, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell, and the Independent Administrators of the Estate of Kelly Leanne Page, seek all remedies and damages available under Texas and federal law including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Kelli's estate and/or her heirs at law suffered the following damages, for which they seek recovery from the County:

- Kelli's conscious physical pain, suffering, and mental anguish;

- Kelli's medical expenses; and

- Kelli's funeral expenses.

All such damages were caused and/or proximately caused by the County. If Kelli had lived, she would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

111. Mr. Fairchild and Ms. Fairchild also seek all damages available to them individually, and all other heirs-at-law individually (including Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell), as a result of Kelli's wrongful death. Like all other damages alleged in this section of this pleading, damages suffered by these people were caused and/or proximately caused by the County and the County's policies, practices, and/or customs were moving forces behind and caused such damages. Therefore, the County's actions, policies, practices, and customs caused, were proximate causes of, were producing causes of, and were moving forces behind the following damages suffered by these people (to the full extent allowed by law), for which they individually seek compensation:

- loss of services that they would have received from Kelli;

- Kelli's funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Kelli's death; and

- loss of companionship and society.

Moreover, all Plaintiffs (and heirs) seek from the County reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

E.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

112. In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several

jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

113. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objective reasonability basis. There is no reason to treat pretrial detainees' other rights arising under the 14th Amendment's due process clause – such as the right to receive reasonable medical care, the right to be protected from harm, and the right not to be punished – differently.

114. It appears that this standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided

by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[2]

---

[2] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

115.    The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

116.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. Thus, aside from the fact that an objective unreasonableness standard clearly applies to the Fourth Amendment excessive force claims set forth above, an objective unreasonableness standard, instead of a deliberate indifference standard, should apply to the Fourteenth Amendment "punishment" claims set forth above. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to such claims (instead of a subjective state of mind and/or deliberate indifference standard). The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

---

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

IV.    Concluding Allegations

A.    Conditions Precedent

117.    All conditions precedent to assertion of the Plaintiffs' and heirs' claims have occurred.

B.    Use of Documents

118.    The Plaintiffs intend to use at one or more pretrial proceedings, in motion practice, and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

C.    Jury Demand

119.    The Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

120.    For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs (and Kelli's heirs at law, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for including but not necessarily limited to:

     a)    actual damages of and for Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell individually, to the extent allowed by law, including but not necessarily limited to;

           •   loss of services that they would have received from Kelli;

           •   Kelli's funeral expenses;

- past mental anguish and emotional distress resulting from and caused by Kelli's death;

- future mental anguish and emotional distress resulting from and caused by Kelli's death; and

- loss of companionship and society;

b) exemplary/punitive damages for all Plaintiffs (including all heirs at law of Kelli, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell) from the natural person Defendants;

c) reasonable and necessary attorneys' fees for all Plaintiffs (including all heirs at law of Kelli, including Mr. Fairchild, Ms. Fairchild, Cesar Tamala Lactod, III, Angie Fairchild, Maile Sue Fairchild, Patrick Sterling Fairchild, and Tiffany May Gruwell) through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d) court costs and all other recoverable costs;

e) prejudgment and postjudgment interest at the highest allowable rates;  and

f) all other relief, legal and equitable, general and special, to which the Plaintiffs (and all of Kelli's heirs at law) are entitled.

Respectfully submitted,

_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904
michael.oconnor@deanmalone.com

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on March 29, 2019 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

      Eric A. Johnston
      McGinnis Lochridge LLP
      600 Congress Ave., Suite 2100
      Austin, Texas  78701

      J. Eric Magee
      Allison, Bass & Magee, L.L.P.
      A.O. Watson House
      402 W. 125h Street
      Austin, Texas  78701

      S. Cass Weiland
      Robert A. Hawkins
      Squire Patton Boggs LLP
      2000 McKinney Ave., Suite 1700
      Dallas, Texas  75201

                         /s/ T. Dean Malone
                        T. Dean Malone