UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JOHN FAIRCHILD and SUSIE, FAIRCHILD, individually, and as Independent Administrators of, and on behalf of, the ESTATE OF KELLI LEANNE PAGE and the heirs-at-law of KELLI LEANNE PAGE, | § § § § § § | |
| | § | CASE NO. 6:19-cv-00029-ADA-JCM |
| Plaintiffs, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY; and WESLEY HARLAND PELFREY, | § § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs file this Plaintiffs' Appendix in Support of Plaintiffs' Responses to Defendants' Motions for Summary Judgment. Plaintiffs intend that this appendix and attached evidence support all three responses filed by Plaintiffs, on October 4, 2019, to Defendants' Motions for Summary Judgment.

Respectfully submitted:

_____/s/ T. Dean Malone_____

T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:        (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:          (214) 670-9904
michael.oconnor@deanmalone.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2019, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

Eric A. Johnston
McGinnis Lochridge LLP
600 Congress Ave., Suite 2100
Austin, Texas 78701

Attorney for Defendant Coryell County, Texas

J. Eric Magee
Allison, Bass & Magee, L.L.P.
A.O. Watson House
402 W. 125h Street
Austin, Texas 78701

Attorney for Defendant Steven Lovelady

S. Cass Weiland
Robert A. Hawkins
Squire Patton Boggs LLP
2000 McKinney Ave., Suite 1700
Dallas, Texas 75201

Attorney for Defendant Wesley Harland Pelfrey

/s/ T. Dean Malone
T. Dean Malone

## SUMMARY JUDGMENT EVIDENCE

Exhibit A:     Autopsy report ..................................................................... App.   5

Exhibit B:     Coryell County Sheriff's Office – Jail Cell Extraction Policy ............... App.  15

Exhibit C:     Defendant Steven Russell Lovelady's Responses to Plaintiff's
               Third Set of Discovery Requests ............................................. App.  29

Exhibit D:     Defendant Wesley Pelfrey's Responses to Plaintiffs' Second Set of
               Discovery .......................................................................... App.  32

Exhibit E:     Deposition transcript for Steven Russell Lovelady ............................... App.  37

Exhibit F:     Deposition transcript for Wesley Harland Pelfrey.................................. App. 216

Exhibit G:     Expert Scott A. DeFoe's report.................................................. App. 276

# Exhibit A




**SOUTHWESTERN**
# INSTITUTE OF FORENSIC SCIENCES
**AT DALLAS**

**Office of the Medical Examiner**
**In the County of Dallas**
**State of Texas**

This affidavit is in compliance with Texas Rules of Criminal Evidence, Rule 902(10b).

Case No. IFS-17-17913 in the matter of

Page, Kelli Leanne, deceased.

Before me, the undersigned authority, personally appeared Ruenette Ellis-Chambers, who being duly sworn, deposed as follows:

My name is Ruenette Ellis-Chambers. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the Deputy Custodian of Records of the Dallas County Medical Examiner's Office. Attached hereto are 8 pages of records and xx photographs from the Dallas County Medical Examiner's Office. These said 8 pages of records and xx photographs are kept by the Dallas County Medical Examiner's Office in the regular course of business, and it was the regular course of business of the Dallas County Medical Examiner's Office for an employee or representative, or a doctor permitted to practice in the Dallas County Medical Examiner's Office, with personal knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

_Ruenette Ellis Chambers_

SWORN TO AND SUBSCRIBED before me on November 16, 2017

_____
Notary Public in and for Dallas County, Texas
My commission expires

MARYANN ABBOTT
Notary Public, State of Texas
My commission expires
My commission expires September 2019

(By statute, the original records are retained by the Dallas County Medical Examiner's Office. See Art. 49.25, Sec. 11, Vernons Texas Statutes, CCP.)

FILED
AT_____O'CLOCK___M

NOV 2 0 2017

Cory R. Latham
Justice of the Peace, Precinct 4
Coryell County, Texas

App. 6



# SOUTHWESTERN
## INSTITUTE OF FORENSIC SCIENCES
### AT DALLAS
#### Office of the Medical Examiner
#### Autopsy Report

**Case: IFS-17-17913 - CC**

**Decedent: Page, Kelli Leanne**     46 years White Female     DOB: 02/20/1971

Date of Death: 10/08/2017 (Actual)
Time of Death: 09:01 AM (Actual)

Examination Performed: 10/09/2017 08:00 AM

| | | | |
|---|---|---|---|
| Body Weight: | 220 lbs | BMI: 35.51 | |
| Body Length: | 66 in | | |

**ORGAN WEIGHTS:**

| | | | |
|---|---|---|---|
| Brain: 1,370 g | Right Lung: 1,140 g | Right Kidney: | 310 g |
| Heart: 610 g | Left Lung: 790 g | Left Kidney: | 230 g |
| Liver: 1,600 g | Spleen: 720 g | | |

This autopsy is performed at the request of Coy Latham, Justice of the Peace, Precinct 4, Coryell County, Texas.

## EXTERNAL EXAMINATION

The body is identified by toe tag. Photographs and fingerprints are taken.

When first viewed, the body is clad in striped pants and white underwear. A striped shirt is underneath the body. No jewelry is present. The clothing is released.

The body is that of a well-developed, morbidly obese, white female whose appearance is older than the stated age of 46 years. The body, when nude, weighs 220 pounds and is 66 inches long. There is good preservation in the absence of embalming. The body is cold, rigor is fully-developed, and there is well-developed, mostly fixed posterior lividity.

The scalp hair is long, light brown and straight. The irides are hazel, the corneae are clear, and there are no petechiae of the bulbar or palpebral conjunctivae. The ears, nose and lips are unremarkable. The teeth are natural and in poor condition. The neck is unremarkable. The chest and breasts are symmetrical, and the abdomen is moderately protuberant. The external genitalia, anus and perineum are normally developed and atraumatic. External hemorrhoids are present. The extremities are well-developed and symmetrical. The legs have 2+ pitting edema and thickened skin. The back is unremarkable.

## IDENTIFYING MARKS AND SCARS



Case: IFS-17-17913 - CC

Page, Kelli Leanne

COPY
DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 2 of 8

A tattoo is on the lateral left leg. A 2-1/2 inch scar is superior to the umbilicus. A horizontal scar is on the lower abdomen. Depressed round and linear scars are in the right antecubital fossa. Numerous small scars are on the dorsal forearms and the ventral legs, as well as the chest and abdomen. A 1 inch scar is on the dorsal right leg. A few scattered tan-pink papules are on the body including the right side of the face and the upper left side of the chest.

EVIDENCE OF THERAPY

An endotracheal tube is in the mouth. Defibrillator pads are on the chest. Electrocardiogram leads are on the body. An intraosseous access line is in the left pretibial region. Various items of medical packaging and medical devices are in the body bag, including a bag mask, ventilator, and a sodium bicarbonate injection syringe. Red abrasions overlie the central chest. By internal examination the sternum is fractured at the level of the third ribs. The left second through sixth ribs are fractured anterolaterally. There is focal hemorrhage involving the mediastinum, as well as focal contusions involving the atria. These fractures and areas of hemorrhage are consistent with having occurred during attempted cardiopulmonary resuscitation; although, it is also possible that they were present prior.

EVIDENCE OF INJURY

Blunt force injuries:

I.  Head and neck:

A 1 x 1/4 inch purple contusion with associated soft tissue swelling overlies the left supraorbital ridge. The left upper and lower eyelids have pink-purple contusions.

An up to 2 inch area of subscalpular hemorrhage overlies the right frontal and parietal bones.

There are no skull fractures.

There are no subdural, epidural or subarachnoid hemorrhages.

There are no gross injuries of the brain.

A layer-by-layer anterior neck dissection is performed revealing hemorrhage around the right internal jugular vein extending into the surrounding soft tissues and the right sternocleidomastoid muscle; this hemorrhage is likely related to postmortem venipuncture. There is no other hemorrhage within the soft tissues or musculature of the anterior neck. The hyoid bone and laryngeal cartilages are intact. A layer-by-layer posterior neck dissection is performed revealing no hemorrhage within the soft tissues of the posterior neck. The spinal cord is removed from the posterior approach. The spinal cord is intact and free of hemorrhage. There are no associated subdural, epidural or subarachnoid hemorrhages.

II.  Trunk:

A 1/2 x 1/2 inch red abrasion is on the upper right side of the chest. The skin and subcutaneous tissues of the back are reflected, revealing no hemorrhages within the underlying tissues.



There are no blunt force injuries of the visceral organs.

There are no fractures of the sternum, clavicles, ribs, pelvis and vertebrae other than those previously described (see EVIDENCE OF THERAPY).

There is no hemorrhage in any of the body cavities.

III. Extremities:

At least seven distinct round, purple contusions measuring up to 5/16 inch are on the medial right arm. The ventral and lateral aspect of the right forearm have scattered round, blue contusions measuring up to 5/16 inch. A 1/2 x 3/8 inch pink contusion is on the lateral distal right forearm. A 2 x 3/8 inch pink contusion is on the medial distal right forearm. A 1/4 inch crusted, brown abrasion is on the right thumb. A 1 x 1/2 inch purple contusion is on the anterior left arm. Additional purple contusions up to 1/4 inch are on the anterior left arm. A curvilinear 3-1/2 x up to 1/4 inch pink contusion is on the dorsal left forearm. A 3/4 x 3/8 inch pink contusion is on the dorsal left hand. A 1/4 inch red abrasion is on the dorsal left third finger. The lateral and medial aspects of the wrists are incised revealing focal areas of hemorrhage within the subcutaneous tissues bilaterally.

A 1 x 1/2 inch purple contusion is on the lateral left thigh. The soles are incised revealing no evidence of hemorrhage.

There are no visible or palpable fractures of the extremities.

Other injuries:

There are extensive red to yellow, crusted lesions in various stages of healing, concentrated on the upper chest, breasts, abdomen, lateral right thigh, anterior right thigh, ventral right leg, dorsal left forearm, lateral left thigh and ventral left leg.

These injuries, having been once described, will not be repeated.

INTERNAL EXAMINATION

BODY CAVITIES: The thoracic and abdominal organs are in their normal anatomic positions. The pleural cavities have focal fibrous adhesions. The remaining body cavities have no adhesions and there are no abnormal collections of fluid.

HEAD: See EVIDENCE OF INJURY. The skull is unremarkable. The dura and dural sinuses are unremarkable. There are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical, with an unremarkable gyral pattern. The cranial nerves and blood vessels are unremarkable. Sections through the cerebral hemispheres, brainstem, and cerebellum are unremarkable. There are no hemorrhages of the deep white matter or the basal ganglia. The cerebral ventricles contain no blood. The spinal cord, as viewed from the cranial cavity, is unremarkable.

NECK: See EVIDENCE OF INJURY. The lumen of the larynx is not obstructed.

CARDIOVASCULAR SYSTEM: The intimal surface of the abdominal aorta has moderate atherosclerosis. The aorta and its major branches and the great veins are normally distributed. The pulmonary arteries contain no thromboemboli. The pericardium, epicardium, and endocardium are smooth, glistening, and unremarkable. There are no thrombi in the atria or



ventricles. The foramen ovale is closed. The coronary arterial system is free of significant atherosclerosis. The atrial and ventricular septa are intact. The cardiac valves are unremarkable. The myocardium is dark red-brown and firm, and there are no focal abnormalities. The right ventricle is 0.4 cm thick, the left ventricular free wall is 1.5 cm thick and the interventricular septum is 1.5 cm thick. The heart has moderate four-chamber dilatation.

RESPIRATORY SYSTEM: The upper airway is unobstructed. The laryngeal mucosa is smooth and unremarkable, without petechiae. The pleural surfaces are smooth and glistening. The major bronchi are unremarkable. Sectioning of the lungs discloses a dark red-blue, severely congested parenchyma.

HEPATOBILIARY SYSTEM: The liver is covered by a dull, nodular capsule. The parenchyma is light brown and firm with numerous nodules ranging from 0.1 to 0.5 cm. The gallbladder contains approximately 5 mL of dark green bile as well as two black calculi measuring 1.3 and 0.7 cm in greatest dimension.

GASTROINTESTINAL SYSTEM: The esophageal mucosa is gray, smooth, and unremarkable. The stomach contains approximately 100 mL of light brown fluid. There are no tablets or capsules. The gastric mucosa has normal rugal folds, and there are no ulcers. The small and large intestines are externally unremarkable. The appendix is absent. The pancreas is unremarkable externally and upon sectioning.

GENITOURINARY SYSTEM: The capsules of both kidneys strip with ease to reveal moderately granular surfaces. The cortices are of normal thickness, with well-demarcated corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The urinary bladder is empty. The mucosa is gray, smooth, and unremarkable. The uterus, fallopian tubes, and ovaries are unremarkable externally and upon sectioning.

ENDOCRINE SYSTEM: The thyroid and adrenal glands are unremarkable externally and upon sectioning.

LYMPHORETICULAR SYSTEM: The spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red. The cervical, hilar, and peritoneal lymph nodes are unremarkable.

MUSCULOSKELETAL SYSTEM: See EVIDENCE OF INJURY. The clavicles, pelvis, and vertebral column have no fractures. The diaphragm is intact.

## MICROSCOPIC EXAMINATION:

Lungs – Sections show scattered macrophages in the alveolar spaces and rare multinucleated giant cells. Some of the arteries show moderate narrowing. Congestion is present.

Heart – Sections show patchy interstitial fibrosis and myocyte hypertrophy.

Liver – A section shows fibrous bands distorting the normal architecture of the liver, dividing it into multiple nodules. There is moderate chronic inflammation in the portal tracts and within the bands of fibrosis. Congestion is present.

Kidney – A section shows renal parenchyma with scattered sclerotic glomeruli. There is moderate arteriolosclerosis and arteriosclerosis. Patchy chronic inflammation is present in the cortex. There are scattered intratubular mineralizations.



## TOXICOLOGY:

**Evidence Submitted:**

The following items were received by the Laboratory from Forensic Pathology:

005: Biohazard Bag
005-001: Blood, femoral - gray top tube
005-002: Blood, femoral - gray top tube
005-003: Blood, femoral - gray top tube
005-004: Blood, femoral - gray top tube
005-006: Vitreous - red top tube
005-007: Skeletal muscle - plastic tube
005-008: Blood, subclavian - red top tube

**Blood, postmortem**

**Acid/Neutral Screen (GC/MS)**
negative (Item# 005-004)

**Alcohols/Acetone (GC)**
negative (Item# 005-003)

**Alkaline Quantitation (GC/FID)**
nortriptyline: 0.19 mg/L (Item# 005-001)
paroxetine: 0.27 mg/L (Item# 005-001)

**Alkaline Screen (GC/MS)**
results reported in reflex assays

**Synthetic Cannabinoids**
none identified

**Vitreous**

**Alcohols/Acetone (GC)**
negative (Item# 005-006)

**Electrolytes (Analyzer)**
sodium: 136 mEq/L (Item# 005-006)
potassium: 12.6 mEq/L (Item# 005-006)
chloride: 119 mEq/L (Item# 005-006)
glucose: 21 mg/dL (Item# 005-006)
urea nitrogen: 13 mg/dL (Item# 005-006)

## CHEMISTRY:

|  |  | Performing Laboratory |
|---|---|---|
| Hemoglobin A1C | 5.3 % | LabCorp |

## SEROLOGY:

|  |  | Performing Laboratory |
|---|---|---|
| Hep C antibody | Positive | LabCorp |
| Hep B surface antigen | Negative | LabCorp |
| Hep B core antibody | Negative | LabCorp |
| HIV1/HIV2 | Negative | LabCorp |





## FINDINGS:

1. Mechanical asphyxia in association with physical restraint:

   A. Per reported history and/or video evidence, jailers attempted to restrain the decedent and she resisted and became combative. The officers attempted to handcuff her, but she took the handcuffs and refused to give them back. She was eventually restrained in a prone position with one officer putting force on her upper back region and another officer putting force on her buttocks/thighs until she became unresponsive.
   B. Focal subscalpular hemorrhage.
   C. Scattered predominantly round contusions involving arms and forearms.
   D. Linear/curvilinear hemorrhages on distal forearms with underlying hemorrhage in subcutaneous tissues.
   E. Contusion of left thigh.

2. Hypertensive cardiovascular disease:

   A. Left ventricular hypertrophy with cardiomegaly (610 g).
   B. Moderate four-chamber dilatation of heart.
   C. Nephrosclerosis.
   D. Legs with pitting edema.
   E. Medical history of hypertension.

3. Cirrhosis:

   A. Serology positive for hepatitis C antibody.

4. Obesity (body mass index 35.5 kg/m^2).

5. Contusion surrounding left eye:

   A. Per reported history, the decedent assaulted a guard on 10/7/17 and suffered a contusion surrounding the left eye. She was taken to a hospital and medically cleared.

6. Cholelithiasis.

## CONCLUSIONS:



Based on the case history and autopsy findings, it is my opinion that Kelli Leanne Page, a 46-year-old female, died as a result of mechanical asphyxia in association with physical restraint. Hypertensive cardiovascular disease, cirrhosis, and obesity likely contributed to the cause of death.

Per report and/or video evidence, the decedent had to be segregated due to being disruptive, combative, and assaulting a correctional officer. She continued to be disruptive, banging on her cell and refusing to stop after being asked multiple times. Two correctional officers attempted to restrain her, but she resisted and was taken to the ground. The officers attempted to handcuff her, but she took the handcuffs and refused to give them back. She became combative, biting and kicking the officers, and she was struck multiple times. She was subsequently restrained in a prone position, with one officer putting force on her upper back region and another officer putting force on her buttocks/thighs. After being placed in this position, she initially continued to resist and then became unresponsive.

**MANNER OF DEATH:**     Homicide

11/07/2017

Stephen M. Hastings, M.D.
Medical Examiner

11/08/2017

Stephen M. Lenfest, M.D.
Medical Examiner

11/09/2017

Chester S Gwin, M.D.
Medical Examiner

11/08/2017

Jill E Urban, M.D.
Medical Examiner

11/12/2017

Janis K Townsend-Parchman, M.D.
Medical Examiner



*Accredited by The National Association of Medical Examiners*

App. 13



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

11/07/2017

Emily Ogden, M.D.
Medical Examiner

11/13/2017

Tracy J Dyer, M.D., J.D.
Medical Examiner

11/08/2017

Elizabeth Ventura, M.D.
Medical Examiner

11/14/2017

Reade A Quinton, M.D.
Deputy Chief Medical Examiner

11/08/2017

Jeffrey J Barnard, M.D.
Director and Chief Medical Examiner



# Exhibit B

JAIL POLICY

CORYELL COUNTY SHERIFF OFFICE

CELL EXTRATION

SECTION 1

I.      Purpose: It is the purpose of this Jail to provide specific guidelines for the deployment of a response team to meet cell extraction contingencies which may arise within the facilities.

A.      To safely extract offenders from cells who refuse to be moved or to follow proper security procedures.

B.      To establish a technique which minimizes injury to offender(s) and Jail staff, and is consistent with the need to accomplish the cell extraction.

II.     Policy:

A.      This Office will maintain a well-trained cell extraction team in order to remove offenders from their cells when their behavior poses a threat to the smooth operation of the jail or themselves.

B.      The Sheriff is responsible for the assignment, training, and readiness of the Jail's Cell extraction team.

C.       Cell extractions will be executed by trained teams ONLY. Any other staff, alone or in groups, will NOT attempt cell extractions, except in emergency situations, and then only to prevent imminent serious injury or death.

III.    Definitions:

A.      Multiple extraction, 2 or more inmates to be extracted from a cell.

IV.     Procedure:

A.      Rules and guidelines for cell extractions

a.      The cell extraction team is a group effort, and when each team member performs his/her assigned task, maximum control is achieved.

b.      Each team member has a specific job to do for the method to be successful. Each team member, unless directed otherwise by the team leader, will perform his/her own specific assignment.

c.      There is no talking between members when inside a cell. All verbal communications of team members will be directed towards the team leader/supervisor, and only to accomplish the assigned task. When each set of restraints has been applied, the appropriate team member will announce "handcuffs on" and "Leg irons on."

d.      When executing a cell extraction, the sequence of staff members should never be broken. If for some reason a staff member becomes incapacitated, an alternate fills the void. There should always be (1) or (2) alternate staff members standing by in the event they are needed.

B.      Each team member must have the following equipment:

a.      Helmet- clearly marked by a number or letter to identify the staff member and assignment

b.      Flak vest

c.      Groin protector

d.      Leather gloves

e.      Gas mask

f.      Shin guards

g.      Elbow pads

h.      Jumpsuit/coveralls properly marked for identification

i.      Shield

C.      Video camera operations

a.      Once the video recorder is turned on and video recording begins, the camera must remain on and video recording must continue until the offender has been delivered to his or her final housing assignment, all restraints have been removed, offender has been examined by medical personnel, the cell door is secured and the cell extraction team de-briefing has concluded.

b.      Every effort should be made to video record the disruptive behavior that led to the decision to deploy the cell extraction team.

c.      The actual cell extraction recording shall begin in a marshalling area or neutral area where the team has been assembled and suited up in protective equipment.

d.      The video operator shall introduce him/herself as the operator and note the current date and time of the day.

e.      The video recorder will introduce the supervisor/team leader by full name and rank.

f.      The team leader/supervisor will introduce the members of the extraction team. Each member will be identified by their specific job assignment that corresponds with an alphabetical or numerical number on their helmets. The team leader/supervisor will describe the events leading up to the decision to deploy a forced extraction team.

g.      When the team is ready to mobilize to the incident site, the video operator will assume responsibility for narrating the remainder of the incident, except for the debriefing which will be conducted by the team leader/supervisor.

h.      A step by step narrative will describe the significance of the events from the moment of deployment. The narrator will be as descriptive as possible throughout the entire event - to include transfer, decontamination and medical exam and debriefing.

i.      The video operator should do their best to video record all evidence of what the subject was doing leading up to the extraction to include damage to cell or surrounding areas, weapons and or injuries.

j.      In the event of Oleo resin Capsicum or other chemical mix the narrator/video recorder announce the time that the inmate was warned and the narrator should don a gas mask. Once again the video should remain on until the entire extraction is complete.

k.      The cell extraction team may utilize an electronic control device during the cell extraction in compliance with the use of force policy.

l.      If an inmate continues to be unruly even after transfer the recording of the inmate's behavior will continue until compliance and order is met.

m.      In the event of power failure to the video recording device or any other disruption of the event, the narrator will do his/her best to document the time of failure and also try to document the extraction to include the supervisor/team leader's orders and observations.

D.      Responsibilities of Team Leader/Supervisor

a.      Ensures all equipment is functional and operational.

b.      Observes and briefs cell conditions (obstructions, weapons, injuries etc.) to the entire cell extraction team. This will also be recorded. In the event of a double occupancy cell the team leader/supervisor will distinguish which of the two inmates or both will be extracted. Note: each inmate must be clearly identified for the record.

c.      The Team leader/Supervisor will be the only person to give commands.

d.      It is the responsibility of the supervisor/team leader of all actions of the team members. The supervisor/team leader must position him/her to maintain constant observation of the incident at all times.

e.      Must give clear and concise instructions to offender (e.g.; "lay face down on the floor, cross your legs, place your hands behind your back") prior to commencing the extraction process.

f.      Must be sure that participating team members were not directly involved with the original incident precipitating the extraction.

g.      May designate a neutral third party staff member in an attempt to convince said offender to comply with direct orders peacefully before the commencement of the cell extraction.

h.      In the event a third party can persuade the offender to comply, the supervisor/team leader will instruct the offender to lie down face first cross his/her arms behind their back. The order will then be given to cross their legs so that restraints may be applied.

E.      Responsibilities of Team Members

a.      No maneuver utilized by team members will place any pressure on the front of an offender's neck that would result in the compression of the airway.

b.      Shields will be used on the order of the supervisor/team leader.

c.     The following are recommended configurations of 5 (five member) cell extraction teams:

i.     Members will be assigned their positions by the supervisor/team leader.

ii.     An alternate will be assigned to record each member's duties and assignment that corresponds with the helmet/position (letter) or (number).

iii.     The recommended positions and duties of the cell extraction members are:


NOTES:

* The first person restrained should be the first person removed from the cell

* When the transfer/objective has been met, the team shall exit the cell in reverse order


iv.     5 Member Cell Extraction Team:

Pos. #   Duty

1     Pins offender to the wall and takes control of offender's head

2     Pulls legs out from under the offender, then controls left arm

3     Secures right arm and applies handcuffs

4     Secures left leg

5     Secures right leg and applies leg irons


F.     Use of Force: Taser

a.     When considering the deployment of the Taser for cell extraction, the jail staff member who is preparing to deploy shall give the inmate a warning that they are to be tased and an opportunity to comply, unless exigent circumstances exist justifying deployment without a warning.

b.      Jail staff must be aware concerning the ability of the electrical charge to act as an ignition for combustible materials.

c.      Multiple Electronic Control Device deployments against an inmate may increase the likelihood of serious injury where the inmate is suffering from other symptoms such as cocaine intoxication.  Jail personnel shall minimize the number of deployments in a single event.

d.      A contributing factor to serious injury or death is the level of a subject's exhaustion. Studies recommend that when jail staff members believe that control of a subject will be necessary and met with resistance, deployment of the Electronic Control Device should be considered early on in the event so that the person has not reached a level of exhaustion prior to the Electronic Control Device's use.

e.      The preferred targeting is the center mass of the inmate's back, however it is recognized that it is not always possible to get behind the subject.

f.      Where back-targeting is not possible-the secondary area is lower-center mass, chest targeting should be avoided.

g.      Jail staff shall make all reasonable efforts to avoid striking persons in the head, neck, eyes or genitals.

h.      All staff members are prohibited from using the device as a punitive measure.

i.      No more than one officer should deploy an electronic control device against a single individual at the same time.

j.      Jail personnel should consider the particular subject and any vulnerability they may have such as: a person who is small in stature or very frail will be more dramatically impacted; some jails have been criticized as well as sued for use on pregnant women and the elderly.

k.      The use of a Taser on a pregnant female shall be limited to a deadly force circumstance due to the possibility of serious injury or death to the fetus when the female undergoes an uncontrolled fall due to the muscular disruption.

l.      Documentation:

i.      All deployments of an Electronic Control Device shall be documented including those cases where an inmate complies once threatened with such a device.  By documenting the non-discharge uses, the jail establishes jails staff judgment and control as well as the deterrent effect of this tool.

ii.     Photographs of the affected area shall be taken following the removal of darts from the subject to document any injury.  Where the push-stun method has been used, photographs are extremely important due to the increased potential for this method to cause scarring.

iii.    Supervisory personnel shall be notified and review all Electronic Control Device deployment for consistency with policy and training.

iv.     Darts/Cartridges shall be properly stored and maintained as evidence following a discharge.

v.      The officer who deployed the weapon shall complete a use of force report which shall be reviewed by a supervisor following the ECD use.

vi.     All deployments shall be reviewed by the Office as well as training personnel.

vii.    Where there is any indication of lasting injury, claim or complaint internal data from device shall maintained

viii.   All ECD units will be audited monthly to ensure that all deployment/activations have been reported as required.

ix.     Office policy/training must address removal of darts from a person who is brought under control by deployment.  Where there is any difficulty, removal shall conducted by medically trained personnel.  Deployed probes that have been removed from a suspect should be treated as a bio-hazard.

x.      All persons who have been the subject of an Electronic Control Device deployment shall be cleared medically and monitored for a period of time with a focus on symptoms of physical distress.  It should be noted that studies indicate that persons who suffer from excited delirium may not be immediately impacted and the onset of difficulty may occur a period of time after the control event.

xi.     Mandatory Medical Clearance by trained medical staff:

(a)     Persons struck in a sensitive area-eyes, head, genitals, female breasts.

(b)     Where officer cannot safely remove darts in accordance with training.

(c)     Persons who do not appear to have fully recovered after a short period of time.

(d)     Persons who fall into one of the vulnerable classes such as juveniles, pregnant women, persons who are small in stature, persons who officers become aware have a pre-existing medical condition that increases danger and the elderly.

(e)     Persons who have been struck with the probes in the chest.

(f)     Persons who have been subjected to two or more deployments.

(g)     Persons who have been subject to a deployment lasting more than five seconds.

(h)     Subjects who request medical assistance.


G.     Medical Personnel:

a.     Medical Personnel are alerted, when available, in the clinic during cell extractions.

b.     Medical Personnel and the use of Oleoresin Capsicum (OC) or Oleoresin Capsicum (OC) Mixed with Chemical Agents

i.     The team leader/supervisor will ensure offender(s) has/have no medical conditions(s) that would prevent the use of OC and/or chemical agent(s). Where feasible, on site medical staff or EMS should be available during cell extractions

ii.     OC is the first choice of agent for the purpose of cell extractions when efforts to de-escalate the offender/situation prove ineffective. OC mixed with chemical agents may be used in cases where the extracted evidences resistance to OC alone (e.g., offenders who are "under the influence")

iii.     Under no circumstances will an OC container, which contains more than 18.5 ounces of any agent to be used for the purpose of a cell extraction. (These are manufactured for use in large areas and for multiple aggressors.)

iv.     The person administering oleoresin capsicum (OC) or OC mixed with chemical agents' dispersion and certified by the munitions trainer.

v.     Prior to use of OC or OC mixed with chemical agents, approval must be received from the highest-ranking person on site.

vi.     Gas masks are required when OC or OC mixed with chemical agents is used.

vii.     Offender(s) must be warned by the Team Leader that oleoresin capsicum (OC) or OC mixed with chemical agents will be applied

viii.     When OC or OC mixed with chemical agents is applied, team members should not:

(i)     Remove gas masks at any time.

(ii)     Rub skin.

ix.     If following the application of OC, the offender indicates he/she will be compliant and allow restraints to be applied, the Team Leader will instruct the offender to kneel down facing the far wall of the cell, cross his/her ankles, and allow Team members to apply restraints.

x.     After the cell extraction is complete, the offender is moved by a 5-person team.

(i)     COMPLIANT offenders are to be placed in the shower, have their handcuffs removed and be provided with non-oil based soap.  They are to be allowed at a minimum three (3) minutes to decontaminate their faces, hair, chest and arms under cold running water. Restraints will be reapplied after the offender exits the shower.

(ii)     NON-COMPLIANT offenders are to be allowed a minimum of four (4) minutes under cold running water while remaining in restraints.

xi.     As a precaution against positional asphyxiation, a restrained offender will not be left in a prone position alone or for any length of time following the use of OC or OC mixed with chemical agents.

c.     General Information Regarding OC and Chemical Agents

i.     The use of OC and chemical agents may be used to remove an offender from a cell only if the offender is in possession of a weapon, poses a physical threat to Officers or other offenders; is behaving in a manner that is creating a serious disturbance in the housing.  This force will not be used against an offender who is merely noisy or shaking, punching, or kicking the cell door, for example.

ii.     Point of aim for the aerosol delivery system will be the eyes, nose, and mouth whenever possible. "Pepper ball" point of aim will be the chest area.

iii.     Whenever possible, OC, or OC mixed with chemical agents is delivered through the bars or trap and NOT through an open door.

iv.     With a direct contact application, a 1- to 2-second CONTACT ON SKIN/FACE burst is the recommended dosage.

v.     When cell obstructions impair a direct application, the fogging of the area is accomplished by delivering the agent through a trap through the top or bottom of the door utilizing a hose adapter on a hand-held fogger (18.5 OUNCES MAXIMUM CONTENTS) or through the ventilation of the cell. The recommended dosage is a 2- to 5-second burst.

vi.     OC is not to be administered until the Team has arrived at the offender's cell and the Leader has given a final verbal warning to the inmate that OC and the Team will be used.

vii.    Allow sufficient time for the agent to take effect before the Cell Extraction Team enters (recommend 3-5 minutes for maximum effect).

Viii.   Cell Extraction Team members continue to wear gas masks to protect against residual contamination.

ix.     If the facility possesses a gurney or wheelchair stretcher, non-compliant offenders will be placed on the gurney (avoiding the face down position if possible), taking care to prevent the risk of asphyxiation.  Offenders needing to be transported downstairs will be seated and secured in the wheelchair stretcher.  NOTE:  The offender should be allowed to walk after being restrained.  If the offender is cooperative/compliant after being secured/restrained, he/she may walk.

x.      No maneuver, which places any pressure on the front of any offender's neck, resulting in compression of the airway, may be used.

G.      After extraction is complete, Medical Staff or EMS on scene will conduct a complete physical assessment of the offender, record and document all injuries in his/ her medical record and Cell Extraction Package, and provide appropriate treatment or referral for treatment for any injuries.

a.      The Medical Staff or EMS will examine the offender while the offender is still in restraints.

b.      Medical personnel shall always give on-camera briefing; noting any medical problems caused by the extraction requiring further examination or noting none resulted.  Specific medical conditions will not be disclosed on tape.  Medical personnel must follow up with a written report(s) submitted to the supervisor prior to the end of the shift.

c.      In the event of a double-cell extraction, even if the second offender was compliant and not extracted, medical personnel examine both offenders, and examinations are documented in the medical record(s).

d.      All refusals for medical examination/attention must be documented in offender medical records, on video, and in a report submitted by medical personnel to accompany the cell extraction reports.

e.      Constant observation will be maintained by jail staff for the duration of the appearance of the effects of the OC and/or OC mixed with chemical agents.

f.      Any symptoms lasting more than forty-five (45) minutes should be considered adverse and be treated by medical staff.

g.      The team leader will submit to the supervisor the cell extraction Video Narrative report for review prior to being relieved of duty.

h.      All reports must be completed and submitted to the supervisor prior to affected Officers being relieved of duty.

i.      A complete "Cell Extraction Video Narrative" Package includes:

i.      Cell Extraction Video Narrative report.

ii.      Individual team members and witnesses' report;

iii.      Medical report;

iv.      Videotape, labeled and tagged with date, time and inmate's name (s) and identification numbers.

j.      The supervisor will review the reports and video tape. He/she will then complete an administrative review (create a review report/form). This review report and use of force report will be forwarded to the supervisor for review.


H.      Double occupancy provisions

a.      When two (2) Inmates reside in one cell and one is non- hostile to the cell extraction, the non- hostile offender is ordered to move under the bottom bed frame, face his head to the wall and remain there until ordered to move.

b.       The Cell Extraction Team then extracts the non-complying inmate.

c.       The #6 and #7 team member (if present) observe the non-hostile inmate and are prepared to act if non-hostile inmate then becomes hostile.

d.      The complying inmate is ordered out from underneath the bottom bed and allowed to remain in the cell unless a search is utilized and decontamination is necessary. If OC or OC mixed with chemical agents is used, the complying offender will receive a medical evaluation.

e.      In the event both inmates refuse to comply with orders given, the following alternatives are available to extract both inmates:

i.      The use of OC or OC mixed with Chemical agents is authorized for the purpose of gaining a tactical advantage over the non- complying inmates.

ii.      For the double - cell extraction with both inmates hostile, the extraction team consists of six (6) to eight (8) members. The team is divided in two. The Inmate to be extracted by the team subdivisions is pre-determined prior to the extraction.

iii.      Use of OC or OC mixed with chemical agents prior to a cell extraction reduces risk of injury to both staff and inmate(s) being extracted.


I.      Administrative review

a.      All Cell Extraction reports will be reviewed in their entirety (to include review of all reports, Video, and any other applicable documentation or evidence) by the supervisor, Jail Administrator. The review shall address, but not be limited to the following.

i.      Policy violations

ii.      Appropriateness of staff/Inmate interaction

iii.      Appropriateness of staff actions.

iv.      Training needs as they relate to decision-making of the staff involved.

v.      Appropriateness of the level of forced used.

vi.      Necessary recommendations for follow-up action.


Note: In the event that a cell extraction results in serious bodily injury and or death, the Sheriff after investigation will turn over the findings to include video and all reports regarding the incident to the appropriate investigative body.


J.      Disclaimer

a.      In an extended disruption or emergency of normal operations of facility operations, the Sheriff or his designee may suspend provisions or sections of this policy for a specific period of time.

K.      Training

a.      All personnel will receive training prior to being assigned to a position involving the possible use of force.

b.      All Jail staff must receive training in Cell Extractions before they can participate on a Cell Extraction team.

c.      All applicable staff will be required to re-qualify/re-certify in use of force related tactics and equipment in accordance with guidelines established by the Sheriff.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JOHN FAIRCHILD and SUSIE FAIRCHILD, individually, and as Independent Administrators of, and on behalf of, the ESTATE OF KELLI LEANNE PAGE and the heirs-at-law of KELLI LEANNE PAGE, <br> *Plaintiffs,* <br><br> v. <br><br> CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY, and WESLEY HARLAND PELFREY, <br> *Defendants.* | § § § § § § § § § § § § § § | Civil Action No. 6:19-cv-29 |

**DEFENDANT STEVEN RUSSELL LOVELADY'S RESPONSES TO PLAINTIFF'S THIRD SET OF DISCOVEY REQUESTS**

To:    Plaintiffs, by and through their attorney of record, T. Dean Malone, Law Offices of Dean Malone, P.C., 900 Jackson Street, Suite 730, Dallas Texas 75202.

Defendant Steven Russell Lovelady makes these responses to Plaintiff's Third Set of Discovery Requests as required by Federal Rule of Civil Procedure.

**DEFENDANT STEVEN RUSSELL LOVELADY'S RESPONSES TO PLAINTIFF'S INTERROGATORIES**

**Interrogatory No. 9:** Please provide your approximate height and weight as of the date of the Incident.

    **Answer:**    Height: 6'1    Weight: 230 lbs.

---

Respectfully Submitted

J. Eric Magee
SBN: 24007585
e.magee@allison-bass.com
**ALLISON, BASS & MAGEE, L.L.P.**
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
(512) 482-0701 telephone
(512) 480-0902 facsimile

## CERTIFICATE OF SERVICE

    I hereby certify that on the 26th day of July, 2019, I served the foregoing Defendant's Responses to Plaintiff's Third Discovery Requests by email and facsimile to the following:

T. Dean Malone
Michael T. O'Connor
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
dean@deanmalone.com
michael.oconnor@deanmalone.com
*Attorneys for Plaintiff*

Eric A. Johnston
McGinnis Lochridge LLP
600 Congress Ave., Suite 2100
Austin, Texas 78701
ejohnston@mcginnislaw.com
*Attorney for Defendant Coryell County, Texas*

S. Cass Weiland
Robert A. Hawkins
SQUIRE PATTON BOGGS LLP
2000 McKinney Ave., Suite 1700
Dallas, Texas 75201
cass.weiland@squirepb.com
robert.hawkins@squirepb.com
*Attorneys for Defendant Wesley Pelfrey*

J. Eric Magee

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JOHN FAIRCHILD and SUSIE FAIRCHILD, individually, and as Independent Administrators of, and on behalf of the ESTATE OF KELLI LEANNE PAGE and the heirs-at-law of KELLI LEANNE PAGE, | § § § § § § § | NO. 6:19-CV-29 |
| Plaintiffs, | § § | |
| v. | § § | |
| CORYELL COUNTY, TEXAS; STEVEN RUSSELL LOVELADY; and WESLEY HARLAND PELFREY | § § § § | |
| Defendants. | § | |

**DEFENDANT WESLEY PELFREY'S RESPONSES
TO PLAINTIFFS' SECOND SET OF DISCOVERY**

COMES NOW, Wesley Pelfrey ("Defendant" or "Pelfrey") by and through his counsel of record, and submits his Responses to Plaintiffs' Second Set of Discovery.

Respectfully submitted,

*/s/ Robert A. Hawkins*
S. Cass Weiland
State Bar No. 21081300
Robert A. Hawkins
State Bar No. 00796726
SQUIRE PATTON BOGGS LLP
2000 McKinney Ave., Suite 1700
Dallas, Texas 75201
(214) 758-1500
(214) 758-1550 (fax)
cass.weiland@squirepb.com
robert.hawkins@squirepb.com

ATTORNEYS FOR DEFENDANT
WESLEY PELFREY

## CERTIFICATE OF SERVICE

I certify that on July 25, 2019, a true and correct copy of the foregoing was served on counsel of record via electronic mail.

| | |
|---|---|
| Dean Malone, Esq.<br>Law Offices of Dean Malone<br>900 Jackson Street, Suite 730<br>Dallas, TX 75202 | VIA E-MAIL: dean@deanmalone.com |
| Eric A. Johnston, Esq.<br>McGinnis, Lochridge & Kilgore, LLP<br>600 Congress Ave., Suite 2100<br>Austin, TX 78701 | VIA E-MAIL: ejohnston@mcginnislaw.com |
| Eric Magee<br>Allison, Bass & Associates, LLP<br>402 W. 12th St.<br>Austin, TX 78701 | VIA E-MAIL:  e.magee@allison-bass.com |

*/s/ Robert A. Hawkins*
Robert A. Hawkins

**Interrogatory No. 8**:  Please provide your approximate height and weight as of the date of the incident.

    **Response**:     5' 7" approximately 390 lbs.

## VERIFICATION

BEFORE ME, the undersigned notary public, on this day personally appeared Wesley Harlan Pelfrey, who being duly sworn on oath, stated that he has reviewed the responses to the above and foregoing interrogatories, and the facts contained therein are true and correct.

_Wesley Pelfrey_
Wesley Harlan Pelfrey

SUBSCRIBED AND SWORN TO BEFORE me on this 25th day of July 2019 to certify which witness my hand and official seal.

_Bobby Sanders_
Notary Public

[Seal]

> BOBBY SANDERS
> My Notary ID # 124847140
> Expires March 8, 2020

# Exhibit E

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| JOHN FAIRCHILD and SUSIE | § | |
| FAIRCHILD, Individually, | § | |
| and as Independent | § | |
| Administrators of, and on | § | |
| behalf of, the ESTATE OF | § | |
| KELLI LEANNE PAGE and the | § | |
| heirs-at-law of KELLI | § | |
| LEANNE PAGE, | § | CASE NO. 6:19-CV-00029-ADA-JCM |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| VS. | § | |
| | § | |
| CORYELL COUNTY, TEXAS; | § | |
| STEVEN RUSSELL LOVELADY; | § | |
| and WESLEY HARLAND PELFREY, | § | |
| | § | |
| Defendants. | § | |

-------------------------------------------------------------

VIDEOTAPED ORAL DEPOSITION OF

STEVEN RUSSELL LOVELADY

AUGUST 16, 2019

VOLUME 1 OF 1

-------------------------------------------------------------

VIDEOTAPED ORAL DEPOSITION OF STEVEN RUSSELL
LOVELADY, produced as a witness at the instance of the
Plaintiffs and duly sworn, was taken in the above-styled
and numbered cause on the 16th day of August, 2019, from
9:15 a.m. to 2:57 p.m. before Terri L. Edwards, Certified
Shorthand Reporter in and for the State of Texas, reported
by machine shorthand at the Coryell County Attorney's

1 Office, 210 South 7th Street, Gatesville, Texas 76528,
2 pursuant to the Federal Rules of Civil Procedure and the
3 provisions stated on the record or attached hereto.
4                    A P P E A R A N C E S
5 FOR THE PLAINTIFFS:
        MR. T. DEAN MALONE
6       LAW OFFICES OF DEAN MALONE, P.C.
        900 Jackson Street, Suite 700
7       Dallas, Texas 75202
        Telephone: 214.670.9989
8       Fax: 214.670.9904
        Email: dean@deanmalone.com
9
  FOR THE DEFENDANT CORYELL COUNTY, TEXAS:
10      MR. ERIC A. JOHNSTON
        McGINNIS LOCHRIDGE LLP
11      600 Congress Avenue, Suite 2100
        Austin, Texas 78701
12      Telephone: 512.495.6064
        Fax: 512.505.6364
13      Email: ejohnston@mcginnislaw.com
14 FOR THE DEFENDANT STEVEN RUSSELL LOVELADY:
        MR. J. ERIC MAGEE
15      ALLISON, BASS & MAGEE, LLP
        A.O. Watson House
16      402 West 12th Street
        Austin, Texas 78701
17      Telephone: 512.482.0701
        Fax: 512.480.0902
18      Email: e.magee@allison-bass.com
19 FOR THE DEFENDANT WESLEY HARLAND PELFREY:
        MR. S. CASS WEILAND
20      SQUIRE PATTON BOGGS LLP
        2000 McKinney Avenue, Suite 1700
21      Dallas, Texas 75201
        Telephone: 214.758.1504
22      Fax: 214.758.1550
        Email: cass.weiland@squirepb.com
23
  ALSO PRESENT:
24      Wesley Harland Pelfrey
        Kevin Thomas, Videographer
25      Scott Williams

```
                            INDEX
```

                                                    Page

Appearances ........................................   2

STEVEN RUSSELL LOVELADY

        Examination by Mr. Malone .....................   5

        Examination by Mr. Weiland ....................  144

        Examination by Mr. Johnston ...................  159

        Further Examination by Mr. Malone .............  163

        Further Examination by Mr. Weiland ............  171

        Further Examination by Mr. Malone .............  173

Changes and Signature ..............................  174

Court Reporter's Certificate .......................  176

```
                          EXHIBITS
```

NO.  IDENTIFICATION

  1  Coryell County Jail Use of Force Report ........   7

  2  Collection of Documents ........................  106

  3  Jail Policy Coryell County Sheriff's Office

     Use of Restraints Section 28 ...................  159

1          (All parties present have hereby waived the

2          necessity of the reading of the statements

3          by the deposition officer as required by

4          Rule 30(b)(5)

5          THE VIDEOGRAPHER:  Going on the record,

6   Friday, August 16th, 2019, at 9:15 a.m.  Beginning the

7   deposition of Steven Lovelady.  Will Counsel please state

8   their appearances for the record?

9          MR. MALONE:  Dean Malone here on behalf of

10  the Plaintiff.

11         MR. MAGEE:  Eric Magee on behalf of Steven

12  Lovelady.

13         MR. JOHNSTON:  Eric Johnston on behalf of

14  Coryell County, Texas.

15         MR. WEILAND:  Stephen Cass Weiland on behalf

16  of Wes Pelfrey.

17         THE VIDEOGRAPHER:  Will the court reporter

18  please swear in the witness?

19         THE REPORTER:  Mr. Lovelady, if you'll

20  please raise your right hand, I'll swear you in.  Do you

21  solemnly swear or affirm that the testimony you're about to

22  give will be the truth, the whole truth, and nothing but

23  the truth?

24         THE WITNESS:  Yes.

25         THE REPORTER:  Thank you.

1                   STEVEN RUSSELL LOVELADY,

2    having been first duly sworn, testified as follows:

3                        EXAMINATION

4    BY MR. MALONE:

5         Q     Good morning, sir.  How are you?

6         A     Yes, sir, good.

7         Q     My name is Dean Malone, and I represent Susie

8    Fairchild in this case, and she's brought it regarding the

9    death of her daughter Kelli Leanne Page.  Do you understand

10   who I am and who I represent?

11        A     Yes, sir.

12        Q     All right.  You understand who Kelli Leanne Page

13   is?

14        A     Yes, sir.

15        Q     Okay.  Would you give us your full name, please?

16        A     Steven Russell Lovelady.

17        Q     Would you give us just the month and the year of

18   your date of birth, not the actual date.

19        A     Okay.  3-2 --

20        Q     Okay.

21        A     -- '78.

22        Q     '78.

23        A     Yes, sir.  I'm sorry.

24        Q     All right.  Thank you.  That's fine.  What city

25   or town do you currently live in?

1      A    Gatesville.

2      Q    Have you ever given a deposition before?

3      A    No, sir.

4      Q    Okay.  It's not normal conversation, as you'll

5 kind of figure out.  You probably already are.  I'm asking

6 questions, and -- and you're giving answers.

7      A    Yes, sir.

8      Q    And just to make that easier on the court

9 reporter who's to your left, I'm going to try not to ask a

10 question until you've finished an answer.  And if you can

11 do your best to try to not talk until I finish a question.

12      A    Yes, sir.

13      Q    She can't -- in other words, she can't get us at

14 the same time.

15      A    Okay.

16      Q    Also, if I ask you a question and you don't

17 understand it, would you let me know at the time?

18      A    Yes, sir.

19      Q    Okay.  So if you answer a question, can we assume

20 that you understood it?

21      A    Yes, sir.

22      Q    Thank you.  Are there any physical or mental

23 reasons that you believe you cannot testify truthfully and

24 accurately today?

25      A    No.

1    Q    Okay.  You feel good?

2    A    Yes, sir.

3    Q    Feel like you're in your right mind?

4    A    Yes, sir.

5    Q    All right.  I appreciate that.  Okay.  Let's --

6  first off, by the way you and I met for the first time ten

7  minutes ago, I guess.

8    A    Yes, sir.

9    Q    And all it was was pleasantries.  You and I have

10  never talked about this case or anything related to it.

11    A    No.

12    Q    And then right before we went on the record, five

13  or ten minutes before that, I was handed a document by

14  counsel for the county, if I remember correctly.  I'm going

15  to mark that as Exhibit 1.

16              (Exhibit No. 1 marked)

17              And I'm handing that to you, sir.

18    A    Okay.

19    Q    And that's comprised of several pages.  The first

20  page at the top, it says "Coryell County Jail Use of Force

21  Report."

22    A    Yes, sir.

23    Q    Have you seen the documents which are in Exhibit

24  1 before?

25    A    Yes, sir.

1    Q    And let me be clear about one thing.  I don't

2    want to know anything that you talked to your lawyers

3    about.  So some of my questions might seem to get into

4    that, but that's not my intent.  All right?

5    A    All right.

6    Q    Have you seen this document before today?

7    A    Yes, sir.

8    Q    Okay.  And page one, there's some handwriting --

9    And by "page one," I'm talking about the first page of

10   Exhibit 1.  There's some handwriting a little bit above the

11   middle of that page.  It says "Cpl," which I assume means

12   Corporal Lovelady.  You see that?

13   A    Yes, sir.

14   Q    Do you know whose handwriting that is?

15   A    That's mine.

16   Q    And then the second page in Exhibit 1, bottom

17   left-hand corner there's a signature.  Is that your

18   signature?

19   A    Yes, sir.

20   Q    Page three of Exhibit 1, bottom left-hand corner,

21   do you know whose signature that is?

22   A    That would be Mr. Washington's.

23   Q    Okay.  And there's a number next to his

24   signature.  I think that says -- is it 825 or 325 or do you

25   know?

1    A    It says 325.

2    Q    Okay.  What does that refer to?

3    A    His radio number.

4    Q    And what is a radio number at the Coryell County

5    Jail?

6    A    When you call somebody on the radio, instead of

7    using their name, we use the number.

8    Q    And have you seen a number like that used in

9    reports at the Coryell County Jail, also?

10    A    Yes, sir.

11    Q    In lieu of using somebody's name?

12    A    Yes, sir.

13    Q    Okay.  And we'll -- we'll talk more about this

14    later, but you're no longer employed at the Coryell County

15    Jail; is that right?

16    A    Right.

17    Q    When you were employed there, did you ever have

18    more than one radio number?

19    A    Yes.

20    Q    Can you give us a list of the radio numbers you

21    had?

22    A    I had 329 and then 308.

23    Q    Thank you, sir.

24    A    You're welcome.

25    Q    All right.  The next page in Exhibit 1, there's a

1 four in the bottom center. It looks like that's a Cheryl

2 Pruitt, probably her signature, to your knowledge?

3     A    Yes.

4     Q    And who is Ms. Pruitt, or who was she and her

5 rank on October 7 of 2017?

6     A    She was my control officer.

7     Q    And as a control officer, did she have a certain

8 rank?

9     A    No.

10     Q    Were you a corporal at the time?

11     A    Yes, sir.

12     Q    And at that time what ranks were there over at

13 the Coryell County Jail?

14     A    There's the lieutenant, sergeant, corporal, and

15 then COs.

16     Q    The next page, which has a five in the bottom

17 center of Exhibit 1, is a handwritten page. Do you believe

18 that to be handwritten by Kelli Page?

19     A    Yes.

20     Q    And --  Strike that.  The first two pages of

21 Exhibit 1 have some typed remarks, have some "Xs" in

22 certain boxes.  Did you type those remarks and "Xs"?

23     A    Yes.

24     Q    And what software did you use to do that?

25     A    It was just -- I don't know what the name was of

1 it.

2     Q    Just something the jail had for you there?

3     A    Yes.  It's -- it's on the computer, yes.

4     Q    Now, this was a use of force report document.

5 Could you use that same software to do other kinds of

6 reports?

7     A    Yes.

8     Q    What kind of reports could you do?

9     A    Like, shakedowns and stuff like that, shakedown,

10 which means cell searches and stuff.  It was all on

11 computer.

12     Q    Now, when you were at the Coryell County Jail,

13 was a shakedown considered to be an incident of such

14 importance that you would have to do a report on it?

15     A    No.

16     Q    Is that just kind of a normal day-in, day-out --

17     A    Yes, sir.

18     Q    -- thing you do?

19     A    Yes, sir.

20     Q    So when would you actually put a report into --

21 or, rather, use the software to make a report related to a

22 shakedown.

23     A    After you got done doing your job shaking down a

24 dorm.

25     Q    Okay.  Every day you would be doing those

1   reports?

2       A    Yeah, you have to do one once a week.

3       Q    All right.  And everything in pages -- excuse

4   me -- one and two of Exhibit 1, is it accurate?

5       A    Yes, sir.

6       Q    Okay.  And then the next page --

7            MR. MAGEE:  Is this my copy?

8            MR. JOHNSTON:  Yeah, you can have it, yeah.

9       Q    (BY MR. MALONE)  -- which actually has a four

10  the bottom of it and at the top, says "Witness Statement,"

11  and further it says "Statement of Washington, Tyrell 325."

12  Have you ever read that page before?

13      A    Yes, sir.

14      Q    Okay.  Recently?

15      A    Yes, sir.

16      Q    Okay.  And do you agree with everything that

17  Mr. Washington put on that page in his statement?

18      A    Yes, sir.

19      Q    Okay.  The next page in Exhibit 1 also has a four

20  in the bottom center, and it's a statement of Cheryl

21  Pruitt.  Is that how you pronounce her first name, Cheryl?

22      A    Yes.

23      Q    Okay.  Have you read that statement recently?

24      A    Yes, sir.

25      Q    And do you agree with everything that Ms. Pruitt

1   put in that statement?

2       A    Yes.

3       Q    Page -- the next page in Exhibit 1 has a five in

4   the bottom center, and that's a handwritten page by Kelli

5   Page.  Is there anything on that page that you disagree

6   with?

7       A    No, sir.

8       Q    Okay.  The next page in that exhibit has a six in

9   the bottom center, and it's handwritten.  And at least to

10  me, a lot of it is difficult to read, but it looks to me

11  like what's written there is Lovelady and I had a -- an

12  altercation.  I sprayed him cleanser maybe, something like

13  that, plus Tide.  Do you agree or disagree with my --

14      A    I agree --

15      Q    -- interpretation?

16      A    -- yes, sir.

17      Q    All right.  And this -- all of what we've been

18  looking at so far references something that happened on

19  October 7, 2017, between you and Kelli Page, right?

20      A    Right.

21      Q    Now, she said that y'all had an altercation.  And

22  by "y'all," I mean you and Kelli Page.  And by the way,

23  when I say "Ms. Page" during the deposition, I'm going to

24  be referring to the deceased, Kelli Leanne Page.  All

25  right?

1      A      Okay.

2      Q      Do you believe that you and Ms. Page had an

3   altercation on October 7, 2017?

4      A      Yes, sir.

5      Q      How did -- how did that start?

6      A      I was going to pick up the trays after chow.  And

7   I was walking down, and I opened her food slot.  I picked

8   out her tray, went to put on the cart.  I turned -- she

9   sprayed me with whatever that was in there, and then --

10     Q      Okay.  And prior to that happening, had you had

11  any issues between of two of y'all that day?

12     A      No, sir.

13     Q      Just out of the blue, as far as you're concerned?

14     A      Yes, sir.

15             (Sotto voce discussion between Mr. Weiland

16             and Mr. Pelfrey)

17     Q      Do you know how she got the cleaner?

18     A      I mean, they have some stuff in their cells.

19     Q      Was -- the cleaning solution that was in the

20  bottle that she sprayed you with, was that authorized for

21  her to have in her cell?

22     A      It was -- she put down it was Tide.  Yes, she's

23  allowed to have Tide in her -- in her cell.

24     Q      Okay.  And is it your understanding there was

25  something other than Tide in the cleaning solution that she

sprayed you with?

     A     Yes, sir.

     Q     What is your understanding as to what else was in there?

     A     It was just a chemical, from what I understand.

     Q     Okay.  And was she authorized to have that chemical in her cell?

     A     No.

     Q     Why could a prisoner, in your understanding, at the Coryell County Jail have Tide in his or her cell?

     A     To wash clothes.

     Q     And would they wash them in the sink?

     A     Yes.

     Q     Okay.  Do you know or have you heard how the other chemical got into Ms. Page's cell?

     A     No.

     Q     When this happened on October 7, 2017, how many people were on duty at the jail that could actually visually perform checks on people that were in cells?

     A     The day of?

     Q     Yes, sir.

     A     There was four -- or three, sorry.  One's in control, so there was three.

     Q     And by "in control," was that a dispatcher?

     A     No.  That is a opening for -- call on the radio

1  to open cells and stuff, control --

2      Q    Okay.

3      A    Yes, and distribute keys.

4      Q    Is control by the sally port?

5      A    No.

6      Q    So the person in control on October 7, 2017, was

7  he, or her, authorized to go and perform cell checks?

8      A    Can you repeat the question?

9      Q    Yes, sir.  The person that was in control and on

10 duty when this October 7, 2017, incident happened, was he

11 or she authorized to actually authorized to perform cell

12 checks?

13     A    No.

14     Q    Was he or she authorized to go to any particular

15 cell if an incident occurred?

16     A    No.

17     Q    So as of the time of the incident on October 7,

18 2017, it was just you and one other person on duty who

19 could actually go to a cell and respond to an incident?

20     A    Me and two others, yes.

21     Q    Two others?

22     A    Yes.

23     Q    I gotcha.  So there were three people plus the

24 person --

25     A    Right.

1    Q    -- in control?  Who were the other two people?

2    A    It was me and then Pelfrey and Washington that

3  day.

4    Q    All right.  So Mr. Pelfrey, what, if anything,

5  did he do related to the October 17, 2017, incident we've

6  been discussing?

7    A    I'm sorry.  Can you repeat it again?

8    Q    Yes, sir.  You said it was yourself,

9  Mr. Washington, and Mr. Pelfrey that were on duty during

10  the October 7, 2017, incident, at least in the cell area,

11  right?

12    A    Right.

13    Q    Did Mr. Pelfrey help at all after this October 7

14  incident occurred related to the incident itself?

15    A    I think he helped decontaminate her.

16    Q    And after the incident happened, did y'all

17  extract Ms. Page from her cell?

18    A    No.  I mean, we cuffed her, and we walked her

19  out, but we didn't extract her from her cell.

20    Q    All right.  What in your mind is the difference

21  between cuffing and removing someone from a cell and

22  extracting someone from a cell?

23    A    Well, I mean, in segregation you have to have two

24  officers to open the door and take somebody out in

25  handcuffs.

1      Q    Okay.  And you would not term that "extraction,"

2  correct?

3      A    Right.

4      Q    What would you term as being an extraction versus

5  what you just described?

6      A    An extraction to me be would be, you know,

7  getting a team suited up and going in and cuffing her that

8  way and stuff, but, I mean --

9      Q    And before the October 7, 2017, incident had you

10  ever participated in a cell extraction at the Coryell

11  County Jail?

12      A    Before then?

13      Q    Yes, sir.

14      A    Yes.

15      Q    Approximately how many times?

16      A    I can't remember on how many times I done it.  I

17  mean, it's been several years, I mean.

18      Q    More than once, though?

19      A    Yes, sir.

20      Q    As of October -- and we'll go over your

21  employment history in a few minutes.

22      A    Okay.

23      Q    But as of October 7, 2017, about how long had you

24  worked at the Coryell County Jail?

25      A    Fourteen years.

1    Q    And in that 14-year period would you say that you

2  did a cell extraction at least once a year?

3    A    No.

4    Q    In that 14-year period would you say that you had

5  participated in at least five extractions before the

6  October 7, 2017, incident?

7    A    No.

8    Q    Less than five?

9    A    Yes.

10    Q    But more than once?

11    A    Yes, sir.

12    Q    Okay.  Now, when you had participated in those

13  cell extractions the more than once and less than five

14  times in the 14 years or so before October 7, 2017, did you

15  have an understanding as to why the cell extraction had to

16  be done?

17    A    Yes, sir.  I mean, there's -- different

18  situations do different things.

19    Q    Okay.  And what was your understanding as to the

20  cell extractions you can recall occurring during that

21  14-year period as to why they had to happen?

22    A    Can you repeat the question?

23    Q    Yes, sir.  The more than one and less than five

24  cell extractions you recall participating in that 14-year

25  period before October 7, 2017, can you tell us your

1  recollection as to why those cell extractions had to occur?

2       A    I -- I just don't understand --

3       Q    Yes, sir.

4       A    -- what the -- what the question is.

5       Q    Now, when you say "cell extraction," in that

6  14-year period tell us what you mean by that.

7       A    Cell extraction --

8       Q    Yes, sir.

9       A    -- it means that they're -- they're harming

10 themselves or, you know, destroying stuff, causing a

11 disturbance.

12      Q    Anything else?

13      A    No.

14      Q    So what you just told us -- if I understood your

15 testimony correctly, is you told us the reasons that you

16 can recall that those cell extractions had to be done

17 during that 14-year period.

18      A    Yes, sir.

19      Q    Okay.  Now, when you participated in those cell

20 extractions during that 14-year period, how many people

21 would there be for any specific cell enstraction --

22 extraction, excuse me, that would have to go into a cell?

23      A    Five people.

24      Q    Did that ever change over that 14-year period of

25 time?

1    A    No, sir.

2    Q    Did you feel like five people was a -- a good

3  number of people to be able to handle those situations,

4  those extractions?

5    A    Yes, sir.

6    Q    Okay.  And when did you first receive training

7  about how do to a five-person cell extraction?

8    A    I -- it's been a while, I mean.

9    Q    It had happened before October 7 of 2017, I

10  assume.  Am I right?

11    A    Yes, sir.

12    Q    And I would assume it also happened before you

13  actually participated in any of the more than one and less

14  than five cell extractions that occurred in the 14-year

15  period before October 7, 2017, right?

16    A    Yes, sir.

17    Q    When you first began to work at the Coryell

18  County Jail, did you receive some training?

19    A    It was later.

20    Q    About how much later?

21    A    Maybe a couple of years.

22    Q    When you first began to work at the Coryell

23  County Jail, was it TCLEOSE back then that licensed you?

24    A    Yes, sir.

25    Q    And did you work for any period of time at all at

1   the Coryell County Jail without being a licensed jailer?

2       A    No.

3       Q    When you got that training after about two years

4   of beginning your work at the Coryell County Jail, did the

5   training include five-person cell extraction training?

6       A    Yes.

7       Q    And since you first got that training on

8   five-person cell extraction about two years after you began

9   to work for the Coryell County Jail up until the October 7,

10  2017, incident with Ms. Page, do you recall the Coryell

11  County Jail policies changing at all regarding how that

12  five-person cell extraction would occur?

13      A    No, sir.

14      Q    Was that policy in writing that entire period of

15  time to your knowledge and recollection?

16      A    No.

17      Q    Did you say "no"?

18      A    Yes.

19      Q    Okay.  When do you recall that five-person cell

20  extraction policy at the Coryell County Jail first being

21  put into writing?

22      A    Can you repeat the question again?

23      Q    Yes, sir.

24      A    I'm sorry.

25      Q    You told us that the cell extraction policy that

1  you were trained on roughly two years after you began to

2  work at the Coryell County Jail was not always in writing.

3  Did I understand you correctly?

4      A    No, it was in writing.

5      Q    Okay.

6      A    I'm sorry.  I --

7      Q    That's fine.  It's no problem.

8      A    I misunderstood you.

9      Q    So the whole time it was in writing?

10     A    Yes.

11     Q    Okay.  Let's go back to that October 7, 2017,

12 incident.  It was you and Mr. Washington that removed

13 Ms. cell -- excuse me -- Ms. Page from her cell after

14 handcuffing her?

15     A    Yes.

16     Q    Did she willingly leave the cell after being

17 handcuffed?

18     A    Yes.

19     Q    And it was at that time that she was put into a

20 restraint chair?

21     A    Yes.

22     Q    Who made the decision to put Ms. Page into a

23 restraint chair on October 7, 2017?

24     A    It was my decision.

25     Q    In October of 2017 you were a corporal, correct?

1    A    Uh-huh.

2    Q    Is that a "yes," for corporal?

3    A    Yes.  I'm sorry.  Yes.

4    Q    That's okay.  No problem.  So in October of 2017

5  was it your understanding you would have to obtain

6  permission from anybody else working for Coryell County

7  before you decided to put somebody into a restraint chair?

8    A    No.

9    Q    And in October 2017 was it your understanding

10  that you had to get permission from anybody else working

11  for Coryell County before you decided to remove somebody

12  from a cell?

13    A    No.

14    Q    In October 2017 did you have any understanding as

15  to what, if anything, you had to do if you wanted to remove

16  a person from a cell and you believed that a five-person

17  cell extraction was necessary?

18    A    I needed permission to --  Can you repeat the

19  question?

20    Q    Yes, sir.  In October 2017 did you have any

21  understanding as to what you would need to do if in your

22  opinion somebody needed to be extracted from a cell through

23  use of a five-person cell extraction team?

24    A    No.

25    Q    I'm going to ask it a different way just to be

sure we're on the same page here.

    A    Okay.

    Q    If -- in October of 2017 if you wanted to -- to use a five-person cell extraction team to remove somebody from a cell at the Coryell County Jail, what would you do?

    A    Well, I would suit up a team, I mean.

    Q    You could just decide to do that?

    A    Yes, I -- I was supervisor, yes.

    Q    Okay.  And as supervisor who did you supervise?

    A    I had correction -- correctional officers with me.  I mean, I had a regular crew.

    Q    So on October 7, 2017, you've already told us -- and I'm using "Mr." or "Ms." for these people.  I understand --

    A    Okay.

    Q    -- people might be corporals --

    A    Yes.

    Q    -- and all.  And I'm not trying to be disrespectful to anybody.  I just don't want to get it wrong.

    A    Right.

    Q    Okay.  So you had Mr. Washington and Mr. Pelfrey working with you on October 7, 2017.

    A    Yes, sir.

    Q    You supervised both of them.

1   A  Yes, sir.

2   Q  And then you had somebody in control.  Did you

3 supervise that person?

4   A  Yes, I did.

5   Q  Who was that person on October 7?

6   A  In control?

7   Q  Yes, sir.

8   A  It was Cheryl Pruitt.

9   Q  So you supervised everybody at the jail on

10 October 7, 2017?

11   A  Yes, sir.

12   Q  Now, you've already told us you only had three

13 people that could actually go to the cells and one person

14 in control.  If you had decided -- and I know you didn't --

15 but on October 7, 2017, that you needed a five-person cell

16 extraction team to remove Ms. Page from her cell, how could

17 you have done it?

18   A  The thing is we didn't need a five-man team.

19   Q  Okay.

20   A  Because you only need two to go in the seg.

21   Q  But are there not times when you have somebody in

22 seg that you might have the opinion that a five-person cell

23 extraction team is necessary?

24   A  Yes.

25   Q  Because people can be in seg for lots of reasons,

1  right?

2      A    Right.

3      Q    And, in fact, don't you have some folks that are

4  in seg because they're aggressive and want to fight?

5      A    Yes, sir.

6      Q    So you might even be more likely, if you've got

7  somebody in seg, to need a five-person cell extraction team

8  if they're in for that reason?

9      A    Yes.

10     Q    Okay.  And I'm assuming you had people in the

11 jail on October 7, 2017, that were not in seg.

12     A    Some people that weren't in seg?

13     Q    Yes, sir.

14     A    Yes.

15     Q    So you -- you would know day in and day out

16 whether folks are going to act right or not at the jail,

17 right?

18     A    Well, it -- it all depends.  I mean, it -- it's a

19 day-to-day thing.  You don't go in there, you know, knowing

20 that somebody's going to be acting up that day.  It just

21 happens.

22     Q    Okay.  I think we're on the same page.

23     A    Yes, sir.

24     Q    That's kind of what I'm saying.  Right?

25     A    Yes, sir.

1    Q    People are people.  You never know for sure what

2  they're going to do.

3    A    Right.

4    Q    So if you only have three people that can

5  actually go to a cell, for example, on October 7, 2017, and

6  you need to do to a five-man extraction team -- or

7  five-person, excuse me, extraction team, how could you do

8  it if you wanted to?

9    A    We'd have to call somebody in.

10    Q    Okay.  And was policy in Coryell County such that

11  you could call people in to do that?

12    A    Yes.

13    Q    How would you do that?

14    A    I would get on the telephone and ask some people

15  to come in.

16    Q    Okay.  And are there people that are typically on

17  call at the jail?

18    A    No.  I mean, the only people that were on -- on

19  call is the lieutenant and sergeant.

20    Q    So they could -- you could call the two of them

21  then to help with an extraction?

22    A    Yeah, if you need to, yes, sir.

23    Q    All right.  And in October of 2017 about how many

24  employees were there of Coryell County that could actually

25  assist with a five-person cell extraction, if needed?

1    A    I don't -- I don't remember how many we had

2 employed at the time.  I mean, I'm not -- I wasn't in

3 charge of --  Well, I don't -- I don't know.  I don't know

4 how many people were employed at the time.

5    Q    Okay.  In 2017 what is the largest number of

6 people that you worked with at the Coryell County Jail just

7 at one time on one shift that could actually go to cells

8 and interact with prisoners?

9    A    You mean on my shift that day?

10    Q    Yes, sir.

11    A    There was three of us.

12    Q    At --  Well, let me -- let me ask a different

13 question because I'm not sure we're on the same page.  You

14 told us there were three people that could access cells on

15 October 7 --

16    A    Right.

17    Q    -- 2017.  I'm just talking about just in that

18 time period, that year of 2017, what's the most people you

19 ever had on one shift that could actually go to cells by

20 number?  Were there four?

21    A    Probably --

22    Q    Was it --

23    A    Probably about four.

24    Q    Okay.  So do you recall a time in 2017 when you

25 had at least five people on duty at the same time that

1  could go to a cell if a five-person cell extraction were

2  necessary?

3      A    About four.

4      Q    Okay.  And -- and I'm -- what I'm wondering is do

5  you ever recall a time when you had five people on duty

6  that could go to cells in -- in 2017?

7      A    Yes.

8      Q    Okay.  About how many times do you recall that

9  happening where you had five people that could go to cells?

10      A    Pretty often.  I mean, it -- yeah, pretty often.

11      Q    And when you say "pretty often," what do you

12  mean?

13      A    I mean, we were staffed unless, you know,

14  somebody took a day off or something like that, so, I mean,

15  on a normal basis, yes, we'd be staffed.

16      Q    Okay.  Now, I think the evidence is going to show

17  that October 7, 2017, was a Saturday.

18      A    Yes.

19      Q    And you've already told us that y'all had three

20  people, you, Mr. Washington, and Mr. Pelfrey, that were

21  actually available to access the cells, right?

22      A    Right.

23      Q    Was that -- was the reason that there were only

24  three people there because it was a weekend?

25      A    No.

1     Q    Okay.  Was that a normal number of people to

2  staff a Saturday at that time, three?

3     A    No.

4     Q    Okay.  What would've been a normal number?

5     A    Probably about four.

6     Q    So do you think -- or do you even know, was

7  somebody out that day sick or --

8     A    Yes.  We had one -- he was gone to TCLEOSE

9  school.

10     Q    All right.  Now, we both use the term "TCLEOSE."

11  It's now TCOLE, right?

12     A    Right.

13     Q    Okay.  So is it true to say that normally in 2017

14  it's your experience at the Coryell County Jail you would

15  have four to five people on duty that could actually go to

16  cells if there's any issue with a prisoner?

17     A    Yes, sir.

18     Q    Okay.  And if there aren't enough people on duty

19  and you decided to perform a five-person cell extraction,

20  you could call people and -- to come in and -- and help you

21  out?

22     A    Yes, sir.

23     Q    And you knew that.

24     A    Yes, sir.

25     Q    And you didn't think that was an issue having to

1   do that, right?

2        A    Right.

3        Q    Okay.  And in October 2017 you were aware that

4   there was a written policy on use of restraint chairs,

5   right?

6        A    Yes, sir.

7        Q    And do you believe that you applied that

8   appropriately on --  Oh, strike that.  In October 2017 what

9   was your understanding as to when you were allowed by

10  Coryell County policy to use a restraint chair?

11       A    Can you repeat the question again?  I'm sorry.

12       Q    No, no problem at all.  In October -- let's just

13  say on October 7, 2017, what was your understanding as to

14  Coryell County policy as to when you could use a restraint

15  chair?

16       A    Whenever an inmate or whoever, you know, is

17  trying to destroy something, you know, trying to harm

18  themselves, like banging on a wall or on the door.  We put

19  them in there for the safety of them and the safety of the

20  jail.

21       Q    Okay.  And why did y'all decide -- or, actually,

22  why did you decide to put Ms. Page into a restraint chair

23  on October 7, 2017?

24       A    Because she was -- she was -- what's the word? --

25  for the safety of herself and safety of staff.

1    Q    Can you be more specific?  What -- what concerns

2  did you have about her safety?  Let's start there, I guess.

3    A    Well, I mean, she was -- she had thrown that

4  liquid on me, and she was just -- just for her safety so

5  she wouldn't do it again.

6    Q    Was it for punishment for --

7    A    No.

8    Q    -- what she had done?

9    A    No.

10   Q    Okay.  Were you angry at her at that point?

11   A    No.

12   Q    Before October 7 of 2017 had you had issues with

13  her, you know, between the two of y'all?

14   A    No.

15   Q    Have you ever seen a document or statement that

16  Ms. Page indicated that you think you're God?  Ever see

17  that?

18   A    Yes.  I think it's one of the use of force --

19   Q    Do you have --

20   A    -- paperwork.

21   Q    Do you have any opinion as to why she would say

22  something like that?

23   A    No.

24   Q    So it's your testimony that before she sprayed

25  you with the liquid on October 7, 2017, you and she never

1   had any issues at all with each other?

2       A    No, sir.

3       Q    That was just completely out of the blue?

4       A    Yes, sir.

5       Q    Before October 7, 2017 --  Well, strike that.

6   Now, Ms. Page had been in the Coryell County Jail for some

7   period of time before October 7, 2017, right?

8       A    I believe so, yes, sir.

9       Q    And had she been transferred out of Coryell

10  County and transferred back due to population issues in

11  Coryell County?

12      A    I believe she was.

13      Q    That -- that incarceration, whenever it began,

14  was that the first time that you had interaction with

15  Ms. Page?

16      A    What do mean by "interaction"?

17      Q    Did you know her before that?

18      A    I believe she'd came to jail before.

19      Q    Okay.

20      A    Yes.

21      Q    And, once again, you've already told us even when

22  she came to jail before you and she never had any personal

23  problems at all with each other.

24      A    No, sir.

25      Q    As far as you're concerned, the first time there

was ever any personal issue between the two of y'all was

when she sprayed that -- that solution on you.

    A    Yes, sir.

    Q    And I'm assuming you weren't afraid her.  Right?

    A    No, sir.

    Q    Am I right in what I said?  You weren't afraid of

her?

    A    No.

    Q    Okay.  And when you say Mr. Pelfrey helped with

decam -- decontamination, what do you mean?

    A    We had to get the OC spray off of her.

    Q    On -- and we're talking October 7 of 2017, right?

    A    Yes, sir.

    Q    And was it you that had used the OC spray?

    A    Yes, sir.

    Q    Why did you choose to use that?

    A    Well, she wasn't complying with the orders being

given.

    Q    And how did you use it?  Did you spray it through

the food slot or --

    A    Yes, sir.

    Q    Okay.  Was that, in your understanding,

authorized by Coryell County policy?

    A    Yes, sir.

    Q    And what was your understanding as to when

1  Coryell County policy would allow you to spray OC spray

2  through a food slot in a cell door?

3      A    Can you repeat it again?

4      Q    Yes, sir.  In October of 2017 what was your

5  understanding as to when Coryell County policy would allow

6  you to spray OC spray through a food slot in a cell door?

7      A    Whenever they're being noncompliant.  I mean, you

8  give them orders and after the third orders, you're -- use

9  a chemical agent.

10     Q    Okay.  And was there more than one chemical agent

11 available for your use at the time?

12     A    What do you mean by that?

13     Q    Yeah.  We -- so we talked about OC spray.  Are

14 there not other chemicals that can be sprayed in -- into a

15 cell to gain compliance or for whatever reason you might do

16 it?

17     A    You mean there -- if there was more than one?

18     Q    Yes.  In other words, you've got OC spray.  Do

19 you have any other options?  Anything else you can spray in

20 there, or is OC spray it?

21     A    OC spray, yes.

22     Q    Okay.  And just for people that don't know what

23 that is, is there common terminology for what OC is?

24     A    Chemical agent.

25     Q    All right.  Do you call it -- you ever call it,

1  like, pepper spray, or is that something different in your

2  mind?

3      A     It's the same thing.

4      Q     Okay.

5      A     Yes, sir.

6      Q     So after Ms. Page was removed from the cell on

7  October 7, 2017, she was put into the restraint chair.  Do

8  you recall how long she was in the chair?

9      A     No, sir, I don't.

10     Q     Who decided when she could be removed from the

11 restraint chair?

12     A     Who decides that?

13     Q     Yes, sir.  On that day who decided it?

14     A     It's been two years.  I -- I think the lieutenant

15 let her go back to her cell.

16     Q     Was the lieutenant on duty during the incident

17 with Ms. Page on October 7?

18     A     No, she was not.

19     Q     Did she get called in --

20     A     Yes.

21     Q     -- as a result of it?

22     A     I believe so, yes, sir.

23     Q     And -- and you said it's been two years.  Just so

24 we have our -- our record clear, we're sitting here today

25 in Coryell County on August 16, 2019, right?

1       A     Right.

2       Q     So Ms. Page goes to the hospital for medical

3 treatment on October 7, 2017, right?

4       A     Right.

5       Q     During the time you interacted with her

6 physically in cell her head contacted the wall and she got

7 a bump on her forehead, right?

8       A     Yes, sir.

9       Q     And that's why she went to the hospital --

10       A     Yes, sir.

11       Q     -- to your knowledge?  Then she comes back to the

12 Coryell County Jail and is incarcerated again.  Same cell

13 when she comes back?

14       A     No.  They moved her to a different cell.

15       Q     Do you know why?

16       A     Because they were still cleaning out the other

17 cell she was in.

18       Q     Both of those cells, though, were seg cells,

19 right?

20       A     Yes, sir.

21       Q     "Seg" meaning segregation?

22       A     Yes, sir.

23       Q     She was segregated from other prisoners or

24 inmates at the -- at the jail.

25       A     Yes, sir.

1    Q    The cell that she was moved to when she came back

2    from the hospital on October 7, 2017, is that the cell that

3    she actually died in the next day?

4    A    Yes, sir.

5    Q    That cell, is it adjacent to other cells?  In

6    other words, is it next to other cells?

7    A    Yes, sir.

8    Q    And is there a hallway --

9    A    Yes, sir.

10   Q    -- for all those cells?  So if you were standing

11   in Ms. Page's cell on October 8, 2017, and looking out,

12   would there be a wall on the other side, or would there be

13   another cell?

14   A    There'd be another cell.

15   Q    Okay.  And then how many cells were there on that

16   hallway?

17   A    Four.

18   Q    Two on each side?

19   A    Yes, sir.

20   Q    And then all the way at the end of the hallway

21   was it just a wall?

22   A    All the way down -- I mean, what -- what do you

23   mean?  If you --

24   Q    Yes, sir.

25   A    -- walk out of her cell and go down the hall?

1    Q    Good question.  So if you would've walked out of

2    her cell and made a left, you would see another cell to

3    your left, correct?

4    A    No.  You would turn, and then the library is

5    right there.

6    Q    Okay.  And if you would go out of her cell and

7    look straight ahead, you'd see another cell in front you?

8    A    Yes, sir.

9    Q    And then if you look a little more to your left,

10   would you see another cell opposite Ms. Page's cell?

11   A    No.

12   Q    Okay.  But if you were to look to your right,

13   you'd see another cell?

14   A    You'd see the two on the hallway, yes, sir --

15   Q    Okay.

16   A    -- and then --

17   Q    So if you're facing out of Ms. Page's cell on

18   October 8, 2017, to your right kind of over your shoulder

19   would be the cell that's adjacent to hers, correct?

20   A    If I'm looking out and I look right, yes, there

21   would be another cell next door.

22   Q    All right.  Those four cells --  Excuse me.

23   Those -- the three cells other than Ms. Page's on

24   October 8, 2017, at the time of the incident that we

25   haven't talked about yet in which she -- she passed away,

1    were there people in those other cells, prisoners --

2         A    I --

3         Q    -- those other three?

4         A    I believe there was two -- two.  I think two.

5         Q    Do you recall who they were?

6         A    No, sir, I don't remember.

7         Q    Could males be kept in that section even if

8    there's a female in a cell?

9         A    Yes, sir.

10        Q    Okay.  You still good to keep going?  I didn't

11   tell you.  If you ever need a break, if there's not a

12   pending question, you know, we're happy --  It's not a

13   marathon.

14        A    I would like to take a break.

15        Q    You would?

16        A    Yes, sir.

17             MR. MALONE:  All right.  Let's do it.

18             THE VIDEOGRAPHER:  Off the record at 9:50.

19             (Recess from 9:50 a.m. to 10:12 a.m.)

20             On the record at 10:12.

21        Q    (BY MR. MALONE)  All right, sir.  Are you ready

22   to continue?

23        A    Yes, sir.

24        Q    Okay.  I'd like to go through -- briefly through

25   your educational background, if we could.  Did you graduate

1   high school?

2        A    Yes, sir.

3        Q    Which high school?

4        A    Lampasas.

5        Q    And what year was that?

6        A    '97.

7        Q    And after that did you attend any colleges, trade

8   schools, universities?

9        A    No, sir.

10       Q    Okay.  Other than training that you have received

11  to perform duties that you performed for Coryell County

12  when you worked at the jail, such as, you know, TCOLE- or

13  TCLEOSE-reported training, have you had any additional

14  education after high school?

15       A    Can you repeat it?  I --

16       Q    Yes, sir, no problem at all.  So the training

17  that you've received -- training and education so that you

18  could perform duties at the Coryell County Jail, as far as

19  you know was all that training reported to either TCLEOSE

20  or TCOLE?

21       A    Right.

22       Q    Okay.  Other than all that training and other

23  than high school, have you had any other classes,

24  education, anything like that?

25       A    No.

1     Q     Okay.  And you kind of hesitated a bit.  Is there

2     something you're thinking about?

3     A     No.  I -- I -- no, I -- I haven't had no other

4     education.

5     Q     Okay.  Ever taken any online classes that's

6     unrelated to your work at the jail?

7     A     No, no.

8     Q     Okay.  Let's go through your work history, if we

9     could, please.

10    A     Uh-huh.

11    Q     You graduated high school in '97.  What was your

12    first job after that?

13    A     It was Sure Cast.  It was pouring liquid metal

14    and stuff.

15    Q     What -- what's the name of the company?

16    A     Sure Cast.

17    Q     S-u-r-e Cast?

18    A     Yes, sir.

19    Q     All right.  Pouring liquid metal?

20    A     Yes, sir.

21    Q     How long did you work -- work there?

22    A     Maybe three or four years.

23    Q     And did you start in '97 or so?

24    A     Yes.  It was right after high school.

25    Q     So maybe 2000, 2001 maybe?

1    A    Probably about 2000.

2    Q    Okay.  And what was your next employment

3  position?

4    A    Bartlett State Jail.

5    Q    Bartlett?

6    A    Yes.

7    Q    Okay.  And at the time was Bartlett State Jail

8  run by TDCJ, or was it a private company?

9    A    Yeah, it was a private company, CCA.

10    Q    CCA?  Do you know if CCA still runs it?

11    A    No.  They closed down.

12    Q    Okay.  And then did you work there from year

13  2000?

14    A    Yes.

15    Q    Until about when?

16    A    Till about 2004, and then I went over to T. Don

17  Hutto.

18    Q    And was T. Don Hutto run by TDCJ or private?

19    A    The same company, CCA.

20    Q    And you worked there from 2004 till about when?

21    A    It was about a year or so.  It was about two

22  thousand --  What was the date on that?

23    Q    Yeah.  You said -- you said you ended that around

24  2004 at Bartlett.

25    A    Yeah.  No.  That wasn't right.  It was -- I

1  stayed at Bartlett until about 2002 because I came to the

2  sheriff's office in 2004.

3      Q    But then you had T. Don Hutto in the middle.

4      A    Yes, sir.

5      Q    Hutto, right?

6      A    Yes, sir.

7      Q    How long were you there?

8      A    Probably about six months because they were

9  changing -- changing inmates.  Or they were short on

10  inmates -- sorry -- and they were transferring people out

11  to -- and I went back to Bartlett for about a year, and

12  then that's when I went to the sheriff's office.

13      Q    So for sure you went to the sheriff's office in

14  Coryell County 2004?

15      A    Yes.  It was May 2nd.

16      Q    And what date did your employment end there?  You

17  don't have to be exact.  Do you remember the approximate

18  month and year?

19      A    Yeah.  It was in December.

20      Q    Okay.  Of '18?

21      A    No, seven -- no, '17.

22      Q    '17.

23      A    Yes, sir.

24      Q    Okay.  So kind of working backwards, after Sure

25  Cast you went to Bartlett State Jail --

1    A    Uh-huh.

2    Q    -- then to T. Don Hutto and then back to

3  Bartlett.

4    A    Yes, sir.

5    Q    And you think you were at T. Don Hutto about six

6  months?

7    A    Yes, sir.

8    Q    And the last time you were at Bartlett, did you

9  say about a year?

10    A    If that, because -- I think so, yes, sir.

11    Q    And were you working for CCA the whole time from

12  when you started working at Bartlett State Jail until you

13  finished working at Bartlett the second time?

14    A    Yes, sir.

15    Q    And were you just being assigned to those

16  different facilities, or did you have to reapply every time

17  you went somewhere else?

18    A    No.  If you wanted to transfer, you could

19  transfer.

20    Q    Okay.  Was that Correctional Corporation of

21  America?

22    A    Yes, sir.

23    Q    Okay.  Do you know if that's still the name?

24    A    Yes.

25    Q    Okay.  Why did you end your employment at Sure

1  Cast?

2      A    I was going to go work for Bartlett.

3      Q    Okay.  Did you resign?

4      A    Yeah.  I put in my notice.

5      Q    Okay.  And then why did you leave, ultimately,

6  your employment with CCA over at Bartlett the second time?

7      A    I got the job at Coryell County.

8      Q    You consider that to be a better position?

9      A    Yes, sir.

10      Q    Okay.  And so did you resign your position at

11  Bartlett?

12      A    Yes.

13      Q    And since you left your employment at Coryell

14  County at the sheriff's office in December of 2017, have

15  you been working?

16      A    Yes.

17      Q    Okay.  And let's pick it up there.  What was your

18  next employment position?

19      A    The school.

20      Q    Okay.  Which school?

21      A    Junior high.

22      Q    Okay.

23      A    Gatesville.

24      Q    Gatesville Junior High.  What are you doing

25  there?

1      A    Custodial.

2      Q    And when did you start?

3      A    Last -- March of '18.

4      Q    And you're still employed the whole time --

5      A    Yes, sir.

6      Q    -- until we're sitting here in August of 2019?

7      A    Yes, sir.

8      Q    All right.  Do you like that work?

9      A    Yes, sir.

10     Q    Okay.  And why did you leave your employment with

11 Coryell County?  Were you terminated or did you resign?

12     A    I resigned.

13     Q    Okay.  Were you offered to resign in lieu of

14 termination?

15     A    No.

16     Q    It was just solely your decision?

17     A    Yes, sir.

18     Q    Okay.  And why did you choose to resign?

19     A    I just didn't want to do it anymore.

20     Q    And what was it about the work that made you not

21 want to do it anymore?

22     A    It's stressful work.

23     Q    Yeah.  So you'd been there about thirteen and a

24 half years, I guess, if I did my math right.

25     A    Thirteen and fourteen years, yes.

1  Q   Okay.  And was there any point in time during

2  that period where you had started thinking about resigning

3  because you didn't want to do that work anymore?

4  A   Yeah.  It was -- yeah, I thought about it a

5  couple of times, but, you know, when you have a family and

6  stuff to support --

7  Q   Yeah.  So what was it that just kind of brought

8  you to the point where you decided to -- to quit?

9  A   Just decided.  Me and my wife talked about it,

10  and I resigned.

11  Q   All right.  And -- and I don't want to know

12  anything you and your wife talked about.  That's kind of

13  protected just like --

14  A   Yes, sir.

15  Q   -- attorney-client stuff.  So did your

16  resignation have anything to do with the death of Ms. Page?

17  A   No.

18  Q   Did you feel bad about her death, though, when it

19  happened?

20  A   Yeah.

21  Q   Now, if I understand you correctly, you quit

22  Coryell County before you had another job, right?

23  A   Right.

24  Q   You know, I think we all hear usually from

25  parents and stuff when we're young, hey, don't ever quit

1    the first job till you've got the second one.  Right?

2        A    Yes, sir.

3        Q    Was that a concern for you with a family, to quit

4    without having another job?

5        A    No.  I had my retirement.

6        Q    All right.  Okay.  Have we covered all of your

7    employment history since high school?

8        A    Yes, sir.

9        Q    All right.  I've got some questions I ask

10   everybody, so don't take offense at any of them.  Have you

11   ever been convicted of a crime other than a minor traffic

12   offense?

13       A    No.

14       Q    Okay.  Have you ever been in the military?

15       A    No.

16       Q    Other than in this case, have you ever been a

17   plaintiff or defendant in a lawsuit?

18       A    No.

19       Q    In other words, have you ever brought one or --

20   This is it.  Okay.  All right.  I want to talk a little bit

21   about the October 8, 2017, incident.  That's the use of

22   force incident in which you and Mr. Pelfrey had entered

23   Ms. Page's cell and at the conclusion of which she was

24   deceased.  All right?

25       A    Yes, sir.

1    Q    And whenever I say "the October 8 incident,"

2    that's what I'm going to be talking about.  So at the time

3    that you had to enter the cell or chose to enter the cell

4    on that date, do you believe that you had been sufficiently

5    trained to know how to deal with Ms. Page in that

6    situation?

7    A    Yes.

8    Q    And at the time you chose to enter the cell on

9    October 8, 2017, do you believe that Coryell County had in

10   place sufficient policies for you to be able to understand

11   what you needed to do?

12   A    Yes, sir.

13   Q    And at the time you chose to enter Ms. Page's

14   cell on October 8, 2017, did you feel like you had

15   sufficient options available to you to do anything you felt

16   you needed to do regarding Ms. Page, as far as personnel,

17   material, things like that?

18   A    Can you repeat that question, sir?

19   Q    Yes, sir.  When you decided to enter Ms. Page's

20   cell on October 8, 2017, did you feel like you had

21   sufficient personnel available to you to handle any

22   situation you might encounter?

23   A    Yes.

24   Q    And we've already established that if you chose

25   to do a five-person extraction team on that date, you

1  could've called other people in, right?

2      A    Yes.

3      Q    Now, at the time that you and, ultimately,

4  Mr. Pelfrey entered the cell on October 8, 2017 --  I'll

5  strike that.  I don't think we've talked about who was on

6  duty at that time.  So at the time that you entered

7  Ms. Page's cell at the beginning of the incident on

8  October 8, 2017, how many people were on duty, total, at

9  the Coryell County Jail?

10     A    How many people were on duty in the jail?

11     Q    Yes, sir.

12     A    There was three on the floor and one in the

13  control.

14     Q    Just like the day before?

15     A    Yes.

16     Q    And October 8, 2017, was a Sunday.  Is that your

17  recollection?

18     A    I'm sorry.  On that last question --

19     Q    Yes, sir.

20     A    -- you're talking about October 8th.

21     Q    Yes.

22     A    I'm sorry.  There was only three of us on shift

23  that day.

24     Q    Two on the floor and one on control?

25     A    Yes.

1     Q   And the only two -- did you say on shift?  Is

2  that what you said?  Or did I hear --

3     A   There was three on shift.

4     Q   Three on --

5     A   Yes.

6     Q   -- shift.

7     A   Yes, sir.

8     Q   Two on the floor, one --

9     A   Yes, sir.

10     Q   -- on control.  And that was you and Mr. Pelfrey?

11     A   Yes.

12     Q   Do you remember how many inmates there were at

13  the jail at that time approximately?

14     A   No, sir.

15     Q   What was capacity at the time?

16     A   Probably in the eighties.

17     Q   And by "capacity," do you understand that to mean

18  what the Texas Commission on Law Enforcement -- excuse

19  me --

20             MR. JOHNSTON:  Jail standards.

21     Q   (BY MR. MALONE)  -- yeah -- Texas Commission on

22  Jail Standards would allow?

23     A   Yes, sir.

24     Q   Okay.  Are there more -- is there a certain

25  percentage of the total number of capacity that you can't

1 exceed based on TDCJ standards?

2   A You can't have no less than three.

3   Q I say "TDCJ," Texas Commission on Jail Standards.

4 Okay.  And I'm --  Oh, strike that.  That's all right.

5 Okay.  So before you enter the cell at the beginning of the

6 incident on -- on October 8, 2017, had you had

7 communications with Ms. Page that -- that day?

8   A Yes.

9   Q About how many times had you actually spoken to

10 her?

11   A I believe that was once or twice.

12   Q Let's go back to the first time that you recall.

13 What was the reason that you had to talk to her?

14   A The first reason is because she was striking a

15 the door with a hairbrush.

16   Q Okay.  And before you actually went up and spoke

17 with her, how many times had she struck the door with a

18 hairbrush approximately?

19   A It was several times.

20   Q Three or more?

21   A Probably, yes, sir.

22   Q More than five?

23   A Yes.

24   Q More than ten?

25   A No.  I don't believe it wasn't more than ten.

1    Q   Okay.  And when you're giving us a number, is --

2  is that, like, all -- at the same time, like, (indicating)?

3  Or are these different times that that happened?

4    A   It was -- sometimes it would be all at once, and

5  then she quit and then do it again.

6    Q   Okay.  Do you remember approximately what time

7  you entered the cell at the beginning of the incident?

8    A   No, sir.

9    Q   Do you remember, was it morning, afternoon,

10  evening?

11    A   It was -- it was in the morning.

12    Q   Do you remember early morning, midmorning, late

13  morning?

14    A   It was eight --  Well, I think it was -- I think

15  it was right after we started shift.

16    Q   And what time did you start shift then?

17    A   7:00.

18    Q   In the morning --

19    A   Yes.

20    Q   -- a.m.?  So from the time you started shift

21  until the time you entered Ms. Page's cell on October 8 at

22  the beginning of the incident, she had hit the cell door

23  with a hairbrush enough times that you believed it was

24  necessary to enter the cell?

25    A   Yes.

1    Q    Why?

2    A    Because she can hit it, keep hitting it, and the

3    door could open up un-alignment.  It was an alignment

4    thing.  And I don't want her to open it up and come out in

5    the hallway.

6    Q    So on October 8, 2017, the doors at the Coryell

7    County Jail were such that they could be opened by hitting

8    them with a hairbrush?

9    A    And use kind of force, you kick it or hit it with

10   your foot or with your -- with an object, keep banging on

11   it, it could un-align the door.

12   Q    Had you seen that happen before?

13   A    Once before, yes?

14   Q    Okay.  And was that a male or a female that did

15   it?

16   A    It was a male.

17   Q    How did -- how did he get it out of alignment?

18   A    By striking the door.

19   Q    With what?

20   A    With his fist.

21   Q    Okay.  Have you ever seen any of the video of

22   Ms. Page in her cell either during the October 8, 2017,

23   incident or before that incident after she woke up that

24   day?

25   A    Yes, sir.

1    Q    Have you seen all of that from the time that she

2    woke up until the time that her body was removed from the

3    cell?

4    A    Yes, sir.

5    Q    And have you ever for yourself tried to figure

6    out, first off, whether you saw her striking the cell door

7    with a brush?

8    A    There's several times that she struck the door.

9    Q    Okay.  And you saw that on that video --

10   A    Yes, sir.

11   Q    -- we just described?  How many times do you

12   think you've actually watched that video?

13   A    Probably about three or four times.

14   Q    All right.  Now, the view that we see of the

15   inside of her cell, do you know whether the person in

16   control could see what's going on inside the cell?

17   A    Yes.

18   Q    Is there a cam -- a screen, rather, up there?

19   A    Yes, sir.

20   Q    And who was the person in control on October 8,

21   2017?

22   A    Cheryl Pruitt.

23   Q    All right.  So all the folks that were on duty on

24   October 8, 2017, were the same folks that were on duty on

25   October 7, 2017, with the exception of Mr. Washington?

1      A      Right.

2      Q      And do you know whether he was scheduled to work

3  on October 8th?

4      A      Mr. Washington?

5      Q      Yes, sir.

6      A      Yes, sir.

7      Q      Did -- was he sick or --

8      A      No.  He was at the hospital with another inmate.

9      Q      With what?  I'm sorry.

10     A      With another inmate.

11     Q      I'm sorry.  One more time.

12     A      He was there with another inmate.

13     Q      Okay.  And do you know what caused the other

14 inmate to have to go to the hospital?

15     A      I don't recollect, no, sir.

16     Q      All right.  So you told us that you spoke with

17 Ms. Page once or twice, based on your recollection, on

18 October 8, 2017.  And I think you said the first time you

19 talked to her was because she was banging the hairbrush.

20     A      Yes, sir.

21     Q      What did you tell her?

22     A      To stop.

23     Q      What did she say?

24     A      She told -- told me no.

25     Q      Did she tell you why?

1          A      No, no, sir.

2          Q      So how long did you actually talk with her at

3   that point?

4          A      A few minutes.

5          Q      Can you give us maybe an estimate?  Is it a

6   couple of minutes?  And by "a couple," I mean two.

7          A      Probably a couple minutes, yes.

8          Q      Okay.  And are you doing that through the -- the

9   door?

10         A      The door, yes, sir.

11         Q      And is there a -- just a window on the door?

12         A      Yes.

13         Q      And is it -- is it open, or is there glass there?

14         A      There's glass there.

15         Q      So you have to talk louder than normal to be

16   heard through it?

17         A      Yeah.

18         Q      Okay.

19         A      Yes, sir.

20         Q      Okay.  So you'd have to talk like this maybe so I

21   could hear you on the other side, something like that?

22         A      Probably not that loud.

23         Q      Okay.

24         A      But, you know --

25         Q      All right.  But there's not -- I mean, it's a

1  solid door with a piece of glass, and you're --

2      A    Uh-huh.

3      Q    You can see her on the other side, and you're

4  having to talk through the glass --

5      A    Right.

6      Q    -- essentially.  And then at -- at the bottom of

7  the door is there any gap at all between the door and the

8  floor, or it fairly tight when you close it?

9      A    There's a little gap.  I mean not a huge gap.

10      Q    All right.  So you -- you tell her, hey, you need

11  to stop hitting the door with the hairbrush, and she says

12  no.  That conversation ends, right?

13      A    Yes, sir.

14      Q    You walk away and do what?

15      A    Go back to booking.

16      Q    Okay.  So before you had that first conversation,

17  were you in booking?

18      A    Yes.

19      Q    Were you booking in somebody?

20      A    No.

21      Q    Were you just doing paperwork --

22      A    Yes, sir.

23      Q    -- or whatever?  And do you recall how soon after

24  your shift started it was that that conversation took

25  place?

1     A     Maybe 30 to -- 30 minutes to an hour.

2     Q     Okay.  Is there anything else that you said or

3 that Ms. Page said during that first conversation that you

4 can recall that you haven't already told us about?

5     A     Can you repeat that again?

6     Q     Yes, sir.  That first conversation you described

7 to us that you remember, is there anything else that you

8 said to Ms. Page or that Ms. Page said to you during that

9 conversation that you can remember?

10    A     No.

11    Q     You've told us everything you can remember about

12 that?

13    A     Yes, sir.

14    Q     Okay.  And you said once or twice.  Do you recall

15 another conversation on October 8, 2017, with Ms. Page

16 before you entered into the cell?

17    A     Yes.  I had one other conversation with her to

18 quit banging.

19    Q     Okay.  Same --

20    A     Yes, the same --

21    Q     -- situation?

22    A     -- conversation.

23    Q     Same response?

24    A     Yes, sir.

25    Q     Is there anything different that either you said

1  or she said during that second conversation other than what

2  you've already told us?

3      A    No.

4      Q    How long did that one last?

5      A    About the same.

6      Q    Okay.  And then how long was it --  Well, strike

7  that.  After that second conversation did you make any

8  decision about going into the cell?

9      A    We were -- we were trying not -- trying not to go

10  in the cell.  We -- you know, we were talk -- trying to

11  talk her down, you know, try to talk her out of it about

12  her banging and everything else.

13      Q    And when you say "we were trying to talk her out

14  of it," who do you mean?

15      A    Me and Mr. Pelfrey.

16      Q    Okay.  So was Mr. Pelfrey present for the first

17  conversation that you described?

18      A    I don't remember.

19      Q    Okay.  But the second conversation you described,

20  Mr. Pelfrey was with you?

21      A    He might've been, yes, sir.

22      Q    But at some point that morning you recall you and

23  Mr. Pelfrey being at the door trying to tell Ms. Page to

24  stop banging on the door --

25      A    Right.

1    Q    -- with the brush?

2    A    Yes.

3    Q    And do you know if that was a third conversation,

4  or do you not really recall whether that was maybe the

5  second conversation when Mr. Pelfrey was there?

6    A    That -- I can't recall on that.

7    Q    And do you know on the morning of October 8,

8  2017, before you finally entered Ms. Page's cell whether

9  Mr. Pelfrey had had a conversation with Ms. Page by himself

10  without you present?

11    A    Repeat the question for me.

12    Q    Yes, sir.  Other than the conversations you've

13  described to us on the morning of October 8 with

14  Ms. Page --

15    A    Uh-huh.

16    Q    -- do you know whether Mr. Pelfrey had his own

17  conversation with her with you not present?

18    A    I believe he did.

19    Q    And why do you believe that?

20    A    Because he -- he talked to her several times.

21    Q    Okay.  He told you he did that?

22    A    Yes.

23    Q    Is that how you know that?

24    A    Yes, sir.

25    Q    Okay.  You didn't personally -- personally

observe him doing that.  Am I right?

    A    I saw him down there, yes.

    Q    Okay.  So who was it that made the decision to
enter Ms. Page's cell at the beginning of the incident on
October 8?

    A    It was my decision.

    Q    And what did you do when you finally made the
decision to enter the cell?  What's the first thing you
did?

    A    We went and got the restraint chair and brought
it down there, and then I opened up the food slot and asked
her to turn around and put her hands behind her back.

    Q    Okay.  And what did she say?

    A    She said she wasn't going to do it.

    Q    Okay.  What happened next?

    A    I gave her several more commands to put her hands
through the food slot to be cuffed and she refused.

    Q    And your understanding was telling an inmate to
put her hands through the food slot to be cuffed normal
Coryell County procedure?

    A    Yes, sir.

    Q    Okay.  And so she refused.  What's the next thing
that happened?

    A    I warned her that she was going to be sprayed
with pepper spray.

1  Q    Okay.  What did she say, if anything?

2  A    She just looked at me.

3  Q    Okay.  And then what happened?

4  A    And then I sprayed her with pepper spray.

5  Q    OC spray, right?

6  A    Yes, sir.

7  Q    Were you using the same --

8  A    Yes --

9  Q    -- thing?

10  A    -- OC.

11  Q    And you do that through the food slot --

12  A    Yes, sir.

13  Q    -- which, in your understanding, was consistent

14  with Coryell County policy?

15  A    Yes.

16  Q    When you spray the OC spray through the food

17  slot, are you -- are you down at that level so you can see

18  where you're spraying?  In other words --

19  A    Right, if I was looking through the food slot

20  when I sprayed her?

21  Q    Yes, sir.

22  A    I was -- I was looking through the window and I

23  had my hand down at the food slot.

24  Q    Okay.  So everything doesn't translate well in --

25  into the transcript.  So you're standing up, looking into

1  the window in the cell, right?

2       A     Yes.

3       Q     So your face is up where the window is, correct?

4       A     Right.

5       Q     And then are you right-handed or left-handed?

6       A     I'm right-handed.

7       Q     You're -- got the OC spray in your right hand?

8       A     Uh-huh.

9       Q     "Yes"?

10      A     Yes, sir.  I'm sorry.

11      Q     That's fine.  And the food slot, is there a flap

12  on it?

13      A     Yes.

14      Q     And you -- so I'm assuming you open the flap with

15  your left hand, and then you spray with your right hand.

16      A     No.  I -- I opened it with my right hand.

17      Q     You opened the flap -- the flap with your right

18  hand and sprayed with your right hand?

19      A     No.  I opened it up, and then I took my spray out

20  and sprayed her.

21      Q     Got you.  When OC spray like that you were using

22  on October 8 comes out of the -- the can or the canister,

23  is there a range that it typically will spray?  Does it

24  spray eight feet, ten feet, fifteen, twenty?  Or do you

25  know?

1    A    I don't know.

2    Q    Does it come out in a stream?

3    A    Yes.

4    Q    Kind of like wasp and hornet spray out of the can

5  like you can spray at a distance if you're aiming at a

6  wasp's nest?  You ever use that before?

7    A    Yes.

8    Q    Is it kind of the same thing?

9    A    I wouldn't say it was that fast.  You know how it

10  sprays and it's real fast?  It -- but, yeah.

11    Q    Okay.  So were you aiming for any part of

12  Ms. Page's body when you sprayed it through the food slot?

13    A    Facial area.

14    Q    Okay.  Were you successful?

15    A    Yes.

16    Q    And then was there any -- did you -- did you

17  visually see any response to her being hit in the face with

18  that?

19    A    I believe she turned around after I had done

20  that.

21    Q    Okay.  What did you do next?

22    A    And then I told her to come back to the door and

23  put her hands through the food slot, and she refused.  She

24  went to the back of the cell.

25    Q    Okay.  And then what happened?

1    A    And then I gave her several more warnings to come

2  up and get handcuffed and she refused.  That's when I had

3  the door open.

4    Q    All right.  In the video that you've reviewed, is

5  there anything in it during the incident -- and by

6  "incident," I mean from the time you entered the cell --

7  Well, strike that.  Start over.  The video that you

8  reviewed of Ms. Page that morning, is there anything in it

9  that you viewed from the time that she woke up all the way

10 through the time her body's removed from the cell -- is

11 there anything that you believe happened in the area that

12 we can see but which the video doesn't show us?

13   A    I don't understand.

14   Q    Okay.  Fair enough.  At some point you and

15 Mr. Pelfrey enter the cell, correct?

16   A    Right.

17   Q    And ultimately -- actually, you initially enter

18 the cell and interact with Ms. Page first, right?

19   A    Right.

20   Q    And at some point Mr. Pelfrey and you are

21 interacting with her when she's on the floor, correct?

22   A    Right.

23   Q    So the video depicts all of that use of force

24 incident going on, correct?

25   A    Right.

1    Q    You've seen that.

2    A    Yes, sir.

3    Q    Is there anything that when you saw the video --

4    and you watched it three or so times, whatever you

5    testified to before -- you thought to yourself, hey, the

6    video didn't -- didn't -- you couldn't really see on the

7    video what happened at that point?  Anything that stuck out

8    to you like that?

9    A    No.

10    Q    You feel like the video accurately depicted

11    everything that happened during that use of force incident?

12    A    Yes.

13    Q    And --  Well, strike that.  So when you are in

14    the cell with Ms. Page on October 8, are there any

15    particular use of force techniques that you used and which

16    you were trained to use, such as -- I've heard terms like

17    "knee strike," things like that?

18    A    Yes.

19    Q    Can you -- can you list those for us, please?

20    A    Can -- can --

21    Q    Yes.

22    A    -- you be more specific about it?

23    Q    Yeah.  So you ever had any law enforcement

24    training?

25    A    No.

1  Q   Okay.  You know, I've heard of different

2  positions that a law enforcement officer can hold his or

3  her firearm in, like the assault position.  Have you ever

4  heard of that?

5  A   Yes.

6  Q   Okay.  So have you ever heard the term "knee

7  strike"?

8  A   Yes.

9  Q   What does that mean to you?

10  A   It means using your knee to strike somebody.

11  Q   Okay.  And that term, "knee strike," when you're

12  a kid you didn't use that term, right?

13  A   Right.

14  Q   You say "I kneed somebody," right?

15  A   Yes.

16  Q   Okay.  So the -- the term "knee strike," is that

17  something that you learned through your training and

18  education related to your work down at the Coryell County

19  Jail?

20  A   Yes.

21  Q   So terms like that, "knee strike," did you

22  actually use any knee strikes during the October 8 use of

23  force incident?

24  A   Yes, I did.

25  Q   Okay.  Are there any other things like that --

can you give us the terms of the things that you used
during that use of force incident other than knee strikes?

        A    Are you asking me if there was anything else used
during that?

        Q    Yeah.  What I'm saying is when we're kids,
somebody gets in a schoolyard brawl, we just use terms "I
punched him," "I kneed him" --

        A    Right.

        Q    -- "I kicked him" --

        A    Right.

        Q    -- things like that.  Okay?

        A    Yes.

        Q    But we're not kids anymore and -- and obviously
you had training and education related to your duties at
the jail, right?

        A    Right.

        Q    And we've established that the term "knee strike"
is a term that you use in the jail environment to describe
a physical action that you did during the use of force
incident.

        A    Right.

        Q    Are there other terms that you would use in that
environment, that professional jail environment, to
describe the things that you physically did with Ms. Page
during that October 8 use of force incident?

1    A    I struck her.

2    Q    Struck her.  Okay.  And is that -- when you use

3  the term "struck," do you have to describe whether you used

4  your fist, whether you used your hand?

5    A    Yes.

6    Q    Okay.  And so can you elaborate on that?  Is it,

7  like, a hand strike?  Is it a fist strike?

8    A    It's a -- probably a hand strike.

9    Q    Okay.  What is a hand strike?

10   A    Just as it says, you know, striking somebody with

11  your hand.

12   Q    Okay.  When you use the term "hand strike" in the

13  jail context, is that open or closed?

14   A    Closed.

15   Q    Is there another term that you would use if you

16  strike somebody with an open hand?

17   A    Open-hand strike.

18   Q    Okay.  So you used a hand strike.  You used a

19  knee strike.  Any other terms that describe the techniques

20  that you used during the use of force incident that you

21  obtained through your education and training to work at the

22  Coryell County Jail?

23   A    No.

24   Q    What, if anything, had you been trained to do if

25  a --  Well, strike that.  What, if anything, had you been

1     trained to do if you entered a cell of an inmate who you

2     thought would not voluntarily exit the cell regarding doing

3     so with handcuffs?  Bad question.  Strike that.  Let me

4     start all over.  Had you ever had any training on when or

5     when you should not go into an inmate's cell with

6     handcuffs?

7         A    I don't understand the question.

8         Q    Did either you or, to your knowledge, Mr. Pelfrey

9     have handcuffs when the October 8 use of force incident was

10    occurring?

11        A    Are you asking me if we had handcuffs?

12        Q    Yes, sir.  Did you have handcuffs?

13        A    Yes, yes.

14        Q    Okay.  Did Mr. Pelfrey have hand -- handcuffs?

15        A    Yes.

16        Q    Both of y'all had a set --

17        A    Yes, sir.

18        Q    -- of handcuffs?  Had you ever had any training

19    about whether you should or should not take handcuffs into

20    a cell when you're having to remove somebody from a cell

21    forcibly?

22        A    No.

23        Q    Never had any training about that?

24        A    Oh, yes.  I mean, we have training on handcuffs

25    and how to apply them and stuff.

1    Q    Okay.  But what about just actually taking them

2  into a cell in a situation like this?  Had you had training

3  about that?

4    A    I don't understand.  I mean, we -- we had utility

5  belts, and we had handcuffs on them.

6    Q    All right.  So as far as you knew, you were

7  always authorized to enter a cell with handcuffs on your --

8  your --

9    A    Yes, sir.

10    Q    -- utility belt?

11    A    Yes, sir.

12    Q    Even if you've got an inmate that's being unruly?

13    A    Yes, sir.

14    Q    And were you supposed to do anything special with

15  those handcuffs, like tuck them away anywhere, do anything

16  different --

17    A    No.

18    Q    -- if you've got a situation like that with

19  Ms. Page?

20    A    No.

21    Q    Okay.  Other than handcuffs on the utility belt

22  on October 8, 2017, were there any other items, physical

23  items, you had with you or, to your knowledge, Mr. Pelfrey

24  had with him that would assist you in a use of force

25  incident?

1      A      No, sir.

2      Q      Since you've worked at the Coryell County Jail,

3   have tasers or other electronic weapons been available for

4   your use?

5      A      No.

6      Q      And to the extent there are any policies in the

7   evidence in this case about use of tasers in the jail,

8   you've never seen them used in the jail.  Am I right?

9      A      Right.

10     Q      And you've never seen them available for use in

11  the jail, right?

12     A      Right.

13     Q      Okay.  I'm assuming that you believe that you

14  acted appropriately during the October 8, 2017, use of

15  force incident, right?

16     A      Yes, sir.

17     Q      Is there anything that you believe that

18  Mr. Pelfrey did wrong during that use of force incident?

19     A      No.

20     Q      And -- and just for the record, he's sitting in

21  the room with us right now, correct?

22     A      Right.

23     Q      Okay.  Is it true that you believe that -- well,

24  strike that.  Do you know whether Mr. Pelfrey's still at

25  the -- at the county?

1    A    Yes.

2    Q    Before October 8, 2017, incident had you ever

3 heard the term "positional asphyxiation"?

4    A    Yes.

5    Q    When and --  Had you heard that term before?  In

6 what context?  Training?

7    A    Training.

8    Q    Okay.  When was the first time you think you ever

9 heard that term in your training?  Was it way back around

10 two years after you were first employed at Coryell County?

11    A    It was before then.

12    Q    Okay.  What -- what was your understanding as --

13 on October 8, 2017, as to the meaning of the term

14 "positional asphyxiation"?

15    A    It's when you --  Can you repeat it one more time

16 for me?

17    Q    Yes, sir.  Before you entered the cell on

18 October 8, 2017, what was your understanding as to the

19 meaning of the term "positional asphyxiation"?

20    A    It meant that on -- when somebody can't breathe.

21    Q    As a result of what?

22    A    What's that word?  They're laying down and

23 somebody is on top of them.

24    Q    Okay.  Faceup or facedown?  Or does it matter?

25    A    Facedown.

1      Q    I'm sorry?

2      A    Facedown.

3      Q    Facedown.  Okay.  So before you entered the cell

4  on October 8, 2017, during that use of force incident you

5  understood that if a person is on top of another person and

6  the person on the bottom is facedown, that could result in

7  positional asphyxiation?

8      A    Do I understand that holding somebody down --

9      Q    Yes.

10     A    Yes, sir.

11     Q    And did you also understand before you entered

12 the cell on October 8, 2017, that a person -- the person on

13 the bottom, the person facedown, if he or she is obese, in

14 other words, heavier than normal, that there is a higher

15 likelihood for that kind of person to be positionally

16 asphyxiated?

17     A    Yes.

18     Q    And did you consider Ms. Page to be obese on

19 October 8, 2017?

20     A    She was a large woman, yes.

21     Q    Okay.  And in your training that you had received

22 before October 8 of 2017, what were you taught as far as

23 what you should or should not do to keep someone from being

24 positionally asphyxiated?

25     A    Don't -- in our training we wouldn't -- we

1  couldn't -- you couldn't be on top of her or knee in the

2  back or anything like that.

3      Q    Okay.  All right.  And during the use force

4  incident did you ever instruct Mr. Pelfrey what he needed

5  to do?

6      A    No.

7      Q    The training that you've described, where did you

8  get that training about positional asphyxiation?

9      A    It was through a TCLOSE class that we went to.

10     Q    Okay.  Just one class?  Or had you heard that in

11 more than one training?

12     A    It was really more than one.

13     Q    Would -- would you consider that to be common

14 knowledge among jailers, what you just described to us, in

15 Coryell County in October of 2017?

16     A    Consider it common knowledge?

17     Q    Yes, sir.

18     A    No, sir.

19     Q    Why not?

20     A    Because, I mean, we -- because we -- through

21 training.  I mean, we learn it through training and stuff,

22 but --

23     Q    So I think we --

24     A    -- you know.

25     Q    -- may be talking past each other.  So would you

1  have expected every other person working at the Coryell

2  County Jail that interacted with inmates to have the same

3  knowledge you had about positional asphyxiation as of

4  October 8 of 2017?

5      A    Oh.  Yeah, I mean, yeah, I mean, we -- what not

6  to do and what to do, you know.

7      Q    Okay.  And -- and -- and what not to do and what

8  to do, you're -- with reference to positional asphyxiation,

9  you'd expect all the other jailers that worked at the

10  Coryell County Jail in October of 2017 to have that same

11  knowledge, right?

12      A    Learned it in TCLOSE and stuff, I mean, when you

13  go to school.

14      Q    Okay.  So -- so you would expect that all the

15  other jailers at the Coryell County Jail who worked there

16  in October of 2017 would have taken similar classes and

17  also learned about positional asphyxiation?

18      A    Yes, sir.

19      Q    In other words, the term "positional

20  asphyxiation" in your experience working at the Coryell

21  County Jail was not some unusual term that your coworkers

22  didn't know anything about.  Am I right?

23      A    Can you repeat that again?

24      Q    Yes, sir.  The term "positional asphyxiation,"

25  during your almost 14 years at the Coryell County Jail, it

1   was your experience that your coworkers knew what that

2   meant --

3       A    Yes.

4       Q    -- as a result of training they'd received like

5   you'd received through what was TCLOSE and what is now

6   TCOLE.

7       A    Right.

8       Q    Or, to be more specific, classes and courses that

9   are reported to what was TCLOSE and is now TCOLE, right?

10      A    Yes, sir.

11      Q    When you worked at the Coryell County Jail did

12  you ever receive any training at the jail with any of your

13  coworkers regarding positional asphyxiation?

14      A    No.

15      Q    It was just through the classes that you had

16  taken as you've --

17      A    Right.

18      Q    -- just described.  Okay.  Did you have any

19  concerns --  Well, strike that.  Toward the end of the use

20  force incident, Mr. Pelfrey laid on the ground and he was

21  partially out of the cell and partially on Ms. Page's upper

22  back region, correct?

23      A    I'm not for sure.  I was trying to control my

24  side of what was going on.

25      Q    Okay.  So during the end of the use of force

1   incident, is it true to say you couldn't see what

2   Mr. Pelfrey was doing?

3        A    Yeah.

4        Q    And, thus, you couldn't really comment on what he

5   did, in your opinion, was appropriate or not appropriate --

6   right? -- during the end of the use of force incident

7   because you couldn't see it.

8        A    Can you repeat that?

9        Q    Yes, sir.  If you couldn't see what he was doing,

10  you certainly couldn't tell us whether you thought what he

11  did was appropriate or not.

12       A    Well, I was just -- I was doing my part, you

13  know, and I don't -- I don't remember what he was doing.

14       Q    Okay.  Now, you told us you watched the video at

15  least -- I think you said three times or so.

16       A    Right.

17       Q    Right?  And since you've watched the video,

18  you've seen exactly what Mr. Pelfrey was doing at the end

19  of the use of force incident -- right? -- toward the end.

20       A    Yes.

21       Q    And what I described a moment ago, isn't that

22  what you saw?  He was -- his body was partially out of the

23  cell -- in other words, his feet were partially out of the

24  cell in that direction, and the upper part of his body was

25  inside the cell.  Right?

1       A       Right.

2       Q       And the upper part of his body inside the cell,

3   he had gotten on the upper back region of Ms. Page, right?

4       A       Yes, sir.

5       Q       And he was doing that, in your opinion, to hold

6   her down, correct?

7       A       Yes.

8       Q       And he was putting weight on her upper back

9   region at the time, right?

10      A       I don't know if he was putting pressure on the

11  back.

12      Q       You don't have --

13      A       I guess --

14      Q       -- an opinion about that?

15      A       Well, I mean, he was laying there, but I don't

16  know if he was putting pressure on it --

17      Q       Okay.

18      A       -- or not.

19      Q       Well, it wouldn't make much sense for him to do

20  that without putting pressure on her, right?

21      A       Yes.

22      Q       Okay.  And with your knowledge of positional

23  asphyxiation, do you have an opinion as to what he did was

24  appropriate?

25      A       Yes.

1      Q    And is your -- your opinion then is that it was

2 appropriate for him to do that?

3      A    Appropriate to put pressure on there?

4      Q    To put weight on her upper back region as we see

5 in the video when she's facedown.

6           MR. WEILAND:  I'm -- I'm going to object to

7 the question because you're mischaracterizing the video,

8 and -- and that is not -- that is not appropriate to

9 mischar -- the video shows what the video shows.  And

10 you're mischaracterizing the video to the witness.

11           MR. MALONE:  All right.  And I'm going to

12 object to a speaking objection and ask that you limit

13 objections to being those to the extent necessary to

14 preserve your objection on the record.

15           Are you instructing him not to answer?  He's

16 not your client, right?

17           MR. WEILAND:  No.  He's not my --

18           MR. MALONE:  Right.

19           MR. WEILAND:  -- witness.

20      Q   (BY MR. MALONE)  All right.  Do you remember the

21 question anymore?

22      A    Can you repeat the question?

23      Q    Yes, yes, sir.

24           Would you read it back, please?

25           THE REPORTER:  "Question:  And is it your

1   opinion that it was appropriate for him to do that?"

2                   MR. MAGEE:  Objection, calls for

3   speculation.

4                   You have to -- yeah, you have to answer.

5                   THE WITNESS:  Can you repeat it one more

6   time?

7        Q    (BY MR. MALONE)  Yes, sir.  When you observed

8   Mr. Pelfrey, as we've described, with part of his body, in

9   other words, his feet, outside of the cell and the other

10  part inside the cell when he has his body on Ms. Page's

11  upper back region, did you believe that was appropriate --

12  do you have an opinion as to whether it was appropriate for

13  him to do so based upon your education, experience,

14  training and background in jail operations?

15                  MR. WEILAND:  Same objection.

16                  MR. MAGEE:  Objection, calls for him to

17  speculate and also mischaracterizes the evidence.

18       A    I just don't feel like he -- I don't know if he

19  was putting pressure on her or not.

20       Q    Okay.  If the evidence in this case indicates

21  that Mr. Pelfrey, when he was in a position I just

22  described, was putting pressure on Ms. Page's upper back

23  area, based upon your education, experience, training, and

24  background in dealing with what you dealt with at the

25  Coryell County Jail, do you believe that was -- do you have

1  an opinion as to whether that was appropriate or not

2  appropriate?

3     A    Like I said, I -- I don't know if she -- he was

4  putting pressure on her or not --

5     Q    Okay.

6     A    -- so, yes.

7     Q    Yes what?

8     A    Yes.  I mean, if he was just laying on her to

9  hold her down and -- you know, I don't know if he was

10  putting pressure on her or not.

11     Q    All right.  And when you say "pressure," what do

12  you mean?

13     A    What you were asking me, if you believe that he

14  was putting pressure on her or not.

15     Q    Okay.  And is it your opinion, based upon your

16  education, experience, training, and background in jail

17  operations that it would've been -- that it would've

18  violated the standards that you'd learned about for

19  Mr. Pelfrey to put pressure on Ms. Page's back when she was

20  facedown in that position?

21            MR. MAGEE:  I'm going to object again.  I

22  think that calls for a hypothetical, assumes facts not in

23  evidence, calls for him to speculate.

24            MR. JOHNSTON:  I'm going to object as

25  compound.

1          THE WITNESS:  Can you repeat the question,

2    please, sir?

3       Q    (BY MR. MALONE)  I'll just ask another one.

4    Based upon your education, experience, training, and

5    background as a jailer, do you have an opinion as to

6    whether it would be appropriate for Mr. Pelfrey to use

7    pressure on Ms. Page's upper back region while part of his

8    body was on her as we see in the video recording of the

9    time period at the end of the October 8 use of force

10   incident?

11          MR. MAGEE:  Same objections.

12          MR. WEILAND:  Same objection.

13      A    I -- I just don't understand.  I mean, I'm --

14   Can you repeat it again, please?

15      Q    Yes.

16      A    I'm sorry.

17      Q    You learned through your training, education, and

18   experience as a jailer that it's inappropriate to put

19   pressure on someone's upper back region when that person is

20   facedown, correct?

21          MR. MAGEE:  Objection.

22          MR. JOHNSTON:  Objection.

23          MR. MAGEE:  Misstates his previous

24   testimony.

25          THE WITNESS:  Were you asking me the same

1   question?

2           MR. MALONE:  Can you read the question back,

3   please?

4           (Requested portion read back by the

5           reporter)

6           THE WITNESS:  Yes.

7       Q    (BY MR. MALONE)  So you would have the opinion

8   that if Mr. Pelfrey, during the end of the October 8, 2017,

9   use of force incident, put pressure on Ms. Page's upper

10  back region, based upon your experience, education,

11  training, and background as a jailer that would've been

12  inappropriate, right?

13          MR. JOHNSTON:  Objection.

14          MR. MAGEE:  Objection, calls for him to

15  speculate, assumes facts not in evidence, and also asks for

16  him to pose a hypothetical.

17      A    Like I said, I don't know if he was putting

18  pressure on her or not.

19      Q    Okay.  And my question assumes that he did.  If,

20  in fact, he did put pressure on her upper back region, it's

21  your opinion that that would've been in -- inappropriate

22  based upon your education, experience, training, and

23  background as a jailer?

24      A    If he had been --

25          MR. MAGEE:  Same objections.

1          Go ahead.

2          THE WITNESS:  If he had've done it?

3          MR. MALONE:  Yes, sir.

4          THE WITNESS:  Yes.

5          MR. MALONE:  Okay.  And --

6          THE WITNESS:  Can we take a break?

7          MR. MALONE:  Yes, sir, we can.  Sure can.

8          THE VIDEOGRAPHER:  Okay.  Off the record at

9   11:06.

10          (Recess from 11:06 a.m. to 11:21 a.m.)

11           On the record at 11:21.

12     Q    (BY MR. MALONE)  All right, sir.  We had been

13   talking about putting pressure on somebody's upper back

14   region when that person is facedown, and -- and you had

15   answered some questions about that.  At the beginning of

16   the use of force incident October 8, 2017, involving

17   Ms. Page you knew that if someone put pressure on someone's

18   upper region while that person was facedown, that the

19   result could be positional asphyxiation.  Correct?

20     A    Yes.

21     Q    And "asphyxiation" is a fancy word basically for

22   somebody suffocating and -- and dying -- correct? -- in

23   common understanding.

24     A    Yes.

25     Q    Okay.  Now, it's my understanding in Ms. Page's

1    cell, the cell that she had passed away in, there was no

2    equipment that would record audio.  Am I right?

3         A    Right.

4         Q    And then, likewise, the hallway outside of that

5    same cell on October 7 or 8, 2017, am I correct in

6    understanding there was no equipment that would record

7    audio?

8         A    Correct.

9         Q    On October 7 or 8 of 2017, are you aware of any

10   parts of the Coryell County Jail other than, perhaps,

11   dispatch and control where audio recording equipment had

12   been placed?

13        A    Can you --

14        Q    Yeah.

15        A    -- ask me again?

16        Q    October 7 and 8, 2017, were there any areas in

17   which prisoners were housed, cells, at the Coryell County

18   Jail where there was audio recording equipment?

19        A    No.

20        Q    And you gave us some testimony earlier about what

21   you understood to be Ms. Page tapping on her door with -- a

22   cell door with a brush.  Are you aware of any audio

23   recordings of any of that?

24        A    No.

25        Q    Or of your or Mr. Pelfrey's conversations with

1    Ms. Page that morning?  No audio --

2        A    No.

3        Q    -- that you're aware of?

4        A    No, no.

5        Q    Okay.  Now, we talked earlier about a five-person

6    cell extraction team.  Do you have an opinion as to the

7    benefits of using five people to extract a person from his

8    or her cell as opposed to trying to extract a person using

9    one or two or three people?

10       A    Repeat it again.

11       Q    Yes, sir.  Do you have any opinion as to the

12   benefits of using five people to extract a person from a

13   cell as opposed to using a lesser number of people to

14   extract a person from a cell?

15       A    Well, I mean, we didn't extract her from the

16   cell.

17       Q    Okay.  And I'm not talking about Ms. Page --

18       A    Okay.

19       Q    -- for the moment.  I'm just talking about a

20   five-person cell extraction team.  You had training on

21   that, right?

22       A    Uh-huh.

23       Q    "Yes"?

24       A    Yes, yes.  I'm sorry.

25       Q    And you -- there were policies in place with

1  Coryell County as to exactly what each of those five people

2  should do in the event of such an extraction, right?

3       A    Right.

4       Q    Okay.  Would one person concentrate on grabbing

5  the person's right arm, for example?

6       A    Right.

7       Q    And another person would concentrate on grabbing

8  the person's left arm, for example?

9       A    Yes.

10      Q    Would one of the people -- are they charged with

11 having a video recording camera?

12      A    No.

13      Q    Okay.  But there are certain policies and

14 procedures in place in October of 2017 at Coryell County as

15 to exactly how that five-person extraction should occur if

16 it incurred --

17      A    Right.

18      Q    -- occurs, right?  And do you think that a --

19 that using five people to extract a person from a cell is a

20 good number of people to perform an extraction?  Five

21 people.

22           MR. MAGEE:  Objection, calls for

23 speculation.

24      A    If we -- if we were extracting -- extracting from

25 a cell --

1    Q    Okay.

2    A    -- yes.

3    Q    And extracting a person from a cell means taking

4    them out of a cell, right?

5    A    Right.

6    Q    Do you have an opinion as to whether five people

7    being on a cell extraction team is an optimal number, in

8    other words, a good number?

9    A    Yes.

10    Q    Okay.

11    A    Yes, sir.

12    Q    Do you have an opinion as to whether there should

13    be more or less on a cell extraction team than five people?

14    A    No, I don't have an opinion on it.

15    Q    Okay.  You think five is the best number?

16    A    Yes.

17    Q    Okay.  In all of your years working at the

18    Coryell County Jail, had you ever heard of an extraction

19    team being comprised of a different number of people other

20    than five?

21    A    No.

22    Q    During the October 8, 2017, use of force incident

23    were you instructing Mr. Pelfrey what to do at all, or was

24    he just doing what he did and you were doing what you did?

25    A    We were just going in to cuff her.

1    Q    Okay.  So did you ever tell Mr. Pelfrey to do

2  anything during the October 8, 2018 [sic], use of force

3  incident with Ms. page?

4    A    The only -- well, I told him that we were going

5  to put her in a restraint chair and we're going to cuff her

6  and put her in a restraint chair.

7    Q    All right.

8    A    I mean, we weren't -- like I said, we weren't

9  going in there to extract her, and so there was no need in

10  that.

11    Q    Okay.  And when you say you weren't going in

12  there to extract her, "extract" means simply you're going

13  to take her out --

14    A    Take her out of the cell, yes, sir.

15    Q    -- involuntarily, right?

16    A    Involuntary -- you mean against her will?

17    Q    Yes, sir.

18    A    Well, I mean, we're going in there to -- yes, I

19  mean, but she was in the cell the whole time.

20    Q    Okay.  But your goal was -- the reason you went

21  into the cell was to take her out of the cell.

22    A    No.

23    Q    Why did you go into the cell?

24    A    We're going to put her in a restraint chair.

25    Q    You were going to put the restraint chair into

1 the cell with her?

2     A    Yes.

3     Q    You were going to move the restraint chair into

4 her cell?

5     A    Yes.

6     Q    Okay.  Where was the restraint chair sitting at

7 the time y'all entered the cell?

8     A    In the hallway.

9     Q    And when you sprayed the OC spray through the

10 food slot, it was still your intent to take the restraint

11 chair and put it into the cell?

12     A    We were going to put her in there, yes, in the

13 restraint chair.

14     Q    Had you ever put a restraint chair into a cell

15 and put a prisoner into it before?

16     A    Yes.

17     Q    Okay.  And in your understanding as of October 7

18 and 8, 2017, was that consistent with Coryell County

19 policy?

20     A    If it was policy to put them in a restraint chair

21 and leave them in a cell?

22     Q    In a cell, yeah.

23     A    We were going to --  Can you repeat it?

24     Q    Yes, sir.  On October 7 and 8 of 2017, was it

25 your understanding Coryell County policy allowed you to put

1    a restraint chair into a person's cell and restrain that

2    person in that chair in that cell?

3         A    Yes.

4         Q    The day before, October 7, 2017, you did extract

5    Ms. Page from her cell, correct?

6         A    Yes.

7         Q    And you put her into a restraint chair, right?

8         A    Right, we did it, yes.

9         Q    And the restraint chair was not in her cell that

10   day, was it?

11        A    No.

12        Q    Where was it?

13        A    It was outside the cell.

14        Q    Why did you put her into a restraint chair

15   outside of her cell on October 7, 2017?

16        A    We had to have it cleaned, the cell cleaned.  I

17   mean, we're -- we were -- that's what we normally do.  We

18   put them in a cell outside, and then we have the cell

19   cleaned.  And then after it's cleaned and decammed

20   [phonetic] and stuff, which doesn't take very long, we have

21   an MA go in there and clean it, and then we put them back

22   in there.

23        Q    Okay.  In the years that you'd work for the

24   Coryell County Jail before October 7th, 2017, are you

25   telling us it was your standard practice when someone would

1   be put into a restraint chair to put him and her in that

2   chair in his or her cell?

3       A    Yes.  That's where the use of force happened.

4       Q    That's why the use of force happened?  Is that

5   what you said?

6       A    No, where the use of force happened.

7       Q    Okay.

8       A    If the use of force happened in that cell, we'd

9   cuff them and put them in a restraint chair.

10      Q    In the cell?

11      A    In the cell.  But then we move them to the

12   hallway so it can get cleaned, that cell.

13      Q    Okay.  So if -- Strike that.  Prior to October

14   of 2017 I'm assuming that you had been involved with

15   putting plenty of inmates at the Coryell County Jail into

16   restraint chairs -- right? -- over the years?

17      A    Over the years, yes.

18      Q    Okay.  And of those times that you did that,

19   would you say almost all of those times the restraint

20   chairs were in the cells when a person was put into them?

21      A    Can you repeat that?

22      Q    Yes, sir.  All the times before October of 2017

23   you'd been involved at the Coryell County Jail with putting

24   somebody into a restraint chair, would you say that almost

25   all those times people were put into a restraint chair in

the cell in which they were incarcerated?

A    Yes.

Q    As opposed to being put in a restraint chair in a hallway or some other designated area for a restraint chair at the jail?

A    No.  I mean, it was easier after a use of force. After we cuffed them we went ahead and put them in a restraint chair.

Q    As of October 8, 2017, how many restraint chairs were available to you at the Coryell County Jail?

A    One.

Q    What was it on October 7, 2017, that needed to be cleaned in the cell in which Ms. Page was incarcerated before she could be put back into it?

A    Her body.  We were getting her showered and cleaned up.

Q    Okay.  It's my understanding that you said that the reason that Ms. Page was put into a restraint chair in the hallway on October 7, 2017, was because the cell had to be cleaned.

A    Right.

Q    Did I get that wrong?  Okay.  What did the cell have to be cleaned of?

A    OC.

Q    So on October 7, 2017, you couldn't put Ms. Page

1  into a restraint chair in the cell because the OC spray in

2  the cell had to be cleaned up.

3      A    Right.

4      Q    On October 8, 2017, when you sprayed the OC

5  through the food slot, the door was still closed, correct?

6      A    I -- I missed that.

7      Q    That's fine.

8      A    I didn't hear you.

9      Q    On October 8, 2017, when you sprayed the OC spray

10 through the food slot, the door to the cell was still

11 closed, correct?

12     A    Yes.

13     Q    So before you ever opened the door on October 8,

14 2017, you knew that there was OC spray inside the cell,

15 correct?

16     A    On what date?

17     Q    October 8, 2017.

18     A    Yes.

19     Q    And thus would have to be cleaned --

20     A    Right.

21     Q    -- before you could put anybody into a restraint

22 chair --

23     A    Right.

24     Q    -- inside that cell.  Correct?

25     A    Right.

1    Q    So when you enter the cell on October 8, 2017,

2    you knew that you could not put Ms. Page into a restraint

3    chair in her cell, correct?

4    A    Before being showered, is that what you're asking

5    me?

6    Q    No.  You said on October 7, 2017, that Ms. Page

7    could not be put into a restraint chair inside her cell

8    because there was OC spray in the cell.

9    A    Right.

10    Q    Right?  And the cell had be cleaned, correct?

11    A    Right.

12    Q    Now, let's go to the next day, October 8, 2017.

13    You go to the food slot.  You open it with your right hand.

14    You spray the OC spray inside the cell before you even open

15    the door.  Right?

16    A    Right.

17    Q    So at that point you know that cell's going to

18    have to be cleaned before anybody can be put into a

19    restraint chair inside the cell.

20    A    Right.

21    Q    So before you ever entered the cell, you knew

22    that you weren't going to put Ms. Page into a restraint

23    chair inside of it -- correct? -- on October 8.

24    A    Correct.

25    Q    So you would have to extract Ms. Page on

1    October 8, 2017, to be put into a restraint chair outside

2    of her cell, wouldn't you.

3          A    Put her in a restraint chair outside?

4          Q    Yes, sir.

5          A    Well, I mean, it only takes two officers to bring

6    her out of the cell to take -- escort somebody out of seg.

7    It only takes two officers --

8          Q    Okay.  But my point is --

9          A    -- so --

10          Q    -- when you entered the cell on October 8, 2017,

11    you knew that you were going to extract Ms. Page from the

12    cell, correct?

13          A    Well, I mean, "extraction" means that we're going

14    to suit up and bring somebody out.

15          Q    You're going to --  Say it again.

16          A    We're going to -- extract is when you're going to

17    suit up and go in and get somebody and bring them out, but

18    we were escorting her out --

19          Q    Okay.

20          A    -- and going to take her down and get her

21    showered.

22          Q    She wasn't -- she didn't want to be escorted, no

23    doubt, right?

24          A    On that day?

25          Q    Yes, sir, on October 8.

1      A    I mean, she was, yes, out of compliance.

2      Q    I mean, you'd already decided before you sprayed

3   OC spray through the food slot on the door that, in your

4   opinion, she was noncompliant, right?

5      A    Right.

6      Q    And you knew as soon as you sprayed the OC spray

7   in the cell that it was contaminated -- "it" being the

8   cell -- such that you couldn't put her in a restraint chair

9   inside, right?

10     A    Right.

11     Q    And you'd already told Mr. Pelfrey, hey, we're

12  going to put her into a restraint chair, correct?

13     A    Right.

14     Q    And that was sitting outside in the hallway

15  outside the cell waiting for her to be put into it.

16     A    Right.

17     Q    So when you entered the cell on October 8, you

18  already knew that you were going to have to remove Ms. Page

19  from the cell and put her into a restraint chair outside

20  the cell, right?

21     A    After she was cleaned up, yes.

22     Q    So you knew that you were going to extract her

23  from the cell and put her into that restraint chair?

24     A    Well, we weren't extracting her.  We were

25  escorting her out.

1    Q    Okay.  We've talked about the video.  We saw what

2  happened.

3    A    Right.

4    Q    Right?  That wasn't an escort, was it?

5    A    On what?  Seven?

6    Q    Nothing that happened on October the 8th was --

7  that was not escorting her out of her cell, right?

8    A    What do you mean by "escorting"?

9    Q    You said "escort."  What do you mean by escorting

10  someone out?

11    A    It takes two officers to take them out of seg.

12    Q    Okay.  What do you mean when you use the word

13  "escort," to escort someone out of a cell?

14    A    Two officers bringing an inmate out of a cell.

15    Q    And is the inmate going voluntarily or

16  involuntarily?

17    A    You mean Inmate Page?

18    Q    Under what you just said, escorting somebody out

19  of a cell, are they going -- when you use the term

20  "escort," are they leaving voluntarily or involuntarily?

21    A    Escorting somebody out you can involuntary or

22  voluntary.

23    Q    Okay.  And when someone's being extracted from a

24  cell, is that involuntarily or voluntarily, when you use

25  the term "extraction"?

1    A    Involuntary.

2    Q    Okay.  So what's the difference in -- in -- in

3    your mind when you use these terms between an involuntary

4    cell extraction and involuntary escorting out of a cell?

5    A    Can you repeat it again?

6    Q    Yes, sir.  What's the difference in your mind

7    between an involuntary cell extraction and an involuntary

8    escorting out of a cell?

9    A    An involuntary, I mean, one is inmate --

10   sometimes, yes, escort them out and then other times you

11   have to put your arms in there and escort her out.

12            MR. MALONE:  Objection, nonresponsive.

13   Q    (BY MR. MALONE)  When you remove someone from a

14   cell involuntarily, that's a use of force incident,

15   correct?

16   A    Right.

17   Q    So when you extract a person from his or her cell

18   involuntarily, you're using force to remove that person

19   from a cell, correct?

20   A    Yes.

21   Q    And when you are escorting a person from his or

22   her cell involuntarily, you are removing that person from

23   the cell using force, correct?

24   A    Can you repeat it again?

25   Q    Yes, sir.  When -- when you remove somebody from

1   a cell involuntarily, whether you use the word "escort" or

2   "extraction," it's still a use of force to remove that

3   person, right?

4               MR. JOHNSTON:  I'm going to object as

5   calling for speculation.

6       A    Yes.

7       Q    Okay.  So is there any -- in your mind any

8   material difference between extracting a person

9   involuntarily from a cell and escorting a person

10  involuntarily from a cell?

11      A    I don't understand.  Can you repeat it again?

12      Q    Yes, sir.  Is there any difference in your mind

13  from --  Strike that.  Is there any difference in your mind

14  between extracting a person involuntarily from her cell and

15  escorting a person involuntarily from her cell?

16      A    Is there a difference, you said?

17      Q    Correct.

18      A    Yes.

19      Q    What's the difference in your mind?

20      A    When you have to help them move by -- you -- you

21  have to help escort them.

22      Q    How?

23      A    By grabbing -- putting your hand on them and

24  helping them move.

25      Q    And when you say help them move, do you mean move

them in a direction they don't want to go?

A   Yes, sir.

Q   So that's an involuntarily use of --

A   Yes.

Q   Right.  Isn't it true there's really no difference between an involuntary cell extraction and an involuntary removal of someone from a cell?

MR. MAGEE:  Objection.

Q   (BY MR. MALONE)  Well, strike that.  You came up with the word "escort" during this deposition, right?

A   Uh-huh.

Q   "Yes"?

A   Yes, sir.

Q   I never asked you any questions about escorting somebody from a cell -- right? -- that you recall --

A   I recall.

Q   -- until we began this discussion after you used the word.  Correct?

A   Yes.

Q   Isn't it true, though, if you escort somebody involuntarily from a cell, you're really just extracting them from the cell?

A   Yes.

Q   And on October 8, 2017, y'all were removing -- attempting to remove involuntarily Ms. Page from her

1  cell -- correct? --

2       A    Yes.

3       Q    -- to put her in the restraint chair in the

4  hallway.

5       A    Right.

6       Q    Okay.  I'm going to hand you what I'm marking as

7  Exhibit 2.

8                 (Exhibit No. 2 marked)

9                 And it's just a collection of documents

10 which may or may not be related to each other, and we've in

11 the bottom right-hand corner --

12                 MR. JOHNSTON:  Thank you.

13      Q    (BY MR. MALONE)  -- numbered those with big

14 numbers.  So you might see other numbers on the bottom of

15 pages, but I'm go to be referring to just the big -- you

16 know, the big dark numbers on the bottom right-hand corner.

17 All right?  And I may have some questions about some pages

18 and -- and not about others.  Okay?  And until I mention

19 another exhibit, I'm going to be talking about Exhibit 2.

20 Starting on page five, page five actually is entitled "Jail

21 Policy and Procedure Operations Manuel," m-a-n-u-e-l.  Just

22 looking at that one page, do you recognize it?  Have you

23 seen it before?

24      A    Yes.

25      Q    Have you seen the manual that this is comprised

1    of?

2         A    The manual?

3         Q    Yes, sir.  In other words, is it your

4    understanding page five in Exhibit 2 is the first page of

5    the manual that was in effect when you worked at the

6    Coryell County Jail in October of 2017?

7         A    Yes.

8         Q    Okay.  And just to let you know, again, don't

9    assume that whatever I have in this little binder is every

10   page.  I'm telling you it's not.

11        A    All right.

12        Q    I just pulled some pages out so you don't have

13   3,000 pages in front of you.  All right?

14        A    All right.

15        Q    So you if look at page six in the manual through

16   page 17 is that cell extraction policy that was in place at

17   the Coryell County Jail on October 7 and 8, 2017?

18             MR. MAGEE:  So I just want to make sure I

19   understand what we're doing.  He's going to look at Exhibit

20   2 and you want him to read page 6 through 17 to make sure

21   that's the policy that he remembers; is that right?

22             MR. MALONE:  Well, I -- I didn't ask him to

23   do any of that.  My question is are pages 6 through 17, are

24   those -- do those page comprise the Coryell County

25   Sheriff's Office cell extraction policy in place on

1  October 7 and 8, 2017.

2                   And take your time looking at it.

3                   (Witness reading document)

4                   You remember the question?

5      A    This was the policy?

6                   MR. MALONE:  Could you read it back, please?

7                   THE REPORTER:  Okay.  Are pages 6 through

8  17 -- pages 6 through 17, are those -- do those pages

9  comply -- no -- comprise the Coryell County Sheriff

10 Department's policies and procedures in place on October 7

11 and 8, 2017?

12     Q    (BY MR. MALONE)  Let me just ask another

13 question.  Sir, you've had time to review pages 6 through

14 17 in Exhibit 2?

15     A    Yes.

16     Q    And are those pages the Coryell County Sheriff's

17 Office cell extraction policy that was in place on

18 October 8, 2017 --

19     A    Yes.

20     Q    -- and October 7, 2017?

21     A    Yes.

22     Q    Okay.  And on page six we -- the first paragraph,

23 it says "Purpose," and then it has a capital letter "A" and

24 a capital letter "B" beneath it.  Capital letter "A" says

25 to safely extract defenders from cells who refuse to be

moved or to follow proper security procedures.  Did I read

that correctly?

     A    Yes.

     Q    And on October 8, 2017, is isn't true that

Ms. Page had refused to follow what you would consider to

be a proper security procedure in refusing to be

handcuffed?

     A    Yes.

     Q    And, thus, she was also refusing to be moved,

correct?

     A    She was refusing to be handcuffed.  We hadn't

moved her yet.

     Q    All right.  And handcuffing a prisoner was a

security procedure, right?

     A    Yes.

     Q    Okay.  And then the second purpose, capital

letter "B," it says to establish a technique which

minimizes injury to offenders and jail staff and is

consistent with the need to accomplish the cell extraction.

Did I read that correctly?

     A    Yes.

     Q    And do you agree that the cell extraction policy

in place in Coryell County on October 8, 2017, was a policy

that would minimize injury to offenders and jail staff if

appropriately applied?

1          MR. MAGEE:  Objection, calls for

2   speculation.

3          MR. JOHNSTON:  Same.

4          MR. MALONE:  Well, strike the question.

5      Q    (BY MR. MALONE)  Do you have an opinion, based

6   upon your education, experience, training, and background

7   as a jailer with Coryell County, as to whether the cell

8   extraction policy on pages 6 through 17 of Exhibit 2 would

9   minimize injury to offenders and jail staff if applied?

10          MR. MAGEE:  Same objection.

11          MR. JOHNSTON:  Yeah, same objection.  It

12   calls for expert opinion.

13      A    No.

14      Q    I'm sorry?

15      A    I said "no."

16      Q    You don't think it would minimize injury to

17   offenders and jail staff if applied?

18      A    It depends on the -- on the situation.

19      Q    Okay.  Can you give us an example of a situation

20   in which it's your opinion that the Coryell County cell

21   extraction policy in place on October 8, 2017, if applied,

22   would not minimize injuries to offenders and jail staff?

23          MR. JOHNSTON:  Objection, calls for

24   speculation.

25          MR. MAGEE:  Same objection.

1          THE WITNESS:  Can you repeat the question,

2    please?

3          MR. MALONE:  Yes, sir.  It's my

4    understanding --  Well, strike that.

5          Can you read the question back, please?

6          (Requested portion read back by the

7          reporter)

8          MR. WEILAND:  I object to the form of the

9    question.

10    A    There's different situations every day in jail,

11    you know.  You go in there and there's --

12    Q    Have you finished your answer?

13    A    Yes, sir.

14          MR. MALONE:  Objection, nonresponsive.

15    Q    (BY MR. MALONE)  You said it's not your opinion,

16    based upon your education, experience, training, and

17    background as a jailer at Coryell County, that the cell

18    extraction policy in place on October 8, 2017, if applied,

19    would not always minimize injury to offenders and jail

20    staff, correct?

21          MR. MAGEE:  I'm going to object that that

22    mischaracterizes his previous testimony.

23    A    Yes.

24    Q    Okay.  All I'm asking you for, sir, is can you

25    give us an example of an occurrence during which

1  application of this cell extraction policy, in your

2  opinion, based upon your education, experience, training,

3  and background would not minimize injury to offenders and

4  jail staff.  Just an example.

5      A    No, sir.

6      Q    Okay.  Still on page six in Exhibit 2 under Roman

7  numeral two capital letter "A," it beings with "This office

8  will maintain a well-trained cell extraction team," and

9  then it continues.  Did I read that correctly?

10     A    Yes.

11     Q    Have you -- were you part of the cell extraction

12 team at the Coryell County Jail when you worked there in

13 October of 2017?

14     A    No.

15     Q    Was there, to your knowledge, a cell extraction

16 team at that time?

17     A    No.

18     Q    So despite the policy on page six saying that

19 this office will maintain a well-trained cell extraction

20 team, when you worked at Coryell County you were not aware

21 of any such team.  Am I right?

22     A    That I wasn't aware of a team?

23     Q    Was there a team at Coryell County like it's

24 described there?

25     A    No.

1    Q    Never was when you worked there?

2              MR. JOHNSTON:  Objection.  It's a

3    mischaracterization.

4    A    Yes, we did at one time.

5    Q    Okay.  And when was the last time that Coryell

6    County had at its jail a cell extraction team while you

7    worked there?

8    A    I can't remember.

9    Q    Well before October 8 of 2017?

10   A    Did we have one then?

11   Q    Well, let's start with that question.  On

12   October 8, 2017, did Coryell County have a cell extraction

13   team --

14   A    No.

15   Q    -- for its jail?

16   A    No.

17   Q    No?  How long approximately, if you can remember,

18   was it before October of 2017 when the Coryell County Jail

19   last had a cell extraction team as described on page six in

20   Exhibit 2?

21   A    No.

22   Q    You just know it -- it had one at one time; you

23   just don't remember when.

24   A    Right.

25   Q    Okay.  Had it been more than a year before

October of 2017?

    A    Yes.

    Q    More than five years before October of 2017?

    A    Yes.

    Q    So if on October 8 of 2017 you had decided to apply this policy and call in three more jailers, did you know who to call?  Strike that.  So October 8, 2017, there were not to your knowledge --  Oh, strike that.  Had you ever received training to be on a cell extraction team for Coryell County?

    A    Yes.

    Q    And were you actually on a cell extraction team at one time?

    A    Yes.

    Q    And then how did you know that you were no longer on the team?  Was that just for a certain period of time, or did somebody tell you?

    A    No.  I -- we -- I just got off of it.  I didn't want to do it no more.

    Q    Did you ask to be taken off of it?

    A    Yes.

    Q    Do you remember when that was?

    A    No, I don't.

    Q    It was before October of 2017, though?

    A    Yes.

1    Q    Years before that?

2    A    Yes.

3    Q    What function did you have on the cell extraction

4    team when you were on it?

5    A    I think I was a one or two man.

6    Q    And what did the one or two man do?

7    A    Control the arms.

8    Q    Okay.  On page eight there's a reference to video

9    camera operations.  When you were on the cell extraction

10   team was a video camera available to record what -- any

11   cell extraction?

12   A    No.

13   Q    Were you ever a team leader or supervisor on a

14   cell extraction team?

15   A    Yes.

16   Q    Was there a difference between those two terms,

17   like, between what a team leader would do versus a

18   supervisor?

19   A    No.

20   Q    Now, on page ten at the bottom it references

21   taser, but I think you've made it clear to us, you've never

22   seen --

23   A    We don't --

24   Q    -- tasers.  Am I right?

25   A    Right.

1    Q    Never seen one in the Coryell County Jail, right?

2    A    Right.

3    Q    When was the first time you that saw this cell

4  extraction policy that we're talking about here?  Would it

5  have been during your initial training at the jail?

6    A    You get one when you get hired, when we started.

7    Q    Okay.  Back in year 2004?

8    A    Uh-huh, yes, sir.

9    Q    Okay.  Thank you.  So all this stuff we see on --

10 on page 11 about when a taser should be used and when a

11 taser should not be used, as far as you're concerned, that

12 didn't have any application in the jail because there were

13 no tasers.

14   A    Right.

15   Q    Right?  Page 12, if you look down, there's a

16 little Roman numeral four.  It says the person

17 administering oleoresin capsicum, OC, or OC mixed with

18 chemical agents dispersion and certified by the munitions

19 trainer.  You see where I read that?

20   A    Yes.

21   Q    And you see that "mixed with chemical agents"?

22 Have y'all ever done that since you worked at the Coryell

23 County Jail?

24   A    No.

25   Q    And that's kind of what I was asking about

1   earlier.  All -- all y'all had was OC.  You didn't --

2       A    Yes.

3       Q    -- have OC plus something else.

4       A    Right.

5       Q    Page 14, Roman numeral seven -- it's the second

6   one, little Roman numeral seven.  It talks about allowing

7   time --  Well, strike that.  Let's go down a little

8   further, little Roman numeral 10.  It says, "No maneuver

9   which places any pressure on the front of any offender's

10  neck resulting in compression of the airway may be used."

11  Did I read that correctly?

12      A    Yes.

13      Q    And in your understanding is that a reference to

14  the risk of positional asphyxiation by putting that

15  pressure we talked about earlier?

16      A    Yes.

17              MR. JOHNSTON:  I'm sorry.  What Roman

18  numeral page are you?

19              MR. MALONE:  That was page 14.

20              MR. MAGEE:  Fourteen.

21              MR. JOHNSTON:  Fourteen.  Thank you.

22              MR. WEILAND:  Object to the form of the

23  question.

24      Q    (BY MR. MALONE)  Page 15, Roman numeral -- oh,

25  not Roman numeral -- excuse me -- lower letter "g," it

1    says, "The team leader will submit to the supervisor the

2    cell extraction video narrative report for review prior to

3    being relieved of duty."  Did I read that right?

4         A    Right.

5         Q    And I think you told us that you had been

6    involved in cell extractions.  Had you ever or, to your

7    knowledge, did anybody else video any of those extractions?

8         A    No.  We did not have a camera.

9         Q    Have you ever been involved in intake screening

10   at the Coryell County Jail?

11        A    Yes.

12        Q    Were you involved in any of Ms. Page's intake

13   screening at any point in time?

14        A    I believe so.

15             MR. MAGEE:  If we're going to move on to

16   another policy, can we take a break?

17             MR. MALONE:  Sure.

18             THE VIDEOGRAPHER:  Off the record at 12:11.

19             (Recess from 12:11 p.m. to 1:24 p.m.)

20             On the record at 1:24.

21        Q    (BY MR. MALONE)  All right, Mr. Lovelady.  We're

22   back after a lunch break.  You remember we've just been

23   going through some of the documents here in Exhibit 2 in

24   front of you there?

25        A    Yes, sir.

1     Q   So starting on page 28 -- and it goes through

2  page 31 -- it's my understanding that's a use of restraints

3  policy that was in effect on October 8, 2017, in Coryell

4  County.  Can you tell me whether or not you agree with

5  that?

6             (Witness reading document)

7     A   Yes.

8     Q   Okay.  On page 29 there's a definitions section

9  starting kind of in the middle.  It has Roman numeral four,

10  "Definitions."  The first one beneath that, capital letter

11  "A," there's a definition for emergency restraint chair.

12  You see that?

13     A   Yes.

14     Q   So what I have called a restraint chair during

15  this deposition, is that the same thing as an emergency

16  restraint chair as defined by this policy?

17     A   Yes.

18     Q   Okay.  And then toward the bottom of page 29, the

19  next to the last procedure listed, there's a lower case

20  "a."  It says, "The hog-tie method of restraining an inmate

21  at the jail is prohibited."  Do you know why that method of

22  restraining an inmate would've been prohibited?

23     A   Yes.

24     Q   And what's the reason for that?

25     A   Because they wouldn't be able to breathe.

1    Q    Okay.  And by hog-tie, would that be tying

2  somebody's wrists and ankles together behind them?

3    A    Yes.

4    Q    And then the person would be typically facedown

5  in that situation?

6    A    Yes, sir.

7    Q    Is that another positional asphyxiation problem,

8  to your knowledge?

9    A    Yes.

10    Q    And then at the bottom of page 29 it says, "No

11  inmate shall be placed in the restraint chair without the

12  approval of the jail administrator or shift commander."

13  Did I read that correctly?

14    A    Yes.

15    Q    Who was the jail administrator on October 8,

16  2017?

17    A    It would be Porter, Lieutenant Porter.

18    Q    And then when you were on duty at the time of the

19  use of force incident we've been discussing on October 8,

20  2017, would you be the shift commander?

21    A    Yes, the shift supervisor, yes.

22    Q    Okay.  So you had authority under this policy to

23  use a restraint chair?

24    A    Yes.

25    Q    And then page 30 at the top says, "No inmate

1  shall be placed in the restraint chair that has been

2  exposed to any chemical sprays without being medically

3  evaluated."  Did I read that correctly?

4      A    Yes, you did.

5      Q    Okay.  Was that policy actually applied, in your

6  experience, at the Coryell County Jail?

7      A    Can you repeat the question?

8      Q    Yes, sir.  What I just read, was that policy

9  actually applied?  Was it used at the Coryell County Jail

10  when you worked there?

11      A    No.

12      Q    So, for example, if this policy had been applied

13  by you on October 8, 2017, after you had sprayed Ms. Page

14  in the face with the OC spray, you could not put her into a

15  restraint chair until she was medically evaluated, correct?

16          MR. MAGEE:  Objection, calls --

17          MR. WEILAND:  Objection, form of the --

18          MR. MAGEE:  -- for speculation.

19          MR. WEILAND:  Objection, form of the

20  question.

21          MR. JOHNSTON:  Join.

22          THE WITNESS:  Repeat the question for me.

23      Q    (BY MR. MALONE)  Yes, sir.  When you read the

24  phrase "chemical sprays" in what I just read, where it

25  says, "No inmate shall be placed in the restraint chair

1    that has been exposed to any chemical sprays without being

2    medically evaluated."  What do you understand "chemical

3    sprays" to mean?

4         A    Chemical agents.

5         Q    Including OC spray?

6         A    Yes.

7         Q    So do you understand that policy to require a

8    jailer or someone working at the jail to have a person

9    who's been exposed to OC spray checked out by medical

10   personnel before that person can be put into a restraint

11   chair?

12              MR. MAGEE:  Objection, calls for speculation

13   and also misstates the policy.

14        A    Yes.

15        Q    Did you ever receive any training at Coryell

16   County on that specific policy other than just being handed

17   a copy of the policy and procedure manual?

18        A    No.

19        Q    If you wanted to have Ms. Page medically

20   evaluated on October 8, 2017, how would you have done that?

21        A    I would -- the nurse doesn't come in on weekends.

22        Q    Okay.  And -- and I probably need to make my

23   question clear.  Obviously as a -- she passed away on that

24   day, and EMS folks showed up.  Right?

25        A    Right.

1     Q    So I'm not talking about that.  I'm just saying

2   let's assume --  Well, strike that.  Other than calling an

3   EMS personnel for somebody in the Coryell County Jail,

4   specifically Ms. Page on October 8, 2017, did you have any

5   other way available to you to have her checked out by

6   medical personnel?

7     A    Calling the nurse.

8     Q    And -- and would he or she come in on a Sunday?

9     A    Well, I've seen Ms. Ferguson come in on weekends,

10  yes.

11    Q    Okay.  And do you know if Ms. Ferguson is an LVN

12  or an RN?  Any idea?

13    A    I think she's a LVN.

14    Q    Okay.  Page 38, can you tell me if that's an

15  observation log?

16    A    No, that's not observation log.

17    Q    Is it --  What -- what is that?

18    A    That's a shift log.

19    Q    Okay.  So we see on October 7, Saturday, there's

20  several names listed, and this would be the upper

21  right-hand corner.  If you turn it sideways, it's got your

22  name, Pelfrey, Pruitt, Washington.  Then it lists your name

23  again, Lovelady, twice.  And then what's the last thing

24  listed there?

25    A    That's Officer Polk.

1    Q    Okay.  And Officer Polk, is that the one that was

2    at TCLEOSE or TCOLE --

3    A    Yes.

4    Q    -- seminar?  Do you recognize any of the

5    handwriting on page 38?

6    A    I believe it was Mr. Washington's.

7    Q    All of it, to your knowledge?

8    A    Yes.

9    Q    And then what about page 39?  Do you recognize

10   any of the handwriting on that page?

11   A    That would've been mine.

12   Q    All of it?

13   A    Yes.

14   Q    Now, look at page 38 -- excuse me -- 39, I mean,

15   some of it looks darker and some of it looks light.  It

16   still looks, in your opinion, all your handwriting?

17   A    Yes.  All of it?

18   Q    Yeah, that's what I'm asking.  Is there

19   anything -- any handwriting on page 39 you see that you

20   don't think is yours?

21   A    It's -- the only one I filled out was Sunday,

22   October 8th.  The rest were other shifts.

23   Q    Okay.  And I may not be clear.  I'm just -- the

24   handwriting, in other words, the handwritten comments, when

25   you look at them can you tell who wrote them on pages 38

1  and 39?  I'm just wondering if you have any idea who

2  actually wrote those.  Because they look like different

3  handwriting, to me, on both pages.

4       A    What --

5            MR. MAGEE:  He's talking about the whole

6  page.  It's page 38.

7            THE WITNESS:  The whole page?

8            MR. MAGEE:  Can you tell who wrote that

9  stuff?

10            THE WITNESS:  No, I don't know --

11            MR. MALONE:  Okay.

12            THE WITNESS:  -- who wrote it.  I know I

13  wrote --

14       Q    (BY MR. MALONE)  None of it's --

15       A    -- mine.

16       Q    -- your hand writing.  Am I right?

17       A    On 38?

18       Q    Yes, sir.

19       A    No.

20       Q    And then on 39 you do see some of your

21  handwriting?

22       A    Yes.

23       Q    And where do you see it?

24       A    It's on Sunday, October 8th.

25       Q    Okay.  First column kind up toward the top there?

1    A    Yes.

2    Q    Anywhere else?

3    A    No.

4    Q    So when these shift logs are completed, who, when

5    you worked at Coryell County, would do it?  Who would

6    actually fill this information in, like which position?

7    Supervisor or jail administrator?

8    A    I mean, the CO can write it in, you know.  If I

9    told him where everybody was going, they can write that in

10   there.

11   Q    Okay.  And -- and would the supervisor on duty

12   determine for each shift where each person would go?

13   A    I mean, there really ain't nowhere to go.  I

14   mean, they just walk the halls and signed off on their

15   sheets and stuff.

16   Q    Okay.  So control, for example --

17   A    Well, yeah, control.  That's the only person that

18   you assigned, was control.

19   Q    Does control have to have a license different

20   than a jailer's license?

21   A    No.

22   Q    Not a telecommunications license, anything like

23   that?

24   A    No, no.

25   Q    All right.  Page 40 appears to me to be a written

 1   resignation by you.  Am I right?

 2        A    Yes.

 3        Q    So you had quit on December 4, 2017, at 4:43 in

 4   the afternoon?

 5        A    Yes.

 6        Q    And you signed it.  And then who is the witness

 7   at the bottom?

 8        A    It looks like -- I don't recognize the hand --

 9        Q    Okay.

10        A    -- signature.

11        Q    All right.  Page 41, it's entitled "Personnel

12   Compliant."  It's dated December 1 of 2017.  I'm not going

13   to read all where the incident is.  But do you recall this?

14        A    Yes.

15        Q    And was it Sergeant Arrington that sat down with

16   you and talked about it?

17        A    Yes.

18        Q    And then you signed this on December 4, 2017,

19   right?

20        A    Right.

21        Q    Which is the same day that you resigned, correct?

22        A    Yes.

23        Q    And is part of the reason you resigned because

24   you were written up on this day?

25        A    No.

1      Q    This had nothing to do with it?

2      A    No.

3      Q    So when you arrived at work on December 4, 2017,

4   had you already planned to quit?

5      A    Yes.

6      Q    And this just -- by happenstance they happened to

7   show you this document on page 41?

8      A    Yes.

9      Q    And I noticed on your resignation there was no

10  reason listed.  Any reason you didn't tell them why?

11     A    No.  I -- I told them in person that I was ready

12  to --

13     Q    Okay.  Were you upset with them when they had

14  written you up and you signed off on December the 4th?

15     A    On December 4th?

16     Q    Yes, sir, when they -- they wrote you up,

17  Sergeant Arrington on page 46.

18     A    I was a little bit, but I wasn't, like, overly

19  mad about it.

20     Q    It wouldn't have caused you alone to quit?

21     A    No.

22     Q    Okay.

23     A    No, sir.

24     Q    And I'm not going to go through -- I think there

25  may be a handful of write-ups or reprimands, et cetera, in

here.  Have you ever been reprimanded or written up while

working for the Coryell County Sheriff's Department and you

disagreed with being reprimanded or written up?

     A    No, sir.

     Q    Page 53, there's just a statement of

qualifications listed.  And is that your signature on that

page?

     A    Yes.

     Q    And is that when you were hired?  Is that when

you think you signed this?

     A    No, because I -- I --  Well, wait a minute.  Yes,

it is.

     Q    Is that before --

     A    I put --

     Q    -- you were hired?

     A    No, no, no.  This is when I put my application

in.

     Q    Makes sense.  So then on page 54 there's the

May 3rd, 2004, you gave us earlier.  That's when you signed

off for receiving the Coryell County Employee Handbook on

policies and procedures, right?

     A    Yes.

     Q    Page 56, there's a completion certificate for

training you received on OC spray, correct?

     A    Yes.

1    Q    And that was in September of 2004?

2    A    Yes.

3    Q    Page 57 is a certificate for an interpersonal

4    communications course.  Do you remember what that was

5    about?

6    A    No, sir.

7    Q    Now, page 62 is a -- I don't know.  I'll just

8    call it a notice regarding observation logs.  Is it your

9    understanding that this was written up not because you

10   falsified any logs but rather you just weren't making

11   checks often up?

12   A    Observation logs just meant --  Can I read it?

13   Q    Yeah, yeah, feel free.

14            (Witness reading document)

15   A    I don't remember this one.

16   Q    That's fine.  I think before lunch I'd asked

17   about intake and whether you had been involved in the

18   intake of --  Well, strike that.  You know, we talked a

19   little bit about the intake before lunch.  And I'm trying

20   to remember what you said about intake regarding Ms. Page.

21   Were you involved in the intake of her?

22   A    I can't really say.  Can't remember.

23   Q    Okay.  Before October 8, 2017, had you received

24   any information that indicated to you that Ms. Page may

25   have had mental health issues?

1          A     Say that again, sir.

2          Q     Yes, sir.  Before the use of force incident on

3     October 8, 2017, had you received any information that made

4     you think that Ms. Page might have mental health issues?

5          A     No, because that goes all to medical.

6          Q     And that kind of leads to another question.  When

7     you were working at the Coryell County Jail on

8     October 2017, what, if any, access did you have to inmates'

9     medical, psychiatric, psychological, and -- and mental

10    health records?

11         A     We don't have that information.  It all goes to

12    the nurse.

13         Q     Page 87 is another certificate of completion for

14    you.  And the course is entitled "What jail staff needs to

15    know about the jail medical care system," and it's dated

16    October 29 of 2011.  Do you remember that class?

17         A     No.  It's -- No, sir.

18         Q     Okay.  Do you recall if the jail medical care

19    system referenced there is -- is specific to Coryell County

20    or just in general, you know, just kind of generally?

21         A     I don't understand what you're trying to ask me

22    on that.

23         Q     Do -- do you remember where you took this course?

24         A     No.  I mean, it was in 2011.  I don't remember

25    where it was taken.

1    Q    All right.  Do you know in October of 2017 the

2  name of any company that provided health care to prisoners

3  in the Coryell County Jail?

4    A    No.

5    Q    Pages 95 and 96 are a -- it says "Voluntary

6  Statement" typed up.  Have you seen that before?

7    A    Yes.  This is the ranger's.

8    Q    The ranger's?

9    A    Yes.

10    Q    Okay.  Did you type that, or did he type it?

11    A    No, we typed it.

12    Q    Did you say "we"?  I'm sorry.

13    A    I typed it.

14    Q    You typed it up.  Okay.  And then did you initial

15  kind of toward the bottom of page 95 and then sign on page

16  96?

17    A    Yes.

18    Q    Did you know Adam Russell before October 8 of

19  2017?

20    A    No.

21    Q    Do you know whether Adam Russell knew anybody

22  else that worked at the Coryell County Jail before

23  October 8 of 2017?

24    A    I don't know that information.

25    Q    And I'm assuming everything that you typed in to

1   this statement on page 95 from your perspective is true and

2   correct?

3         A     Yes, sir.

4         Q     Were you present when anybody ever visited Kelli

5   Page in the Coryell County Jail?

6         A     No.

7         Q     On page 102 there's something, and it says

8   "PinkNotes Plus."  It's a form.  Do you recognize what that

9   form is?

10        A     PinkNotes Plus, yes, that's information done on a

11  computer.

12        Q     Okay.  And then could you just print out a small,

13  like, note, like, this after you put something in?

14        A     Yes.

15        Q     What would you use that for when you worked at

16  the Coryell County Jail?

17        A     Communications with other officers, other shifts.

18        Q     At -- only at Coryell County?

19        A     Yes.

20        Q     Pages 104 and 105, are those examples of

21  observation logs for the jail?  I'm sorry.  I didn't hear

22  your answer.

23        A     I didn't -- I didn't --

24        Q     Yeah, yeah.  Are those just --

25        A     -- know that you asked me a question.

1    Q    -- examples of inmate observation logs?

2    A    Yes.

3    Q    -- pages 104 and 105.

4    A    Okay.  I thought you just said turn to 104 and

5    105.

6    Q    Okay.

7    A    But, yes, that is.

8    Q    Are any of those initials on there your initials?

9    A    Yes.

10   Q    Which ones?

11   A    On 104, the top one over here on 10-6.

12   Q    18:21, I think the time.  Is that right?

13   A    Yes --

14   Q    Okay.

15   A    -- 18:21.  And then 10-7 at 6:28, 6:55, 7:20,

16   7:44, 8:09, 8:32, 8:56, 9:15, 10:17, 11:07, 15:54, and

17   18:13.

18   Q    Thank you.  Page 111 is another completion

19   certificate for training you received, and this was for the

20   less than lethal chemical weapons course.  Right?

21              MR. JOHNSTON:  I'm going to object.  It's a

22   mischaracterization.

23   Q    (BY MR. MALONE)  Your name's not Wesley Pelfrey,

24   is it?

25   A    Nope.

1          MR. MALONE:  I withdraw the question.

2     Q    (BY MR. MALONE)  Pages 112 and 113 is a statement

3  apparently of Mr. Pelfrey's.  Have you read that before?

4     A    I don't remember.

5     Q    Okay.  Would you mind reading it for me?  It's

6  really just on page 112 and let me know when you're done.

7               (Witness reading document)

8     A    Okay.  I read it.

9     Q    All right.  Do you agree with everything that is

10  in it?

11     A    Yes, sir.

12     Q    Okay.  All right.  Over on page 121 -- I'll just

13  ask you about pages 121 through 124.  Are those photos of

14  you?

15     A    Yes, sir.

16     Q    I'm sorry?

17     A    Yes, sir.

18     Q    Okay.  And do you know when those were taken?

19     A    That was the day that she threw that liquid on

20  me.

21     Q    All right.  That October 7, 2017, incident?

22     A    Yes, sir.

23     Q    Do you know who took them?

24     A    Deputy Dayton.

25     Q    D-a-y-t-o-n?

1      A     I believe so.

2      Q     All right.  From the sheriff's department?

3      A     Yes.

4      Q     Pages 125 through 130, in your understanding are

5 those photos of Ms. Page?

6      A     Yes.

7      Q     And do you believe those were taken on October 7,

8 2017?

9      A     Yes.

10      Q     And do you think Deputy Dayton also took those?

11      A     I don't know who took them.

12      Q     Okay.  Had you seen these photos before now?

13      A     Yes.

14      Q     And are those photos of Ms. Page when she was in

15 a restraint chair after the use of force incident on

16 October 7, 2017?

17      A     Yes.

18      Q     Then we see on pages 126 and 127 it looks like

19 some swelling, maybe some bruising on the upper left part

20 of her left eye.  Is that your recollection of the injuries

21 she sustained in the cell that day?

22      A     Can you repeat the questions.

23      Q     Yes, sir.  The -- the injuries that we see on

24 those pages, 126 and 127, by her left eye, the swelling, is

25 that consistent with what you remember about the injury she

sustained during the use of force incident on October 7?

A    Yes.

Q    Page 130, that's another photo of her in the chair, correct?

A    Yes.

Q    That hallway we see there, is that -- that's not a cell hallway.  Am I right?

A    No.  That's into the booking area.

Q    And when Ms. Page was put into a restraint chair on October 7, is this the location she was put at?

A    No.

Q    Do you know why she was at this location at that time?

A    They were taking pictures.

Q    They moved her up there?

A    Yeah.  I don't know who took the pictures, though.

Q    Page 135, is that a photo of the front of the door to the cell in which Ms. Page passed away on October 8, 2017?

A    Cell four, yes.

Q    Pages 141 through 143, are those photos of the inside of that same cell taken, in your understanding, on October 8, 2017?

A    Yes.

1     Q    And what is your recollection as to all of the

2 items that Ms. Page had in her cell before she received the

3 medical treatment on that date? We've talked about a

4 hairbrush. We've seen photos, I think, of a styrofoam cup.

5 Right? Can you tell us what else you remember being in her

6 cell?

7     A    A toothbrush, and I don't know what else she had

8 in there.

9     Q    Page 150, do you recognize the gentleman there?

10     A    That's Deputy Crossman.

11     Q    Crossman?

12     A    Yes.

13     Q    Was he performing CPR on October 8?

14     A    Yes, he relieved me.

15     Q    Page 151, the person in the upper right-hand

16 corner of that photo, do you recognize that person?

17     A    Yes.

18     Q    Who is that?

19     A    It's Pelfrey.

20     Q    Page 182 references a CERT team. What is a CERT

21 team?

22     A    It's the four-man team.

23     Q    Four man?

24     A    Five-man team. Sorry.

25     Q    Gotcha. The cell extraction team we've been

1   talking about?

2       A    Yes.

3       Q    Pages 198 and 199 appear to be copies of text

4   messages.  Do you know who those are?

5       A    What page?

6       Q    I see Adam Russell, but --  198 and 199.

7       A    No, I do not.

8       Q    Okay.  Would it be true that every statement you

9   have signed or written related to Ms. Page and her death

10  would be from your perspective true and accurate?

11      A    Yes.

12      Q    Pages 215 and 216 appear to be a letter.  Have

13  you ever seen that before?  It's signed by a Lisa.

14      A    No, sir.

15      Q    Do you have any idea who -- who wrote that, who

16  that Lisa is?

17      A    No, sir.

18      Q    Okay.  Kind of in the middle of page 215 it

19  references the October 7 incident.  It says, "I was sick

20  when I got here.  She threw water on a guard," "Lovelady"

21  in parentheses, "He sprayed her and roughed her up.  She

22  went to the hospital," et cetera.  You see that?

23      A    Yes.

24      Q    Do you recall a Lisa being incarcerated at the

25  time?

1    A    I can't remember all that.

2    Q    Page 222 is a classification notice for Ms. Page.

3  Were you involved in classifying prisoners when you worked

4  at the Coryell County Jail?

5    A    Did I classify?

6    Q    Yeah.  Were you involved in, like, filling out

7  forms like this?

8    A    Yes.

9    Q    Okay.  And at the time of Ms. Page's death would

10  she have been housed consistent with what we see on this

11  page?

12    A    It -- well, I mean, it wouldn't be consistent.

13  It'd be -- you know, it depends on her charge or whatnot,

14  so it could change.

15    Q    Okay.  And if I'm reading this page correctly,

16  would she have been in the minimum presentence or -- or

17  not?

18    A    She would -- yeah, according to this, it was --

19  she would've been medium.

20    Q    Medium presentence.  Okay.

21          MR. WEILAND:  What page was that?

22          MR. JOHNSTON:  It's 222.

23    Q    (BY MR. MALONE)  When the Texas Commission on

24  Jail Standards inspector showed up to investigate

25  Ms. Page's death, were you involved at all in that

1   investigation?

2           MR. WEILAND:  Object to the form of the

3   question.

4       A    I don't -- I don't even know that was -- that

5   happened.

6       Q    In the first, let's say, week after Ms. Page

7   died, other than Ranger Russell, were you interviewed by

8   anybody else?

9       A    Can you repeat that question?

10      Q    Yes, sir.  Other than -- Ranger Russell

11  interviewed you, I assume, after Ms. Page died.

12      A    Right.

13      Q    Other than him, say in the first week after her

14  death, did anybody else interview you?

15      A    No.  The only one that did was the ranger.

16      Q    I'm sorry?

17      A    No.

18      Q    Okay.  And on pages 307 through 311 is a TCOLE

19  record for you dated April 18, 2018.

20      A    You said --

21      Q    Yeah, 307 --

22      A    307.

23      Q    -- to 311.  Correct?

24      A    Is my TCOLE information you asked?

25      Q    Yeah, Texas Commission on Law Enforcement.  Have

1  you ever seen this before?

2      A    Yes.

3      Q    Okay.  To your knowledge, is all of the education

4  and training you've received related to jail operations

5  been reported to the Texas Commission on Law Enforcement?

6      A    As far as I know.

7      Q    Now, on page 307 it lists, other than Coryell

8  County Sheriff's Office, the T. Don Hutto --

9      A    Uh-huh.

10      Q    -- Corrections Center but not the Bartlett State

11  Jail.  Right?

12      A    Because at Bartlett you -- it was just state jail

13  inmates.  At T. Don you had to have TCLEOSE.

14      Q    Okay.

15      A    So that's where I got my TCLEOSE at.

16      Q    All right.  There's also a TCOLE record in

17  here -- it's on page 312 through 317 -- for a Melissa K.

18  Lovelady.  Are y'all related?

19      A    That's my wife.

20      Q    I didn't want to hazard the guess, but that's --

21      A    Right.

22      Q    -- my guess.  Does your wife still work for the

23  county?

24      A    Yes.

25      Q    Still at the jail?

1    A    She doesn't work in the jail.  She works in

2  dispatch.

3    Q    Gotcha.  Thus, her telecommunications operator

4  license.

5    A    Right.

6    Q    And has dispatch, to your knowledge, in the last

7  five years always been in a separate location from the jail

8  here in the county?

9    A    Has been separate from the jail --

10    Q    Yeah --

11    A    Yes.

12    Q    -- from the jail.

13    A    Yes.

14    Q    Okay.  All right, sir.  I know it's -- a

15  deposition's not a lot of fun to go through, but have I

16  been courteous to you?

17    A    Yes, sir.

18              MR. MALONE:  All right.  I'm going to pass

19  you as a witness.

20              MR. JOHNSTON:  Hold on one second.  Put your

21  microphone back on.

22              MR. WEILAND:  I have some questions.

23              MR. MAGEE:  Oh, here.  Do you need one?

24              MR. JOHNSTON:  Here.  There's one right

25  here.

1           MR. MAGEE:  Here's an extra one.

2           MR. WEILAND:  Does anybody want to take a

3   break for minute besides me?

4           MR. MAGEE:  If you need to take a quick

5   break, that's fine.

6           MR. WEILAND:  Yeah.  I'd just like to

7   take -- really, literally four or five --

8           MR. MAGEE:  Sure.

9           MR. WEILAND:  -- minutes and come right

10  back.

11          THE VIDEOGRAPHER:  Off the record at 2:06

12  p.m.

13          (Recess from 2:06 p.m. to 2:15 p.m.)

14          On the record at 2:15.

15                    EXAMINATION

16  BY MR. WEILAND:

17      Q    Mr. Lovelady, my name's Weiland.  Do you know

18  that I represent your former colleague over here?

19      A    Yes, sir.

20      Q    And I -- I was confused by some of your

21  testimony, so I -- I just want to go back and hit a few

22  points.  And then, also, a couple of issues that I don't

23  think Dean really cover that I'd like to know your

24  information.  I want be too long.

25      A    Okay.

1     Q    Let me -- let me direct your attention first to

2  the decision to go into Ms. Page's cell on the 8th of

3  October.  Okay?

4     A    Okay.

5     Q    Did you feel that it was your responsibility to

6  go into the cell at the time that you did?

7     A    Yes.

8     Q    And why was that?

9     A    Just to get the order back in the jail, the --

10  What is the word?

11     Q    When you say get the order back in the jail, you

12  mean restore order and --

13     A    Restore order and --

14     Q    -- have her behave herself?

15     A    Yes, sir.

16     Q    Okay.  So you considered it your responsibility

17  to go in?

18     A    Yes.

19     Q    When you went into the cell, were you expecting a

20  all-out fight to develop?

21     A    No.

22     Q    Is that what happened?

23     A    Yes.

24     Q    I was noticing towards the end of your testimony

25  that Mr. Malone asked you about Mr. Pelfrey's statement to

the ranger.  Do you remember that?

A    Yes.

Q    And I -- I -- I've watched the video a time or two myself.  Did you -- did you go in there and intentionally grab her and throw her to the ground?

A    No.  I think she was holding on to the sink.  And she let go, and that's when we went to the ground.

Q    And that -- at that time you had her -- her arm, her right arm --

A    I believe so, yes, sir.

Q    -- and you were preparing to handcuff her.  Is that right?

A    Yes.

Q    Okay.  So it wasn't your intention just to throw her to the ground.

A    Right.

Q    Well, it -- it looked like, to me, that once she hit the ground that she just didn't become compliant, did she?

A    No.

Q    So how would you describe, I guess, the ferocity of the fight that developed?

A    What do you mean by "ferocity"?

Q    Well, was it a pretty ferocious fight?  Was it a pretty intense fight a or --

1      A    Yes, it was pretty intense.

2      Q    Because we don't have any audio.

3      A    Right.

4      Q    She was -- she was cursing you and Mr. Pelfrey,

5  wasn't she?

6      A    Yes.

7      Q    Tell the jury what she was saying.

8      A    She --

9      Q    Did she call you mother fuckers?

10     A    Yes, she called us mother fuckers and get the

11  fuck off of me and stuff like that.

12     Q    Okay.  When you -- when you're trying to quiet

13  her down and you were still in the hallway --

14     A    Yes.

15     Q    -- she called you mother fuckers then, also,

16  didn't she?

17     A    Yes.

18     Q    When you asked or Pelfrey tried to convince her

19  to quiet herself, did she say to fuck you?  Pardon the

20  expression.

21     A    When Mr. Pelfrey was out there?

22     Q    Well, when either of you were talking -- if you

23  heard it, first of all, just to you directly.  You -- you

24  testified that on one or two occasions you went up to the

25  door and tried to reason --

1   A Right.

2   Q -- with her knowledge.

3   A Right.  She doesn't cuss me personally when I was

4 outside the door.  It was when we were in the middle of the

5 fight.

6   Q Okay.  Did you hear her curse Mr. Pelfrey when he

7 was trying to reason with her?

8   A I don't remember on that, sir.

9   Q Okay.  When she went into the cell, there was

10 cursing and -- and more yelling?

11   A Yes, when she --

12   Q Loud voices?

13   A Yes.

14   Q And I have read the statements to the ranger.

15 But when you look at the video, for example, I don't see

16 the handcuffs.  Where were the handcuffs initially once

17 she -- once she hit the ground?

18   A They were underneath her.

19   Q Underneath her?

20   A Yes.  She grabbed them and pulled them underneath

21 her.

22   Q So was a good part of your struggle and effort

23 to get her to turn over so that you could handcuff her?

24   A Yes.

25   Q And was that consistent with the way you were

1    trained?

2         A    Yes.

3         Q    Did she attempt to -- I -- I think Mr. Pelfrey

4    has told the ranger that she attempted to bite him.

5         A    She tried to attempt to bite him first, and she

6    was able to bite me on my hand, yes.

7         Q    Did she -- did she actually bite you on the hand?

8         A    Yes.  The ranger took pictures of it.

9         Q    Did she draw blood?

10         A    Yes.

11         Q    That wasn't anything you were expecting when you

12    entered the cell.

13         A    No.

14         Q    Now, there was some testimony about Mr. Pelfrey's

15    role.  First of all, to be very clear, you were the one who

16    made the decision to go into the cell.

17         A    Yes.

18         Q    Okay.  And Mr. Pelfrey worked for you.

19         A    Right.

20         Q    And, of course, he -- he followed you in as he

21    was supposed to.

22         A    Yes, sir.

23         Q    Okay.  He didn't protest.

24         A    No.

25         Q    He knew what his job was.

1      A    Right.

2      Q    Now, you testified that at no time do you -- have

3 you -- Well, let me rephrase that. I think your testimony

4 is that you cannot say that Pelfrey ever put any pressure

5 on the back of Page, on her back.

6      A    Right, because I don't know if he did.

7      Q    Okay. And you can't really tell from the video.

8      A    Right.

9      Q    Mr. Malone was asking you about this phenomenon

10 of positional asphyxia. Remember those -- that series of

11 questions?

12      A    Yes.

13      Q    Okay. Is that something that law enforcement

14 worries about after the fight is over, after the individual

15 has been subdued? You don't then jump on the back of the

16 individual and prevent them from breathing --

17      A    Right.

18      Q    -- do you?

19      A    No.

20           MR. MALONE: Objection, ambiguous,

21 multifarious.

22      Q    (BY MR. WEILAND) You wouldn't jump on the back

23 of an individual once they have been restrained.

24      A    Right.

25      Q    And that didn't happen in this case, did it?

1       A     No, sir.

2       Q     Okay.  Because the fight went on.

3       A     Right.

4       Q     And once she was finally restrained, you rolled

5   her over and found that she wasn't breathing.

6       A     Right.

7       Q     The -- the confusion that I had about this method

8   of removal of inmates from their cells revolves largely

9   around the use of the term "extraction" and the term

10  "removal."

11      A     Yes.

12      Q     And that somewhat -- as I listened to your

13  testimony, some of that seemed to be used interchangeably.

14      A     Yes.

15              MR. MALONE:  Objection, argumentative.

16      Q     (BY MR. WEILAND)  Was it?

17      A     Yes.

18      Q     Did you find yourself using the term "extraction"

19  sort of interchangeably with the term "removal" as you

20  testified this morning?

21      A     I don't understand.  Can you --

22      Q     Okay.  Well, my understanding was that you -- you

23  were trying to define "extraction" --

24      A     Right.

25      Q     -- as a situation where there was perceived

1  danger --

2       A    Yes.

3       Q    Did you --

4            MR. MALONE:  Objection, asked --

5       Q    (BY MR. WEILAND)  -- not?  Did you not --

6            MR. MALONE:  -- asked and answered.

7  Mischaracterizes his prior testimony.

8       Q    (BY MR. WEILAND)  Perceived danger to the

9  officers --

10           MR. MALONE:  Same.

11           MR. WEILAND:  Well --

12           MR. MALONE:  Sorry.

13           MR. WEILAND:  Let me just finish --

14           MR. MALONE:  Sorry.  Go ahead.

15           MR. WEILAND:  -- my question, please.

16      Q    (BY MR. WEILAND)  -- perceived danger to the

17 officers or the inmates.

18           MR. MALONE:  Same objections.

19      Q    (BY MR. WEILAND)  Is that correct?

20      A    Yes.

21      Q    Okay.  And -- and the -- is it true that the

22 extraction teams that you were familiar with in the past

23 generally involved removing one or more inmates from a

24 multi-person cell?  Because you had cells with several

25 inmates in them at once, didn't -- you don't you?

1    A    Yes.  They're dorms.

2    Q    So I read the -- I read the definition.  It

3  sounded like you need a extraction team when you have multi

4  people in the cell, five people.  You need five people to

5  do that.  Is that your understanding?  Or not necessarily?

6    A    Not necessarily.

7    Q    Okay.

8    A    I mean, it -- it depends on the situation.

9    Q    Well, I mean when there's danger perceived.

10    A    Right.

11    Q    Okay.

12    A    Yes, sir.

13    Q    But you could -- you could go into a multi-person

14  cell with just two guys and take someone out --

15    A    Yes.

16    Q    -- if you didn't perceive danger?

17    A    Yes.

18    Q    And the same thing certainly in a segregated cell

19  situation.

20    A    Yes.

21    Q    Take a look at this Exhibit 2 of -- of

22  Mr. Malone's, if you would.  There's a picture in there

23  that he skipped over that I wanted to ask you about.  Would

24  you look at page 155 while we're on at this subject of

25  removing people from cells?

1          MR. MAGEE:  155.

2          THE WITNESS:  Oh, 155.  I thought you said

3   255.  Okay.

4      Q    (BY MR. WEILAND)  You see that sign that's

5   affixed to the side of cell door there that says --

6      A    Yes.

7      Q    -- "Attention" at the top?

8      A    Yes, sir.

9      Q    Okay.  Now, that -- that sign speaks to two

10  officers, doesn't it?

11     A    Yes, sir.

12     Q    And so when -- when is it appropriate or is it

13  always appropriate in a -- in a segregated cell situation

14  that two officers are -- are sufficient?

15          MR. MALONE:  Objection, asked and answered.

16     A    Every time.

17     Q    Every time?

18     A    Every time.

19     Q    Now, I wanted to hit on a couple of things that I

20  think Mr. Malone may not have covered, but I'm interested

21  in your take on this.  Would you look at page 101 while

22  we're looking at this book?  He asked you about this.  This

23  is the inmate visitor list.  Now, this is something that

24  the inmate fills out when she arrives.  Is that right?

25     A    Yes.

1    Q    And these would be people who are approved to

2  come and see her.

3    A    Yes.

4    Q    And I think Mr. Malone may have asked you if you

5  ever saw any of these people actually visiting her.  But I

6  don't know if he asked that question or not, but I'm asking

7  it now.

8    A    No.  I don't --  No, I've never seen them come

9  visit.

10    Q    Okay.  You recognize some of these or all of

11  these names yourself?

12    A    I know one, Patrick Fairchild.

13    Q    Okay.  Now, that -- he -- that -- he's listed as

14  a son.

15    A    Right.

16    Q    He's been in your jail, hasn't he?

17    A    Yes, sir.

18    Q    Okay.  How about James O. Crouch the common-law

19  husband?  Do you know who --  Have you ever met him?

20    A    I've seen him, but I never met him.

21    Q    Well, he used to bring money for the commissary

22  for his common-law wife that came from the proceeds of meth

23  sales -- right -- their meth sales.  So he would -- he

24  would use their income from drug sales to finance her --

25  her commissary fund at the jail, didn't he?

1          MR. MALONE:  Objection, assumes facts not in

2   evidence, argumentative.

3      A    I don't know about that.

4      Q    Do you know how much the common-law husband used

5   to bring to the jail to finance her commissary?

6      A    No.

7      Q    You -- you mentioned in reference to page 222

8   that a person's classification can be changed over time; is

9   that right?

10     A    It's -- every time they come to jail.

11     Q    Okay.

12     A    Because it depends on their charge.

13     Q    Okay.  Well, do you recall that Ms. Page was

14  first --  Well, Ms. Page had been in your jail a few times,

15  hadn't she?

16     A    I believe so, yes.

17     Q    Okay.  Well, when she came to your jail in April

18  of 2017, do you recall that she was bailed out?  This was

19  after the drug raid on her house.  You recall that?

20  Then -- to refresh your recollection, then she was

21  rearrested and got back to your jail in May of 2017.  Do

22  you recall that?

23     A    I can't recall all the inmates that come in, you

24  know.

25     Q    Well, and your lack of recollection is a

1   indication of the fact that you had no real animosity

2   against Ms. Page.  Did you?

3       A     No.

4             MR. MALONE:  Objection, leading, assumes

5   facts not in evidence, argumentative.

6       Q     (BY MR. WEILAND)  Did you have any prior

7   experience with this lady before she got in -- in your jail

8   in 2017?

9       A     No.

10       Q     You weren't out to get her?

11       A     No.

12       Q     After the incident on October 7th, were you out

13   to retaliate against her?

14       A     No.

15       Q     Do you have Exhibit 1 over there somewhere?

16       A     Yes, sir.

17       Q     Would you take a look at the last page of this

18   exhibit for me?  It's a bit difficult to read.  What does

19   that last couple of lines say to you where it starts out

20   "Angela"?  Can you read that out loud?

21       A     It says, "Angela Muff is a snitch bitch."

22       Q     Okay.  What -- what does that mean to you?  First

23   of all, do you know who Angela Muff is or was?

24       A     No, I don't know who --

25       Q     Okay.

1    A    -- Muff is.

2    Q    Do -- do you know what she is implying here?

3          MR. MALONE:  Objection, calls for

4    speculation.

5    A    It -- it means that she -- she told on her or

6    something.

7    Q    She told on her or something?

8    A    Yeah.  I mean, I don't know about what, but --

9    Q    Well -- well, based on your experience in the

10   business, what is a snitch?

11   A    Somebody that goes to the correctional officer

12   and tells them information and stuff like that.

13   Q    Okay.  But sitting here today, you don't know

14   what Angela Muff may have told a correctional officer about

15   Ms. Page?

16   A    Right.

17         MR. WEILAND:  I'll pass the witness.  Thank

18   you.

19         MR. JOHNSTON:  Can we go off the record?  I

20   need to grab one document.

21         MR. MALONE:  Sure.

22         THE VIDEOGRAPHER:  Off the record, 2:34.

23         (Recess from 2:34 p.m. to 2:40 p.m.)

24         On the record at 2:40.

25                   EXAMINATION

BY MR. JOHNSTON:

    Q    Mr. Lovelady, my name's Eric Johnston, and I represent the county in this matter. Do you understand that?

    A    Yes, sir.

    Q    Mr. Malone asked you a few questions earlier out of Exhibit No. 2 on page 28. Do you recall that?

    A    Yes, sir.

    Q    And what is -- what is page 28?

    A    Use of restraints.

    Q    Okay. And if you flip, 28, 29, 30, 31, and then page 32 is a new policy, correct?

    A    Yes, sir.

    Q    Okay. And that new policy says "Separation Section 33," correct?

    A    Yes.

          MR. JOHNSTON: May I have this marked, please, Exhibit 3? Are they --

          MR. MALONE: Yeah.

          MR. JOHNSTON: Thank you.

          THE REPORTER: You're welcome.

          (Exhibit No. 3 marked)

    Q   (BY MR. JOHNSTON) Mr. Lovelady, I'm going to hand to you what I've marked as Exhibit 3.

          Here you go.

1          MR. MALONE:   Thank you.

2     Q    (BY MR. JOHNSTON)   And do you recognize this

3 document?

4     A    It's the restraint chair.

5     Q    And if you flip --  And let me go back for one

6 second.  Do you see on the -- on the front of the Exhibit 3

7 the lower right-hand corner says Coryell CTY 000947?

8     A    Yes, sir.

9     Q    And if you flip back to Coryell CTY 000952, there

10 is a portion of this policy that is Subsection D, and it's

11 labeled "Restraint Chair."  Do you see that?

12     A    Yes, sir.

13     Q    And if you'll flip for me, if you look back at

14 Exhibit 2 pages 28, 29, 30 and 31, that's not in there, is

15 it?

16     A    Starting on 29?  What page starting on?  28.

17 Okay.

18     Q    My question is, is Subsection D Restraint Chair

19 included in Exhibit 2.

20     A    No, sir.

21     Q    Okay.  And Subsection D says, "In addition to the

22 general considerations for restraints, the following

23 specific directives will apply to the restraint chair."

24 Roman numeral -- lower Roman numeral one is Application and

25 Uses, and it says, "The emergency restraint chair will not

1  be used for punishment, harassment, or to intentionally

2  inflict pain on any offender."  Did I read that correctly?

3      A    Yes.

4      Q    And was the restraint chair ever used for

5  punishment of Ms. Page?

6      A    No.

7      Q    Was it ever used to harass Ms. Page?

8      A    No.

9      Q    Was it ever used to intentionally inflict pain on

10  Ms. Page?

11      A    No.

12      Q    Subsection B says, "May only be used for the

13  following reasons."  Number one is control of a disruptive

14  offender.  Do you see that?

15      A    Yes, sir.

16      Q    Now, was -- on October 7th, not the 8th but on

17  the 7th, was Ms. Page placed into a restraint chair?

18      A    Yes.

19      Q    And was she placed in there because she was a

20  disruptive offender?

21      A    Yes.

22      Q    The second one is to prevent -- prevention of

23  bodily harm to other persons, correct?

24      A    Yes.

25      Q    And then the fifth one -- or it's Roman numeral

1  lower case five, is Transportation of a Disruptive Inmate,

2  correct?

3      A    Yes.

4      Q    Now, if you recall, Mr. Malone asked you

5  questions about this policy, and it is --  Give me one

6  second to find it.  It is on Coryell County 949, and it is

7  Subsection C, it says, "No inmate shall be placed in the

8  restraint chair that has been exposed to any chemical

9  sprays without being medically evaluated," correct?

10     A    Yes.

11     Q    Now, if an inmate is disruptive, can they be

12  medically evaluated?

13     A    No.

14     Q    So you have to de-escalate the actions of the

15  inmate before they can be medically evaluated, correct?

16     A    Correct.

17     Q    Now, there was another question that was asked

18  about on the -- on October 7th and 8th whether the nurse

19  was at the jail.  Do you recall that?

20     A    Yes.

21     Q    And what was your answer?

22     A    She was not.

23     Q    And there was a question about how inmates

24  receive medical care.  Do you recall that?

25     A    Yes.

1     Q    Now, inmates are routinely transported by Coryell

2  County to the hospital, correct?

3     A    Yes.

4     Q    So there are other ways to receive medical care

5  than just the nurse and EMS?

6     A    Yes.

7              MR. JOHNSTON:  I pass the witness.

8              MR. MAGEE:  I pass the witness at this time.

9                   FURTHER EXAMINATION

10  BY MR. MALONE:

11     Q    Just a few more questions.  You just testified

12  that Ms. Page was disruptive on October 7, 2017, right?

13     A    On when?

14     Q    October 7th, 2017, the day that she sprayed

15  you --

16     A    Okay.  Yes.

17     Q    -- with the liquid, right?

18     A    Yes.

19     Q    And did you consider her assaulting -- that being

20  an assault of you when she sprayed that liquid on you?

21     A    Yes.

22              MR. JOHNSTON:  I'm going to object.  It

23  calls for a legal conclusion.

24     Q    (BY MR. MALONE)  You had no idea at the time what

25  was in the liquid, right?

1    A    Right.

2    Q    You thought it might be something caustic that

3    could burn your eyes or burn your skin or whatever --

4    A    Yes, sir.

5    Q    -- right?  And so she was being, in your mind,

6    aggressive toward you.

7    A    Yes.

8    Q    She assaulted you in your mind.

9    A    Yes.

10   Q    Right?  She was being disruptive, and this was

11   all on October 7, 2017, right?

12   A    Yes.

13   Q    And then when you went into the cell on that day

14   she still was not compliant, was she?

15   A    No.

16   Q    You actually had to spray her with OC spray,

17   right?

18   A    I think I sprayed her before I went in.

19   Q    Okay.  You sprayed her with OC spray before you

20   went in because you anticipated a problem with her --

21   right? -- on October 7.

22             MR. JOHNSTON:  I'm going to object as a

23   misstatement.

24             MR. MAGEE:  I'm going to join that

25   objection.

1          THE WITNESS:  Can you repeat the question?

2          Q    (BY MR. MALONE)  Yes, sir.  Tell us why you

3     sprayed Ms. Page with OC spray on October 7, 2017, before

4     you went into the cell.

5          A    Because she wouldn't comply with orders.

6          Q    Okay.  And you did that to assist in subduing her

7     so you could force compliance?

8          A    By "force" what do you mean by that?

9          Q    Yes, sir.  I mean, the reason you use OC spray as

10    a jailer is to partially incapacitate somebody.  Maybe

11    they're dealing with the effects of it --

12         A    Yes, sir.

13         Q    -- and that allows you to move in and do what you

14    need to do --

15         A    Yes, sir.

16         Q    -- and use the force that you feel like you need

17    to use.  Right?

18         A    The minimal use, yes.

19         Q    So October 7 you did that.  You sprayed her

20    before you went into the cell because she was not

21    compliant -- right? --

22         A    Yes, sir.

23         Q    -- and had assaulted you, in your mind, by

24    spraying the liquid on you.

25         A    Yes.

1     Q    And then when you went in, she still wasn't

2  compliant, was she?

3     A    No.

4     Q    And, in fact, it got to the point where when you

5  were handcuffing her, y'all were scuffling a bit and her

6  head was banged on the back wall of the cell, right?

7     A    Yes.

8     Q    And that's why she had the bump over her eye that

9  we looked at --

10     A    Yes.

11     Q    -- in photos earlier.  So let's go to October 8.

12  You testified a few minutes ago when Mr. Pelfrey's lawyer

13  was asking you about that date that you had no reason to

14  believe that she was going to fight when you went into the

15  cell.  You remember that testimony?

16     A    That she wasn't going to fight?

17     Q    Yes, sir.

18             MR. JOHNSTON:  I'm going to object as

19  misstates.

20     A    I think --  I --  Repeat the question again --

21     Q    Yes, sir.

22     A    -- for me.

23     Q    When you sprayed the OC spray through the -- the

24  food slot on the cell door on October 8, 2017, you did so

25  because she was not being compliant -- right? --

1    A    Right.

2    Q    -- just like on October 7.

3    A    Right.

4    Q    And you did so to assist in gaining compliance,

5 right?

6    A    Right.

7    Q    And she still wasn't compliant after you sprayed

8 through the slot, correct?

9    A    Right.

10   Q    And then when you went in, isn't it true that you

11 anticipated she was going to act at least in the same

12 manner that she did just the day before?

13   A    Yes.

14           MR. MAGEE:  Object.

15   Q    (BY MR. MALONE)  Okay.  And so you were prepared

16 for that and went in with handcuffs, right?

17   A    Yes.

18   Q    And Mr. Pelfrey went in with handcuffs, right?

19           MR. JOHNSTON:  Objection --

20   A    No.

21           MR. JOHNSTON:  -- mischaracterization.

22   Q    (BY MR. MALONE)  Just you went in with handcuffs?

23   A    Yes.

24   Q    Okay.  Now, you told us earlier, before, that

25 handcuffs are on --

1    A    Utility belt.

2    Q    -- utility belt.  So did Mr. Pelfrey not have a

3  similar belt on October 8?

4    A    Yeah.

5    Q    He did have?

6    A    Yes, sir.

7    Q    But he didn't have handcuffs?

8    A    He had handcuffs.

9    Q    Gotcha.  So each of you had handcuffs when you

10  went into the cell?

11    A    Oh, yes, yes.

12    Q    Okay.  So y'all could both attempt to gain

13  compliance by handcuffing her?

14    A    No.  I -- I he had them on him, but I had pulled

15  mine out to handcuff her.

16    Q    Okay.  So you -- you testified that you did not

17  intentionally throw her to the floor; it's your belief that

18  when she released her hand from the sink as a result of the

19  tension --

20    A    Yes, sir.

21    Q    -- between you and her she went floor, right?

22    A    Yes.

23    Q    And once she went to the ground, she still didn't

24  become compliant, right?

25    A    No.

Q   And at that point was there anything that prevented you from telling Mr. Pelfrey, "Let's go out and shut the door and get an extraction team"?

A   Repeat that question.

Q   Yes, sir.  At the time you testified that Ms. Page released the sink and fell to the ground, was there anything that prevented you from leaving the cell, shutting the door, and telling Mr. Pelfrey we need to get an extraction team in here?

A   When she let go of the sink and she went tumbling down, I went with her.

Q   Okay.  And was there anything at that point to prevent y'all from leaving the cell and getting an extraction team?

A   No, we couldn't leave the cell.

Q   Why not?

A   Because I was on the ground with her.

Q   Okay.  Now, you testified that she was cussing y'all, right?

A   Right.

Q   And you testified that she said get the "F" off of me, right?

A   Right.

Q   And who was she cussing at at that point?

A   She was cussing at both of us.

1    Q    Because y'all were on her.

2    A    No, we weren't on her.  It just means, you know,

3    inmate slang can be like "Get the fuck off me" means don't

4    come near me or get away from me.

5    Q    Okay.  When she said, "Get the 'F' off of me,"

6    where were you

7    A    I was beside her.

8    Q    All right.  And where was Mr. Pelfrey?

9    A    I don't recollect where he was.

10   Q    Okay.  And I know you told us that she never

11   cussed you until y'all were in there, meaning the cell,

12   doing the fighting, right?

13   A    Repeat that, sir.

14   Q    Yes, sir.  You testified that Ms. Page did not

15   cuss you until y'all were in there do -- doing the

16   fighting -- correct? -- in the cell.

17          MR. MAGEE:  I'm going to object as it

18   mischaracterizes his previous testimony.

19   Q    (BY MR. MALONE)  You remember testifying to

20   saying she cussed you when y'all were in there doing the

21   fighting?

22   A    Yes.

23   Q    Okay.  So she didn't cuss you until she was

24   actually in a fight with two men, correct?

25   A    Repeat it again for me, please.

Q    Yes, sir.  She did not cuss you until she was in a physical fight with two men in that cell, correct?

A    Yes.

MR. MALONE:  All right.  Thank you very much, sir.  I pass you as a witness.

FURTHER EXAMINATION

BY MR. WEILAND:

Q    Mr. Lovelady, you hesitated for quite a while in responding to his last couple of questions.  You really remember when she started to cuss you guys out from when you went into the cell?

A    No, wasn't --

MR. MALONE:  Objection, asked and answered.

THE WITNESS:  I was fixing to just say that, too.

Q    (BY MR. WEILAND)  Okay.  You were fixing to say that to Mr. Malone?

A    Yes.

Q    Okay.  But you don't remember the exact sequence of "Get the fuck away from me" or "You --"

A    No.

Q    -- "mother fuckers leave me alone"?

A    No.

Q    But there was talk like that that was going on.

A    Yes.

1    Q    Right?

2    A    Yes, sir.

3    Q    And then -- and he suggested the -- the somewhat

4  incredible idea that while she's biting you -- and -- and

5  was she grabbing your groin area?

6    A    No.  She kicked me in my groin.

7    Q    Kicked you.

8    A    Yes.

9    Q    Okay.  Is that what fomented or is that what

10  caused you to try to -- to strike her or actually strike

11  her?

12    A    Yes.

13    Q    So it wasn't really feasible just to jump up and

14  run outside the cell, was it?

15    A    No.

16    Q    That would be totally against your -- your

17  policies and procedures and accepted standards of conduct

18  by a officer, wouldn't it?

19         MR. MALONE:  Objection, leading.

20    A    Yes.

21    Q    And so --

22         Okay.  I think that's all I have.

23         MR. JOHNSTON:  I pass the witness.

24         MR. MAGEE:  No questions at this time.

25              FURTHER EXAMINATION

BY MR. MALONE:

    Q    Real quick.

    A    Okay.

    Q    So Mr. Lovelady then can -- Strike that. The testimony that you gave in response to Mr. Pelfrey's attorney about when Ms. Page was cussing and not, do you still stand by that?

    A    No, because I really don't know when it all started.

    Q    Okay. So we should disregard all of those answers to those questions by him that you gave?

               MR. JOHNSTON: Objection, argumentive.

               MR. MAGEE: And misstates what the questions were, objection.

    A    No.

               MR. MALONE: All right. I pass the witness.

               MR. MAGEE: Okay. I'll pass the witness and reserve all my questions till time of trial.

               THE VIDEOGRAPHER: Off the record. End of the deposition at 2:57.

               (The deposition concluded at 2:57 p.m.)

```
                    CHANGES AND SIGNATURE

WITNESS: STEVEN RUSSELL LOVELADY  DATE: AUGUST 16, 2019

PAGE    LINE    CHANGE          REASON
```

1
2
3
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

1       I, STEVEN RUSSELL LOVELADY, have read the

2   foregoing deposition and hereby affix my signature that

3   the same is true and correct, except as noted above.

4

5                            _____

6                            STEVEN RUSSELL LOVELADY

7   STATE OF TEXAS           §

8   COUNTY OF _____§

9       Before me, _____, on this day

10  personally appeared STEVEN RUSSELL LOVELDAY, known to me or

11  proved to be under oath or through _____(description

12  of identity card or other document) to be the person whose

13  name is subscribed to the foregoing instrument and

14  acknowledged to me that he executed the same for the

15  purpose and consideration therein expressed.

16      Given under my hand and seal of office on

17  this _____ day of _____, 2019.

18

19

20                           _____

21                           NOTARY PUBLIC IN AND FOR THE

                            STATE OF TEXAS

22                           COMMISSION EXPIRES: _____

23

24

25

<pre>
 1                    UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                         WACO DIVISION
 3   JOHN FAIRCHILD and SUSIE      §
     FAIRCHILD, Individually,      §
 4   and as Independent            §
     Administrators of, and on     §
 5   behalf of, the ESTATE OF      §
     KELLI LEANNE PAGE and the     §
 6   heirs-at-law of KELLI         §
     LEANNE PAGE,                  § CASE NO. 6:19-CV-00029-ADA-JCM
 7                                 §
             Plaintiffs,           § JURY DEMANDED
 8                                 §
     VS.                           §
 9                                 §
     CORYELL COUNTY, TEXAS;        §
10   STEVEN RUSSELL LOVELADY;      §
     and WESLEY HARLAND PELFREY,   §
11                                 §
             Defendants.           §
12
13                      OFFICER'S CERTIFICATE
             ORAL DEPOSITION OF STEVEN RUSSELL LOVELADY
14                        AUGUST 16, 2019
15           I, TERRI L. EDWARDS, Certified Shorthand
16   Reporter in and for the State of Texas, do hereby certify
17   that there came before me on the 16th day of August 16,
18   2019, at 9:15 a.m. at 210 South 7th Street, Gatesville,
19   Texas 76528, the following named person, to-wit:  STEVEN
20   RUSSELL LOVELADY, who was by me duly sworn to testify to
21   the truth and nothing but the truth of his knowledge
22   touching and concerning the matters in controversy in this
23   case; that he was thereupon carefully examined upon his
24   oath and his examination reduced to typewriting with the
25   aid of Computer-Assisted Transcription; and that the
</pre>

deposition is a true record of the testimony given by the witness; that it was requested that the witness review the transcript; and that the transcript was submitted on _____, 2019, to the attorney for the witness for review, signature, and return to me by _____, 2019.

I further certify that I am neither attorney nor counsel for, not related to, or employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

Further certification requirements will be certified to after they have occurred.

Certified to by me this _____ day of _____, 2019.

_____
TERRI L. EDWARDS, Texas CSR 4055
Expiration Date: 12.31.19
Independent Reporters Association
Firm Registration No. CRF-10398
1308 Grinnel Drive
Mesquite, Texas 75150
Phone: 972.270.4711

1  deposition is a true record of the testimony given by the
2  witness; that it was requested that the witness review the
3  transcript; and that the transcript was submitted on
4  _____9.5-19_____, 2019, to the attorney for the witness
5  for review, signature, and return to me by _10-5-19_,
6  2019.
7      I further certify that I am neither attorney
8  nor counsel for, not related to, or employed by any of the
9  parties to the action in which this deposition is taken and
10 further that I am not a relative or employee of any
11 attorney or counsel employed by the parties hereto or
12 financially interested in this action.
13     Further certification requirements will be
14 certified to after they have occurred.
15     Certified to me this _5th_ day of
16 _Sept._____, 2019.
17
18
19     _Terri L. Edwards /wk_
20     TERRI L. EDWARDS, Texas CSR 4055
       Expiration Date: 12.31.19
21     Independent Reporters Association
       Firm Registration No. CRF-10398
22     1308 Grinnel Drive
       Mesquite, Texas 75150
23     Phone: 972.270.4711
24
25

# Exhibit F

```
                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                     WACO DIVISION
JOHN FAIRCHILD and SUSIE      §
FAIRCHILD, Individually,      §
and as Independent            §
Administrators of, and on     §
behalf of, the ESTATE OF      §
KELLI LEANNE PAGE and the     §
heirs-at-law of KELLI         §
LEANNE PAGE,                  § CASE NO. 6:19-CV-00029-ADA-JCM
                              §
          Plaintiffs,         § JURY DEMANDED
                              §
VS.                           §
                              §
CORYELL COUNTY, TEXAS;        §
STEVEN RUSSELL LOVELADY;      §
and WESLEY HARLAND PELFREY,   §
                              §
          Defendants.         §
```

-----------------------------------------------------------
VIDEOTAPED ORAL DEPOSITION OF
WESLEY HARLAND PELFREY
AUGUST 16, 2019
VOLUME 1 OF 1
-----------------------------------------------------------

     VIDEOTAPED ORAL DEPOSITION OF WESLEY HARLAND
PELFREY, produced as a witness at the instance of the
Plaintiffs and duly sworn, was taken in the above-styled
and numbered cause on the 16th day of August, 2019, from
3:09 p.m. to 4:19 p.m. before Terri L. Edwards, Certified
Shorthand Reporter in and for the State of Texas, reported
by machine shorthand at the Coryell County Attorney's

1  Office, 210 South 7th Street, Gatesville, Texas 76528,
2  pursuant to the Federal Rules of Civil Procedure and the
3  provisions stated on the record or attached hereto.
4                     A P P E A R A N C E S
5  FOR THE PLAINTIFFS:
        MR. T. DEAN MALONE
6        LAW OFFICES OF DEAN MALONE, P.C.
        900 Jackson Street, Suite 700
7        Dallas, Texas 75202
        Telephone: 214.670.9989
8        Fax: 214.670.9904
        Email: dean@deanmalone.com
9
   FOR THE DEFENDANT CORYELL COUNTY, TEXAS:
10       MR. ERIC A. JOHNSTON
        McGINNIS LOCHRIDGE LLP
11       600 Congress Avenue, Suite 2100
        Austin, Texas 78701
12       Telephone: 512.495.6064
        Fax: 512.505.6364
13       Email: ejohnston@mcginnislaw.com
14  FOR THE DEFENDANT STEVEN RUSSELL LOVELADY:
        MR. J. ERIC MAGEE
15       ALLISON, BASS & MAGEE, LLP
        A.O. Watson House
16       402 West 12th Street
        Austin, Texas 78701
17       Telephone: 512.482.0701
        Fax: 512.480.0902
18       Email: e.magee@allison-bass.com
19  FOR THE DEFENDANT WESLEY HARLAND PELFREY:
        MR. S. CASS WEILAND
20       SQUIRE PATTON BOGGS LLP
        2000 McKinney Avenue, Suite 1700
21       Dallas, Texas 75201
        Telephone: 214.758.1504
22       Fax: 214.758.1550
        Email: cass.weiland@squirepb.com
23
   ALSO PRESENT:
24       Steven Russell Lovelady
        Kevin Thomas, Videographer
25       Scott Williams

```
                         INDEX

                                              Page

Appearances ........................................   2

WESLEY HARLAND PELFREY

     Examination by Mr. Malone .....................   5


Changes and Signature .............................  55


Court Reporter's Certificate ......................  57




          EXHIBITS REFERENCED BUT NOT ATTACHED

  2   Collection of Documents ......................  20
```

1          (All parties present have hereby waived the

2          necessity of the reading of the statements

3          by the deposition officer as required by

4          Rule 30(b)(5)

5          THE VIDEOGRAPHER:  Going on the record

6  Friday, August 16, 2019, at 3:09 p.m.  Beginning the

7  deposition of Wesley Pelfrey.  Will Counsel please state

8  their appearances for the record?

9          MR. MALONE:  Dean Malone here on behalf of

10  the Plaintiff.

11          MR. WEILAND:  Stephen Cass Weiland on behalf

12  of the witness.

13          MR. JOHNSTON:  Eric Johnston on behalf of

14  Coryell County, Texas.

15          MR. MAGEE:  Eric Magee on behalf of Steven

16  Lovelady.

17          THE VIDEOGRAPHER:  Will the court reporter

18  please swear in the witness?

19          THE REPORTER:  Mr. Pelfrey, if you'll please

20  raise your right hand, I'll swear you in.  Do you solemnly

21  swear or affirm that the testimony you're about to give

22  will be the truth, the whole truth, and nothing but the

23  truth?

24          THE WITNESS:  Yes.

25          THE REPORTER:  Thank you.

1    THE WITNESS:  Thank you.

2         WESLEY HARLAND PELFREY,

3    having been first duly sworn, testified as follows:

4                    EXAMINATION

5    BY MR. MALONE:

6         Q    Good afternoon, Mr. Pelfrey.  How are you?

7         A    Pretty good. How are you?

8         Q    Good.  Now, you've been sitting here in the room

9    on August 16, 2019, most of the day while we took

10   Mr. Lovelady's deposition, correct?

11        A    Yes.

12        Q    So you have kind of a good sense of how the

13   questions go and how it all works?

14        A    Uh-huh.

15        Q    "Yes"?

16        A    Yes, sir.

17        Q    All right.  Have you ever given a deposition

18   before?

19        A    No.

20        Q    Okay.  Would you give us your full name, please?

21        A    Wesley Harland Pelfrey.

22        Q    Would you give us your month and year of birth?

23        A    May of '76.

24        Q    And what town or city do you live in?

25        A    Gatesville, Texas.

1    Q    Okay.  And that's where we're sitting today,
2 correct?

3    A    Yes.

4    Q    All right.  If don't understand any of my
5 questions, would you let me know at the time?

6    A    Okay.

7    Q    Thank you.  And after listening to Mr. Lovelady
8 for a while, is there anything that you heard him testify
9 in his deposition that you thought to yourself that's not
10 right?

11    A    Not that I can think of, no.

12    Q    Okay.  All right.  And I'll ask you the same
13 thing I asked him in general.  From a physical and mental
14 perspective, do you feel like you can testify truthfully
15 and accurately today?

16    A    Yes.

17    Q    You feel good and in your right mind?

18    A    Yes.

19    Q    Okay.  Thank you.  Let's cover some background on
20 you first, if we could.  Did you graduate high school?

21    A    Yes.

22    Q    Where?  Which high school?

23    A    Gatesville High School.

24    Q    And what year?

25    A    1995.

1      Q    Have you lived in Gatesville all your life?

2      A    Yes.

3      Q    And after graduating Gatesville High School in

4  1995 did you attend any colleges, universities, or trade

5  schools?

6      A    No.  I worked at Walmart for a couple of years.

7  Then I went to work at TDC.

8      Q    Okay.  So would it be true to say other than any

9  training you've received related to working in a jail or a

10  prison --  Strike that.  I already forgot what I said.

11  Would it be accurate to say that other than high school --

12  you know, education through high school and any training

13  you received related to working in a jail or a prison, you

14  haven't had any other education?

15      A    No, I've had -- I've been in school for mortuary

16  science.  I almost finished an associate's, been to EMT

17  school, and that's about it.

18      Q    Now, mortuary science, you said you almost got an

19  associate's?

20      A    Yes.

21      Q    Is that what you would need to be able to do

22  that?

23      A    Yes.

24      Q    What interested you in that?

25      A    I just -- it's a interesting to subject to me, I

1  mean.

2     Q     All right.

3     A     I had friend, his mom did it, and I got to go

4  watch them embalm, and I thought it was a interesting job.

5     Q     All right.  And what -- what made you decide to

6  not keep pursuing that?

7     A     My boss was trying to get me to do illegal things

8  that could've got me in trouble, so we had a dispute about

9  it.  And he said it was his way or the highway, so I quit.

10    Q     Illegal things related to deceased people?

11    A     Well, it was just, like, talking to family.

12  While you're a student you're not allowed to talk to the

13  family, and he was trying to get me to talk to the family

14  and, you know, start trying to arrange funerals and all.

15  You can't do.

16    Q     Hmm.

17    A     And I told him I wasn't gonna, and, like I said,

18  he said it was his way or the highway.

19    Q     And you chose the highway wisely --

20    A     Yeah.

21    Q     -- it sounds like.  Okay.  And then EMT school,

22  when did you do that?

23    A     That'd been 2008, I believe.

24    Q     Where was that?

25    A     Temple College.

1    Q    And how many -- were -- was it hours that you

2    took or --

3    A    Yeah, it was hours.  I don't remember exactly how

4    many, but --

5    Q    Did you complete it?

6    A    I completed it.  I just never went and took the

7    state board.

8    Q    Did you lose interest in that job or what?

9    A    I don't know why I never went and did it.

10    Q    So give us a sense of the types of classes you

11    took to -- what do you call it? -- get a EMT certificate or

12    degree?

13    A    It was a certificate for EMT.

14    Q    Okay.  Can you give us a list maybe of the types

15    of classes you took?

16    A    Anatomy.  That's about the only one I can think

17    of for them right now.

18    Q    How long was that school in months or years?

19    A    Six months, I believe.

20    Q    Full-time?

21    A    Uh-huh.

22    Q    "Yes"?

23    A    Yes.

24    Q    Did you ever do any fieldwork related to becoming

25    an EMT?

      A    I did ride-outs along with Belton Fire Department
and Scott & White Hospital.

      Q    About how many rides-outs do you think you did?

      A    About eight.

      Q    And by "eight," would each of those be multiple
occurrences, or do you mean just eight occurrences?

      A    No.  It'd be like eight totally different days,
like I'd have to go stay with them for 12 hours, and I'd do
ride-outs.  So you have -- you may have one a day.  You may
have 12 a day.

      Q    Could be car wrecks, could be --

      A    Yeah.

      Q    -- heart attack, could be anything?

      A    Anything.

      Q    Okay.  So you know we've talked about positional
asphyxiation in this case with Mr. Lovelady.  When you went
to EMT school, did you learn about positional asphyxiation?

      A    Yes.

      Q    And what did you learn in EMT school about
positional asphyxiation?

      A    Oh, pretty much just be careful how they're --
how you position them.  I mean, there's not a lot you can
really say, to just be careful.

      Q    Okay.  And what did you learn about how you
should not position a person if you were concerned about

positional asphyxiation?

    A    To get them off their stomach as quick as you can, don't leave them there.

    Q    And did you learn that positional asphyxiation can be more of a problem with someone who is obese?

    A    No.  They never said anything about that.

    Q    Okay.  So other than EMT school at Temple College and the mortuary science classes you took and high school and then other classes related to jail and/or TDCJ work, have you had any education?

    A    Oh, just the school of life, learned everything --

    Q    Good answer --

    A    -- I could.

    Q    -- to a long-winded question --

    A    Yeah.

    Q    -- school of life.  Let's talk about school of life.  And let me just ask you more succinctly, have we covered all of your education?

    A    Yes.

    Q    Okay.  Let's talk about your work history, if we could.  After high school in 1995, what was your first position?

    A    I was a cashier at Walmart.

    Q    Did you start that in '95?

    A    I believe I started that in '94.

1    Q    Part-time before you graduated?

2    A    Yeah, it was part-time.

3    Q    And then when did that position end?

4    A    In 2000, I believe.

5    Q    And you were full-time, I assume, after high

6    school?

7    A    Yes.

8    Q    What was your next employment position?

9    A    Texas Department of Criminal Justice.

10    Q    And where did -- where did you work initially for

11    TDCJ?

12    A    I began at Goree.

13    Q    How do you spell that?

14    A    G-o-r-e-e.  And that's in Huntsville.

15    Q    Okay.  And did you start with TDCJ in year 2000?

16    A    Yes.

17    Q    When did your employment end there?

18    A    '05 or '06.  I'm not sure which one.

19    Q    Okay.  So you started at Goree.  Where were you

20    next assigned in TDCJ?

21    A    I made laundry manager at the Hughes Unit here in

22    Gatesville.

23    Q    Okay.  And did you --

24    A    I then transferred to the Hilltop Unit here as

25    the laundry manager.

1    Q    And anywhere else?

2    A    No.  That's where I left from, was Hilltop.

3    Q    Okay.  Now, was one of those units an all-female

4  unit at the time you were there?

5    A    Hilltop.

6    Q    And that was the last unit that you were at

7  with --

8    A    Yes.

9    Q    -- TDCJ?  What about Goree and Hughes?  Were

10  they --

11    A    Hughes is maximum security men, and Goree was

12  kind of a co-ed.  They have men and women.  They just

13  lockdown the men when the women come out.  Other than that,

14  it's a -- the women stay locked up passing through.

15    Q    Did you find any unique challenges with

16  all-female versus all-male versus co-ed?

17    A    It was all about the --

18            MR. WEILAND:  Object to the form of the

19  question.

20    Q    Not really any significant differences

21  between them?

22    A    No, not to me, no.

23    Q    Now, I think we have some of your personal

24  information, and I thought it indicated that you might have

25  had some difficulty adjusting after being at a all-female

1  unit -- or adjusting to an all-female unit is probably more

2  accurate.

3      A    No.

4      Q    Make any sense to you?

5      A    No.

6      Q    All right.  When you went to work for TDCJ in

7  year 2000, did you receive any training?  Let's say in the

8  first year.

9      A    I first -- it was a six-week course then.  You

10  had a six-week academy you had to attend.  I don't remember

11  if it was six or eight weeks, may have been eight weeks.

12      Q    When you weren't a laundry manager, what were you

13  doing for TDCJ?

14      A    Security.

15      Q    And what is security?

16      A    Making sure the officers and the inmates are

17  safe, and, I mean --

18      Q    What were your duties being in security for TDCJ?

19      A    Same as that, just making sure everybody's

20  staying safe, watch out and make sure the inmates aren't

21  hurting theirselves or any of the officers.

22      Q    Okay.  So would you lock dorms?  Would you check

23  cells?

24      A    Lock dorms.  Depending where you're at, you'd

25  have to walk, check each cell, feed chow, shower them, give

1    them opportunity to go to rec.

2         Q    Similar duties to what you've learned are duties

3    for a jailer --

4         A    True.

5         Q    -- in a county jail?  "Yes"?

6         A    Same.

7         Q    Okay.

8         A    Yes.

9         Q    As part of your training at TDCJ, did you cover

10   cell extraction?

11        A    Yes.

12        Q    Did TDCJ, the unit you worked at, have cell

13   extraction team?

14        A    Yes.

15        Q    And how many people were comprised in each team

16   at TDCJ?

17        A    Five.

18        Q    So your entire time in corrections, both at

19   TDCJ -- and we haven't talked yet about Coryell County --

20   your experience has been the cell extraction teams are made

21   up of five people?

22        A    Yes.

23        Q    Was that covered in your six- or eight-week

24   academy at TDCJ?

25        A    Yes.

1    Q    And do you remember what, if anything, you

2    were -- Well, strike that. Do you remember what you were

3    told about when the cell extraction team would be needed at

4    TDCJ?

5    A    With TDC it's -- you had the cell extraction and

6    you had a removal, just like at the jail. On cell

7    extraction if you had to go in and they were fighting, they

8    were not going to cooperate, you had a cell extraction. If

9    they were upset, you went in, you got them under control,

10   you did a removal. They may still not have wanted to go,

11   but they cooperated. And on the removals, just like the

12   jail, you could have two people on separation.

13   Q    So removal, if I understand you correctly, at

14   TDCJ would be a situation in which either a prisoner is

15   willing to leave the cell or may be hesitant.

16   A    Yeah. I mean, they're still going. They don't

17   want to, but --

18   Q    Okay.

19   A    -- they're cooperating.

20   Q    All right. Versus somebody who's not

21   cooperative, that's when a cell extraction would be done?

22   A    Yes.

23                MR. JOHNSTON: Objection,

24   mischaracterization.

25   Q    (BY MR. MALONE) Or fighting, that's when a cell

1  extraction could be done?

2       A    It could.

3       Q    Okay.  At TDCJ did they also cover positional

4  asphyxiation?

5       A    I -- I can't recall if they did or not.

6       Q    Did they have restraint chairs at the TDCJ units?

7       A    I never used one there.

8       Q    Did you ever participate in a cell extraction for

9  TDCJ?

10      A    No.

11      Q    Did you have to be specially trained to be on a

12 cell extraction team at TDCJ?

13      A    They did have certain people on their teams.

14      Q    And, as far as you knew, those were folks that

15 were specially trained to do that?

16      A    Yeah, yes.

17      Q    So from security to laundry at TDCJ, was that a

18 promotion?

19      A    Some believed it was.  Some thought it wasn't.

20 It just --

21      Q    Did you prefer doing laundry over security?

22      A    Yes.

23      Q    Why?

24      A    It was Monday through Friday.

25      Q    Okay.  So when you left TDCJ in 2005-2006, where

1   did you next work?

2       A    I believe at the time I went to work for Farm

3   Bureau.

4       Q    What did you do for Farm Bureau?

5       A    Kind of a secretary.

6       Q    For a -- an agent --

7       A    Yes.

8       Q    -- here in town?  How long -- what -- when did

9   you work there?  From 2005-2006 until about when?

10      A    2007, I believe, and that is when I left to go to

11  the EMT school.

12      Q    Okay.  And where did you work after Farm Bureau?

13      A    Auto Zone.

14      Q    How long were you there?

15      A    I'd say seven years.

16      Q    So roughly 2007 to 2014?

17      A    Uh-huh.

18      Q    "Yes"?

19      A    Yes.

20      Q    And what was your next position?

21      A    After that's when I came here.

22      Q    Coryell County?

23      A    Yes.

24      Q    Sheriff's department?

25      A    There was some time in between there and here,

though.

Q    Okay.  So when did you start with Coryell County?

A    May 17th of 2017.

Q    Now, when you initially started with Coryell County, did you have a jailer's license?

A    No.

Q    Did you have a temporary jailer's license?

A    They did give me a temporary license.

Q    And what did you have to do to get a temporary jailer's license?

A    You had to work with, like, a supervisor for a few weeks in the jail.

Q    Did you have to have any specialized training other than that?

A    No.

Q    And were you required to get a jailer's license within a year?

A    Yes.

Q    And, in your understanding, that was in accordance with state law?

A    Yes.

Q    You said there was some time in between leaving Auto Zone and working for the sheriff's department.  That was -- what? -- three years, give or take, something like that?

1     A   (Moving head up and down)

2     Q   What were you doing during that time period?

3     A   Taking care of my dad.

4     Q   Was he ill?

5     A   Yeah.

6     Q   Sorry about that.

7     A   That's all right.

8     Q   And, as we sit here today on August 16, 2019, are

9 you still employed by the Coryell County Sheriff's

10 Department?

11    A   Yes.

12    Q   The whole time you've been employed by Coryell

13 County have you worked at the jail?

14    A   Yes.

15    Q   And has there only been one jail in Coryell

16 County, to your knowledge, during that time?

17    A   Yes.

18          MR. MALONE:  With everybody's permission,

19 I'm just going to use the same Exhibit 2 that we used in

20 Mr. Lovelady's deposition.  Everybody good with that?

21          MR. WEILAND:  I suggest that we just number

22 the exhibits consecutively, and so this was Exhibit 2 for

23 every deposition.  Would you -- that's the Exhibit 2 now

24 for this case.  That's fine.

25          MR. MALONE:  Okay.  You good with that?

1          MR. JOHNSTON:  Yeah, I'm good with that.

2          MR. MAGEE:  Yeah, I agree.

3          MR. MALONE:  Okay.

4          MR. JOHNSTON:  Makes it easy.

5     Q    (BY MR. MALONE)  All right.  If you would -- you

6 should have Exhibit 2 in front of you there, page 318 and,

7 also page 319, is just the Texas Commission on Law

8 Enforcement report dated as of April 18, 2018, for you.

9 Have you ever seen a report like that for you?

10    A    Yes.

11    Q    So we see service history on page 318 shows

12 temporary jailer's license May 22, 2017, which is, I guess,

13 five days after you started, right?

14    A    Yes.

15    Q    And then it looks like that ended not quite a

16 year later on April 2, 2018, when you got your jailer's

17 license.

18    A    Yes.

19    Q    And is that after you completed the basic county

20 jail course listed on the bottom of page 318?

21    A    Yes, it is.

22    Q    And on page 319 that shows a hundred and eight

23 course hours.  Was that actual time spent in that course, a

24 hundred and eight hours?

25    A    Yes, it is, a hundred and eight.

1    Q   Was that spread over a year, or was it all, like,
2 one chunk of time, a hundred and eight hours?
3    A   It was four weeks --
4    Q   Okay.
5    A   -- I believe.  I think that was right, four
6 weeks.
7    Q   Now, on page 319 there is listed less lethal
8 chemical weapons training which you took on November 1,
9 2017, correct?
10    A   Yes.
11    Q   And that was after, obviously, the October 8
12 death of Kelli Page.
13    A   Yes.
14    Q   Were you instructed to take that class as a
15 result of Ms. Page's death?
16    A   No.  It was just the way it was scheduled.
17    Q   All right.  Because I noticed that Mr. Pelfrey
18 also took it, I believe, on the same day.  Do you have that
19 recollection?
20         MR. WEILAND:  Mr. Lovelady?
21    Q   (BY MR. MALONE)  I'm sorry.  Mr. Lovelady.
22    A   I believe we did.
23    Q   Okay.  Was that actually at the Coryell County
24 Sheriff's Office?
25    A   Yes, it was.

1    Q    And I notice on page 319 it says training rosters

2    in parentheses, and it shows eight hours.  Was that a

3    full-day deal?

4    A    Yes, because we had to do it on our day off.

5    Q    Easy to remember, huh?

6    A    Yeah.  Yes, it was.

7    Q    So was that something that was required, to your

8    knowledge, of all Coryell County jail personnel?

9    A    Yes, it is.

10   Q    Do you know why that was required on that day?

11   A    I don't --  What I remember, they had been

12   scheduled a day or two earlier and something happened and

13   they just had to reschedule for that day.

14   Q    When were you told that you had to attend that

15   class?

16   A    Oh, I can't remember that far back.

17   Q    Was it that weeks or days earlier?

18   A    I don't remember.

19   Q    And before taking that class, just looking at

20   this TCOLE record, I don't see that you had taken a less

21   lethal chemical weapons training course.  Am I right?

22   A    Yes.  No, I haven't.

23   Q    Did you receive any training on that at the TDCJ?

24   A    Yes.

25   Q    Did y'all use tasers in TDCJ?

1     A    No.

2     Q    And I'm assuming you agree with Mr. Lovelady,

3     that you've never seen those used at the Coryell --

4     A    Yes, sir.

5     Q    -- County Jail?

6     A    I never used them in there.

7     Q    Have you ever even seen a taser in the Coryell

8     County Jail other than maybe on a sheriff's deputy

9     that's bringing --

10     A    No.

11     Q    -- somebody in?

12     A    That'd be the only place you'd see it.

13          MR. WEILAND:  Be careful to let him finish

14     so she can get that.

15          THE WITNESS:  Okay.

16     Q    (BY MR. MALONE)  Okay.  Let's go to October 7,

17     2017, and you've obviously -- obviously heard

18     Mr. Lovelady's testimony about the incident that he had

19     with Ms. Page when she had sprayed some liquid on him,

20     right?

21     A    (Moving head up and down)

22     Q    Were you present when that happened?

23     A    I believe that day -- I think I was in booking.

24     Q    How did you find out about it happening?

25     A    He came back down after he picked up the trays

from chow.  He just told me that she had sprayed it on him.

Q    Okay.  And I think the evidence will indicate
that it was Mr. Washington that helped Mr. Lovelady related
to that incident.  Do you think that to be true?

A    Yes.

Q    Okay.  And what, if anything, did you do on
October 7, 2017, relating to that incident?

A    I -- I actually went to the hospital with her to
have her head checked out.  I'm the one that transported
her back to the jail.

Q    Okay.  Was it just you and her?

A    Yes.

Q    So before she was transported, she had been put
into a restraint chair?

A    Yes.

Q    And then do you know how long she was in that
restraint chair before transport?

A    I don't remember.

Q    Did a lieutenant show up after that incident and
determine that she should go to the hospital?

A    I don't believe so.

Q    Who determined that she should go to the
hospital?

A    I believe Corporal Lovelady did.  He was in
charge.

1    Q    Did you have any incident at all with her from

2    the time you left the -- the jail all the way to the

3    hospital on the 7th and all the way back to the jail?

4    A    No.

5    Q    No?  She acted appropriately?

6    A    Yeah.

7    Q    Okay.  Did she cuss you on that day?

8    A    No.

9    Q    Try to get away?

10    A    No.

11    Q    Act aggressive?

12    A    No.

13    Q    Before October 7, 2017, did you --  Well, strike

14    that.  Bad question.  Before Ms. Page's incarceration,

15    which included October 7 of 2017, did you know her?

16    A    No.

17    Q    Was the first time you met her just simply as a

18    result of her being incarcerated here in Coryell County?

19    A    Yes.

20    Q    Before October of 2017 had you had any issues

21    with her just between the two of y'all?

22    A    No.

23    Q    Before October 7 of 2017 were you aware of

24    Ms. Page having any issues with Mr. Lovelady?

25    A    No.

1    Q    Before October 7 of 2017 were aware of Ms. Page
2  creating any kind of a disturbance in the Coryell County
3  Jail?
4    A    Not up to that day that I can think of.
5    Q    Okay.  Or -- or banging anything on the cell door
6  before that day?
7    A    No.
8    Q    Nothing at all sticks out in your mind?
9    A    Not that I can think of.
10   Q    Okay.  So you return Ms. Page to the Coryell
11 County Jail on October 7, 2017.  And to my understanding,
12 she was put into a cell different from the one in which the
13 incident occurred.
14   A    I'm -- I'm sure.  I can't guarantee it.  I can't
15 remember that far back, but --
16   Q    That's fine.
17   A    -- I'm sure they were probably cleaning the other
18 cell.
19   Q    And she had been in a seg cell on -- on the 7th?
20   A    Yes.
21   Q    Now, we've heard testimony and I think we've seen
22 some -- some documents that indicate that if you're going
23 to go into a seg cell, even with a compliant prisoner,
24 you've got to have two folks.  Right?
25   A    Yes.

1    Q    What about when you're returning a prisoner to a
2  seg cell?  Do you need two jailers?
3    A    Yes.
4    Q    And is that what happened on the 7th?
5    A    Yes, there would've been two of us taking her
6  back.
7    Q    Was it you and Mr. Lovelady?
8    A    I can't remember.
9    Q    Okay.  So --
10    A    I don't remember if it was he or Washington that
11  was with me, but --
12    Q    All right.  So would it be true to say on October
13  7, 2017, you never saw any interaction that you can recall
14  between Ms. Page and Mr. Lovelady?
15    A    No, I can't think of anything.
16    Q    Okay.  And other than what we've already talked
17  about regarding October 7, 2017, is there anything that --
18  that -- in your mind that you recall about Ms. Page acting
19  in a manner you thought was inappropriate?
20    A    Can you repeat that one?
21    Q    Yes, sir.  Other than what you've already
22  testified to -- and this is just about October 7 of 2017,
23  that Saturday -- do you remember anything that Ms. Page did
24  or -- or anybody alleges that she did that you believe is
25  inappropriate?

1      A      Well, throwing the liquid on Corporal Lovelady --

2      Q      Right.

3      A      -- was very inappropriate, her not cooperating

4   when they went into the cell.

5      Q      Okay.  And how do you know she didn't cooperate

6   on the 17th -- I'm sorry -- on the 7th?

7      A      Well, if she had cooperated, they wouldn't -- she

8   wouldn't have got sprayed.  I mean, if she --

9      Q      So --

10      A      -- wouldn't have been fighting them, wouldn't

11   have got the bump on her head either.

12      Q      So it's your understanding that on the 7th she

13   was uncooperative in her cell, right?

14      A      Yes.

15      Q      And she was also fighting in her cell, correct?

16      A      Yes.

17      Q      And that she was sprayed with OC spray on the 7th

18   because she was uncooperative?

19      A      Yes.  She wouldn't cuff up or anything.

20      Q      And that she was physically injured as a result

21   of fighting in her cell on the 7th?

22              MR. WEILAND:  Object to the form of the

23   question.

24      Q      (BY MR. MALONE)  Is that your understanding?

25      A      Yeah, yes.

1    Q    Okay.  Where did you gain that understanding?

2  Somebody tell you?

3    A    Well, I mean, if they brought her out and she was

4  covered with spray and she had the bump -- I mean, I'm sure

5  she didn't spray herself or run into the wall.

6    Q    All right.  So that was circumstantial evidence,

7  and you made the assumption as to the other stuff?

8    A    Yeah.

9    Q    You just assumed that nobody would spray her just

10  for the heck of it?

11    A    Yeah, or yes.

12    Q    I got it.  Let's go to October 8 of 2017.  That

13  was a Sunday.  Do you remember that being a Sunday?

14    A    Yes.

15    Q    What time did you start that day?

16    A    We report at 6:45.  That way you can have your

17  briefing before you start.

18    Q    And did y'all have a briefing that day?

19    A    Yes.

20    Q    Do you remember it?

21    A    I don't remember what all was talked about, but --

22    Q    Is there anything that stands out in your mind

23  about that briefing?

24    A    No.

25    Q    Okay.  And then your -- your shift would start at

7:00, I guess.

A    Yes, sir.

Q    And what were you assigned to do that day?

A    That day I was on the floor.  I was responsible for doing cell checks and count.

Q    And what else had you done before other than being on the floor?

A    I'd been in booking the day before, fed chow, was changing their laundry.  That's about it.

Q    Okay.  So what you do when you're on the floor versus doing booking or doing chow or doing laundry, are those all separate functions?

A    Yes.

Q    Okay.  So you could come in one day and somebody says to you, the supervisor says today you're doing laundry, and that's all you would do?

A    No.  You would still help on the floor.

Q    Okay.

A    It was just at that point when you had time to do it, then you would go do laundry.

Q    Same with booking?  You might do booking for an hour or two and then go back out --

A    A lot of them switch out every four hours.  Like, you'd start in booking four hours.  Then you'd go on the floor four hours.

1    Q    And does it depend on how many people have been

2  arrested, also, whether you had people showing up at the

3  jail?

4    A    Not really.

5    Q    Have you ever been in booking and nobody's

6  showing up because aren't many arrests?

7    A    Yeah, yes.

8    Q    Okay.  And working in booking you become familiar

9  with Texas Commission on Jail Standards --

10   A    Yes.

11   Q    -- regulations, right?

12   A    Yes.

13   Q    And you, I guess, noticed -- was it January 1 of

14 2018? -- the change in the mental health evaluation form

15 you have to do --

16   A    Yes.

17   Q    -- from Sandra Bland Act.  Yes?

18   A    Yes.

19   Q    Okay.  As of October 8, 2017, did you have any

20 information that indicated to you that Kelli Page had

21 mental health issues?

22   A    No.

23   Q    Do you know who had done Ms. Page's booking for

24 the incarceration that included October 8, 2017?

25   A    No, I do not.

1    Q    Okay.  So on October 8, 2017, your shift starts

2  at 7:00.  Normal day, as far as you know --

3    A    Yes.

4    Q    -- starting out?

5    A    (Moving head up and down)

6    Q    What's the first thing you can recall, as you sit

7  here today, that related to Ms. Page that you had to deal

8  with or that you heard about?

9    A    First thing I can think of was -- was her tapping

10 on the door and me going in there and talking to her.

11 That's probably about it.

12   Q    And, obviously, when I say "Ms. Page" during this

13 deposition, you understand I'm referring to Kelli Leanne

14 Page?

15   A    Yes.

16   Q    Okay.  So she's tapping on the door, and you go

17 to the cell door to talk to her?

18   A    Yes.

19   Q    And, as I talked with Mr. Lovelady about, the

20 door's closed, and there's glass that you can see her

21 through.  Correct?

22   A    Yes.

23   Q    When she's tapping on the door, do you have any

24 idea what she's using at that time?

25   A    At first I couldn't tell.  But, I mean, then she

stepped back from the door, and you could see it.

Q    What was it?

A    Hairbrush.

Q    How long did you talk to her at that time?

A    Well, maybe ten minutes.

Q    What did she say to you?

A    Pretty much that I was going in the chair, she wasn't, and that she's going to stab me in the eye with a hairbrush.

Q    Just out of the blue?

A    Yeah.  She was upset.

Q    About what, in your understanding?

A    Really couldn't tell.  She was just upset and screaming.  I'm not sure if she just wanted out of that cell or what.

Q    Do you know whether Mr. Lovelady had spoken with her before you talked to her that time?

A    He had.

Q    Okay.  If a prisoner in Coryell County at the jail wants to get the attention of a jailer, how would -- should he or she do so?

A    Use their speaker in their cell, their call --

Q    Do you know whether --

A    -- control.

Q    I'm sorry.  Were you finished?

1   A   It's just a button you hit to call control, and

2   control will answer them.

3   Q   Okay.  Do you know whether Ms. Page did that at

4   all that morning?

5   A   I'm not sure.

6   Q   Do you know whether those types of requests are

7   recorded?

8   A   I have no idea.

9   Q   Do you know whether control can just turn off

10  access to a cell for -- for that speaker?

11  A   No.

12  Q   Cannot?

13  A   No, they cannot.

14  Q   Have you ever worked in control?

15  A   Yes.

16  Q   And do you know what, if anything, is recorded

17  related to control?  I mean audio.

18  A   Not that I know of.

19  Q   Okay.  And what did you tell Ms. Page during that

20  first interaction?

21  A   I was just trying to calm her down and talked to

22  her and -- and I told her, I said, "You keep acting up, you

23  know you're going to end up in the chair, and we don't want

24  that."  And she had -- seemed like she kind of calmed down

25  when I left, but as soon as I walked off she started doing

1  it again.

2      Q    Doing what?

3      A    Beat -- or tapping on the door and yelling.

4      Q    Now, you started to say "beating," and then you

5  said "tapping," which is the word you used before.  Would

6  you characterize it as --

7      A    Yeah.

8      Q    -- tapping or beating?

9      A    Just tapping.

10      Q    Okay.  Did you ever hear her beating on the door

11  on October 8, 2017?

12      A    Seemed like a couple of times maybe she was

13  kicking the door.

14      Q    Okay.  And do you know there's video of her

15  inside the cell that morning, right?

16      A    Uh-huh.

17      Q    Have you seen that?

18      A    I saw the part with me and Lovelady.  I haven't

19  seen the very first of it, so --

20      Q    Okay.  So you have not seen from the point at

21  which she woke up until she started going to the door and

22  interacting --

23      A    Yeah, I have not seen that part.

24      Q    And I forget the word you used.  You said -- I

25  think you said once or twice or maybe a couple of times you

1 think she -- did you say hit or kicked the door?

2     A    Kicked.

3     Q    What did you say?

4     A    Kicked.

5     Q    What makes you think she kicked it?

6     A    Just the sound it makes.  It's pretty distinct

7 when they kick the door.

8     Q    Have you ever seen a door get misaligned and thus

9 be able to be opened by an inmate?

10     A    I have not, but --

11     Q    Okay.  So after you spoke to her that time, did

12 you speak to her anymore before Mr. Lovelady entered the

13 cell?

14     A    No.

15     Q    What happened next related to her?

16     A    He opened the food slot, sprayed her, shut the

17 bean slot, and we went in.

18     Q    I don't think I caught the end of what you said.

19 You opened --

20     A    We -- we opened -- he shut the bean slot --

21     Q    All right.

22     A    -- opened the door, and we both went into the

23 cell.

24     Q    Okay.  So bean -- bean slot/food slot same thing?

25     A    Same thing.

1    Q    Before y'all went into the cell, did -- it's

2  corporal, right?  Corporate Lovelady?

3    A    Yes.

4    Q    I know I call everybody mister because I don't

5  want to mess up all that.

6    A    Yeah, Corporal Lovelady.

7    Q    Did -- did Corporal Lovelady tell you what y'all

8  were going to do?

9    A    Yes.

10    Q    What did he say?

11    A    That we were going to get her to cooperate and

12  calm down and sit her in the chair and we were going to

13  leave her in there or we'd take her to detox.  We would

14  have to decontaminate her for the spray, which she'd be sat

15  back in the chair and put in detox, most likely.

16    Q    Okay.  And before y'all -- or before Corporal

17  Lovelady opened the door, did one of y'all wheel the

18  restraint chair to the hallway in front of the cell, or was

19  it already out there?

20    A    I don't remember.

21    Q    But do you remember whether it was out there at

22  the time?

23    A    It was out there.

24    Q    Okay.  Pretty close to the cell door?

25    A    Yes.

1    Q    Within just six, eight, ten feet?

2    A    Oh, yeah.

3    Q    All right.  After watching the video of your and

4    Corporal Lovelady's use of force with Ms. Page on

5    October 8, 2017, is there anything that you thought in your

6    mind it did not depict -- that you couldn't see but which

7    actually happened?

8                    MR. JOHNSTON:  I'll object to form.

9    A    I don't understand that.

10   Q    Yes, sir.

11   A    I don't understand that question.

12   Q    Well, fair enough.  I'll -- I'll ask it another

13   way.  So you said you saw the video of you and Corporal

14   Lovelady dealing with Ms. Page on October 8, 2017, right?

15   A    Yes.

16   Q    In the cell, right?

17   A    Yes.

18   Q    And did you see the video from the point at which

19   y'all entered until the point at which her body was

20   removed?

21   A    No, I didn't see up to the point where she was

22   removed.

23   Q    Okay.  But at some point --  Did you see it up to

24   a point at which she was receiving medical treatment?

25   A    Yes.

1      Q    Okay.  During that period of time you were in the

2  cell the whole time.  Am I right?

3      A    I was in there for a little while, and then I was

4  told to -- I needed to go down to the booking area and wait

5  for them.

6      Q    Okay.  The time that you were in the cell on

7  October 8 that -- that we're discussing, you obviously saw

8  things, heard things, did things.  Correct?

9      A    Yes.

10     Q    Based on what you saw and you heard and you did,

11  do you think the video accurately depicted all of that or

12  showed all of that?

13          MR. WEILAND:  Object to the compound,

14  multi- --

15     A    I --

16          MR. WEILAND:  -- farious question.

17          THE WITNESS:  I think it -- I'm trying to

18  find a way to say it.  I think it made things look like --

19  it made it look like things happened that didn't happen.

20     Q    (BY MR. MALONE)  Okay.  Give me a list of the

21  things that the video made look like happen that didn't

22  happen.

23     A    Where everybody's saying that I had my elbow in

24  the back of her neck.  That's not what was going on.  I

25  didn't have a knee on the back of her neck.  I wasn't

putting weight on her.

    Q    Anything else?

    A    That's all I can think of right now.

    Q    Okay.  Now, so it's your testimony you believe the video -- it makes -- the video makes it look like you had your elbow on the back of Ms. -- Ms. Page's neck, correct?

    A    Yes.

    Q    And you're saying that didn't happen?

    A    Didn't --

    Q    Okay.

    A    -- not at all.

    Q    Do you have any explanation as to why the video makes it look like you had your elbow on the back of her neck?

    A    No explanation for it.  That's just -- I mean, I was down, trying to help him get the arm so we could handcuff her, but --

    Q    Okay.  And I think you said your knee on the back of her neck, you believe the video makes it look like you had your knee on the back of her head?

    A    Oh, I've been questioned about it a couple of times.

    Q    Okay.  But do you think the video shows that or seems to indicate that you did?

1    A    Yeah, seems to --

2          MR. JOHNSTON:  I'm going to --

3          THE WITNESS:  -- indicate it.

4          MR. JOHNSTON:  -- object to a misstatement.

5          THE WITNESS:  Oh.

6    Q    (BY MR. MALONE)  All right.  I'll just ask a

7    different question.  You testified a minute ago when I

8    asked you about things that the video shows --  Strike

9    that.  When I was asking you about the video, you said a

10   minute ago, you testified that you believe the video makes

11   it look like things happened that really didn't happen,

12   right?

13   A    Yes.

14   Q    And one of those things you said was your knee

15   being on the back of Ms. Page's neck, right?

16   A    Yes.

17   Q    But you're telling us that even if it looks like

18   that you didn't do that?

19   A    No, not at all.

20   Q    And another thing you listed that the video, at

21   least to you, seems to indicate when you watch is that you

22   had put weight on Ms. Page?

23          MR. WEILAND:  Object to the form of the

24   question.  That's not what he said.  He said he was

25   questioned about it.

1    THE WITNESS:  Yeah, I've been questioned

2  about it.  All of that's not -- not really what I would say

3  you see in it.  That's a lot of what I keep being

4  questioned about.  Because, I mean, they showed -- you

5  know, everybody in the country's seen the video now.  It

6  was on You Tube, but --

7    Q    (BY MR. MALONE)  Oh, it is?

8    A    I think it's everywhere.  But I've -- I've been

9  questioned about it and -- which it's -- none of it -- none

10  of it happened.

11    Q    Okay.  Well, then let's go back to my original

12  question because my question to you was looking at the

13  video are there things which you when looking at it think

14  it indicates happen but which didn't happen.  You remember

15  me asking that question?

16    A    Kind of.

17    Q    Okay.  And then you gave me a list.  You said no

18  elbow on her neck, no knee on her neck, and no weight on

19  her.  You remember that?

20    A    Yeah.

21    Q    So were you not -- were those answers not related

22  to what you saw on the video but instead what you've been

23  question about?

24    A    Yes, more of what I've been questioned about.

25    Q    Okay.  So let me go back to my original question.

1  Is there -- looking at the video, from your perspective is

2  there anything you see in the video that seems to indicate

3  that something happened that really didn't happen?

4      A    Not to me.

5      Q    Okay.  You believe the video accurately

6  reflects --

7      A    Yes.

8      Q    -- what actually happened?  Yes?

9      A    Yes.

10     Q    Okay.  Now, at one point the video -- toward the

11  end of the use of force incident Ms. Page is -- is

12  relatively facedown, right?

13     A    Yes.

14     Q    And Mr. Pelfrey [sic] is on the lower portion of

15  her body or I'll just dealing with the lower portion of her

16  body, and you're dealing with the upper portion of her

17  body.  Right?

18              MR. WEILAND:  Object to form of the

19  question, compound question.

20     A    Still dealing with her arm.

21     Q    All right.  I've got to ask more questions

22  because he objected.  So at some point during the end of

23  the use of force incident Mr. Pelfrey is dealing with the

24  lower portion of Ms. Page's body, correct?

25     A    Corporal Lovelady?

1    Q    Yes.

2    A    Yes.

3    Q    All right.  Did I say "Pelfrey"?

4    A    Yes.

5    Q    Let me just start all over.  At some point during

6    the end of the use of force incident on October 8, 2017,

7    Corporal Lovelady is dealing with -- physically dealing

8    with the lower portion of Ms. Page's body, correct?

9    A    Yes.

10   Q    And at the same time you are physically dealing

11   with the upper portion of Ms. Page's body, correct?

12   A    Yes.

13   Q    What is it that you're attempting to do when

14   you're physically dealing with the upper portion of

15   Ms. Page's body?

16   A    Still trying to get her left arm over so we could

17   handcuff her.

18   Q    Okay.  And at that point you're laying pretty

19   much on your stomach, correct?

20   A    Yes.

21   Q    And what are you doing with your arms?

22   A    I'm underneath her, trying to get the arm in

23   the -- out so we could handcuff.

24   Q    Okay.  And are you saying then at no time you put

25   any pressure on Ms. Page's upper back area during that

incident?

  A  You can't really say because, I mean, so much is going on, and you've got to define what you mean by "pressure."

  Q  Weight.

  A  I mean, no, I didn't put weight on her. I mean, I may have, you know, had a little pressure to keep her from getting out and away from me. But, no, there wasn't weight put on her.

  Q  Okay. So pressure, it would've been putting pressure on her upper back area to keep her from getting out from under you?

  A  Holding on to her arm mostly.

  Q  Okay. Well, you say "mostly." That means --

  A  Because we were --

  Q  -- part of what --

  A  We were tangled. My arm was with her pretty much the whole time.

  Q  Okay. And wasn't there a time at which when you're laying pretty much on your stomach toward the end of the use of force incident on October 8, 2017, you put pressure on her upper back?

  A  No.

  Q  And how was it that you used the pressure you just testified to a minute ago to keep her from getting out

1  under from under you?

2      A    On her arm.  Like, I said, we were tangled with

3  arms.

4      Q    Just her arms?

5      A    Yes.

6      Q    Your testimony is that you never were using any

7  pressure on her upper back?

8      A    Exactly.

9      Q    And your testimony is that you were never on her

10  upper back, right?

11      A    Exactly.

12      Q    Now, have you read the autopsy in this case, the

13  autopsy report?

14      A    No.

15      Q    Any reason why not?

16      A    I just haven't.

17      Q    And, as we sit here today, it's been not --

18  almost two years since her death, correct?

19      A    Yes.

20      Q    Do you have any understanding as to what the

21  medical examiner said was the cause of Ms. Page's death?

22      A    No, I do not.

23      Q    Are you interested in learning that?

24      A    Possible.

25      Q    Is there any reason you haven't tried to figure

1  that out in almost two years since her death?

2      A    I don't know about you, but I really don't like

3  to think about things like this.  I mean, I've done good

4  for the last year and a half to get to where I don't have

5  nightmares about it.  So I'm not trying to add something to

6  it.

7      Q    Yeah.

8                  MR. WEILAND:  Is this a good time to take

9  five minutes.

10                 MR. MALONE:  Sure.

11                 THE VIDEOGRAPHER:  Off the record at 3:59.

12                 (Recess from 3:59 p.m. to 4:09 p.m.)

13                 On the record at 4:09.

14     Q    (BY MR. MALONE)  Mr. Pelfrey, when you were

15  employed at the Coryell County Jail, were you given a copy

16  of a policy and procedures manual?

17     A    Yes.

18     Q    If you look at page five please of Exhibit 2,

19  it's my understanding that's the first page, or the cover

20  page, of the manual.  Do you agree?

21     A    Possibly.  I can't say for sure.

22     Q    All right.  And when you were handed -- or

23  provided, rather, a copy of that policy and procedures

24  manual, did you read it?

25     A    Yes.

1    Q    And do you recall it having policies regarding

2    cell extraction?

3    A    Well, it's been about two years ago, but I'm not

4    real sure what all I read in it.

5    Q    And have you -- you haven't --

6    A    It's been a while.

7    Q    -- reviewed it since then?

8    A    No, I haven't.

9    Q    Have y'all had training on items in the Coryell

10   County policy and procedure operations manual since then?

11   A    They do.  We have little -- a lot of time in our

12   briefings before our shifts they'll go over some of them,

13   and I'll -- I was trying to see if -- if this is the one

14   that we got that was on the disc or the paper.  I can't

15   remember.

16   Q    I may have asked you this before, and if I did, I

17   apologize.

18   A    Okay.

19   Q    Have all the statements that you have signed

20   related to Ms. Page and/or her death been accurate and

21   truthful?

22   A    Repeat that.

23   Q    Any -- any statements that you have signed

24   related to Ms. Page and her death, have they been truthful?

25   A    Yes.

1    Q    You gave a statement to the Texas Ranger, Adam

2    Russell, correct?

3    A    I didn't know his name, but --

4    Q    But a Texas Ranger?

5    A    Yes.

6    Q    Okay.  And you don't know Adam Russell?

7    A    I never met the man before the day.

8    Q    Other than giving a statement to the Ranger --

9    and, again, I don't want to know anything you talked to you

10    your lawyer about, have you given any statement to anybody

11    else?

12    A    No.

13    Q    When you left employment with TDCJ, did you quit

14    or were you terminated?

15    A    I quit.

16    Q    What about your employment at Auto Zone?  Quit or

17    terminated?

18    A    Quit.

19    Q    Was that because of your dad?

20    A    A lot to do with it, yes.

21    Q    Okay.  Pages 112 and 113 in Exhibit 2 in front of

22    you there, is that a statement that you initialed on page

23    112 and signed on page 113?

24    A    Yes, it is.

25    Q    And that would be one of those statements you

1    just answered about a moment ago that's -- that was

2    truthful and accurate when you signed it, right?

3       A    Let me read it on here.  I believe it's all the

4    same, yeah.

5       Q    There's some photos beginning on page 121, the

6    photos that are 121 -- I'm still in Exhibit 2 -- through

7    124, do you know who took those?

8       A    I do not.  I do not know who took them.

9       Q    Have you ever seen more than just one restraint

10   chair at the Coryell County Jail?

11      A    We have two now.

12      Q    When did you get the second one?  Before or

13   after Ms. Page's death?

14      A    After.

15      Q    Okay.

16      A    It was after.

17      Q    And on page 147 and 148 in Exhibit 2, are those

18   photos of the first restraint chair that y'all had?

19      A    I would say it is since we didn't have the other

20   one, but they're -- they look pretty much identical.

21      Q    Are they used with both men an women?

22      A    Yes.

23      Q    When you took Ms. Page to the hospital on October

24   7, 2017, were you in -- were you with her in the same room

25   the whole time at the hospital?

1      A    Yes.

2      Q    Is that a security requirement?

3      A    Yes.

4      Q    Did you learn anything about her medical history

5  at that time?

6      A    No, never -- never talked much about it.

7      Q    And since you've worked at the Coryell County

8  Jail, have you been able to learn medical or mental health

9  care information about any of the inmates?

10      A    No.

11      Q    If you wanted to learn that information, is there

12  a way for you to do that?

13      A    Not that I know of.

14      Q    On page 222 is a classification notice that

15  actually has stamped on it "Milam County Sheriff's

16  Department Copy" at the bottom.  Do you know what

17  classification Ms. Page had October 8, 2017?

18           MR. WEILAND:  I'm sorry.  Does he know now,

19  or did he know then?  I couldn't understand the question.

20           MR. MALONE:  Yeah, does he know, does he

21  know now --

22           MR. WEILAND:  Oh.

23           MR. MALONE:  -- what her classification was

24  on that date.

25      A    Well, it shows she was reclassified on 5-25.

1   Q    And I probably shouldn't even have referred to
2   that document because that was several months before.
3   Right?
4   A    Well, they're -- she'd still been a medium, I
5   believe.
6   Q    But do you know for sure that --
7   A    I don't know for sure.
8   Q    Okay.
9   A    But according to this, it looked like she should
10  still -- should've still been a medium.
11  Q    And what does "medium" mean in application at the
12  jail in Coryell County?
13  A    Just medium custody, depending on their charges.
14  They're -- they're not maximum security.  They're not
15  minimum.
16  Q    But what does that -- what does that translate
17  into?  How -- where is that person housed, or can they be
18  housed with other medium only but not low or high?
19  A    Medium can pretty much, I believe, be house with
20  either one of them.  You can't have maximum with minimum,
21  but you can put medium with minimum if you have to.  I
22  haven't done classification in a while, but I believe
23  that's how it was.
24  Q    All right, sir.  Have I been courteous to you?
25  A    Yes, you have.

1          MR. MALONE:  I'm going to pass you as a

2     witness.

3          THE WITNESS:  All right.

4          MR. MAGEE:  I'll reserve my questions.

5          MR. JOHNSTON:  I'll do the same.

6          MR. WEILAND:  Let me just ask my colleague a

7     question before I pass him.  I don't think I have any

8     questions, but --

9          THE VIDEOGRAPHER:  Off the record at 4:18.

10          (Recess from 4:18 p.m. to 4:19 p.m.)

11          MR. WEILAND:  I have no questions -- I have

12     no further questions, you'll be happy to hear.

13          THE VIDEOGRAPHER:  Off the record.  Ending

14     the deposition at 4:19 p.m.

15          (The deposition ended at 4:19 p.m.)

16

17

18

19

20

21

22

23

24

25

CHANGES AND SIGNATURE

WITNESS: WESLEY HARLAND PELFREY   DATE: AUGUST 16, 2019

PAGE    LINE       CHANGE              REASON

1

2

3

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1       I, WESLEY HARLAND PELFREY, have read the

2  foregoing deposition and hereby affix my signature that

3  the same is true and correct, except as noted above.

4

5                    _____

6                    WESLEY HARLAND PELFREY

7  STATE OF TEXAS          §

8  COUNTY OF _____§

9       Before me, _____, on this day

10  personally appeared WESLEY HARLAND PELFREY, known to me or

11  proved to be under oath or through _____(description

12  of identity card or other document) to be the person whose

13  name is subscribed to the foregoing instrument and

14  acknowledged to me that he executed the same for the

15  purpose and consideration therein expressed.

16       Given under my hand and seal of office on

17  this _____ day of _____, 2019.

18

19

20                    _____

21                    NOTARY PUBLIC IN AND FOR THE

                    STATE OF TEXAS

22                    COMMISSION EXPIRES: _____

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JOHN FAIRCHILD and SUSIE      §
FAIRCHILD, Individually,       §
and as Independent            §
Administrators of, and on     §
behalf of, the ESTATE OF      §
KELLI LEANNE PAGE and the     §
heirs-at-law of KELLI         §
LEANNE PAGE,                  §   CASE NO. 6:19-CV-00029-ADA-JCM
                              §
        Plaintiffs,           §   JURY DEMANDED
                              §
VS.                           §
                              §
CORYELL COUNTY, TEXAS;        §
STEVEN RUSSELL LOVELADY;      §
and WESLEY HARLAND PELFREY,   §
                              §
        Defendants.           §

OFFICER'S CERTIFICATE
ORAL DEPOSITION OF WESLEY HARLAND PELFREY
AUGUST 16, 2019

        I, TERRI L. EDWARDS, Certified Shorthand
Reporter in and for the State of Texas, do hereby certify
that there came before me on the 16th day of August 16,
2019, at 3:09 p.m. at 210 South 7th Street, Gatesville,
Texas 76528, the following named person, to-wit:  WESLEY
HARLAND PELFREY, who was by me duly sworn to testify to the
truth and nothing but the truth of his knowledge touching
and concerning the matters in controversy in this case;
that he was thereupon carefully examined upon his oath and
his examination reduced to typewriting with the aid of
Computer-Assisted Transcription; and that the deposition is

1  a true record of the testimony given by the witness; that

2  it was requested that the witness review the transcript;

3  and that the transcript was submitted on _____,

4  2019, to the attorney for the witness for review,

5  signature, and return to me by _____, 2019.

6          I further certify that I am neither attorney

7  nor counsel for, not related to, or employed by any of the

8  parties to the action in which this deposition is taken and

9  further that I am not a relative or employee of any

10 attorney or counsel employed by the parties hereto or

11 financially interested in this action.

12          Further certification requirements will be

13 certified to after they have occurred.

14          Certified to by me this _____ day of

15 _____, 2019.

16

17

18 _____

19 TERRI L. EDWARDS, Texas CSR 4055

   Expiration Date: 12.31.19

20 Independent Reporters Association

   Firm Registration No. CRF-10398

21 1308 Grinnel Drive

   Mesquite, Texas 75150

22 Phone: 972.270.4711

23

24

25

```
 1          UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                 WACO DIVISION
 3  JOHN FAIRCHILD and SUSIE    §
    FAIRCHILD, Individually,    §
 4  and as Independent          §
    Administrators of, and on   §
 5  behalf of, the ESTATE OF    §
    KELLI LEANNE PAGE and the   §
 6  heirs-at-law of KELLI       §
    LEANNE PAGE,                § CASE NO. 6:19-CV-00029-ADA-JCM
 7                              §
        Plaintiffs,    § JURY DEMANDED
 8                              §
    VS.                         §
 9                              §
    CORYELL COUNTY, TEXAS;      §
10  STEVEN RUSSELL LOVELADY;    §
    and WESLEY HARLAND PELFREY, §
11                              §
        Defendants.    §
12
13          OFFICER'S CERTIFICATE
       ORAL DEPOSITION OF WESLEY HARLAND PELFREY
14              AUGUST 16, 2019
15          I, TERRI L. EDWARDS, Certified Shorthand
16  Reporter in and for the State of Texas, do hereby certify
17  that there came before me on the 16th day of August 16,
18  2019, at 3:09 p.m. at 210 South 7th Street, Gatesville,
19  Texas 76528, the following named person, to-wit: WESLEY
20  HARLAND PELFREY, who was by me duly sworn to testify to the
21  truth and nothing but the truth of his knowledge touching
22  and concerning the matters in controversy in this case;
23  that he was thereupon carefully examined upon his oath and
24  his examination reduced to typewriting with the aid of
25  Computer-Assisted Transcription; and that the deposition is
```

```
 1  a true record of the testimony given by the witness; that
 2  it was requested that the witness review the transcript;
 3  and that the transcript was submitted on  9-5-19   ,
 4  2019, to the attorney for the witness for review,
 5  signature, and return to me by  10-5-19   , 2019.
 6          I further certify that I am neither attorney
 7  nor counsel for, not related to, or employed by any of the
 8  parties to the action in which this deposition is taken and
 9  further that I am not a relative or employee of any
10  attorney or counsel employed by the parties hereto or
11  financially interested in this action.
12          Further certification requirements will be
13  certified to after they have occurred.
14          Certified to by me this  5th  day of
15    Sept.   , 2019.
16
17
18          Terri L. Edwards /wk
19          TERRI L. EDWARDS, Texas CSR 4055
            Expiration Date: 12.31.19
20          Independent Reporters Association
            Firm Registration No. CRF-10398
21          1308 Grinnel Drive
            Mesquite, Texas 75150
22          Phone: 972.270.4711
23
24
25
```

# Exhibit G

# On-Scene Consulting

September 24, 2019

Mr. T. Dean Malone, Esq.
Law Offices of T. Dean Malone, PC
900 Jackson Street, Suite 730
Dallas, Texas 75202

## <u>Federal Rules of Civil Procedure 26 (a) (2) (B) Report</u>

**JOHN FAIRCHILD and SUSIE FAIRCHILD, individually, and as Independent Administrators of, and on behalf of, the ESTATE OF KELLI LEANNE PAGE and the heirs-at law of KELLI LEANNE PAGE, Plaintiffs.**
**vs.**
**CORYELL COUNTY, TEXAS; STEVE RUSSELL LOVELADY; and WESLEY HARLAND PELFREY, Defendants.**
**(CIVIL ACTION NO. 6:19-CV-29).**

Dear Mr. Malone,

Thank you for retaining me to analyze and render opinions regarding the October 8, 2017, In-Custody Death of Ms. Kelli Leanne Page by Coryell County Jailer Corporal Steve Russell Lovelady and Jailer Wesley Harland Pelfrey. Pursuant to the requirements of Rule 26, I have studied reports, photographs, videos, Coryell County Documents, and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. I provide all of my opinions based upon a reasonable degree of law enforcement and corrections probability.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

Fairchild v Coryell County
P-001629
App. 277

# On-Scene Consulting

**Materials Reviewed:**

1. Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner, In the County of Dallas, State of Texas, (Fairchild v. Coryell County, P0000001-9).

2. Coryell County Sheriff's Office Detention Booking Report, (Fairchild v. Coryell County, P0000012-14).

3. Coryell County Sheriff's Office, Incident-Details Report, IR No. 17-06977, (Fairchild v. Coryell County, P0000152-156).

4. Coryell County Sheriff's Jail Procedure Operations Manual, (P000334-527).

5. The State of Texas Coryell County Commissioners Court, September 28, 2015, (Fairchild v. Coryell County, P0000015-151).

6. Coryell County Sheriff's Office, IR-Property, IR No. 17-06977, (Fairchild v. Coryell County, P0000157-159).

7. Coryell County Sheriff's Office Statement Form, Case No. 17-06977, (Fairchild v. Coryell County, P0000160-165).

8. Coryell County Sheriff's Office, Incident-Details Report & Miscellaneous Documents, (Fairchild v. Coryell County, P0000167-179).

9. Coryell County Sheriff's Office, Call Master Report & Miscellaneous Documents, (Fairchild v. Coryell County, P0000180-333).

10. Medical Records for Kelli Leanne Page, (Fairchild v. Coryell County, P0000528-540).

11. Ken Paxton Attorney General of Texas, Custodial Death Report, CDR #17-560-CJ, Kelli Leanne Page, (Fairchild v. Coryell County, P0000541-547).

12. State of Texas, Certification of Vital Records, Coryell County, State File No. 015102, Kelli Leanne Page, (Fairchild v. Coryell County, P0000548).

13. Reporter's Record Inquest Hearing No. 17-0104, In Re: Kelli Leanne Page, Inquest Hearing, (Fairchild v. Coryell County, P0000549-627).

14. Miscellaneous Letters, (Fairchild v. Coryell County, P0000628-632).

15. Miscellaneous Documents, RE: Kelli Leanne Page, (Fairchild v. Coryell County, P0000633-658).

16. Texas Commission on Jail Standards, Coryell County Jail, Gatesville Texas, Inspection, (Fairchild v. Coryell County, P0000659-662).

17. Miscellaneous Email Correspondence, (Fairchild v. Coryell County, P0000663-666).

18. Inmate Death Reporting Form, Coryell County Jail, Page, Kelli, Leanne, (Fairchild v. Coryell County, P0000667).

19. Miscellaneous Emails, (Fairchild v. Coryell County, P0000668-716).

20. Texas Commission on Jail Standards, (Fairchild v. Coryell County, P0000717-731).

21. Miscellaneous Letters, (Fairchild v. Coryell County, P0000732-733).

22. Texas Commission on Law Enforcement Personal Status Report, Steven R. Lovelady, (Fairchild v. Coryell County, P0000734-738).

23. Texas Commission on Law Enforcement Personal Status Report, Melissa K. Lovelady, (Fairchild v. Coryell County, P0000738-744).

24. Texas Commission on Law Enforcement, Personal Status Report, Wesley H. Pelfrey, (Fairchild v. Coryell County, P0000745-746).

25. Order for Autopsy, Kelli Leanne Page, (Fairchild v. Coryell County, P0000747-748).

26. Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner, Cause of Death Report, Case IFS-17-17913-CC, (Fairchild v. Coryell County, P0000749-750).

27. Southwestern Institute of Forensic Services at Dallas, Office of the Medical Examiner, Autopsy Report, Case IFS-17-17913-CC, (Fairchild v. Coryell County, P0000751-758).

28. Texas Department of Public Safety, Texas Rangers Report of Investigation, (Fairchild v. Coryell County, P0000778-793).

29. Coryell Memorial Healthcare Systems Records for Kelli Leanne Page, (Fairchild v. Coryell County, P0000794-821).

30. Diagram of Kelli Leanne Page's Cell at Coryell County Jail, (Fairchild v. Coryell County, P822).

31. Texas Department of Public Safety Voluntary Statement, Steven Lovelady, (Fairchild v. Coryell County, P0000826-827).

32. Texas Department of Public Safety Voluntary Statement of Wesley Pelfrey, (Fairchild v. Coryell County, P0000828-829).

33. Texas Department of Public Safety Voluntary Statement of Desmond Dents, (Fairchild v. Coryell County, P0000830-831).

34. Texas Department of Public Safety, Texas Highway Patrol Division Offense Report, by Trooper III Jackie L. Ford, 10/8/17, Page, Kelli Leanne, (Fairchild v. Coryell County, P0000832-833).

35. Coryell County Sheriff's Office, Incident Details Report by Officer Dayton, Report No. 17-06977, (Fairchild v. Coryell County, P0000834-849).

36. Miscellaneous Coryell County Sheriff's Office Jail Incident Reports & Medical Information, (Fairchild v. Coryell County, P0000850-886).

37. Coryell County Jail Inmate Observation Log, Cell S4, 10/2017, Inmate Kelli Leanne Page, (Fairchild v. Coryell County, P0000888).

38. Plaintiff's Original Complaint, Civil Action No. 6:19-cv-29.

39. Defendant Wesley Pelfrey's Responses to Plaintiff's Second Set of Discovery, Case No. 6:19-cv-29.

40. Physician Clinical Report, Coryell Memorial Hospital Emergency Department & Other Miscellaneous Medical Documents, Page, Kelli Leanne, 10/7/17, (001-72).

41. Screening Forms for Suicide and Medical/Mental/Developmental Impairments, for Kelli Leanne Page, 5/15/17.

42. Coryell County Sheriff's Office Detention-Medical Questionnaire Report, 5/15/17.

43. CoryellCty Documents (00001-426).

44. Defendant Steven Russell Lovelady's Responses to Plaintiff's Interrogatories, Civil Action No. 6:19-cv-29.

45. Statement of Resignation by Steven R. Lovelady effective 12-4-17, (CoryellCty 00024).

46. Coryell County Sheriff's Office Supervisors Report, Personnel Complaint, CPL Steven R. Lovlelady, Incident Date 12/1/17, (CoryellCty 000030-34).

47. Coryell County Sheriff's Office Supervisor's Report, Personnel Complaint, Corporal Steven R. Lovelady, Incident 11/27/17, (CoryellCty 000036-42).

48. Personnel Records for Steven R. Lovelady, (CoryellCty 000043-63).

49. Coryell County Sheriff's Office Supervisor's Report, Personnel Complaint, Corporal Steven R. Lovelady, 8/28/12, (CoryellCty 000064-68).

50. Reprimand, Steven R. Lovelady, (Logs), (CoryellCty 000069).

51. Reprimand, Steven R. Lovelady, (Sexual Harassment), (CoryellCty 000075).

52. Disciplinary Statement for Corporal Lovelady, (Losing Keys), (CoryellCty 00076).

53. Reprimand-Corporal Lovelady, (Failure to Complete Forms)-Medical and Mental Impairments on Inmate Randal Floyd, (CoryellCty 000104).

54. CoryellCty, Photographs, (000427-497).

55. CoryellCty Miscellaneous Documents, (001075-1148).

56. Jail Videos.

57. Deposition Transcript and Exhibits of Steven Russell Lovelady taken on August 16, 2019.

58. Defendant Steven Russell Lovelady's Designation of Expert Witness, Civil Action No. 6:19-cv-29.

59. Affidavit of William Ray Jennings, Jr. Case No. 6:19-cv-00029-ADA-JCM, (LOVELADY 000001-8).

60. Deposition Transcript and Exhibits of Wesley Harland Pelfrey taken on August 16, 2019.

61. Affidavit and Attachments of Wesley H. Pelfrey, 9-5-19, Case No. 6:19-cv-29.

62. Photograph, (CoryellCty 000486).

63. Declaration of Desmond Dents, 10-12-17, Case No. 6:19-cv-29.

64. Affidavit and Attachments of Sheriff Scott A. Williams, 9-5-19, Case No. 6:19-cv-29.

65. Coryell County Sheriff's Office Jail Division Orders, Division Order: 025-JOL, Date: 9-6-05, (CoryellCty 000734-735).

66. Affidavit and Attachments of Steven Russell Lovelady, 9-5-19, Case No. 6:19-cv-29.

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The below listed information is Texas Department Voluntary Statement, by Steven R. Lovelady on October 8, 2017, (Fairchild v. Coryell County, P-000826):**

*"My Name is Steven Lovelady I am a Jailer at the Coryell County Jail and have been employed there for over fourteen years, twelve of which have been as a shift supervisor.*

*As a certified jailer I have been trained and certified in the use of force tactics and first aid to include CPR.*

*On 10/08/2017 at approximately 8:30 a.m., myself and Jailer Pelfrey, went to Serration 4 due to Inmate Page, Kelli striking the door with a hairbrush. I ordered her to stop striking the door of the cell. Inmate Page, Kelli refused, so I ordered her around and place her hands behind her back. Inmate Page Kelli stated she was not going to get handcuffed and placed in the restraint chair. While standing outside the cell I then sprayed Inmate Page with a short burst of chemical agent through the food slot. She then went to the back of the cell and refused to obey any orders given and turned facing the wall. I then had the door to the cell opened by control, myself and Jailer Pelfrey went to cuff her as I got closer to inmate Page, she raised her hand up with the brush and acted like she was going to strike me with the brush. I then grabbed her arm and placed her on the floor. I inadvertently dropped my handcuffs and inmate Page grabbed them and placed them under her. I applied some knee strikes to her hip and right side. Jailer Pelfrey and I attempted to get the cuffs from her. While trying to get them, she bit me on the hand and tried to bite Jailer Pelfrey. I then struck her about the head. I finally was able to get the handcuffs from her. I then grabbed her right arm and placed one handcuff on. I then was able to get the other one on while she was yelling and cussing at us. I had one knee on her buttocks when I noticed that she became quiet and wasn't moving. We removed the cuffs and roller her over. I discovered she was not breathing. I immediately started CPR. While conducting CPR, I then radioed control to call for an ambulance. I continued to do CPR until the deputies arrived and relieved me. I was then removed and isolated from the scene."*

**The below listed information is Texas Department Voluntary Statement, by Wesley Pelfrey, (Fairchild v. Coryell County, P-000828):**

*"I Wesley Pelfrey have had training in the past while working at the Texas Department of Criminal Justice, on different types of chemical agents to include use of force and have seven years of detention experience.*

*On 10/08/2017, CPL Lovelady and I proceeded to separation Cell #4 to talk to Inmate Kelli Page because she was banging on her cell door with a hairbrush and yelling. CPL Lovelady had to use force on Inmate Page the day before after she threw a chemical bottle at CPL Lovelady. He took her to the ground resulting in a black eye. She was treated at the hospital and returned to the jail soon after. Today after CPL Lovelady gave several commands to calm down and to not disturb the other inmates, she continued. For her safety and in the interest of the other inmates, CPL Lovelady intended to place her in handcuffs and restrain her in a safety chair until she complied. Due to the past experience with Inmate Page, CPL Lovelady tried to get her to comply by spraying her with pepper spray but she turned away at the back of the cell and faced the wall. The pepper spray was ineffective. CPL Lovelady and I then entered the cell and Inmate Page raised the hairbrush over her head as to strike or stab CPL Lovelady. CPL*

*Lovelady grabbed her right arm and took her to the ground causing inmate Page's nose to bleed when she hit the ground. Somehow Inmate Page got CPL Lovelady's handcuffs and was lying on top of them. We attempted to pull her arms out from under her, while CPL Lovelady applied strikes to her side. Inmate Page attempted to bite me and CPL Lovelady responded by striking her about the head. We were able to roll her over and get the handcuffs away. CPL Lovelady was straddling her and Inmate Page grabbed CPL Lovelady's groin area and would not let go. CPL Lovelady struck her again about the head. We rolled her over again and as she was kicking and screaming, CPL Lovelady was able to get her handcuffed after a few moments. Inmate Page was quiet and motionless. I took the handcuffs off and rolled her face up. We both recognized Inmate Page was not breathing. CPL Lovelady immediately started CPR. We yelled for EMS and Deputies. When the Deputy arrived, he relieved CPL Lovelady and we were removed from the scene. I stayed in the control room and was separated from CPL Lovelady."*

**The below listed information is Texas Department of Public Safety, Texas Rangers Report of Investigation, (Fairchild v. Coryell County, P0000778-793):**

2.13: I reviewed the initial surveillance footage from inside Page's jail cell and made the following observations:

a). The footage was dated 10/08/2017 and started at 8:28:02 AM. The arena of performance was a semi-overhead view with no audio. Page was standing by the cell door and had a white hairbrush in her right hand. She put on her orange sandals, then went back to the door and banged on the window with the hairbrush, (Investigator note: other video provided showed Page's banging started about 45 minutes prior to the incident and will be documented in a future supplemental report.)

b). 8:29:46 AM- Lovelady went to the door and opened the food tray and communicated with Page. Page can be seen shaking her head no. From both jailers' statements, this must have been in response to being told to move to the back of the cell and put her hands behind her back.

(c). 8:29:50 AM-Lovelady then reached through the food tray door and sprayed Page with pepper spray. Page reacted and moved to the back of the cell and turned away from the door, still holding the brush in her right hand.

(d). 8:30:00 AM-Lovelady and Pelfrey made entry into the cell. Page grabbed the metal sink with her left hand and spread her feet in a defensive posture as she looked over her right shoulder as trying to locate Lovelady and Pelfrey. Lovelady pointed at Page as to turn away and grabbed his handcuffs with his left hand, but Page did not comply and further steadied herself, now concealing the brush against her stomach. You can also see her re-grip the sink with her left hand in further defiance.

 App. 282

(e). <u>8:30:10 AM</u>- Lovelady grabbed a can of pepper spray from his belt and with his right hand and reached around in an attempt to spray Page's face. She turned to the left and Lovelady responded by attempting to spray her once more from the left side, which was ineffective.

(f). <u>8:30:10 AM</u>- Lovelady turned to speak to Pelfrey at which point Page picked up a blue towel with her right hand while still holding the hairbrush. Page attempted to put the towel over her head as protection from anymore pepper spray. Lovelady immediately saw the brush, which could be used as a weapon and locked onto Page's right arm, taking her to the ground. Page can be seen bracing herself and struggled against Lovelady by trying to hold onto the metal sink.

(g). <u>8:30:35 AM</u>- Lovelady straddled Page's torso to bring her arms behind her back. Page resisted and was still gripping the brush in her right hand. Page dropped the brush and grabbed back at Lovelady's groin area, grabbing his handcuffs off his belt as he tried to secure the brush Page dropped.

(h). <u>8:30:40 AM</u>-Page rolled over to her stomach, holding the handcuffs underneath her, obviously gripping a cuff in each hand and continued to resist. Her body was completely rigid as if every muscle was flexed. Her feet were spread apart and buttocks taught so neither jailer could roll her over.

(I). <u>8:30:47 AM</u>- Lovelady applied two (2) knee strikes to the right hip and rib area of Page and her body loosened up, but Page continued to resist and would not comply with Lovelady and Pelfrey.

(J). <u>8:31:17 AM</u>-Lovelady attempted to use his radio on his right lapel at the same time Page rolled over to her left side. Page reached out and grabbed the brush that Lovelady had just removed. Lovelady responded by landing a glancing blow to Page's head. Page continued to resist by kicking Lovelady in the groin. Lovelady wrestled the handcuffs away from Page. Page responded violently by kicking and pushing Lovelady away with her feet and knees.

(K). <u>8:31:44 AM</u>- Lovelady tried to roll Page over and it appeared that Page reached for Lovelady's groin area. The video showed Lovelady bring his knees together, protecting himself as he pulled away. This action also pulled Page the same direction.

(L). <u>8:31:55 AM</u>- Page made a violent attempt to bite Pelfrey's right hand, clearly seen in the footage. Lovelady struck Page solidly in the nose, distracting Page long enough to get her on her stomach. At 8:32:07 AM, Pelfrey untangles her from the blue towel and secured both handcuffs behind her back.

(M). <u>8:32:38 AM</u>- Page continued to resist thrashing her legs. Lovelady straddled Page's torso and held himself up by placing his right hand on the cell floor.

(N). 8:32:43 AM- Pelfrey had his right forearm across Page's shoulder and neck area as he held up some of his weight with his left hand on the concrete stool. Page can clearly be seen as moving her head from left to right. Nothing was obstructing her mouth or nose. Lovelady was partially straddling Page with his right knee in the buttocks and hip area.

(O). 8:33:27 AM- Lovelady continued to straddle Page's buttocks and held down her right leg with his right hand as he caught his breath and coughed from the pepper spray that was discharged in the small cell.

(P). 8:33:29 AM- Page's legs contracted and moved almost into a 90-degree angle. Possibly this was the moment she becomes unresponsive. Her legs lowered, relaxed and completely stop moving.

(Q). From the time she was on her stomach, handcuffs were applied, and her legs stiffened and relaxed **one minute and 12 seconds** with the weight of the jailer being shifted and moved at different moments during that time frame.

(R). 8:34:11 AM- Lovelady was clearly not putting any weight on Page as his left knee was up and his right knee was on the floor, though he continued to straddle Page's left leg.

(S). 8:34:20 AM- Lovelady started assessing Page, obviously noticing she wasn't moving anymore or being responsive. 8:34:40 AM Lovelady gets up and Page lies motionless. Lovelady and Pelfrey rolled her partially over and looked down at her.

(T). 8:35:06 AM- Lovelady shook or gave Page a sternum rub with no response. Lovelady radios someone and checked his wound on his hand and appeared to continue to catch his breath. Lovelady and Pelfrey removed the handcuffs and rolled Page all the way over on her back.

**The below listed information is Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner, Cause of Death Report, (Fairchild v. Coryell County, P0000749):**

Case IFS-17-17913-CC
Date of Death: 10/08/2017
Decedent: Page, Kelli Leanne, 46 years, White Female, DOB: 02/20/1971

An autopsy was performed, and the cause of death is:
Mechanical asphyxia in association with physical restraint.

Part II (Other Significant Contributing Factors): Hypersensitive cardiovascular disease, cirrhosis, and obesity.

<u>Manner of Death</u>: Homicide

<u>Examining Pathologist</u>: Stephen Hastings, M.D.
11/15/2017

**<u>Opinions:</u>**

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices. I provide all of my opinions based upon a reasonable degree of law enforcement and corrections probability.

1. It is my opinion that Coryell County Sheriff's Office, Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey failed to initially determine that Ms. Kelli Leanne Page was mentally ill or experiencing a mental crisis. Throughout the United States and in Texas, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Ms. Page who are suffering from a mental illness or experiencing a mental crisis. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. Law enforcement officers and jailers should be trained to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, time to assess and calm the situation, request additional equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, and reduce environmental distractions. Here, Corporal Lovelady and Jailer Pelfrey simply ignored Ms. Page's mental illness and/or mental crisis. They chose not to use de-escalation techniques but instead chose to begin the assault of Ms. Page by deploying OC spray through the food slot. They then chose to enter the cell, knowing that she would have to be extracted at that point due to use of the OC spray, and continued the unnecessary and excessive assault. This culminated in her death, according to the autopsy report and the physicians signing the report. This use of force was unnecessary, excessive, and outside norms in the law enforcement and corrections community.

In addition, my opinion is based on an incident that occurred on 10/7/17 when Ms. Kelli Leanne Page allegedly sprayed some type of cleaning solution directly at Corporal Steven Lovelady and the subsequent use of force that transpired after the alleged act, Corporal Steven Lovelady should have known that Ms. Kelli Page was mentally ill and or experiencing a mental crisis. In addition, Corporal Steven Lovelady was a tenured Jailer with approximately (<u>14</u>) years of experience being assigned to the Coryell County Jail and should have trained Jailer Wesley H. Pelfrey, based on Ms. Kelli Leanne Page's actions both on 10/7/17 as well as her actions of allegedly tapping her hair brush on the door to her cell that she was mentally ill and or experiencing a mental crisis. In addition, it is my opinion based on my review of the facts and testimony in this matter, Jailer Wesley H. Pelfrey had received his Temporary Jailer's License on 5/22/17, five days after he began was employed by Coryell County Jail on 5/17/17 and the only

Fairchild v Coryell County
P-001637

training that he received based on his testimony from 5/17/17 to 10/8/17, was that he had to work with a supervisor for a few weeks in the jail. In addition, according to Jailer Wesley Pelfrey he had not taken a less lethal chemical weapons training course until November 1, 2017, which was over three weeks after the incident on 10/8/17. In addition, Jailer Wesley Pelfrey didn't receive his Jailer License from Coryell County Sheriff's Office on 4/2/2018, (Deposition Transcript of Wesley Harland Pelfrey, Pages 19-23) and Texas Commission on Law Enforcement, Personal Status Report, Wesley H. Pelfrey, (Fairchild v. Coryell County, P0000745).

In addition, I base my opinion on the facts and testimony of Jailer Wesley Pelfrey that on 10/7/17, he transported Ms. Kelli Leanne Page to Coryell Memorial Health Care System to "have her head checked out" following a Use of Force incident that occurred on 10/7/17 with Corporal Steven Lovelady after Ms. Kelli Leanne Page allegedly sprayed Corporal Steven Lovelady with some type of cleaning solution through her cell door, (Deposition Transcript of Wesley Harland Pelfrey, Page 25).

Based on my review of the Coryell Memorial Healthcare System, Emergency Department Note-Final Report, Ms. Kelli Leanne Page suffers from Depression and Anxiety Reaction, (Fairfield v. Coryell County, P-000532-533). In addition, the Final Report does not indicate if the Staff at Coryell Memorial Healthcare System inquired if Ms. Page was prescribed or taking psychotropic medication or if they prescribed Ms. Page psychotropic medication for her mental health conditions/mental illness.

In addition, I base my opinion on Coryell County Sheriff's Office Screening Form for Suicide and Medical/Mental/Developmental Impairments Form, Kelli Leanne Page, (Fairfield v. Coryell County, P-000873), where Kelli Leanne Page was asked the following questions and the following responses were noted on the report:

8. Have you ever received services for emotional or mental health problems? Answer: **Yes**. Depression 1998.

9. Have you ever been in a hospital for emotional/mental health in the last year? Answer: **Yes**. Coryell Memorial Hospital.

10. If yes to 8 or 9, do you know your diagnosis? Answer: **Yes**. Depression.

11. In school, were you ever told by teachers that you had difficulty learning? Answer: **Yes**. SP Ed.

In addition, I base my opinion on Coryell County Sheriff's Office, Detention-Medical Questionnaire Report, Kelli Leanne Page, Booking Number 2170638, SO No. 2120709, Details, (Fairfield v. Coryell County, P-000874), Psychiatric Care: **Yes.**

In addition, I base my opinion on Coryell County Sheriff's Office, Medical Disability/Suicide Intake Screening Report, Kelli Leanne Page, Arrest No. 2170638, S.O.

Fairchild v Coryell County
App. 286
P-001638

No. 2120709, (Fairfield v. Coryell County, P-000875), where Kelli Leanne Page was asked the following questions and the following responses were noted on the report:

1. Have you ever received MHMR services or other mental health services: Answer: **Yes**.

2. Do you know where you are? Answer: **No**.

3. What season is this? Answer: **No**.

4. How many months are there in a year? Answer: **No**.

11. Have you ever attempted suicide or had thoughts about killing yourself? Answer: **Yes**. 7 years ago.

13. Have you ever been so down that you couldn't do anything for more than a week? Answer: **Yes**.

In addition, I base my opinion on Coryell County, Screening for Suicide and Medical and Mental Impairments, *Per Jail Standard 273.5 (b): ALL Questions SHALL be completed in Full Immediately Upon Admission of Inmate,* Name: Page, Kelli Leanne, Completed by Chris Blanchard, where Kelli Leanne Page was asked the following questions and the following responses were noted on the report, (Fairfield v. Coryell County, P-000879),

I. Have you ever received services for mental health or mental retardation? Answer: **Yes**. **Note: Mr. Blanchard did not complete the required box.**

II. Have you ever been in special education? Answer: **Yes**. **Note: Mr. Blanchard did not complete the required box**.

III. Have you ever been very depressed? Answer: **Yes**. **Note: Mr. Blanchard did not complete the required box**.

IV. Have you ever attempted suicide? Answer: **Yes**. **7 years ago**. Note: **Mr. Blanchard did not complete the boxes as to why Ms. Page had attempted suicide and how Ms. Page had attempted suicide.**

In addition, I base my opinion on Southern Health Partners, Admission Data/History and Physical Form, Exam Date 5-11-17, Page, Kelli, where Ms. Kelli Page was asked the following questions and the following responses were noted on the report, (Fairfield v. Coryell County, P-000889),

I. Any prior counseling/outpatient Mental Health Treatment? Answer: **Scott & White**.

II. Have you ever attempted Suicide: How/When? Answer: **7 years ago**.

Fairchild v Coryell County
App. 287
P-001639

In addition, I base my opinion on <u>Coryell County Sheriff's Office Screening Form for Suicide and Medical/Mental/Developmental Impairments Form</u> , 5-5-17, Page, Kelli, completed by Screening Officer Cheryl Pruitt, (<u>DEF 050-052</u>), where Ms. Page was asked the following questions and the following responses were noted on the report, I.  <u>Do you have a history of drugs/alcohol abuse?</u>  <u>Answer</u>: **Yes meth**. (<u>Note</u>: <u>Ms. Page was not asked during screening when the last time she used methamphetamine as required by the form</u>).

II.  <u>Have you ever received services for emotional or mental health problems?</u>  <u>Answer</u>: **Hawaii. 1998. Depression**.

III.  <u>Have you been in a hospital for emotional/mental health in the last year?</u>  <u>Answer</u>: **Coryell Memorial. Dr. Kara Larson. Depression**.

In addition, Jailer Cheryl Pruitt was assigned to the Coryell County Jail as the Control Officer on 10/8/17 during this incident and was aware that Ms. Kelli Leanne Page suffered from a mental health condition and in fact was hospitalized at Coryell Memorial Hospital within the past year for mental health issues/treatment.

In addition, I base my opinion on Coryell County Sheriff Office, Mental Health/Suicide Prevention, Section 36, (<u>Fairfield v. Coryell County, P-000505-511</u>), and specifically:

B. An inmate who identified as a suicide risk shall be evaluated by a mental health professional.

a. In accordance with <u>Code of Criminal Procedure Article 16.22 EXAMINATION AND TRANSFER OF DEFENDANT SUSPECTED OF HAVING MENTAL ILLNESS OR MENTAL RETARDATION</u>.  Not later than 72 hours after receiving evidence or a statement that may establish reasonable cause to believe that a defendant committed to the sheriff's custody has a mental illness or is a person with mental retardation, the sheriff shall notify a magistrate of that fact. A defendant's behavior or the result of a prior evaluation indicating a need for referral for further mental health or mental retardation assessment must be considered in determining whether reasonable cause exists to believe that the defendant has a mental illness or is a person with mental retardation, the magistrate shall order an examination of the defendant by the local mental health or mental retardation authority or another disinterested expert experienced and qualified in mental health or mental retardation to determine whether the defendant has a mental illness as defined by <u>Section 571.003, Health and Safety Code,</u> or is a person with mental retardation as defined by <u>Section 591.003, Health and Safety</u>.

In addition, I base my opinion on my twenty-eight year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of

individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

2. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey failed to use de-escalation and defusing techniques when they responded to Ms. Kelli Leanne Page Cell No. 4 on 10/8/17. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey failed to use defusing techniques, de-escalation techniques and effective active listening skills so to bring Ms. Kelli Leanne Page's emotions under control and to ascertain what transpired prior to their arrival. Here, Corporal Lovelady and Jailer Pelfrey chose not to use de-escalation techniques but instead chose to begin the assault of Ms. Page by deploying OC spray through the food slot. They then chose to enter the cell, knowing that she would have to be extracted at that point due to use of the OC spray, and continued the unnecessary and excessive assault. This culminated in her death, according to the autopsy report and the physicians signing the report. This use of force was unnecessary, excessive, and outside norms in the law enforcement and corrections community.

In addition, it is my opinion that Corporal Steven R. Lovelady's actions may have been influenced due to the incident that transpired on 10/7/17 when Ms. Kelli Leanne Page allegedly sprayed some type of cleaning solution directly at Corporal Steven Lovelady and the subsequent use of force that transpired after the alleged act.

One major emotional factor that officers need to focus on to maintain self-control is anger. Anger is a feeling of displeasure from perceived injury, mistreatment, or opposition, to one's self or to another person. When anger is inappropriate or out of control (i.e., rage), it becomes a liability.

In addition, I base my opinion on my twenty-eight year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department

Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

3. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey failed to formulate a tactical plan. It is my opinion that a reasonable Officer/Jailer acting consistent with standard Sheriff's Office practices would have formulated an effective and safe tactical plan and not entered Ms. Kelli Leanne Page's cell based in part on the testimony by Jailer Wesley Pelfrey that Ms. Kelli Leanne Page was going to stab in the eye with her hairbrush as well as the incident that occurred involving Corporal Steven Lovelady on 10/7/17. Here, Corporal Lovelady and Jailer Pelfrey simply ignored good law enforcement and corrections practices. They chose not to obtain a cell extraction team. They chose not to seek help from anyone else. They chose not to use de-escalation techniques. Instead, they chose to deploy OC spray through the food slot. They then chose to enter the cell, knowing that she would have to be extracted at that point due to use of the OC spray, and continued the unnecessary and excessive assault. This culminated in her death, according to the autopsy report and the physicians signing the report. This use of force was unnecessary, excessive, and outside norms in the law enforcement and corrections community.

**Plan of Action:**
- Officers/Jailers should discuss safety factors as well as possible plans for taking actions.
- Plans may include coordination of who will transmit radio traffic to the Control Officer and Supervisor.
- Appropriate use of escalation of force.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the individual.
- Not considering alternative actions.

**Inappropriate Attitude:**
- Careless or complacent.

- Overconfident.
- Too aggressive.

Officers/Jailers are trained to work together and function as a team. In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate communication involves advising the primary officer of any critical occurrences or safety issues.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Corporal Steven Lovelady, he never instructed Jailer Wesley Pelfrey what to do during the use of force, (<u>Deposition Transcript of Steven Lovelady, Page 78</u>).

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (<u>RPDC</u>). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (<u>Lethal and Non-Lethal</u>), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

4. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey violated <u>Coryell County Sheriff's Office Jail Policy Cell Extraction, Section 1, (Fairfield v. Coryell County, P-000337-349)</u>, when they failed to summon a Cell Extraction Team and instead entered Ms. Kelli Leanne Page's cell after Corporal Steven R. Lovelady deployed Oleoresin Capsicum spray through the food slot. This failure was contrary to accepted police and jail practice. Therefore, it is my opinion that all of the force they used with her, including use of OC spray, was excessive and unnecessary. In addition, it is my opinion that Corporal Steven R. Lovelady should not have deployed Oleoresin Capsicum spray at Ms. Kelli Leanne Page through the food slot as it would have required him to make entry into the cell to ensure that she received proper medical treatment (<u>decontamination</u>) as well as to decontaminate the cell. It is my opinion that if Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey reasonably believed that Ms.

Leanne Page was not following proper jail procedures and posed a threat to the smooth operation of the jail by allegedly "tapping" her hair brush on the door to her cell and they were unsuccessful with using proper defusing techniques, de-escalation techniques, active listening techniques and verbal strategies, then they should have contacted a Coryell County Sheriff's Office Sergeant and or Lieutenant and make the request for a Cell Extraction Team to respond prior to the deployment of Oleoresin Capsicum spray. This would have been consistent with accepted police and jail practice. In addition, it is my opinion that all jailers acting consistent with standard Jail/Sheriff's Office practices would have known based on the incident that occurred involving Ms. Kelli Leanne Page and Corporal Steven Lovelady on 10/7/17, there was a strong likelihood that force may be necessary. It is my opinion that all competent officers in their position would have known this. In addition, I base my opinion on Coryell County Sheriff's Office Jail Policy Cell Extraction, Section 1, (Fairfield v. Coryell County, P-000337-349),

I. Purpose: It is the purpose of this Jail to provide specific guidelines for the deployment of response team to meet cell extraction contingencies which may arise within the facilities.

A. To safely extract offenders from cells who refuse to be moved or to follow proper security procedures.

B. To establish a technique which maintains injury to offender(s) and Jail staff and is consistent with the need to accomplish the cell extraction.

C. Cell extractions will be executed by trained teams ONLY. Any other staff, alone or in groups, will NOT attempt cell extractions, except in emergency situations, and then only to prevent imminent serious injury or death.

G. Medical Personnel:

a. Medical Personnel are alerted, when available, in the clinic during cell extractions, (Based on my review of the facts in this matter, there were no Jail Staff Medical Personnel on duty at the time of this incident on 10/8/17 even though Corporal Steven Lovelady made the decision to deploy Oleoresin Capsicum spray through Kelli Leanne Page's food slot into her cell and continued to deploy Oleoresin Capsicum spray directly at Ms. Kelli Leanne Page once they entered her cell. This incident occurred near the beginning of Corporal Steven Lovelady and Jailer Wesley Pelfrey's shift at 0828 hours. In addition, based on my review of the facts in this matter, Corporal Steven Lovelady was aware that there weren't any medical staff on duty at the time of this incident on 10/8/17).

In addition, it is my opinion that Coryell County Sheriff's Office decision not to deploy/schedule medical staff on 10/8/17 fell below the standard of care in the corrections community. Due to inadequate staffing on 10/8/17, Corporal Steven Lovelady and Jailer Wesley Pelfrey could not leave the jail to take Ms. Leanne Page or any other inmate who may be in need of medical care as it would leave the jail understaffed and pose a significant security risk to the jail and to the lone jailer and Control Officer as there were only (3) Coryell County Sheriff's Office employees on duty at the time of this incident.

In addition, based on my review of the facts and testimony in this matter, Corporal Steven Lovelady stated that he was going to place Ms. Kelli Leanne Page in a restraint chair in her cell even though the environment in the cell would have been contaminated with the residual effects of Oleoresin Capsicum spray due to his deployment of Oleoresin Capsicum spray from outside the cell as well as after he and Jailer Wesley Pelfrey entered the cell. In addition, it is my opinion that if Corporal Steven Lovelady would have placed Ms. Kelli Leanne Page in a restraint chair, he would have violated Coryell County Sheriff's Office, Use of Restraints, Section 28, (Fairfield v. Coryell County, P-000461-466).

III. Procedure:

C. No inmate shall be placed in the restraint chair that has been exposed to any chemical sprays without being medically evaluated.

In addition, I base my opinion on the following facts and testimony:

- According to Jailer Wesley H. Pelfrey, he told Ms. Kelli Leanne Page that they would have to put her in a restraint chair, Ms. Page allegedly replied that she would stab him in the eye with her hairbrush and put her in the restraint chair, (Affidavit and Attachments of Wesley H. Pelfrey, 9-5-19, Case No. 6:19-cv-29).
- According to Corporal Steven Lovelady, he agrees that using five people is a good number to extract a person from a cell, (Deposition Transcript of Steven Lovelady, Page 92).
- According to Corporal Steven Lovelady, he stated that they were going to put the restraint chair in the cell with Ms. Kelli Leanne Page, (Deposition Transcript of Steven Lovelady, Page 94).
- According to Corporal Steven Lovelady, he agrees that if you escort somebody involuntarily from a cell, you are just really extracting them from the cell, (Deposition Transcript of Steven Lovelady, Page 105).
- According to Corporal Steven Lovelady, he agrees that on 10/8/17, Ms. Kelli Leanne Page refused to follow what he would consider to be proper security procedures in refusing to be handcuffed, (Deposition Transcript of Steven Lovelady, Page 109).
- According to Corporal Steven Lovelady, he agrees that he anticipated that Ms. Kelli Leanne Page was going to act in the same manner that she did on 10/7/17, (Deposition Transcript of Steven Lovelady, Page 167).

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of

thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

5. It is my opinion based on my review of the facts and testimony in this matter, Coryell County Sheriff's Office violated Coryell County Sheriff's Office Jail Policy Cell Extraction, Section 1, (Fairfield v. Coryell County, P-000337-349), when they failed to maintain a well-trained cell extraction team in order to remove offenders from their cells when their behavior poses a threat to the smooth operation of the jail or themselves. I base my opinion on Coryell County Sheriff's Office Jail Policy Cell Extraction, Section 1, (Fairfield v. Coryell County, P-000337-349):

I. Purpose: It is the purpose of this Jail to provide specific guidelines for the deployment of response team to meet cell extraction contingencies which may arise within the facilities.

A. To safely extract offenders from cells who refuse to be moved or to follow proper security procedures.

B. To establish a technique which maintains injury to offender(s) and Jail staff and is consistent with the need to accomplish the cell extraction

II. Policy:

A. This Office will maintain a well-trained cell extraction team in order to remove offenders from their cells when their behavior poses a threat to the smooth operation of the jail or themselves.

B. The Sheriff is responsible for the assignment, training, and readiness of the Jail's Cell extraction team.

C. Cell extractions will be executed by trained teams ONLY. Any other staff, alone or in groups, will NOT attempt cell extractions, except in emergency situations, and then only to prevent imminent serious injury or death.

In addition, I base my opinion on the following facts and testimony:

- According to Corporal Steven Lovelady, to his knowledge there was not a Cell Extraction Team on 10/8/17 and there was not a Cell Extraction Team as described in the policy, (Deposition Transcript of Steven Lovelady, Page 112).
- According to Corporal Steven Lovelady, it was more than 5 years before the incident on 10/8/17 that Coryell County Jail had a Cell Extraction Team, (Deposition Transcript of Steven Lovelady, Page 114).
- According to Corporal Steven Lovelady, when he was a member of the Coryell County Jail Cell Extraction Team in the past, they did not have a camera, (Deposition Transcript of Steven Lovelady, Page 118).

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

6. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey's failed to immediately take the pressure and weight off of Ms. Kelli Leanne's back by simply immediately rolling her onto her side or to place her in an upright seated or standing position immediately after she was handcuffed. This is well-known in the law enforcement and corrections community. During the struggle, Corporal Steven Lovelady struck Ms. Kelli Leanne Page with knee strikes and head strikes during the incident as well as multiple direct exposures of Oleoresin Capsicum spray in her cell that had little or no ventilation. In addition, it is my opinion that the use of force by Corporal Steven R. Lovelady and Jailer Wesley Pelfrey was excessive during this incident based on my review of the facts in this matter to include the Office of the Medical Examiner, Cause of Death Report, (Fairchild v. Coryell County, P0000749), determined that the cause of death was Mechanical asphyxia in association with physical restraint. Therefore, based on the autopsy report, the excessive use of force caused Ms. Page's unnecessary death.

Fairchild v Coryell County
P-001007295

Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored:

- Weight is applied to the person's back-the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

This is well-known in the law enforcement and corrections community. The risk of positional asphyxiation is well-known in the law enforcement and corrections community, and it is my experience that every competent law enforcement officer and jailer is aware of the risk. It is my opinion that the Basic Physiology of a Struggle is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. The remedy seems relatively simple: get the pressure off his back. In addition, it is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position:

- Obesity
- Alcohol and high drug use.

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position. This is well-known in the law enforcement and corrections community.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, and sitting or standing the subject up.

In addition, I base my opinion on the following facts and testimony:

- Office of the Medical Examiner, Cause of Death Report, (Fairchild v. Coryell County, P0000749): Case IFS-17-17913-CC, Date of Death: 10/08/2017, Decedent: Page, Kelli Leanne, 46 years, White Female, DOB: 02/20/1971, An autopsy was performed, and the cause of death is: Mechanical asphyxia in association with physical restraint., Part II (Other Significant Contributing

Factors): Hypersensitive cardiovascular disease, cirrhosis, and obesity. <u>Manner of Death</u>: Homicide, Examining Pathologist: Stephen Hastings, M.D, 11/15/2017.

- According to Corporal Steven Lovelady, he understands that if a person is on top of another person and the person on the bottom is face down that could result in positional asphyxiation, (<u>Deposition Transcript of Steven Lovelady, Page 77</u>).
- According to Corporal Steven Lovelady, he understands that if a person is lying face is obese, there is a higher likelihood for that kind of person to positionally asphyxiated, (<u>Deposition Transcript of Steven Lovelady, Page 77</u>).
- According to Corporal Steven Lovelady, he agrees that by reviewing the video, the upper part of Pelfrey's body was inside the cell and had gotten on the upper back region of Ms. Page, (<u>Deposition Transcript of Steven Lovelady, Page 82</u>).
- According to Corporal Steven Lovelady, he agrees that if Pelfrey put pressure on Page's back that would have been inappropriate based upon his education, experience, training and background as a jailer, (<u>Deposition Transcript of Steven Lovelady, Pages 87-88</u>).
- According to Jailer Wesley Pelfrey, while attending EMT school, he learned to avoid positional asphyxiation, get them off their stomach as quick as you can, don't leave them there, (<u>Deposition Transcript of Wesley Harland Pelfrey, Page 11</u>).

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (<u>Lethal and Non-Lethal</u>), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

7. It is my opinion that Coryell County Sheriff's Office should have determined through their review process that Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey's actions in this incident to include their decision to deploy Oleoresin Capsicum spray through Ms. Kelli Leanne Page's food slot to her cell, decision to enter Ms. Kelli Leanne's Page's cell, failure to contact a Coryell County

Fairchild v Coryell County
P-001049<sup>297</sup>

Sheriff's Office Sergeant and or Lieutenant to activate a Cell Extraction Team and ultimately the use of force once they entered Ms. Kelli Leanne Page's cell, violated Coryell County Sheriff's Office Policies which to a reasonable certainty led to the unnecessary death of Ms. Kelli Leanne Page based on my review of the <u>Office of the Medical Examiner, Cause of Death Report, (Fairchild v. Coryell County, P0000749)</u>, determined that the cause of death was Mechanical asphyxia in association with physical restraint.

In addition, I base my opinion on <u>Coryell County Sheriff's Office, Jail Policy, Section 4, Critical Incident Investigation & Review, (Fairfield v. Coryell County, P-000361-363)</u>,

I. <u>Purpose</u>: The purpose of this policy is to direct a proper response to critical incidents by this Sheriff's Office and Jail.

II. <u>Policy</u>: It is the policy of this Jail to provide a thorough investigation and review of all critical incidents involving members of this Jail Staff.

III. This section does not relieve the involved Sheriff's Office of its responsibility to conduct an administrative investigation of the critical incident and review the event for a determination as to whether or not Jail issues, including policy and training, are indicated by the action.

IV. <u>Procedure General</u>: The Sheriff's Office shall conduct an administrative critical incident review of all firearm discharges, in-custody deaths or serious injuries, to include suicides and suicide attempts, even those that do not result in serious injury to the inmate ad all uses of force/detainee when the injury results in hospitalization. <u>The review shall result in a written critique and specifically address the following issues and make a specific determination whether:</u>

A. The force, control and/or restraint were consistent with the Sheriff's Office policy;

B. There are any issues requiring a re-evaluation of the Sheriff's Office policy and/or procedures;

C. There are any training needs identified;

D. The equipment provided by the Sheriff's Office was adequate; and

E. Supervisory involvement was reasonable.

F. Provide for immediate medical attention of all persons injured.

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

8. It is my opinion that Coryell County Sheriff's Office failed to properly train Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey in the proper use of defusing and de-escalation techniques especially when interacting with a mentally ill inmate or an inmate that is experiencing a mental crisis, use of less than lethal force options, and the use of lethal force to include understanding the risks of positional asphyxia. I base my opinion on my review of the following documents:

I. Texas Commission on Law Enforcement, Personal Status Report, Wesley H. Pelfrey, (Fairchild v. Coryell County, P0000745-746), that reflects that Jailer Wesley H. Pelfrey had not received and training and possessed a Coryell County Sheriff's Office Temporary Jailer License on the date of this incident and did not attend the Bell County Sheriff's Office until 3/29/18.

II. Texas Commission on Law Enforcement, Personal Status Report, Steven R. Lovelady, (Fairchild v. Coryell County, P0000734-738), that reflects that Corporal Steven Lovelady last received Suicide Prevention Training on 7/10/15, (Course No. 3517/8 Hours), which was 2 years and 3 months prior to this incident. In addition, the report reflects that Corporal Steven Lovelady received Mental Impairment Training on 4/1/15, (Course No. 4040/4 Hours), which was 2 years and 6 months prior to this incident. In addition, the report reflects that Corporal Steven Lovelady received Use of Force in Corrections on 10/4/09, (Course No. 35004/2 Hours/On-Line), which is approximately 8 years prior to this incident.

This pattern of behavior and failure to train its Jailers had a detrimental effect on this incident. In addition, the failure to take appropriate action by implementing new policies

or augment existing Use of Force and Use of Deadly Force policies as well as enforce written policies and established standards regarding Use of Force and the Use of Deadly Force had a detrimental effect on this incident. It is my opinion that the Coryell County Sheriff's Office should have conducted an After-Action Report following the In-Custody Death of Ms. Kelli Leanne Page to examine its current policies to include properly responding and interacting with inmates who are mentally ill and or experiencing a mental crisis as well as ensure that there is a Cell Extraction Team properly trained and available if necessary as it was in this incident.

In addition, it is my opinion that the Coryell County Sheriff's Office failed to properly train Corporal Steven Lovelady even though Corporal Steven Lovelady received a verbal reprimand by Sergeant Abrahamson to Corporal Lovelady, dated 12/28/11, (Coryell City 000104), when Corporal Steven Lovelady failed to properly annotate inmate Randal Floyd's mental health issues on the Screening Form for Suicide and Medical and Mental Impairments.

In addition, I base my opinion on the following facts and testimony:

- According to Corporal Steven Lovelady, other than being just handed a copy of the Procedures Manual, he did not receive any training by Coryell County Jail, (Deposition Transcript of Steven Lovelady, Page 122).
- According to Jailer Wesley Pelfrey, prior to 11/1/17, he had not taken a less than lethal chemical weapons training course, (Deposition Transcript of Wesley Harland Pelfrey, Page 23).

In addition, I base my opinion on my twenty-eight- year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

Fairchild v Coryell County
P-001652 pp. 300

9. It is my opinion that Coryell County Sheriff's Office Corporal Steven R. Lovelady and Coryell County Sheriff's Office Jailer Wesley H. Pelfrey could not have believed that they were acting appropriately for reasons I provide in my other opinions in this report. Their actions were not consistent with law enforcement and corrections standards and practices. Their actions also violated Coryell County jail policies and failed to account for Ms. Page's underlying health conditions and obesity. Their decisions to violate Coryell County policy and law enforcement and corrections standards and practices resulted in the death of Ms. Page, according to the autopsy report and the physicians signing the report. It is my opinion that no competent jailer could have believed that their actions were in accordance with law enforcement and corrections standards and practices. Their actions with regard to Ms. Page were egregious and appear not to have been based on any accepted law enforcement or corrections practices.

In addition, I base my opinion on my twenty-eight year law enforcement career. As a supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents. In addition, as a Los Angeles Police Department Officer, I have arrested and booked thousands of individuals into jail facilities. In addition, as a Los Angeles Police Department Supervisor over a fourteen-year period, I have supervised the booking process of thousands of individuals at Los Angeles Police Department facilities as well into jails at other law enforcement agencies such as the Los Angeles County Sheriff's Department. Lastly, I base my opinion on my tenure with the Riverside County Sheriff's Department, when I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical/mental health incident, suicide or attempted suicide.

10. Rebuttal to Affidavit of William Ray Jennings, Case No. 6:19-CV-00029-ADA-JCM, (LOVELADY 000001-6).

**Entry into the Cell:**

14. *"Once an officer begins the use of force continuum, the officer should continue until compliance is gained. Here it was necessary to enter the cell. When the officers entered, Inmate Page failed to comply with the officers' directives and, instead, turned and walked to the back of the cell in an effort to shield her face from further pepper spray. In order to gain compliance, Officer Lovelady again deployed the pepper spray and Inmate Page again resisted by turning away and using the blanket to protect her face. Inmate Page's continued non-compliance justified an immediate escalation to hard hand tactics.*

*However, instead, Officer Lovelady attempted to de-escalate the situation by using soft hands to take Inmate Page's right hand and attempt to apply hand restraints. However, again, Inmate Page resisted."*

Rebuttal: I respectfully disagree and dispute Mr. Jennings' opinion in this matter. My rebuttal to this Opinion is outlined in Opinion No. 4 of this report.

19. *"The judgments and actions taken by the officers were reasonable, required discretion for personal deliberation, decision, and judgment by the officers and the actions of the officers were justified based on the circumstances."*

Rebuttal: I respectfully disagree and dispute Mr. Jennings' opinion in this matter. My rebuttal to this Opinion is outlined in Opinions 1,2,3,4,6 and 9 of this report.


## My Qualifications for Reviewing this Case:

My opinions are based on my education, training and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations,

perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

# On-Scene Consulting

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

Fairchild v Coryell County
P-001656    App. 304

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

Fairchild v Coryell County
P-001657
App. 305

# On-Scene Consulting

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies. Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

Dated: September 24, 2019

Fairchild v Coryell County
P-001658
App. 306

# Scott A. DeFoe

P.O. Box 4456, Huntington Beach, CA 92605-4456
Cell: 714-655-4280
sdefoe313@msn.com

**Executive Profile**

**Expert Witness / Consultant Specialties Include:**

| | |
|---|---|
| Police Procedures / Tactics | Use of Force (Lethal and Less Lethal) |
| SWAT | K9 |
| Narcotics | Jail Operations |
| Informants | Police Corruption / Internal Investigation |
| Vehicle Pursuits | Vice |
| Surveillance | Evidence Analysis & Preservation |
| Security | Premise Liability / Forseeability |

**Awards and Commendations**

**Purple Heart** (LAPD),
**Medal of Valor** (LAPD)
**Police Star** (LAPD) and over 100 Los Angeles Police Department and citizen commendations.

**Professional Experience**

**Consultant / Expert Witness**
April 2013 to Present
**On-Scene Consulting Group, LLC.** - Los Angeles, CA
> Provide comprehensive service which includes in-depth analysis and investigations with detailed reporting of all findings. Testified as an Expert Witness in pre-trial depositions and in various courts throughout the United States.

**Director of Security**
March 2016 to September 2017
**L&R Group of Companies** - Los Angeles, CA
> Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments, and projected developments throughout the United States. Conducted all facets of security training to ensure compliance with the Bureau of Security and Investigative Services (BSIS). Ensured compliance with appropriate safety and sustainability regulations for all of the developments in coordination with Human Resources, Legal, and law enforcement to ensure the safety and security of protection of our staff, executives, tenants, and guests.

- Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains.
- Mitigated expected threats. Utilized preplanned coordinated actions in response to infrastructure warnings or incidents.
- Conducted internal investigations and audits.
- Directed the day-to-day management of site security operations for major sites through subordinates to ensure timely delivery of required services and appropriate response to incidents.
- Designed and implemented appropriate security, measures for existing and projected developments.
- Coordinated all security efforts with current practices and procedures.
- Researched and deployed appropriate technology solutions, innovative security management techniques, and other procedures to ensure physical safety of employees, tenants and guests.

*Curriculum Vitae*

**Director of Security**
June 2014 to March 2016
**Universal Protection Service** - Los Angeles, CA

> Directed supervision of 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis.

> - Trained others on Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.
> - Conducted ongoing risk and vulnerability assessments of the City National Plaza to include security staffing and deployment, closed circuit television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.
> - Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.
> - Coordinated all security efforts to ensure safety at special events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD), Los Angeles Fire Department (LAFD) on an ongoing basis.

**Riverside County Sheriff's Department - Deputy Sheriff (Lateral)** - June 2013 to June 2014
April 2014 to June 2014

> Assigned to Jurupa Valley Station Field Deputy Training Program. Conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, booking of evidence, and court testimony.

June 2013 to April 2014

> Assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a Gang Officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations.

> - Provided information to gang detail.
> - Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors.
> - Attended and certified in RSO Supplemental Jail Operations Core Course and Title XV training prior to deployment at RPDC. Received on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

**Vice President of Security Operations**
June 2010 to April 2013
**Caruso Affiliated** - Los Angeles, CA

> Identified and conducted risk and vulnerability assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.

> - Responded to hostilities and identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies.
> - Conducted all facets of security training for the company and employees.
> - Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

**Level I Reserve Police Officer**
June 2010 to March 2016
**Los Angeles Police Department** - Los Angeles, California

Initially assigned to Counter Terrorism from June 2010 through April 2012. Completed staff projects for the Deputy Chief.

Assigned to the Wilshire Division from April 2012 through March 2016. Assisted with tactical and shooting training days as an Adjunct Instructor. Assigned to patrol functions including: responding to calls for service, conducting follow-up investigations, conducting self-initiated law enforcement activities including arrests, booking of arrestees, completing reports and booking of evidence.

- Worked in conjunction with citizens and local businesses in developing crime fighting strategies.
- Provided active shooter training to local businesses.
- Worked in conjunction with Wilshire Detectives and Wilshire Crime Analysis Detail (CAD) to reduce crime.

**Sergeant II+1 Special Weapons and Tactics (SWAT) Supervisor**
August 2005 to June 2010
**Los Angeles Police Department** - Los Angeles, California

Supervised the response and tactical intervention during barricaded subject incidents. Supervised the coordination and facilitation of high risk warrant services. Supervised the Crisis Negotiation Team (CNT) during barricaded and suicidal subject incidents. Developed SWAT's Counter-Terrorism and Training Cadre to include the preparation and submission of federal and state grants for the acquisition of equipment.

- Performed and facilitated all aspects of tactical and crisis negotiation training to federal, state and local law enforcement agencies.
- Responded and trained Mumbai local and state police officers following the 2008 terrorist attack in Mumbai, India.
- Assisted with the development of multi-assault counter-terrorism action capabilities training.
- Completed audits, employee performance reviews, investigative reports and internal investigations.
- Conducted use of force investigations on SWAT incidents and submitted reports to the Officer-in-Charge for his review and approval.
- Testified in court and at administrative hearings.

**Sergeant II+1 Metropolitan Division K9 Platoon**
April 2000 to September 2005
**Los Angeles Police Department** - Los Angeles, California

Supervised and facilitated all facets of K9 training. Ensured that all K9 deployments conformed to the K9 deployment criteria, through training of personnel and supervision of K9 searches. Functioned as a member on a K9 Search Team when necessary. Provided on-scene command during critical incidents at Command Posts.

- Completed use of force investigations and K9 contacts. Submitted all reports to Officer-in-Charge for his review and approval.
- Completed all requisite administrative reports to include audits.
- Testified in court, and at administrative hearings. Wrote 2002 LAPD Metropolitan Division K9 Platoon Manual.

**Sergeant II-77th Division Vice, Officer-in-Charge**
February 1999 to March 2000
**Los Angeles Police Department** - Los Angeles, California

Supervised investigations involving pimping, pandering, prostitution, bookmaking, gaming, gambling and other vice related activities. Conducted audits and administrative reports. Prepared and served search warrants for the above-mentioned crimes. Supervised twelve undercover officers and six uniformed officers on a daily basis. Worked in conjunction with other Department entities on sensitive investigations.

- Completed rating reports for subordinates assigned to the Unit.
- Conducted use of force investigations, audits, personnel complaints and other administrative tasks.
- Submitted all reports to the Officer-in-Charge for his review and approval.
- Testified in court and at administrative hearings.

**Management Services Division Supervisor-Sergeant**
November 1997 to March 1999
**Los Angeles Police Department** - Los Angeles, California

Conducted research projects, directives and correspondence at the direction of the Chief of Police. Reviewed staff work by subordinates. Conducted follow-up investigations as required to ensure that policies and procedures were adhered to by all organizational units within the Department. Conducted large scale audits and investigations.

- Served a six-month loan on the Rampart Corruption Task Force investigating and auditing use of force reports.
- Served a six-month loan at Internal Affairs Division, Headquarters Section. Investigated personnel complaints beyond the scope of geographical patrol divisions.
- Staff writer for the 2000 Los Angeles Police Department Manual.

**Hollenbeck Division Special Enforcement Group Officer-in-Charge**
November 1996 to November 1997
**Los Angeles Police Department** - Los Angeles, California

Provided supervisory oversight of eighteen police officers and detectives during gang investigations, crime suppression and the service of search warrants. Provided all aspects of tactical training to the group. Completed audits, employee ratings and administrative duties.

- Monitored and reviewed gang and narcotic investigations to ensure compliance with Department policy. Conducted use of force investigations.
- Submitted all investigative and administrative reports to the Commanding Officer for his review and approval. Testified in court and at administrative hearings.

**Detective, Wilshire Division**
March 1995 to November 1996
**Los Angeles Police Department** - Los Angeles, California

Assigned to various areas including: Robbery, Burglary, Auto Theft, Major Assault Crimes (Assaults with Domestic Violence), Homicide and the West Bureau Narcotics Group Field Enforcement Section. Conducted preliminary investigations and follow-up investigations. Interviewed victims and witnesses of crimes and interrogated individuals suspected of committing crimes. Conducted surveillances.

- Filed criminal investigations with the Los Angeles City Attorney's Office and the Los Angeles District Attorney's Office.
- Worked in conjunction with other law enforcement agencies and entities within the Los Angeles Police Department.
- Wrote and served search warrants. Booked evidence related to investigations.
- Trained local businesses and community groups in the areas of safety and security.

**Police Officer**
November 1989 to March 1995
**Los Angeles Police Department** - Los Angeles, California

Functioned in numerous roles as a Police Officer I, II, and III to include: Patrol, Field Training Officer (FTO), Detective Trainee, Vice, Special Enforcement Group, Divisional CRASH (gangs) and Operation Central Bureau CRASH (gangs).

- Selected to Specialized Units based on high performance and ability to work well in small cohesive units throughout the Department.
- Testified in court on a multitude of matters. Certified in court as a narcotic, gang, and vice expert.

**Special Agent-Organized Crime Drug Task Force (OCDETF)**
June 1988 to October 1989

**Department of Treasury, United States Customs Service** - San Francisco, California. Special Agent assigned to a multi-agency narcotics task force. Investigated major suppliers of narcotics and dangerous drugs who were engaged in illegal activities on an organized and commercial basis in an undercover capacity.

- Prepared and served search warrants. Worked in conjunction with the Assistant United States Attorney in San Francisco. Testified in Federal Court and at Asset Forfeiture Hearings.

**United States Army Reserve**
June 1983 to June 1989
Honorable Discharge as E-4. Military Occupational Skill (MOS)-72E-Combat Infantry Communications

**Training (Received and Provided Training):**
Weapons Training/Qualification on Monthly Basis-M-4, MP-5, Benelli Shotgun, Kimber/.45/1911, Remington 870 Shotgun, Glock, Force Option Simulator (Quarterly). Quarterly mandatory weapons certification from November 1989 to June 2010.

**Additional Training/Certification(s):** (11/1989-06/2010)

**Supervisor Training:**
Incident Command System 100-800
Sexual Harassment Training for Supervisors
Career Development for Supervisors
Standards Based Assessments for Supervisors
Supervisors Consent Decree Training
Vehicle Pursuit Policy Supervisor Training
Watch Commander School Retaliation Training
RMIS TEAMS II (Non-Categorical Use of Force Supervisor Training)
Ethics in Law Enforcement
Career Survival Workshops
Problem Oriented Policing and the SARA Model
Cultural Diversity Tools for Tolerance
Instructor Development Course (IDC)
Officer Involved Shootings Administrative Investigations Training
Prop 115-Hearsay Evidence Training
Managing Workplace Conflict CLETS-NCIC
Racial Profiling
West Point Leadership School for Supervisors
Basic Supervisor School

**HAZMAT Training:**
Advanced Chemical and Biological Integrated Response, LAFD Hazardous Materials Technical Specialist (A-D)-Certified HAZMAT Technician, Technical Emergency Response Training, Law Enforcement Protective Measures.

**Crisis Negotiations/Mental Health Training:**
Hostage Negotiations - Advanced, Behavioral Sciences Services Section
Officer-Involved Shooting/Barricaded Subject Services Debriefs
Crisis Negotiation Training and Curriculum Development for West Point Military Academy
Didi Hirsch Suicide Prevention Training (Volunteered and Supervised on an ongoing basis)
Mood Disorders/Post Traumatic Stress Disorder Training, Communicating with People with Disabilities
Mental Health Introduction MEU-SMART Orientation
Mental Illness Update
Drug Recognition Expert Training and Certification
Under the Influence-11550 Health and Safety Code Training
Institute for the Prevention of In-Custody Deaths Training on Recognizing Agonal & Other Breathing Problems
(2015). Attended and facilitated LAPD CNT 40-Hour Course
Attended FBI Basic Crisis Negotiation Course

**Tactical Training:**
Crowd Management Control, Search and Arrest Warrant Tactics
Less than Lethal Use of Force Training and Certification TASER MX-26, X-26 Train the Trainer
(Trainer/Instructor Certification)
Tactics Against Hostile Dogs
End of Pursuit Tactics Overview
Communication-Keeping Your Edge
Crowd Management and Control
Immediate Action Rapid Deployment
Arrest and Control Trainer Certification
Animal Shootings
Mobile Field Force Supervisor Train the Trainer
Officer Survival-Shooting
Personal Protective Equipment (PPE)
Pursuit Intervention Techniques for Supervisors
Baton/Impact Weapon
Advanced Canine Supervisor Course
Basic Metro School
Collapsible Baton
Officer Safety Field Tactics
Mobile Field Force Training
Narcotics/Tactical Entry Update
Field Training Officer Update
Standard Emergency Management System (SEMS)
CPR-First Aid Recertification
Basic Arrest and Control Techniques
Driver Awareness Training
Undercover Operations
Interrogation Techniques
VICE School
37mm Baton Round Training
Civil Unrest Response Training
Hobble Training
Advanced Field Officer Course, Oleoresin Capsicum (OC) Gas Training
Search Warrant Counter Measures
Riverside Sheriff's Department Jail Operations Course to include Title XV

**Detective Training:**

Basic Detective School
Juvenile Procedures School
Association of Threat Assessments Professionals (ATAP) Training
Workplace Investigative Training
LAPD Narcotics School
POST Investigative and Interrogation Course
POST Cognitive & Statement Analysis Training Course
Special Investigative Section Surveillance Training

**California Peace Officer Standards and Training (P.O.S.T.) Commission: Basic, Intermediate, Advanced and Supervisory Certificates.**

**Outside Training**:

Dale Carnegie 12-week Public Speaking School
Americans for Effective Law Enforcement (AELE) Certified Litigation Expert Courses
Use of Force By The Numbers: 4, 8, 14 (Institute for the Prevention of In-Custody Deaths-IPICD)
California Specialized Training Unit Hazardous Materials First Responder Operations Weapons of Mass Destruction Law Enforcement Field Support Course
Louisiana State University Screening of Persons by Observational Techniques (SPOT)
Subconscious Communication for Detecting Danger by International Academy for Linguistics and Kinesics
Department of Homeland Security WMD Radiological/Nuclear Course of Hazardous Materials Technicians
UNLV WMD Radiological/Nuclear Awareness Train The Trainer Course, FEMA Advanced Chemical and Biological Integrated Response Course Mobile Training Event
FEMA WMD Law Enforcement Threat
Hazard Recognition, and Emergency Actions Training
CSTI Technician/Specialist 1A-D, DHS WMD Tactical Commander Management and Planning
Licensed California Private Investigator (License No. 29151)
Certified California Criminal Defense Investigator.

**Associations**

California Association of Licensed Investigators
Peace Officers Association of Los Angeles County (POALAC)
Americans for Effective Law Enforcement (AELE)
California Crime Prevention Officers Association
International Association in Crime Prevention Partners
California Peace Officers Association

**Education**

**Master of Legal Studies**, 2018 to Present
**Pepperdine Law School** - Malibu, California, United States

**Master of Arts**: **Public Administration**, 1998
**California State University** - Long Beach, California, United States

**Bachelor of Science**: **Criminal Justice**, 1988
**Northeastern University** - Boston, Massachusetts, United States

# Scott A. DeFoe
# On-Scene Consulting Group, LLC
### P.O. Box 4456
### Huntington Beach, California 92605-4456
### (714) 655-4280 (Cell)
### Email: sdefoe313@msn.com

## RECORD OF TRIAL TESTIMONY & DEPOSITIONS

**1. Deposition:** April 15, 2010, Dorman, et al. v. State of California (CHP) Case No. INC058224.

**2. Deposition:** August 28, 2014, L.H. (Henning) v. County of Los Angeles, et al., Case No. CV13-1156-GW (JCGx)

**3. Deposition:** September 15, 2014, A.D., (De La Torre) et al. v. City of Los Angeles, et al., Case No. CV13-6510-JFW (Asx)

**4. Deposition:** October 28, 2014, Goodlow v. City of El Cajon, Case No. 13cv1542 DMS NLS

**5. Deposition**: February 3, 2015, Castro v. County of Los Angeles, et al., Case No. CV13-6631.

**6. Deposition:** April 10, 2015, James Gallegos v. Havana House, Gilardo Lopez, Donald Bernard, Joseph Escandon and DOES 1-100, Case No. BC508561.

**7. Trial Federal Court:** April 29, 2015, Goodlow v. City of El Cajon, Case No. 13cv1542 DMS NLS.   United States District Court, Southern District of California, Judge Dana S. Sabraw.

**8. Deposition**: May 14, 2015, Eloy Jacobo v. City of Palm Springs, a Government Agency, DOES 1 through 50, inclusive, Case No. INC 1302171.

**9. Deposition**:   August 14, 2015, Valine Gonzalez (Santibanez Matter) v. City of Visalia; Tim Haener; and DOES 2-10, inclusive, Case No1:13-cv-01697.

**10.** **Trial State Court:** August 18, 2015, James Gallegos, Plaintiff v. Havana House; Gilardo Lopez; Donald Bernard; Jose Escandon and DOES 1-100, inclusive, Defendants. Case No. BC 508561

**11.** **Deposition**: September 1, 2015 (Part 1) and September 4, 2015 (Part 2), Frederick Ronald Thomas; JR., individually and as successor-in-interest of Kelly James Thomas, deceased, Plaintiff, vs. City of Fullerton, et al. Case No. 30-2012-00581299.

**12.** **Deposition:** September 15, 2015, Anthony Del Real, individually and as successor-in-interest to John Del Real, Jr; Brittany Del Real Davis, individually and as successor-in-interest to John Del Real Jr.; and Shirley Lowery, Plaintiff vs. City of Long Beach; et al., Defendants.

**13.** **Deposition**: September 23, 2015, R.A., a minor, by and Through his guardian ad Litem Adrianne Penrose, Individually and as successor in interest of John Armes, deceased, and Adrianne Penrose, individually, Plaintiffs vs. County of Riverside, Et al., Defendants.

**14.** **Deposition**: October 19, 2015. Tara Garlick, individually; M.L.S., C.J.S., C.R.S., and E.Z.S., minors, by and through their guardian ad litem, Judy Silva, in each case individually and as successors in interest to David Silva, deceased; J.S., individually and as successor in interest to David Silva, by and through her guardian ad litem Adriane Dominguez; Merri Silva, individually; and Salvador Silva, individually, vs. County of Kern, Et al., Defendants, Lead Case No. 1:13-CV-01051-LJO-JLT.

**15.** **Deposition**: November 20, 2015, Gonzalo Martinez, Plaintiff vs. County of Los Angeles; Cuauhtemoc Gonzalez and Does 1 through 10, inclusive. Defendants.

**16.** **Deposition**: December 1, 2015, Mindy Losee, individually and as successor in interest to Breanne Sharpe, deceased, Plaintiff vs. City of Chico, Scott Zuschin, Damon Selland, Nick Vega, Jared Cumber, David Quigley; and DOES 1-10, inclusive. Defendants.

**17.** **Deposition:** December 17, 2015, Stanley Jordan, an individual, Plaintiff vs. City of Hawthorne, Officer Matthew Manley, and DOES 1-10, inclusive.

**18.** <u>Deposition:</u> February 10, 2016, Bridget Wiseman, individually and as successor-in-interest of Dean Gochenour, deceased, Plaintiff vs. City of Fullerton, Vincent Mater, Carlos Medina and DOES 1 to 50, inclusive.

**19.** <u>Deposition:</u> April 1, 2016, N.W., a minor by through his guardian ad litem Tkeyah Boyd, individually and as successor-in-interest to Tyler Damon Woods, Plaintiffs vs. City of Long Beach, Officer John B. Fagan; Officer Daniel A. Martinez, and DOES 1-10, inclusive, Defendants. Case No. EDCV14-01569-VAP (SP).

**20.** <u>Deposition:</u> April 7, 2016, R.D.C., a Minor, by and through his Guardian ad Litem, Maria Teresa Penaloza, Plaintiffs vs. County of Los Angeles, a public entity; Jerry Powers, Booker Waugh, Les Smith, and DOES 1 through 10, individually and in their official capacity as Probation Officers for the County of Los Angeles, Defendants (Case No. CV14-6014 DMO SHX).

**21.** <u>Trial State Court:</u> April 20, 2016, Eloy Jacobo v. City of Palm Springs, A Government Agency and DOES 1-50, inclusive, Case No. INC 1302171.

**22.** <u>Deposition:</u> April 28, 2016, Ledesma vs. Kern County, Case No.14-CV-01634-LJO-JLT.

**23.** <u>Deposition:</u> May 16, 2016, Dennis Dean Sr., Susannah Hardesty, and Amy Dean, Plaintiff's vs. Salvador Robles; Daryl Meadows; Randy Moya and DOES 4-25, Case No. 2:13-cv-00730 JAM KJN.

**24.** <u>Trial Federal Court:</u> June 16, 2016, N.W., a minor by through his guardian ad litem Tkeyah Boyd, individually and as successor-in-interest to Tyler Damon Woods, Plaintiffs vs. City of Long Beach, Officer John B. Fagan; Officer Daniel A. Martinez, and DOES 1-10, inclusive, Defendants. Case No. EDCV14-01569-VAP (SP).

**25.** <u>Deposition:</u> June 22, 2016, May 11, 2017, Marian Amaya, individually and as successor -in-interest of Emiliano Amaya, deceased; G.A., a Minor by and through his Guardian ad Litem Belinda Krawiec, individually and as successor-in-interest of Emiliano Amaya, deceased; Gloria Amaya, individually, Plaintiffs, vs. County of Los Angeles; Sheriff Lee Baca, and Does 1 to 50, Inclusive, Defendants. Case No. VC062384.

**26. <u>Deposition</u>:** June 27, 2016, Robert J. Zambrano JR., Kathleen Zambrano, and Jillian Zambrano, a Minor and through her Guardian ad Litem, Robert J. Zambrano JR., Plaintiffs vs. Andrew Drobot, Redondo Beach Police Department, City of Redondo Beach, and DOES 1 to 50, Inclusive, Defendants.

**27. <u>Deposition:</u>** July 5, 2016, NONA OPSITNICK AND LINDA STERETT, Plaintiffs vs. CITY OF LONG BEACH; ERIC BARICH, SALVADOR ALATORRE, ABRAM YAP, and DOES 4-10, inclusive Defendants. Case No. 14-9370-PLA.

**28. <u>Deposition</u>:** July 7, 2016, Leslie Laray Crawford, individually and as Successor in Interest to Michael Laray Dozer, deceased, Plaintiff, vs. City of Bakersfield, a municipal entity, Officer Aaron Stringer, an individual, Michael Eugene Dozer (as a nominal defendant) and DOES 1 through 10, inclusive, Defendants, Case No. 1:14-CV-01735-SAB.

**29. <u>Trial Federal Court</u>:** August 19, 2016, Anthony Del Real, individually and as successor-in-interest to John Del Real, Jr; Brittany Del Real Davis, individually and as successor-in-interest to John Del Real Jr.; and Shirley Lowery, Plaintiff vs. City of Long Beach; et al., Defendants.

**30. <u>Deposition</u>:** September 19, 2016, D.G., a minor, by and through his guardian ad litem, Denise Bonilla, individually and as successor-in-interest to David Garcia, deceased; D.E.G., a minor, by and through her guardian ad litem, Denise Bonilla, individually and as successor-interest to David Garcia, deceased; G.D., a minor, by and through her guardian ad litem, Denise Bonilla, individually and as successor-in-interest to David Garcia, deceased; RAMONA RAMIREZ NUNEZ, individually; Plaintiffs, vs. COUNTY OF KERN; ROBERT REED; DOES 2 THROUGH 10; Defendants.

**31. <u>Deposition</u>:** October 4, 2016, J.M., a minor by and through his guardian ad litem Celine Lopez, individually and as successor-in-interest to Hans Kevin Arellano, Plaintiff vs. CITY OF SANTA ANA, OFFICER JESSICA GUIDRY; OFFICER STEPHEN CHAVEZ; and Does 1-10, inclusive, Defendants. Case No. 8:15-cv-00432.

**32**. <u>**Trial Federal Court**</u>: October 20, 2016, Leslie Laray Crawford, individually and as Successor in Interest to Michael Laray Dozer, deceased, Plaintiff, vs. City of Bakersfield, a municipal entity, Officer Aaron Stringer, an individual, Michael Eugene Dozer (as a nominal defendant) and DOES 1 through 10, inclusive, Defendants, Case No. 1:14-CV-01735-SAB.

**33.** <u>**Deposition**</u>: November 30, 2016, Brian Bunnak, Plaintiff, vs. KION JAMES MOSBAT, an individual, and DOES 1 through 10, inclusive, Defendants. Case No. BC571975.

**34.** <u>**Deposition:**</u> February 13, 2017, Abraham Valentin, Alejandro Francisco Peralta, Michael Dominguez, Frank Margarito Escobedo, Plaintiffs vs. ROBERT JACKSON, and DOES 1-50, Inclusive, Defendants. Case No. CV 15-09011-BRO (AFMX).

**35.** <u>**Deposition:**</u> March 3, 2017, ARTURO GONZALEZ, Plaintiff, vs. CITY OF BAKERSFIELD, GARY CARRUESCO, DOUG BARRIER, KASEY KNOTT, JUAN OROZCO, and DOES 5-10, Defendants. Case No. 1:16-CV-00107-JLT.

**36.** <u>**Trial Federal Court:**</u> March 9, 2017, LUIS ARIAS, an individual, Plaintiff, vs. COUNTY OF LOS ANGELES, a municipal entity; DEPUTY KENNETH FITCH, an individual and DOES 1 through 10, inclusive, Defendants. Case No. 2:15-CV-02170-AB-AS.

**37.** <u>**Deposition:**</u> March 10, 2017, FREDRICK THOMAS and ANNALESA THOMAS, as Co-Administrators of the Estate Leonard Thomas, and its statutory beneficiaries, Plaintiffs, vs. BRIAN MARKERT; MICHAEL WILEY; NATHAN VANCE; MICHAEL ZARO; SCOTT GREEN; JEFF RACKLEY; CITY OF FIFE; CITY OF LAKEWOOD; PIERCE COUNTY METRO SWAT TEAM; and JOHN DOES 1 through 10, Defendants. (Case No. 3:16-cv-05392).

**38.** <u>**Deposition:**</u> March 16, 2017, DENNIS BLOCH, an individual and JENNIFER BLOCH, an individual, Plaintiff vs. STANFORD HOTELS CORPORATION, HARBOR VIEW HOLDINGS, Inc., A CALIFORNIA CORPORATION, MARRIOT INTERNATIONAL INC; A DELAWARE CORPORATION, SAN DIEGO HOTEL COMPANY, LLC; PORTER GREER, and DOES 1 through 25, Defendants. Case No. 37-2015-000028814-CV-PO-CTL.

**39. <u>Deposition:</u>**  March 22, 2017, CINDY MICHELLE HAHN; AND BRANDON HAHN, Plaintiffs vs. CITY OF CARLSBAD; OFFICER J. KNISLEY; OFFICER KENYATTE VALENTINE; OFFICER KARCHES; CORPORAL GALANOS; OFFICER SEAPKER; AND DOES 1 THROUGH 50, Defendants.  Case No. 3:15-cv-02007-DMS-BGS.

**40. <u>Deposition:</u>**  April 26, 2017, DEMETRICE SIGHTLER, Plaintiff, vs. CITY OF SAN DIEGO, SAN DIEGO POLICE DEPARTMENT ASSISTANT CHIEF DAVID NISLEIT AND DOES 1-30, Defendants, Case No. 15-CV-2235-LAB (DHB).

**41. <u>Trial State Court:</u>**  May 11, 2017, Marian Amaya, individually and as successor -in-interest of Emiliano Amaya, deceased; G.A., a Minor by and through his Guardian ad Litem Belinda Krawiec, individually and as successor-in-interest of Emiliano Amaya, deceased; Gloria Amaya, individually, Plaintiffs, vs. County of Los Angeles; Sheriff Lee Baca, and Does 1 to 50, Inclusive, Defendants. Case No. VC062384.

**42. <u>Deposition:</u>** June 6, 2017, HECTOR MEJIA, an individual, NORA SANTILLAN, an individual, Plaintiffs, vs. ADIEB TIESSAN, an individual, LEWIS ANTHONY GEORGE, an individual; and LEWIS JOBY ANTHONY, an individual; FAHMY MUSHMEL, an individual; SALAM MUSHMEL, an individual; THE FAHMY MUSHMEL AND SALAM MUSHMEL LIVING TRUST; and DOES 1 through 20, Inclusive, Defendants. Case No. BC594095.

**43. <u>Deposition:</u>** June 8, 2017, Nathaniel Smith v. City of Stockton, et al. Case No. 5:15-CV-01603-JGB-(DTBx)

**44. <u>Trial Federal Court:</u>** June 21, 2017, Abraham Valentin, Alejandro Francisco Peralta, Michael Dominguez, Frank Margarito Escobedo, Plaintiffs vs. ROBERT JACKSON, and DOES 1-50, Inclusive, Defendants. Case No. CV 15-09011-BRO (AFMX).

**45. Trial Federal Court:**  June 26-27, 2017, FREDRICK THOMAS and
ANNALESA THOMAS, as Co-Administrators of the Estate Leonard Thomas, and
its statutory beneficiaries, Plaintiffs, vs. BRIAN MARKERT; MICHAEL WILEY;
NATHAN VANCE; MICHAEL ZARO; SCOTT GREEN; JEFF RACKLEY;
CITY OF FIFE; CITY OF LAKEWOOD; PIERCE COUNTY METRO SWAT
TEAM; and JOHN DOES 1 through 10, Defendants. (Case No. 3:16-cv-05392).

**46.  Deposition:** June 30, 2017, K.J.P., a minor, and K.P.P., a minor, individually,
by and through their mother, LOAN THI MINH NGUYEN, who also sues
individually and as successor in interest to her now deceased husband, Lucky
Phounsy, and KIMBERLY NANG CHANTHAPHANH, individually, Plaintiffs
vs. COUNTY OF SAN DIEGO; et al., Defendants. (Case No. 15-cv-02692-H-
MDD).

**47.  Deposition:** July 10, 2017, REBECKA JACKSON-MOESER, Plaintiffs,
vs. DAVILA and DOES 1 through 10, inclusive, individually and in their official
capacity as CALIFORNIA HIGHWAY PATROL OFFICERS, Defendants.
Case No. CV-116-8733 SVW (JPRX).

**48.  Deposition:** July 12, 2017, A.E.R., a Minor, by and through his Guardian ad
Litem, STEPHANIE YANEZ, both Individually and as Successor in Interest on
behalf of Plaintiff's Decedent EDUARDO EDWIN RODRIGUEZ, ESTELA
RODRIGUEZ, and ABEL RODRIGUEZ, for themselves as parents of the
Decedent, Plaintiffs, vs. COUNTY OF LOS ANGELES, a Public Entity,
ANDREW ALATORRE, SANDY GALDAMEZ, and DOES 1 through 10,
inclusive, individually and in their official capacity as Los Angeles County
Sheriff's Department Deputies, Defendants.
Case No. 2:16-cv-04895.

**49.  Deposition:** July 14, 2017, JONATHAN A. GARCIA, an individual,
Plaintiff, vs. UNITED STATES OF AMERICA, DRUG ENFORCEMENT
ADMINISTRATION SPECIAL AGENT CHARLES VALENTINE, AND DOES
1-10, inclusive, Defendants. Case No. 2:16-cv-016664.

**50.** <u>**Trial Federal Court:**</u> August 2, 2017, CINDY MICHELLE HAHN; AND BRANDON HAHN, Plaintiffs vs. CITY OF CARLSBAD; OFFICER J. KNISLEY; OFFICER KENYATTE VALENTINE; OFFICER KARCHES; CORPORAL GALANOS; OFFICER SEAPKER; AND DOES 1 THROUGH 50, Defendants.  Case No. 3:15-cv-02007-DMS-BGS.

**51.** <u>**Deposition:**</u> August 4, 2017, Arnulfo Hernandez v. United States of America, Case No. 5:16-CV-00727-SVW(SPx).

**52.** <u>**Deposition:**</u> August 9, 2017, PAMELA MOTLEY, ESTATE OF CINDY RAYGOZA, through its legal representative and administrator, YVETTE CALDERA; VALERIE CALDERA; DANNY RICE, Plaintiffs, vs. JOSEPH SMITH; BRIAN LITTLE; DERRICK JOHNSON; MICHAEL COUTO; BERNARD FINLEY; BYRON URTON; RYAN ENGUM; UNKNOWN POLICE OFFICERS; THE CITY OF FRESNO CALIFORNIA, Defendants. Case No. 1:15-CV-00905.

**53.** <u>**Deposition:**</u> August 14, 2017, Desiree Martinez, Plaintiff vs. KYLE PENNINGTON; KIM PENNINGTON; CONNIE PENNINGTON; KRISTINA HERSHBERGER; JESUS SANTILLAN; CHANNON HIGH; THE CITY OF CLOVIS; ANGELA YAMBUPAH; RALPH SALAZAR; FRED SANDERS; THE CITY OF SANGER; DOES 1-20, Defendants. Case No. 1:15-cv-00683.

**54.** <u>**Trial Federal Court:**</u> August 23, 2017, TREVOR WYMAN, Plaintiff vs. COUNTY OF ORANGE, ZACHARY VARELA and DOES 1 through 10, inclusive Defendants.   (Case No. CV-15-01523 AG (KESx).

**55.** <u>**Deposition:**</u> September 6, 2017, JUSTIN KAUFMAN, ESQ., as Personal Representative of the Estate of HANNAH E. BRUCH, Plaintiff, Vs. EXPO NEW MEXICO, et al. Defendants. Case No. D-101-CV-2015-01792.

**56. <u>Deposition:</u>** September 8, 2017, KHANLY SAYCON, JR., and ANNA LUZ SAYCON, individually and as surviving heirs and successors in interest of MHARLOUN SAYCON (deceased), Plaintiffs v. CITY OF LONG BEACH, ROBERT LUNA, VUONG NGUYEN, and DOES 1-20, Inclusive, Defendants. Case No. 2:16-cv-05614 JFW (ASx).

**57. <u>Deposition:</u>** October 17, 2017, JOSE PATINO, an individual, Plaintiff, v. LIVE NATION ENTERTAINMENT INC., a Delaware Corporation; 4FINI, Inc., a California Corporation; ROCKSTAR BEVERAGE CORPORATION, a Nevada Corporation; and DOES 1 through 100, inclusive Defendants., Case No. CIVDS1515083.

**58. <u>Deposition:</u>** October 24, 2017, NICHOLAS MONTGOMERY, Plaintiff, vs. The WHISKEY BARREL, Hesperia, LLC, and DOES 1 through 20, inclusive, Defendants. Case No. CIVDS1518148.

**59. <u>Deposition:</u>** October 30, 2017, ESTATE OF FERAS MORAD, AMAL ALKABRA, and AMR MORAD Plaintiffs v. CITY OF LONG BEACH, MATTHEW HERNANDEZ, ROBERT LUNA, Defendants, Case No. 16-cv-06785-MWF-AJW.

**60. <u>Deposition:</u>** November 3, 2017, ARMANDO AYALA, Plaintiff, v. STATER BROS. MARKETS, and; DOES 1 TO 50, INCLUSIVE, Defendants, Case No. BC546436.

**61. <u>Deposition:</u>** November 7, 2017, PRESTON v. BOYER, et al., USDC Western District of Washington, Case No. 16-CV-01106.

**62. <u>Deposition:</u>** November 8, 2017, TRINA KOISTRA; and LARRY FORD, Plaintiffs, vs. COUNTY OF SAN DIEGO; PLUTARCO VAIL; and DOES 1 through 50, inclusive, Defendants, (Case No. 16-cv-2539 GPC AGS).

**63.** **Deposition:** December 5, 2017, JAMES GOOD, an individual, Plaintiff, vs. COUNTY OF LOS ANGELES; LEROY DAVID "LEE" BACA, as Former Sheriff in his individual and official capacity; JIM MCDONNELL, as Sheriff in his individual and official capacity; DEPUTY PETER NICHOLAS; DEPUTY JASON WILL, Defendants. Case No. 2:15-CV-04290-DSF (MRWx).

**64.** **Deposition:** January 8, 2018, BRYAN JOSEPH FISHER, Plaintiff, vs. COUNTY OF ORANGE; TODD CARPENTER; ROXANA ENRIQUEZ, JAVIER MARQUEZ, et al., Defendants. Case No. 16-CV-01866-CJC (KES).

**65.** **Deposition:** January 10, 2018, MICHAEL GEGENY, Plaintiff, vs. CITY OF LONG BEACH, CHIEF JIM MCDONNELL, OFFICER JOSE MANUEL RODRIGUEZ, #10153; OFFICER JUSTIN S. KRUEGER, #6152 and DOES 1 to 50, Inclusive, Defendants, (Case No. BC 553047).

**66.** **Trial Federal Court:** January 23, 2018, JONATHAN A. GARCIA, an individual, Plaintiff, vs. UNITED STATES OF AMERICA, DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT CHARLES VALENTINE, AND DOES 1-10, inclusive, Defendants. Case No. 2:16-cv-016664.

**67.** **Deposition:** February 8, 2018, DOMINIC ARCHIBALD, and NATHANAEL PICKETT I, AS SUCCESSORS IN INTEREST TO NATHANAEL PICKETT II, DECEASED, Plaintiff, vs. COUNTY OF SAN BERNARDINO, KYLE WOODS, WILLIAM KELSEY and DOES 2-10, INCLUSIVE, Defendants, (Case No. 5:16-cv-01128-AB-SPx).

**68.** **Deposition:** February 13, 2018, THE ESTATE OF JOHNNY MARTINEZ; PLAINTIFF, VS. COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, SHERIFF JIM MCDONNELL, AND DOES 1 THROUGH 50, DEFENDANTS. CASE NO. BC 579140

**69.** **Deposition:** February 21, 2018, TIMOTHY McKIBBEN, an individual, Plaintiff, vs. OFFICER WILLIAM KNUTH, an individual; RAYMOND COTA, in his official capacity, CITY OF SEDONA, an Arizona municipal corporation; JOHN and JANE DOES I-X, Defendants, Case No. 3:17-CV-08009-JWS.

**70.** <u>Deposition:</u> February 23, 2018, TIFFANIE HUPP and RILEY HUPP, a minor, by and through his next friend, Tiffanie Hupp, and CLIFFORD MYERS, Plaintiffs, vs. STATE TROOPER SETH COOK and COLONEL C.R. "JAY" SMITHERS, Defendants, Case No. 2:17-CV-926.

**71.** <u>Trial Federal Court:</u> March 7-8, 2018, DOMINIC ARCHIBALD, and NATHANAEL PICKETT I, AS SUCCESSORS IN INTEREST TO NATHANAEL PICKETT II, DECEASED, Plaintiff, vs. COUNTY OF SAN BERNARDINO, KYLE WOODS, WILLIAM KELSEY and DOES 2-10, INCLUSIVE, Defendants, (Case No. 5:16-cv-01128-AB-SPx).

**72.** <u>Deposition:</u> April 9, 2018, ROBERT PALMER, Plaintiff, vs. CALIFORNIA HIGHWAY PATROL OFFICER IOSEFA, et al., Defendants. Case No. 1:16-CV-00787-SKO.

**73.** <u>Deposition:</u> April 13, 2018, JEFFREY SIHTO, Plaintiff, vs. HYATT CORPORATION; JOSE CEBALLOS; and DOES 1 through 50, Inclusive, DEFENDANTS.
Case No. BC 594206

**74.** <u>Deposition:</u> April 18, 2018, ROSWITHA M. SAENZ, Individually and on behalf of THE ESTATE OF DANIEL SAENZ, Deceased, Plaintiff, vs. G4S SECURE SOLUTIONS (USA) INC., OFFICER JOSE FLORES AND ALEJANDRO ROMERO, Defendants. Case No. 14-CV-244PRM.

**75.** <u>Deposition:</u> April 19, 2018, MILDRED MAE MENDOZA as successor-in-interest of FRANK MENDOZA, SR., et al, Plaintiffs, vs. COUNTY OF LOS ANGELES, et al, Defendants. Case No. BC 594206.

**76.** <u>Trial Federal Court:</u> April 25, 2018, LOUIS SANCHEZ, an individual, Plaintiff, vs. DEPUTY JOSHUA RICARD, an individual, and DOES 1 through 10, inclusive, Defendants. Case No. 5:17-CV-00339.

**77. <u>Deposition:</u>** May 1, 2018, DOUGLAS KEVIN VEALE, individually, and as the Personal Representative for the Estate of KATHRYN JEANETTE NEW, deceased, and on behalf of the beneficiaries of the Estate including AARON JAMES NEW, KENT ROBERT MCMAHON, HEATHER JANDICE BRIGETTE NEW, PATRICK JORDAN WILLIAM NEW, and DUSTY CODY SCOGGINS, Plaintiffs, vs. WASHINGTON FUGITIVE INVESTIGATIONS, a foreign limited liability company; TWO JINN, INC., d/b/a ALADDIN BAIL BONDS, a for-profit corporation, and MARIO D. CAREY, a Washington resident, Defendants. Case No. 17-2-08870-1

**78. <u>Deposition:</u>** May 7, 2018, ESTATE OF JAVIER GARCIA GAONA, JR., et al., Plaintiffs, vs. CITY OF SANTA MARIA, et al., Defendants, (Case No. 2:17-cv-01983).

**79. <u>Trial State Court</u>**: June 4, 2018, NICHOLAS MONTGOMERY, Plaintiff, vs. The WHISKEY BARREL, Hesperia, LLC, and DOES 1 through 20, inclusive, Defendants. Case No. CIVDS1518148.

**80. <u>Deposition:</u>** June 14, 2018, CHRISTINE VILLEGAS; RICEZEN VILLEGAS, a minor, by and through his Guardian Ad Litem MIGUEL VILLEGAS; DANIEL VILLEGAS, a minor, by and through his Guardian Ad Litem MIGUEL VILLEGAS; JOCELYN CASTILLO VILLEGAS and; ESTATE OF BERNIE CERVANTES VILLEGAS, Plaintiffs. VS. CITY OF ANAHEIM, a California municipal entity; JOHN WELTER; NICHOLAS BENNALLACK; BRETT HEITMANN; KEVIN VOORHIS; MATTHEW ELLIS; and Does 1-10, inclusive. CASE No: 30-2017-00897184-CU-PO-CJC.

**81. <u>Trial Federal Court:</u>** July 6. 2018, ESTATE OF FERAS MORAD, AMAL ALKABRA, and AMR MORAD Plaintiffs v. CITY OF LONG BEACH, MATTHEW HERNANDEZ, ROBERT LUNA, Defendants, Case No. 16-cv-06785-MWF-AJW.

**82. <u>Deposition:</u>**  July 16, 2018, SHAWN EDWARD RUMENAPP, an individual; and ERICA RUMENAPP, an individual, Plaintiffs, vs. PANERA BREAD COMPANY, a Delaware corporation; PANERA, LLC, a Delaware limited liability company; SARA JAMAL ZEITOUN, an individual; JAMAL ZEITOUN, an individual; and DOES 1 through 50, inclusive,
Defendants, Case No: CIVDS 1700576.

**83. <u>Deposition:</u>**  July 17, 2018, Fralisa McFall, on behalf of the ESTATE OF JESSICA ANN MARIE ORTEGA, a deceased person, and her statutory beneficiaries I.S. and D.S., two minor children, Plaintiff, vs. PIERCE COUNTY, a subdivision of the State of Washington, Defendant, Case No. 17-2-11836-8.

**84. <u>Trial State Court</u>**: July 20, 2018, ARMANDO AYALA, Plaintiff, v. STATER BROS. MARKETS, and; DOES 1 TO 50, INCLUSIVE, Defendants, Case No. BC546436.

**85. <u>Deposition:</u>**  July 31, 2018, TOMMIE HARRIS, Individually; DERRICK EUGENE COKER, Individually; SHYWINA DIANE COLE, Individually; STEPHANIE LORRAINE WILLIAMS, Individually; JEMICA SHANDRA SPEARS, Individually, Plaintiffs,
vs. GNL, CORP. d/b/a GOLD DIGGERS, a Domestic Corporation; Individually; DOE EMPLOYEES; DOES I through X; and ROE CORPORATIONS I through X, inclusive, Defendants.  Case No. A-16-741693-C.

**86. <u>Deposition:</u>**  August 14, 2018, DAVID JESSEN and GRETCHEN JESSEN, Plaintiffs vs. COUNTY OF FRESNO, CITY OF CLOVIS, and DOES 1 to 100, inclusive, Defendants, Case No. 1:17-cv-00524-DAD-EPG.

**87. <u>Deposition:</u>**  August 15, 2018, ARMANDO VILLANUEVA and HORTENCIA SAINZ, INDIVIDUALLY and as successor in interest to Pedro Villanueva, deceased, and FRANCISCO OROZCO, individually, Plaintiffs vs. STATE OF CALIFORNIA; JOHN CLEVELAND; RICH HENDERSON; and DOES 1-10, inclusive, Defendants.
Case No. 8:17-cv-01302 JLS (KESx).

**88.** **Deposition:** August 17, 2018, BRIAN O'NEAL PICKETT III, A MINOR, AND MICAH OMARI PICKETT, A MINOR, BY AND THROUGH THEIR GUARDIAN AD LITEM TAMIA GILBERT, Plaintiffs, vs. COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, AND DOES 1 THROUGH 50, INCLUSIVE, Defendants. CASE NO. TC028173, Consolidated with TC028210.

**89.** **Deposition:** August 21, 2018, ESTATE OF TASHI S. FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Elia Del Carmen Solano-Patricio; TAMARA BAYLEE KUUMEALI' FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Kuanoni, Plaintiffs, vs. LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, INDIVIDUALLY and in his Official Capacity; and Does 1 through 50, inclusive, Defendants, (Case No. 2:17-CV-01946-JCM-PAL).

**90.** **Deposition:** August 24, 2018, TEAIRA SMALLWOOD, et al, Plaintiffs, vs. OFFICER JOSEPH KAMBERGER, JR., et al, Defendants, Civil Case No. 24-C-16-005543.

**91.** **Deposition:** August 27, 2018, DANIEL MANRIQUEZ, Plaintiff, vs. J. VANGILDER, et al., Case No. 16-cv-01320 HSG (PR).

**92.** **Deposition:** September 14, 2018, ERIKA SEPULVEDA, FOR HERSELF AND ON BEHALF OF HER MINOR CHILDREN MELODY PATRICIO AND ERNESTO PATRICIO, AND MARIA CARMEN SARATE ANGELES, Plaintiffs v. CITY OF WHITTIER, OFFICER HAUSE, OFFICER CABRAL, OFFICER MEDINA, MONETARY MANAGEMENT OF CALIFORNIA, INC. dba MONEY MART, DOLLAR FINANCIAL GROUP, INC., DFC GLOBAL CORP. fdba DOLLAR FINANCIAL U.S. INC., JOSE LOPEZ, DON MORTON, and DOES 2-10, inclusive, Defendants, Case No. 2:17-cv-4457-JAK (KSx)

**93. <u>Deposition:</u>** September 20, 2018, DAPHNE SMITH, an individual, Plaintiff, vs. GGP, INC., a California Corporation Dba EASTRIDGE; EASTRIDGE, a business organization, form unknown; GENERAL GROWTH PROPERTIES, INC, a Delaware Corporation dba EASTRIDGE; and DOES 1-50, inclusive, Defendants. Case No. 2015-1-CV-283003. ABM ONSITE SERVICES-WEST, INC., Cross-Complainants, vs. ALLIED BARTON SECURITY SERVICES, LP; AND DOES 1-20, Cross-Defendants.

**94. <u>Deposition:</u>** September 24, 2018, TIMOTHY GRISMORE, an individual; XAVIER HINES, an individual, Plaintiffs, vs. CITY OF BAKERSFIELD, a municipality; OFFICER MELENDEZ, an individual; OFFICER LUEVANO, an individual; OFFICER POTEETE, an individual; OFFICER CLARK, an individual; OFFICER McINTYRE, an individual; OFFICER VASQUEZ, an individual; OFFICER BARAJAS, an individual; SERGEANT McAFEE, an individual; and DOES 1-10, inclusive, Defendants.
Case No. 1:17-cv-00413-AWI-JLT.

**95. <u>Deposition:</u>** September 25, 2018, CAROLYN GIUMMO and ANTHONY S. HILL, SR., Individually and as Surviving Parents and as Personal Representatives of the Estate of ANTHONY H. HILL, Plaintiffs, vs. ROBERT OLSEN, individually and in his official capacity as a law enforcement officer for DeKalb County Police Department; and the COUNTY OF DEKALB, GEORGIA, a municipal corporation, Defendants. (Civil Action File No. 1:15-CV-03928-TCB).

**96. <u>Deposition:</u>** September 26, 2018, MARIA ADAME, in her individual capacity; CLARISA ABARCA, as a parent of minor child; C.A., in her individual capacity, and the ESTATE OF DEREK ADAME, as statutory beneficiaries of the claim for wrongful death of Derek Adame, deceased, Plaintiffs, vs. CITY OF SURPRISE, SURPRISE POLICE DEPARTMENT, OFFICER JOSEPH GRUVER and OFFICER SHAUN MCGONIGLE, Defendants. Case No. CV-2017-3200-PHX-GMS.

**97. <u>Deposition:</u>** October 17, 2018, BRIAN A. RAMIREZ, Plaintiff, vs. COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S DEPARTMENT, OFFICER RYAN N. VICE, and DOES 1 through 10, Inclusive, Defendants. Case No. 2:17-cv-01868-JAM-GGH.

**98. <u>Deposition:</u>** October 18, 2018, RONEY COFFMAN, Plaintiff, vs. LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; COUNTY OF LOS ANGELES; FRAY MARTIN LUPIAN, DOES 1 TO 20, Defendants, Case No. BC653479.

**99. <u>Deposition:</u>** October 23, 2018, ROBERT PROVOST, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ERIC PROVOST, PLAINTIFF, vs. CITY OF ORLANDO, A FLORIDA MUNICIPAL CORPORATION, POLICE OFFICER SONJA SAUNDERS AND POLICE OFFICER TINO CRUZ IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES, DEFENDANTS. Case No. 6:17-CV-2133-ORL-40DCI.

**100. <u>Deposition:</u>** October 24, 2018, ANGELA AINLEY, individually and as successor-in-interest for KRIS JACKSON, deceased; PATRICK JACKSON, individually and as successor-in-interest for KRIS JACKSON, Deceased, Plaintiff, vs. CITY OF SOUTH LAKE TAHOE, a public entity; JOSHUA KLINGE, individually and as a police officer for the City of South Lake Tahoe; City of South Lake Tahoe Chief of Police BRIAN UHLER, individually; and DOES 2 through 10, Jointly and Severally, Defendants. Case No. 2:16-cv-00049-TLN-CKD.

**101. <u>Trial Federal Court</u>:** October 29, 2018, ROBERT PALMER, Plaintiff, vs. CALIFORNIA HIGHWAY PATROL OFFICER IOSEFA, et al., Defendants. Case No. 1:16-CV-00787-SKO.

**102. <u>Deposition:</u>** November 9, 2018, KIMBERLY J. ZION, individually and as successor in interest to CONNOR ZION, Plaintiff, vs. COUNTY OF ORANGE, MICHAEL HIGGINS and DOES 1 through 10, inclusive, Defendants. Case No. 8:14-cv-01134-JVS-RNB.

**103. <u>Deposition</u>:** November 11, 2018, DONNA HUFF, Plaintiff, vs. THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; THE COUNTY OF LOS ANGELES; DEPUTY GREG WHALEN (EMPLOYEE NO. 476475), OFFICER MICHAEL REYNOLDS (EMPLOYEE NO. 519952) and DOES 1 through 10, Inclusive, Defendants. Case No. LA 16-CV-01733-AB (AGRx).

**104. <u>Deposition:</u>**   November 15, 2018, MERLIN OFFSHORE INTERNATIONAL, a California Corporation, et al., Plaintiffs, vs. ADVANCED RESERVATIONS SYSTEMS, INC., a California corporation, et al., Defendants. Case No. SC12580.

**105.   <u>Trial State Court:</u>**   December 5, 2018, CHRISTINE VILLEGAS; RICEZEN VILLEGAS, a minor, by and through his Guardian Ad Litem MIGUEL VILLEGAS; DANIEL VILLEGAS, a minor, by and through his Guardian Ad Litem MIGUEL VILLEGAS; JOCELYN CASTILLO VILLEGAS and; ESTATE OF BERNIE CERVANTES VILLEGAS, Plaintiffs. VS. CITY OF ANAHEIM, a California municipal entity; JOHN WELTER; NICHOLAS BENNALLACK; BRETT HEITMANN; KEVIN VOORHIS; MATTHEW ELLIS; and Does 1-10, inclusive. CASE No: 30-2017-00897184-CU-PO-CJC.

**106. <u>Deposition:</u>**   December 19, 2018, VICTOR GARCIA, Plaintiff vs. REAL HOSPITALITY, INC., dba MARTINI'S FEEL GOOD LOUNGE; DYLAN OXFORD, and DOES 1-100, Inclusive, Defendants. Case No. BCV-16-102039-SPC.

**107. <u>Trial Federal Court:</u>**   January 15, 2019, KIMBERLY J. ZION, individually and as successor in interest to CONNOR ZION, Plaintiff, vs. COUNTY OF ORANGE, MICHAEL HIGGINS and DOES 1 through 10, inclusive, Defendants. Case No. 8:14-cv-01134-JVS-RNB.

**108. <u>Deposition:</u>**   January 18, 2019, DYLAN KINNEY, individually and on behalf of the ESTATE OF REGINA ANNAS, a deceased person; RACHEL HOLLAND, individually, Plaintiffs, vs. PIERCE COUNTY, a subdivision of the State of Washington, Defendant, Case No. 18-2-07321-4.

**109. <u>Deposition:</u>**   January 22, 2019, GWENDOLYN WOODS, individually and as Successor in Interest to Decedent MARIO WOODS, PLAINTIFF, vs. CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation, et al, DEFENDANTS. Case No. 3:15-05666-WHO.

**110.** <u>**Deposition:**</u>  January 24, 2019, JANICE SLY, individually and as Successor in Interest to ISAAC JERMAINE KELLY, deceased, and CHARLES ROY, individually and as Successor in Interest to ISAAC JERMAINE KELLY, deceased, Plaintiffs, vs. LMV II AFFORDABLE, L.P., a California Limited Partnership doing business as MEADOWVIEW II APARTMENTS; FWC REALTY SERVICES CORPORATION, a Delaware Corporation; CBR PROPERTY MANAGEMENT LLC, a California Corporation; STEVEN RAY DILLICK JR., an individual; and DOES 1 through 50, inclusive, Defendants. Case No. RIC1601732.

**111.** <u>**Trial Federal Court:**</u>  January 29, 2019, TRINA KOISTRA; and LARRY FORD, Plaintiffs, vs. COUNTY OF SAN DIEGO; PLUTARCO VAIL; and DOES 1 through 50, inclusive, Defendants, (Case No. 16-cv-2539 GPC AGS).

**112.** <u>**Deposition:**</u>  February 7, 2019, ANTHONY ECONOMUS, Plaintiff, vs. CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation, et al, City of San Francisco Police Officer; DOES 1-50 INCLUSIVE, Defendants, Case No. 4:18-cv-01071 HSG.

**113.** <u>**Deposition:**</u>  February 11, 2019, GABRIEL LAKATOSH, on behalf of himself and all others similarly situated, Plaintiff, vs. TECHTRONIC INDUSTRIES COMPANY, LTD; MILWAUKEE ELECTRIC TOOL CORPORATION; THE HOME DEPOT, INC.; and DOES 1-10, inclusive, Defendants, Case No. BC712875.

**114.** <u>**Deposition:**</u>  February 13, 2019. JOSE VILLEGAS, an individual; MARIA VILLEGAS, an individual; ALDO VILLEGAS, a minor, by and through his guardian ad litem, Plaintiffs, vs. COUNTY OF SAN BERNARDINO, a governmental entity; SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT, a governmental entity; RYAN CONNER, an individual; PAUL KOWALSKI, an individual; and DOES 1-100, inclusive, Defendants. Case No. CIVDS1606504.

**115.** <u>**Deposition:**</u> February 14, 2019, S.A.C A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, KAREN NUNEZ VELASQUEZ, INDIVIDUALLY AND AS SUCCESSOR INTEREST TO JONATHON CORONEL, AND MARIA B. CORONEL, AN INDIVIDUAL, PLAINTIFFS, vs. COUNTY OF SAN DIEGO, AN ENTITY; CHRISTOPHER VILLANUEVA AN INDIVIDUAL; AND DOES 1 THROUGH 10, INCLUSIVE, DEFENDANTS. Case No. 17CV1459-WQH-AGS.

**116.** <u>**Deposition:**</u> February 28, 2018, FERMIN VINCENT VALENZUELA, Plaintiff, vs. CITY OF ANAHEIM, et al., Defendants, (Lead Case No. SACV 17-0278 CJC (DFMx).

**117.** <u>**Deposition:**</u> March 7, 2019, K.C., a minor, by and through her guardian ad litem Carolina Navarro; A.S., a minor, by and through her guardian ad litem Araceli Saenz; K.C., by and through her guardian ad litem Amber Neubert; JACQUELINE LAWRENCE; KEITH CHILDRESS, SR., in each case individually and as successor in interest to Keith Childress, Jr., deceased; and JACQUELINE LAWRENCE as administrator of the ESTATE OF KEITH CHILDRESS, JR., Plaintiffs, vs. LAS VEGAS METROPOLITAN POLICE DEPARTMENT, UNITED STATES OF AMERICA DEPARTMENT OF JUSTICE; ROBERT BOHANON; BLAKE WALFORD; JAMES LEDOGAR; BRIAN MONTANA; and DOES 2-10, inclusive, Defendants. Case No. 2:16-CV-03039-JCM-NJK.

**118.** <u>**Deposition:**</u> March 13, 2019, BAO XUYEN LE, INDIVIDUALLY, and as the Court appointed PERSONAL REPRESENTATIVE OF THE ESTATE OF TOMMY LE, HOAI "SUNNY" LE, Tommy Le's Father, DIEU HO, Tommy Le's Mother, UYEN LE and BAO XUYEN, Tommy Le's Aunts, KIM TUYET LE, Tommy Le's Grandmother, and QUOC NGUYEN, TAM NGUYEN, DUNG NGUYEN, JULIA NGUYEN AND JEFFERSON NGUYEN, Tommy Le's Siblings, Plaintiffs, vs. MARTIN LUTHER KING JR. COUNTY as sub-division of the STATE OF WASHINGTON, and KING COUNTY DEPUTY SHERIFF CESAR MOLINA. Defendants. Case No. 2:18-CV-00055-TSZ.

**119.** <u>**Deposition:**</u> March 19, 2019, MICHAEL WILLIAM FONG, M.D., an individual, Plaintiffs, vs. COUNTY OF LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; VIRIDIANA PEREZ; AND DOES 1 THROUGH 20, Inclusive, Defendants. Case No. BC630745.

**120.** <u>**Deposition:**</u> March 27, 2019, KATHY CRAIG and GARY WITT, individually and as successor-in-interest to BRANDON LEE WITT, deceased, Plaintiffs, vs. COUNTY OF ORANGE, and NICHOLAS PETROPULOS, an individual, and DOES 1-10, inclusive, Defendants. Case No. SACV 17-00491-CJC (KESx).

**121.** <u>Deposition:</u> April 4, 2019, PATRICK J. CAVANAUGH, Plaintiff, vs. DONNY YOUNGBLOOD, Kern County Sheriff; BRIAN HULL, Classifications/Gang Unit Sergeant; JOSH JENNINGS, Lerdo Pre-Trial Facility Classification/Gang Unit Deputy; OSCAR FUENTEZ, Lerdo Pre-Trial Facility Classification/Gang Unit Deputy; DAVID K. FENNELL, M.D., Medical Director, Atascadero State Hospital; DAVID LANDRUM, Chief, Office of protective Services, Atascadero State Hospital; CHRISTOPHER GUZMAN; Classification/Gang Unit Officer, Atascadero State Hospital; DILLON MORGAN, Classification/Gang Unit Officer, Atascadero State Hospital, Defendants. Case No. 1:17-cv-00832-DAD-JLT.

**122.** <u>**Deposition:**</u> April 12, 2019, TATYANA HARGROVE, Plaintiff, vs. CITY OF BAKERSFIELD, BAKERSFIELD POLICE DEPARTMENT OFFICER CHRISTOPHER MOORE, BAKERSFIELD POLICE DEPARTMENT SENIOR OFFICER GEORGE VASQUEZ, and DOES 1-10, inclusive, Defendants. Case No. 1:17-CV-001743-JLT.

**123.** <u>**Trial Federal Court:**</u> April 25, 2019, KATHY CRAIG and GARY WITT, individually and as successor-in-interest to BRANDON LEE WITT, deceased, Plaintiffs, vs. COUNTY OF ORANGE, and NICHOLAS PETROPULOS, an individual, and DOES 1-10, inclusive, Defendants. Case No. SACV 17-00491-CJC (KESx).

**124.** <u>**Deposition:**</u> May 21, 2019, DEMETRIC FAVORS, Plaintiff, vs. CITY OF ATLANTA, a municipal corporation of the State of Georgia, Defendant. Civil Action File No. 1:17-cv-03996-SCJ.

**125. <u>Deposition:</u>** May 28, 2019, JESSE MONTELONGO, an individual; VICTORIA MONTELONGO, an individual; THERESA LOZANO an individual; J.M., a minor, by and through his Guardian Ad Litem, RUBY MORALES; E.M., a Minor, by and through his Guardian Ad Litem RUBY MORALES; ALE. M., a minor by and through her Guardian Ad Litem, ADOLFO GONZALEZ; ALI. M., a minor by and through her Guardian Ad Litem, ADOLFO GONZALEZ; ALA. M., a minor by and through her Guardian Ad Litem, ADOLFO GONZALEZ, Plaintiffs, vs. THE CITY OF MODESTO, a municipal corporation; DAVE WALLACE, individually and in his capacity as an officer for the CITY OF MODESTO Police Department; and DOES 1-25, DEFENDANTS. Case No. 1"15-CV-01605-TLN-BAM.

**126. <u>Deposition:</u>** May 30, 2019, STAN SEVERI and MYRANDA SEVERI, Plaintiffs, vs. COUNTY OF KERN; KERN COUNTY SHERIFF DONNY YOUNGBLOOD, in his individual capacity; DEPUTY GABRIEL ROMO, in his individual capacity; AND DOES 1 to 10, inclusive, in their individual capacities, Defendants. Case No. 1:17-CV-00931-AWI-JLT.

**127. <u>Deposition:</u>** June 12, 2019, ANDRE THOMPSON, a single man; and BRYSON CHAPLIN, a single man, Plaintiffs, vs. CITY OF OLYMPIA, a municipal corporation and local government entity; and RYAN DONALD AND "JANE DOE" DONALD, individually and the marital community comprised thereof, Defendants. Case No. 3:18-cv-05267-RBL.

**128. <u>Deposition:</u>** June 14, 2019, PRESTON v. BOYER, et al., USDC Western District of Washington, Case No. 16-CV-01106.

**129. <u>Trial Federal Court:</u>** June 20, 2019, DANIEL MANRIQUEZ, Plaintiff, vs. J. VANGILDER, et al., Case No. 16-cv-01320 HSG (PR).

**130. <u>Deposition:</u>** June 25, 2019, LISA G. FINCH, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend of her minor granddaughter, AF; DOMINICA C. FINCH, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and ALI ABDELHADI, Plaintiffs, vs. CITY OF WICHITA, KANSAS; JOHN DOE POLICE OFFICERS 1-10, Defendants. Case No. 18-CV-01018-JWB-KGS.

**131. <u>Deposition:</u>** June 28, 2019, PAMELA ANDERSON, Individually and as Independent Administrator of the Estate of JAMES ANDERSON, deceased, Plaintiff, vs. CITY OF CHICAGO, a Municipal Corporation, and OFFICER CHRISTOPHER RAMEY, individually and as agent, servant and employee of the CITY OF CHICAGO, Defendants, (Case No. 16 L 003346).

**132. <u>Deposition:</u>** July 2, 2019, BRIDGET BRYDEN, Plaintiff, vs. CITY OF SANTA BARBARA; and DOES 1 to 50, Case No. 17CVV01529.

**133. <u>Trial State Court:</u>** July 3, 2019, JANICE SLY, individually and as Successor in Interest to ISAAC JERMAINE KELLY, deceased, and CHARLES ROY, individually and as Successor in Interest to ISAAC JERMAINE KELLY, deceased, Plaintiffs, vs. LMV II AFFORDABLE, L.P., a California Limited Partnership doing business as MEADOWVIEW II APARTMENTS; FWC REALTY SERVICES CORPORATION, a Delaware Corporation; CBR PROPERTY MANAGEMENT LLC, a California Corporation; STEVEN RAY DILLICK JR., an individual; and DOES 1 through 50, inclusive, Defendants. Case No. RIC1601732.

**134. <u>Deposition:</u>** July 8, 2019, WENDY LAGUNA, individually and as The Successor in Interest of the ROBERT CAMACHO Estate, Deceased, Plaintiff, vs. COMMUNITY PROTECTIVE SERVICES, Aa California Corporation; AUSTIN HOUSIGN PATROL, a California Business entity of unknown form; WHEELER STEFFEN PROPERTY MANAGEMENT, a California business entity of unknown form; and DOES 1 through 100, inclusive, Defendants. Case No. CIVDS1516654.

**135. <u>Deposition:</u>** July 17, 2019, DAVID STEININGER, an individual, Plaintiff, vs. MARIPOSA GRILL AND CANTINA, INC., an FTB Suspended California Corporation; and DOES 1-50, Defendants. Case No. BC 689374.

**136. Trial State Court:** July 29, 2019, WENDY LAGUNA, individually and as The Successor in Interest of the ROBERT CAMACHO Estate, Deceased, Plaintiff, vs. COMMUNITY PROTECTIVE SERVICES, Aa California Corporation; AUSTIN HOUSIGN PATROL, a California Business entity of unknown form; WHEELER STEFFEN PROPERTY MANAGEMENT, a California business entity of unknown form; and DOES 1 through 100, inclusive, Defendants. Case No. CIVDS1516654.

**137. Deposition:** August 13, 2019, LISA G. FINCH, Individually, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased, and as Next Friend of her minor granddaughter, AF; DOMINICA C. FINCH, as Co-Administrator of the Estate of Andrew Thomas Finch, deceased; and ALI ABDELHADI, Plaintiffs, vs. CITY OF WICHITA, KANSAS; JOHN DOE POLICE OFFICERS 1-10, Defendants. Case No. 18-CV-01018-JWB-KGS.

**138. Trial State Court:** September 6, 2019, PAMELA ANDERSON, Individually and as Independent Administrator of the Estate of JAMES ANDERSON, deceased, Plaintiff, vs. CITY OF CHICAGO, a Municipal Corporation, and OFFICER CHRISTOPHER RAMEY, individually and as agent, servant and employee of the CITY OF CHICAGO, Defendants, (Case No. 16 L 003346).
**Depositions:** 111
**Trial Testimony:** 27

# On-Scene Consulting Group, LLC

## Scott A. DeFoe

## 2019 Fee Schedule

**Retainer Fee:**                                                        **$4000.00**

Consulting time, including but not limited to, case reviews, report reviews, deposition reviews, analysis of criminal investigations, research, interviews, consultation time, meetings, site inspections, deposition preparation, deposition support, interpretation of police documents, interpretation of investigative files, report preparation, preparation for negotiation or any miscellaneous tasks as assigned by the client attorney or opposing attorney (client approved). **$350.00 per hour.**

Consulting time for the following professional services: deposition testimony, trial testimony and any other legal testimony. **$425.00 per hour.**

Fees for all depositions shall be paid prior to the start of the deposition based upon the anticipated length of the deposition with a 3-hour minimum fee of **$1275.00.**

All out of state travel time:                                    **$100.00 per hour.**

Fees for consulting time remain the same as in-state assignments. Travel and actual expenses reasonably and necessarily incurred (meals, lodging, ground transportation, rental car, etc.) will be billed to the client at cost and copies of expenses will be provided when available. On-Scene Consulting Group LLC, may request a travel retainer of $1000.00 specific to this travel prior to the travel date. Actual out of pocket expenses will be charged against the travel retainer until such time as it is exhausted. Any balance remaining will be applied to professional services outstanding balances.